Jeremy A. Lieberman (admitted *pro hac vice*)
Emma Gilmore (admitted *pro hac vice*)
Villi Shteyn (admitted *pro hac vice*)
Pomerantz LLP
600 Third Avenue
New York, New York 10016
Tel: (212) 661-1100
Fax: (212) 661-8665
*jalieberman@pomlaw.com*

**Lead Counsel for Lead Plaintiff**

*[Additional Counsel on Signature Page]*

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| PRANAY K BAJJURI, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> RAYTHEON TECHNOLOGIES CORPORATION f/k/a RAYTHEON COMPANY; THOMAS A. KENNEDY; ANTHONY F. O'BRIEN; and MICHAEL J. WOOD, <br><br> Defendants. | No. CV-20-00468-TUC-JCH <br><br> **CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> CLASS ACTION <br><br> (DEMAND FOR JURY TRIAL) |

1
2

## TABLE OF CONTENTS

NATURE OF THE ACTION ........................................................................... 1

JURISDICTION AND VENUE ...................................................................... 6

PARTIES ......................................................................................................... 8

SUBSTANTIVE ALLEGATIONS ............................................................... 10

    A.    Background ..................................................................... 10

    B.    Corroborating Confidential Witnesses Report Specific
           Allegations of Misconduct .......................................... 15

    C.    The Individual Defendants Were Required to Maintain
           Adequate Internal Controls Over Financial Reporting ............. 27

    D.    Defendants Misrepresented the Effectiveness of Raytheon's
           Internal Controls Over Financial Reporting and Misreported
           Key Financial Metrics ................................................ 32

    E.    Raytheon Acknowledges Wrongdoing ....................... 37

MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED
    DURING THE CLASS PERIOD .......................................... 38

THE TRUTH EMERGES ........................................................................... 101

ADDITIONAL EVENTS AFTER THE END  OF THE CLASS
    PERIOD ................................................................................. 102

ADDITIONAL SCIENTER ALLEGATIONS .......................................... 103

PLAINTIFF'S CLASS ACTION ALLEGATIONS ................................. 106

COUNT I ..................................................................................................... 109

    (Violations of Section 10(b) of the Exchange Act and Rule 10b-5
    Promulgated Thereunder Against All Defendants) ........................... 109

COUNT II .................................................................................................... 113

    (Violations of Section 20(a) of the Exchange Act Against the
    Individual Defendants) ..................................................................... 113

PRAYER FOR RELIEF ............................................................................ 114

JURY TRIAL DEMANDED ...................................................................... 115

i

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

Plaintiff the State Teachers Retirement System of Ohio ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of United States ("U.S.") Securities and Exchange Commission ("SEC") filings by Raytheon Technologies Corporation f/k/a Raytheon Company ("Raytheon" or the "Company"), as well as media and analyst reports about the Company and Company press releases. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of anyone who purchased or acquired Raytheon Company ("RTN") common stock from the beginning of the Class Period on February 10, 2016 until the date the merger between Raytheon Company and United Technologies Corporation was completed on April 3, 2020; anyone who purchased or acquired United Technologies Corporation ("UTC") common stock from June 10, 2019, the first trading day after the merger was announced, until the date the merger was completed on April 3, 2020; and anyone who purchased or acquired Raytheon

1

Technologies Corporation ("RTX") common stock from the date the merger was completed on April 3, 2020, until the end of the Class Period on October 27, 2020, inclusive.[1]

2.     On April 3, 2020, Raytheon Company and United Technologies Corporation merged to form Raytheon Technologies Corporation. Raytheon is an aerospace and defense company.

3.     During the class period, Raytheon derived a vast majority of its revenues from contracts it received from the U.S. government.[2]   As described in more detail below, U.S. government contracts are subject to heavy scrutiny and contractors are required to comply with all applicable laws and regulations governing the government's acquisition of goods and services. Raytheon was required to comply with, for example, the Application of Appropriation under 31 U.S.C. § 1301, the Bona Fide Need Rule under 31 U.S.C. § 1502, the False Claims Act (31 U.S.C. §§ 3729-3733), the Federal Acquisition Regulations and Defense Federal Acquisition Regulations, and various Presidential Executive Orders, including EO 13810.  These laws and regulations impose a broad range of requirements, many of which are unique to government contracting.  Failure to

---

[1] February 10, 2016 and October 27, 2020, inclusive (the "Class Period").

[2] Unless otherwise indicated, references to "Raytheon" are to Raytheon Company before the Merger and to Raytheon Technologies Corp. after the Merger.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

comply with these requirements can result in severe repercussions including, but not limited to, reduction to the value of contracts, forfeiture of profits, and bars from future government contracts. Government contractors are also subject to audits and investigations by U.S. government agencies to ensure compliance with contracts.

4. During the Class Period, Raytheon repeatedly engaged in egregious misconduct in relation to its contracts with the U.S. government. This wrongdoing led to false and misleading Company filings with the SEC, including the improper reporting and disclosure of unearned revenue. The misconduct included several improper practices designed to overcharge the government under existing contracts. Specifically, Raytheon double-charged the government by miscoding labor charges, purchased and mislabeled goods as services to charge a higher markup and avoid certain registration and oversight requirements, and made unnecessary purchases, without the required authority from the government, for materials that were scheduled to arrive after the end date of the task orders. Raytheon also misappropriated funds, failed to submit sub-contracts for competitive bidding, deliberately prolonged projects to inflate Estimates at Completion, and conducted business with foreign companies in direct violation of presidential executive orders. This misconduct resulted in a gross overstatement

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

of many important financial metrics such as revenues, operating income, and operating expenses.

5.    Rather than disclose the misconduct, Raytheon concealed it by doctoring contracts in advance of government reviews and audits. This slight-of-hand included manipulating dates and other information in the contracts.

6.    As alleged herein, throughout the Class Period, Defendants repeatedly made false and misleading statements regarding the effectiveness of Raytheon's internal controls over financial reporting and disclosure controls and procedures. Contrary to the Defendants' representations to investors, the aforementioned internal controls over financial reporting and disclosure controls and procedures were not effective and did not provide reasonable assurances that transactions were properly executed and/or recorded. As detailed more fully below, Raytheon was not entitled to the benefits of the revenue it generated from its government contracts due to the misuse, misappropriation, and violations of the prescribed protocols and parameters of those government contracts.  The material overstatement of reported revenues resulted in the improper reporting of other important financial metrics, like operating income, operating margin, income from operations and net income.

7.    The misconduct subjected Raytheon to significant fines and other punitive remedies, in addition to future bars from government contracts.

4

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

8.      Indeed, as a result of its misconduct, on October 27, 2020, Raytheon disclosed it received a criminal subpoena from the U.S. Department of Justice on October 8, 2020, seeking information and documents in connection with an investigation relating to financial accounting, internal controls over financing, and cost reporting regarding Raytheon Company's Missiles & Defense business since 2009.[3]

9.      In response to this shocking news, the Company's stock price tumbled $4.19 per share, or approximately 7%, on unusually heavy trading volume, damaging investors.

10.     On April 27, 2021, Raytheon announced it received another criminal subpoena from the Justice Department in connection with its investigation into defective pricing of several contracts awarded to the Company's Missiles & Defense business. On a conference call that same day, Raytheon's current CEO, Greg Hayes, **admitted Raytheon engaged in wrongdoing**.  Hayes affirmed that "***It was alleged that we defectively priced some contracts.  We've looked into it, we think there is potential liability for defective pricing clearly***."  He said the issues

---

[3] The United States Attorney, as the chief federal law enforcement officer, is authorized to request the appropriate federal investigative agency to investigate suspected violations of federal law. *See*, *e.g.*, https://www.justice.gov/jm/jm-9-64000-protection-government-functions

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

under the criminal investigations *are events that "should not have occurred . . . But they did*."

11.    Before the truth about the Company's misconduct was revealed to the market, the Individual Defendants realized substantial benefits from their disposal of their personally-held Raytheon shares.  Defendant Kennedy received almost $24 million in net proceeds from insider trading during the Class Period, representing an approximate 280% increase as compared to the equivalent pre-class period. Similarly, Defendants O'Brien and Wood's net proceeds increased over 1000% and 55% respectively as compared to the equivalent pre-Class Period.

12.    Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities and Exchange Act of 1934 ("the Exchange Act").

## JURISDICTION AND VENUE

13.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

15.     This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this judicial district so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.  The Company's Missiles & Defense segment is also headquartered in this district at 1151 E. Hermans Road, Tucson, Arizona 85756.

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this district and the Company's Missiles & Defense segment is headquartered in this district. There are thousands of damaged shareholders residing in this district.

17.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the U.S. mails, interstate telephone communications and the facilities of a national securities exchange. Defendants disseminated the statements alleged to be false and misleading herein into this district, and defendants solicited purchasers of Raytheon securities in this district.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

## PARTIES

18.     Plaintiff the State Teachers Retirement System of Ohio, as set forth in its previously filed Certification[4], purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

19.     Defendant Raytheon is incorporated in Delaware and its headquarters are located at 870 Winter Street, Waltham, Massachusetts 02451.   Raytheon securities trade in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "RTX."

20.     Defendant Thomas A. Kennedy ("Kennedy") became the executive chairman of the Raytheon Technologies Board of Directors in 2020 upon the closing of the merger between Raytheon Company and United Technologies Corporation, and remained in that position until June 2021.  Before the merger, Kennedy was Chief Executive Officer of Raytheon Company from March 2014 until April 2020 and Chairman from October 2014 until April 2020.

21.     Defendant Anthony F. O'Brien ("O'Brien") has served as Raytheon Technologies' Chief Financial Officer ("CFO") since the merger in April 2020 and until April 2021.  Before the merger, O'Brien served as Raytheon Company's Vice President and CFO from March 2015 until April 2020.

---

[4] *See* Dkt. No. 18-3

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

22.     Defendant Michael J. Wood ("Wood") has served as Raytheon Technologies' Vice President and Controller since the merger in April 2020. Before then, Wood served as Raytheon Company's Vice President, Controller, and Chief Accounting Officer from October 2006 until April 2020.

23.     Defendants Kennedy, O'Brien, and Wood are collectively referred to herein as the "Individual Defendants."

24.     Each of the Individual Defendants: (i) directly participated in the management of the Company; (ii) was directly involved in the day-to-day operations of the Company at the highest levels; (iii) was privy to confidential proprietary information concerning the Company and its business and operations; (iv) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein; (v) was directly or indirectly involved in the oversight or implementation of the Company's internal controls; (vi) falsely certified that the Company's internal controls over financial reporting ("ICFR") were effective during the annual periods included in the Class Period; (vii) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or (viii) approved or ratified these statements in violation of the federal securities laws.

25.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

26.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

27.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A. Background

28.     Raytheon purports to be an aerospace and defense company providing advanced systems and services for commercial, military, and government customers worldwide.  Among the Company's four main operational divisions is its Raytheon Missiles and Defense segment, which designs, develops, integrates, and produces missile and combat systems for the armed forces of the United States and allied nations.

29.     Raytheon is the product of a merger between an aerospace and defense company.  On April 3, 2020, Raytheon Company, a leading defense company, and United Technologies Corporation, a leading aerospace company,

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

completed an all-stock merger of equals.  To complete the merger, both companies abided by an anti-trust settlement with the U.S. Justice Department requiring them to sell off certain business segments to avoid unfair market consolidation.  Upon closing of the merger, United Technologies' name was changed to "Raytheon Technologies Corporation" and its stock began trading under the ticker symbol "RTX."

30.     Before the merger, United Technologies Corporation traded under the ticker symbol "UTX."  In accordance with the merger agreement, each share of Raytheon Company stock was converted into the right to receive 2.3348 shares of the new RTX common stock.  Before the merger, Raytheon Company's stock traded under the ticker symbol "RTN."  United Technologies Chairman and CEO Greg Hayes was named CEO of the newly formed Raytheon Technologies Corporation.  Defendant Kennedy transitioned from CEO of Raytheon Company to executive chairman of the newly formed corporation.

31.     The merger was initially announced in a press release on June 9, 2019, which stated "[t]he combined company will have approximately $74 billion in pro forma 2019 sales.  With a strong balance sheet and robust cash generation, Raytheon Technologies will enjoy enhanced resources and financial flexibility to support significant R&D and capital investment through business cycles."

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

32.     Analysts were very bullish on the merger upon its announcement on June 9, 2019.  An analyst report published on June 9, 2019 by UBS on United Technologies Corp. titled "Shareholders win with UTX+RTN=RTX" with a "Buy" rating stated the deal "makes financial and strategic sense[.]" Also, an analyst report published on June 10, 2019 by Morningstar titled "United Technologies and Raytheon Will Combine to Form Megasize Aerospace and Defense Firm" stated "[W]e don't believe that the combination comes at the cost of either company's shareholders.  We think the combined company will benefit from increased scale, complementary technology that plugs the gaps of each separate company's portfolios, and a portfolio that can offset a slowdown in either end market's spending growth."  Cowen was also bullish on the merger describing it as "attractive" and shifting their rating from "Market Perform" to "Outperform" in a June 24, 2019 analyst report discussing the benefits of the merger.

33.     The same is true of a Bank of America Merrill Lynch analyst report published on July 25, 2019, titled "Reiterate Buy on strong organic growth, accretion from COL, and deal with RTN" which reiterated a "Buy" rating for UTC based heavily on the merger with RTN.  Morningstar reiterated their positivity towards the merger in an analyst report published October 16, 2019, emphasizing how the two companies complement one another and stating, "we believe the merger with Raytheon should help provide some steady cash flow as well as

12

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

additional customer bargaining power in an increasingly consolidating aerospace and defense industrial."

34.     Based on the magnitude of the announced merger and subsequent widely disseminated analysis, UTC shareholders clearly relied on statements made by RTN after the merger announcement on June 9, 2019 until the merger completion date on April 3, 2020.

35.     Throughout the Class Period, the vast majority of Raytheon's revenues derived from contracts it received from the U.S. government:

**Sales to the U.S. Government**

| (In millions, except percentages) | | 2016 | | 2015 | | 2014 |
|---|---|---|---|---|---|---|
| Sales to the U.S. government[1] | $ | 16,101 | $ | 15,767 | $ | 16,083 |
| Sales to the U.S. government as a Percentage of Total Net Sales[1] | | 67% | | 68% | | 70% |
| Foreign military sales through the U.S. government | $ | 2,899 | $ | 2,814 | $ | 2,962 |
| Foreign military sales through the U.S. government as a Percentage of Total Net Sales | | 12% | | 12% | | 13% |

(1)    Excludes foreign military sales through the U.S. government.

Our principal U.S. government customer is the DoD; other U.S. government customers include other U.S. Intelligence Community agencies, NASA and the FAA.

**Sales to the U.S. Government**

| (In millions, except percentages) | | 2019 | | 2018 | | 2017 |
|---|---|---|---|---|---|---|
| Sales to the U.S. government[1] | $ | 20,111 | $ | 18,447 | $ | 16,860 |
| Sales to the U.S. government as a percentage of Total Net Sales[1] | | 69% | | 68% | | 67% |
| Foreign military sales through the U.S. government | $ | 4,198 | $ | 3,502 | $ | 3,311 |
| Foreign military sales through the U.S. government as a percentage of Total Net Sales | | 14% | | 13% | | 13% |

(1)    Excludes foreign military sales through the U.S. government.

Our principal U.S. government customer is the DoD; other U.S. government customers include U.S. Intelligence Community agencies, NASA, the DHS and the FAA.

**U.S. Government Sales.** Our U.S. government sales were as follows:

| (dollars in millions) | | 2020 |
|---|---|---|
| Sales to the U.S. government [1] | $ | 25,962 |
| Sales to the U.S. government as a percentage of total net sales [1] | | 46% |

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

36.     As the Company acknowledged in its public filings, "U.S. government contracts generally are subject to the Federal Acquisition Regulation ("FAR"), which sets forth policies, procedures and requirements for the acquisition of goods and services by the U.S. government; department-specific regulations that implement or supplement the FAR, such as the DoD's Federal Acquisition Regulation Supplement ("DFARS"); and other applicable laws and regulations."[5]  "These regulations impose a broad range of requirements, many of which are unique to government contracting, including various procurement, import and export, security, contract pricing and cost, contract termination and adjustment, audit and product integrity requirements."[6] "A contractor's failure to comply with these regulations and requirements could result in reductions to the value of contracts, contract modifications or termination, cash withholds on contract payments, forfeiture of profits, and the assessment of penalties and fines, and could lead to suspension or debarment, for cause, from U.S. government contracting or subcontracting for a period of time."[7]

37.     Moreover, "government contractors are also subject to routine audits and investigations by U.S. government agencies such as the Defense Contract

---

[5] Item 1 of the Company's Annual report on Form 10-K for the year ended December 31, 2019 filed on February 12, 2020.

[6] *Id.*

[7] *Id.*

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

Audit Agency ("DCAA") and Defense Contract Management Agency ("DCMA.")[8] "These agencies review a contractor's performance under its contracts, cost structure and compliance with applicable laws, regulations and standards."[9]   "The DCAA and DCMA also review the adequacy of and a contractor's compliance with its internal control systems and policies, including the contractor's accounting, purchasing, property, estimating, earned value management and material management accounting systems."[10]

38.    Also, the U.S. Department of Defense requires companies doing business with the government to follow the FAR [Federal Acquisition Regulations] and DFAR [Defense Federal Acquisition Regulations] guidelines for "fair and reasonable pricing."

39.    Raytheon, in its Forms 10-K for the relevant timeframe, acknowledged the risk of failing to comply with the guidelines set out in its contracts or, more globally, from the Federal guidelines described above.

**B.   Corroborating Confidential Witnesses Report Specific Allegations of Misconduct**

40.    CW1 worked at Raytheon as a Purchasing Agent and Subcontracts Manager from June 2009 until August 2018.   His/her duties included auditing

---

[8] *Id.*

[9] *Id.*

[10] *Id.*

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

procurement group pre-award and post-award purchase order files for Contractor Purchasing System Review ("CPSR"). The objective of the CPSR is to "evaluate the efficiency and effectiveness with which the contractor spends government funds and complies with Government policy when subcontracting."[11]

41.     During his/her employment encompassing the Class Period, CW1 witnessed many instances of wrongdoing at Raytheon related to a government contract worth approximately $11.5 billion, awarded to Raytheon by the U.S. Department of Defense. The contract's life spanned throughout the Class Period. The contract provided for training, engineering, and logistics support and provided for operations, maintenance, systems integration and engineering support services for live, virtual and constructive training systems and mission-focused, global training support.

42.     The misconduct related to this contract alone, which continued into close to mid-2018, included failure to submit sub-contracts to a competitive bidding process, resulting in Raytheon improperly overcharging the government. For example, CW1 recounted that Raytheon failed to submit for competitive bidding at least 155 purchase orders related to the $11.5 billion contract alone. Competitive bidding is required by federal regulations that apply to Raytheon,

---

[11] https://www.dcma.mil/Portals/31/Documents/CPSR/CPSR_Guidebook_050917.pdf.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

such as FAR Part 6 and DFAR Parts 206 and 215.  These provisions implement the Competition in Contracting Act (CICA) of 1984, Pub. L. No. 98-369, Division B, Title VII, §§ 2701-2753, 98 Stat. 1175 (July 18, 1984).

43.    CW1 also stated that Raytheon miscoded for labor charges related to this contract.  S/he explained that labor, which should have been billed just as part of overhead, was billed through direct charges, leading to double-charging the government. Further, for several months, Individual Work Authorizations were not provided for the procurement group resulting in unapproved labor charges in violation of government regulations.  CW1 also stated that Raytheon purchased and mislabeled certain goods as services because there was a higher markup for services that Raytheon could charge the government, and labeling them as services allowed the Company to sidestep certain registration and oversight requirements that would have been in play had the goods been correctly labeled.

44.    CW1 witnessed other overcharges on the $11.5 billion contract, stemming from unnecessary orders and inflated Estimates at Completion.  For example, CW1 recounted that Raytheon ordered and charged the government for extra materials at the end of projects, and that these materials were clearly not necessary for the proper completion of the task orders.  Delivery of these materials was scheduled to arrive *after* the end date of the task orders, rendering these materials useless but nevertheless inflating the Company's revenues.  CW1

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

explained that delivery was well beyond the task order end dates, and the required long lead material purchase authority[12] from the government was not obtained.

45.    Other misconduct CW1 witnessed, which related to the $11.5 billion contract alone, included improper procurements from countries that were subject to bans under presidential executive orders, including by doing business with companies that were conducting business with North Korea, such as China.[13]

46.    Importantly, in view of the foregoing violations of the Company's contract with the DoD, CW1 stated that s/he was repeatedly ordered by his/her superiors to "fix" certain contracts in advance of government reviews and audits, including in 2015 and 2018.[14]  "Fixing" meant doctoring dates and information to allow the contracts to pass government review, such as by back-dating, putting in another supplier into the supposed bidding process that wasn't originally there, doctoring paperwork to pretend like there was a bidding process when there wasn't, conducting and adding price analysis after the award was already granted, and getting the sub-contractors to participate in the fraud by asking them to sign paperwork with the wrong dates, to which they obliged.

---

[12] Long lead material purchase authority is the authority to make purchases under a contract where delivery occurs past the period of performance end date for the task order.

[13] See, e.g., Executive Order ("EO") 13810 issued September 20, 2017 "Imposing Additional Sanctions With Respect to North Korea"; EO 13466, June 26, 2008; EO 13551, August 30, 2010; EO 13687, January 2, 2015; EO 13722, March 15, 2016; EO 13382, June 28, 2005.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

47.    During the Class Period, CW1 repeatedly reported the misconduct s/he witnessed up the chain of command at Raytheon, including reporting to Raytheon's Senior Director of Internal Audit, Thomas Sanglier, and to Raytheon's Director of Ethics and Business Conduct, Garth Chandler.  CW1's reporting of the misconduct ended in Raytheon eventually terminating his/her employment in 2018.

48.    CW1 further stated that Operations and Maintenance ("O&M") Funding was misappropriated towards facility construction, upgrades, and improvements, which is Military Construction ("MILCON") and not a proper use of those funds.  This manipulation allowed Raytheon to use the funds for MILCON without the requisite approvals and oversight with which they were required to comply.  S/he also said that unallowed advanced payments were made to suppliers (and advanced billing thus made to the government) before project completion, enabling Raytheon, for example, to improperly book revenues earlier. Additionally, s/he said the Company would improperly obtain competitor cost data under the table, in violation of the Truth In Negotiations Act ("TINA"), and obtain awards based on that data—which Raytheon included in the price proposals it submitted.

---

[14] CW1 explained that the government audits occurred in 2010, 2015, and 2018.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

49.     After his/her termination, CW1 filed several whistleblower complaints with the U.S. Department of Defense.  CW1 alleged, among other things, that Raytheon filed false claims and documentation, overcharged the government, and conducted business with companies in China, in direct prohibition of presidential executive orders.

50.     CW2 witnessed similar misconduct during the Class Period.  CW2 was a Senior Principle Financial Analyst at the Company from October 2016 to December 2018.  S/he reported to Brian Simmerman, the Senior Finance Manager, and later to Gina McKinley after Simmerman's departure.  CW2 was assigned to Global Business Services, working across all of Raytheon's divisions.  CW2's job responsibilities included being an Internal Auditor who "vetted their respective proposals from vendors and contractors and other companies."  According to CW2, the U.S. Department of Defense requires companies doing business with the government to follow the FAR [Federal Acquisition Regulations] and DFAR [Defense Federal Acquisition Regulations] guidelines for "fair and reasonable pricing," which Raytheon similarly acknowledged in its Forms 10-K for the Class Period.

51.     As part of his/her job responsibilities, CW2 reviewed proposals to ensure that they were financially sound, compliant with FAR and DFAR, and audit proposals that met and/or exceeded the Truths and Negotiations Act

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

threshold of $750,000 submitted through supply chain management.   S/he also audited proposals and other cost-saving initiatives.   CW2 noted that s/he ran into obstacles when trying to do his/her job and learned "to keep my mouth shut because it didn't matter."

52.   CW2 stated that Raytheon was "pretending that they were [placing] competitive bids, but they weren't actually doing it."   CW2 said that "the benefit of having a competitive bid is that it shows the government that you're using your due diligence to follow the regulations, the guidelines they set in place because if the government finds out you did not do something right, they will slash contracts, they will slash funding. The government wants to save money."

53.   CW2 explained that Raytheon uses a green, yellow and red color rating system for its suppliers.   Green means they are good, yellow means "Go," and Red means "No," s/he said.   Most of the suppliers Raytheon used were either green or red, and only a handful were yellow.   CW2 underscored that Raytheon was supposed to get competitive bids from different suppliers in order to secure the best prices, but instead Raytheon had "favored" suppliers they used repeatedly. Those "favored" suppliers were aerospace and defense and missile suppliers. Raytheon placed the "favored" suppliers with whom they wanted to conduct business in the green category, irrespective of whether they qualified for the green rating.   This maneuver created the appearance of a competitive bidding process,

which the government requires, but is not what was actually happening at Raytheon, CW2 said.

54.     According to CW2, many of the suppliers that were placed in the green category shouldn't have been there. "I can honestly say from what I worked on the ones I received that were green maybe about 30 percent of them shouldn't have been green," s/he said.  CW2 said s/he questioned these gimmicks all the time, but his/her superior directed him/her to "Just do your job. Don't ask questions."  CW2 also noted that there was no explanation for how a supplier could get out of the red category and go to the green one, or why Raytheon didn't just cut off the suppliers in the red category.  "They had the people they wanted to work with and that's who they worked with and only kept a prospective pool of suppliers and vendors because that made them appear . . . that they were competitive bidding."

55.     CW3 also witnessed misconduct at Raytheon leading into the Class Period.  CW3 worked as a Senior Financial Analyst at Raytheon from July 2012 to October 2015.   CW3 worked across all of the projects Raytheon handled, including Missiles and Defense.  CW3 observed that it was common practice for Raytheon to get extensions for its projects and miss its Estimates at Completion. CW3 said "they were flowing contracts down to get more money and more government funds" even though Raytheon had enough to meet their goal in

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

completing whatever project it was. Instead, Raytheon "kept dragging it out." CW3 explained that "flowing down" relates to Estimates at Completion. "They had all of the essential tools and funding [to complete a project] but instead Raytheon would say, 'It's going to take longer. We need additional funds,'" CW3 said. "They used labor as part of their base and the longer you work, the more funds you get against labor." CW3 said these gimmicks happened on "almost every project" s/he was privy to at Raytheon, and the contracts were valued in the high millions. "It was kind of becoming the norm around the place." This slowing down the projects was intentional, CW3 emphasized.

56. Raytheon engaged in such manipulations with at least the Tomahawk and Javelin missiles projects, CW3 said. "They were working on those but slowing the project down when it could have been done sooner," CW3 said.

57. Between 2014 and 2019, Raytheon booked approximately $2.5 billion on the Tomahawk and the Javelin projects. According to Raytheon's public filings, "[i]n 2014, MS [Missile Systems] booked . . . $316 million for Tomahawk for the U.S. Navy and international customers . . . [and] $119 million for production of Javelin missiles for the U.S. Army[.]"[15] "In 2015, MS booked . . . $267 million for Tomahawk for the U.S. Navy and an international customer . . . and $104 million for production of Javelin missiles for the U.S. Army and

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

international customers."[16]  "In 2016, MS booked . . . $367 million for Tomahawk for the U.S. Navy and international customers[.]"[17]  "In 2017, MS booked . . . $424 million for Tomahawk for the U.S. Navy and international customers . . . [and] $135 million for Javelin for the U.S. Army and international customers[.]"[18] "In 2018, MS booked . . . $226 million for Tomahawk for the U.S. Navy and Air Force and international customers . . . [and] $164 million for Javelin for the U.S. Army and international customers[.]"[19]  In 2019, MS booked . . . $504 million for Tomahawk for the U.S. Navy and an international customer[.]"[20]

58.    CW4 corroborates the information supplied by the other CWs.  CW4 was a Principal Finance Analyst in Raytheon's Financial Controls Department from mid-2019 to fall 2020.  CW4 reported to the Finance Manager of Hypersonic Weapons & Strategy, which at the time was part of the Missile Systems division. CW4 handled all of the financial controls and "earn value" for government

---

[15] Annual report on Form 10-K for the year ended December 31, 2014 filed on February 11, 2015.

[16] Annual report on Form 10-K for the year ended December 31, 2015 filed on February 10, 2016 .

[17] Annual report on Form 10-K for the year ended December 31, 2016 filed on February 15, 2017 .

[18] Annual report on Form 10-K for the year ended December 31, 2017 filed on February 14, 2018 .

[19] Annual report on Form 10-K for the year ended December 31, 2018 filed on February 13, 2019 .

[20] Annual report on Form 10-K for the year ended December 31, 2019 filed on February 12, 2020.

24

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

contracts.    S/he explained that "earned value" means measuring the percent completion of a project based on how much the contract for that project is worth. CW4 recounted that shortly after s/he started her job at Raytheon in mid-2019, s/he learned from a colleague that Raytheon was being investigated by the U.S. Department of Justice and that "there were issues with EACs, Estimates at Completion."

59.    CW5 also recounted wrongdoing during the Class Period.  CW5 was the Vice President of Business Development, Air Warfare Systems at Raytheon from December 2015 to approximately mid-2017.   S/he reported to the Vice President of Business Development for all of Raytheon's Missile Systems.   In mid-2018, CW5 learned from a former colleague and friend still employed at Raytheon that an internal audit at the Company showed at least $250 million of false labor charges made on several contracts related to Raytheon's naval weapons system, which at the time was part of the Missile Systems.

60.    According to CW5, several high-level Raytheon employees allegedly fudged the numbers to ensure Raytheon met its profit margins (and the employees got their bonuses).   These high-level employees included Todd Callahan, the Deputy Vice President of Naval Weapon Systems, Richard MacDonald, the Program Manager for Close-in Weapon System, and Tina Fay, the Contract Director for the entire product line.   Raytheon was "charging labor to contracts

25

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

where there wasn't work going on for it," CW3 said.   Greg White, the Chief Financial Officer overseeing Raytheon's Missile Systems, was terminated around that time.   White reported to Lawrence Taylor, the Vice President overseeing Raytheon's Missile Systems.   Taylor, in turn, reported to Raytheon's CEO, Defendant Kennedy.

61.   The information supplied by these confidential witnesses is also corroborated by CW6, who worked in the Executive Communications and Employee Engagement division of Raytheon from December 2016 to April 2020. Among other things, CW6 wrote speeches for the president of the Company and edited the Company's newsletter.   CW6 learned in late 2018 or early 2019 from another colleague that several Raytheon employees were "fudging numbers" on contracts.   According to CW6, the Pentagon was also looking into it, and they wanted answers.   CW6 said that Taylor was eventually terminated in March 2019.

62.   CW7 was Director of Digital Transformation for Raytheon from October 2019 to October 2020. His/her job responsibilities included reengineering all of Raytheon's servers and separating UTC from its parent company in the wake of UTC's merger with Raytheon (which was completed in April 2020). CW7 remarked that "Everything about Raytheon is shady. It's a** covering all the way around."   Raytheon spends "hundreds of millions of dollars" on outside contractors but there is no recordkeeping for what they are doing or what the

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

money is being used for, s/he said.  CW7 said that Raytheon paid "hundreds of millions of dollars" in "funny money" to outside vendors.  While most companies have "processes and procedures to follow," Raytheon did not, s/he said. "There's no control over the contractors, no accountability," said CW7.  S/he said months and months passed without contractors doing the work they were hired to do.

## C. The Individual Defendants Were Required to Maintain Adequate Internal Controls Over Financial Reporting

63.    After a series of high-profile financial scandals relating to large public companies (and their auditors) that occurred in the early 2000s, the Sarbanes-Oxley Act of 2002 ("SOX") was enacted to purportedly protect the investments of shareholders and the general public from potentially improper actions or misrepresentations by public companies.  One of the key provisions of Section 404 of SOX reiterated the need for management at public companies to establish and maintain a system of internal controls relating to, among other things, financial reporting, and to document, test, and maintain those controls and procedures to ensure their effectiveness, as well as to assess and report on the design and operating effectiveness of internal control over financial reporting on at least an annual basis.

64.    SEC General Rules and Regulations (17 C.F.R. § 240.13a-15(f)) defines the term "internal control over financial reporting" (or "ICFR") as:

27

… a process designed by, or under the supervision of, the issuer's principal executive and principal financial officers, or persons performing similar functions, and effected by the issuer's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

(1) Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

(2) Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the issuer are being made only in accordance with authorizations of management and directors of the issuer; and

(3) Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the issuer's assets that could have a material effect on the financial statements.

65. SEC Regulation S-K (17 C.F.R. § 229.308 [Item 308] (a)) describes what information should be included in management's report on ICFR, including the following:

(1) A statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting for the registrant;

(2) A statement identifying the framework used by management to evaluate the effectiveness of the registrant's internal control over financial reporting as required by paragraph (c) of §240.13a-15 or §240.15d-15 of this chapter;

28

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(3) Management's assessment of the effectiveness of the registrant's internal control over financial reporting as of the end of the registrant's most recent fiscal year, including a statement as to whether or not internal control over financial reporting is effective. This discussion must include disclosure of any material weakness in the registrant's internal control over financial reporting identified by management. Management is not permitted to conclude that the registrant's internal control over financial reporting is effective if there are one or more material weaknesses in the registrant's internal control over financial reporting.

66.     Many U.S. public companies, including Raytheon (as expressly stated in its previously-issued financial statements during and before the Class Period), have adopted the integrated framework for establishing and maintaining a system of internal controls originally published and established by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in 1992 (the "COSO Integrated Framework").[21]   The COSO Integrated Framework assists management, boards of directors, external stakeholders, and others interacting with the entity in their respective duties as they relate to the establishment and maintenance of internal controls.  It does so by providing both an understanding of what constitutes a system of internal controls and insight into when internal controls are being applied effectively.

---

[21] Raytheon represented that, in assessing the effectiveness of its internal control over financial reporting, management has utilized the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in its 2013 Internal Control – Integrated Framework ("COSO Report").

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

67.     COSO's integrated framework stipulates that:

[A]n effective system of internal control reduces, to an acceptable level, the risk of not achieving an objective relating to one, two, or all three categories of objectives – that is, operations, reporting, and compliance. It requires that (i) each of the five components of internal control and relevant principles is present and functioning, and that (ii) the five components are operating together in an integrated manner.

(COSO Internal Control-Integrated Framework Frequently Asked Questions, May 2013)

68.     COSO defines internal control as a process "designed to provide reasonable assurance regarding the achievement of objectives" related to the effectiveness and efficiency of operations, the reliability of financial reporting, and compliance with applicable laws and regulations.

69.     Raytheon acknowledged that "[i]nternal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with accounting principles generally accepted in the U.S."[22]

70.     Raytheon also represented that "[t]he financial statements and related information contained in [the Company's filings with the SEC] have been

---

[22] Item 9A to the Annual report on Form 10-K for the year ended December 31, 2020 filed on February 8, 2021.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

prepared by and are the responsibility of our management."[23]   "Our management is responsible for the integrity and objectivity of the financial statements and other financial information included in [Raytheon's filings with the SEC]."[24]   "To meet this responsibility, we maintain a system of internal control over financial reporting to provide reasonable assurance that assets are safeguarded and that transactions are properly executed and recorded."[25]   "The system includes policies and procedures, internal audits and our officers' reviews."[26]   Raytheon underscored that "management is responsible for establishing and maintaining adequate internal control over financial reporting."[27]

71.   Accordingly, at all relevant times, the Individual Defendants were responsible for establishing and maintaining Raytheon's disclosure controls and procedures and internal control over financial reporting to ensure the reliability of Raytheon's financial reporting and the preparation of its financial statements for external purposes in accordance with generally accepted accounting principles, and were responsible for evaluating the effectiveness of Raytheon's disclosure

---

[23] Raytheon's Annual Reports on Forms 10-K for the years ended December 31, 2015, 2016, 2017, 2018, and 2019.

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] Raytheon's Annual Reports on Forms 10-K for the years ended December 31, 2015, 2016, 2017, 2018, 2019, and 2020.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

controls and procedures.

72.     Raytheon was also required by SEC regulations to perform, at least annually, an assessment of the operating effectiveness of its system of ICFR, and to report on such effectiveness in its Forms 10-K, with express certifications as to whether the ICFR was effective for the period and whether there were identified material weaknesses in ICFR.  Raytheon explained that its management conducted the evaluations of the effectiveness of the Company's design and operation of its disclosure controls and procedures "under the supervision and with the participation of the Chief Executive Officer and Chief Financial Officer."

73.     The Individual Defendants were responsible for reporting any changes in Raytheon's internal control over financial reporting that occurred that had materially affected, or was reasonably likely to materially affect, the registrant's internal control over financial reporting.

**D.  Defendants Misrepresented the Effectiveness of Raytheon's Internal Controls Over Financial Reporting and Misreported Key Financial Metrics**

74.     During the Class Period, Raytheon filed reports, forms, and other documents with the SEC that contained false and misleading statements regarding the effectiveness of the Company's internal controls and procedures.   For example, Raytheon consistently represented that its "disclosure controls and procedures" during the relevant time "were effective."

32

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

75.     Moreover, during the Class Period, the Individual Defendants, acting on behalf of Raytheon, signed certifications pursuant to the Sarbanes-Oxley Act of 2002.   Those certifications contained misrepresentations that Raytheon had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information."

76.     Contrary to the Defendants' representations, Raytheon's internal controls over financial reporting were not effective, and did not provide reasonable assurances transactions were properly executed and/or recorded.  For example, during the Class Period, Defendants failed to appropriately report various key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's agreed contracts with the government (as discussed in detail above).  Because of such misuse, misappropriation, and violations of protocols and parameters, Raytheon was not entitled to the benefits of the revenue it generated thereunder.

77.     The framework to generally accepted accounting principles in the United States ("GAAP") includes what are referred to as Statements of Financial Accounting Concepts, or FASCONs.   FASCON No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises* ("FASCON 5")

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

includes particular language regarding the recognition of revenues and expenses in an income statement.   With respect to revenue, FASCON 5 provides the following:

> Revenues are not recognized until earned. An entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues.

78.    In the event an entity has not conformed with the terms of a contract, or has misrepresented or withheld information from a customer (in this case, the DoD), an entity may not be entitled to the benefits of the services it purports to have provided, rendering the recognition of such revenue/net sales improper.

79.    The SEC, in Topic 10, *Revenue Recognition,* references the same basic premise as it pertains to revenue recognition, drawing directly from FASCON 5, stating, "[r]evenue should not be recognized until it is realized or realizable and earned."

80.    During the Class Period, Raytheon improperly recorded revenues it was not entitled to record as a result of its violations related to the Company's government contracts.  Those actions included overcharging the government by using improper billing procedures, intentionally prolonging projects and making unnecessary orders, failing to submit sub-contracts for competitive bidding, misappropriating funds, conducting business with companies in direct violation of

34

presidential executive orders, and doctoring contracts to conceal misconduct.

81.   In addition to revenues, other reported metrics were similarly impacted by Raytheon's misconduct.   For example, operating income was improperly reported as a result of the misstatement of revenues, as was the Company's determined and reported operating margin, and its income from operations, net income, and net income attributable to Raytheon in its income statements for the Class Period.

82.   Each of these financial metrics was impacted by the Company's violations, including Raytheon's payment of inflated and/or unapproved amounts for labor, materials or subcontractors; Raytheon's payment to contractors and/or subcontractors with whom the Company was expressly forbidden from transacting business pursuant to Presidential executive orders; Raytheon's payment for services from contractors that had not been subject to the required bidding procedures; and Raytheon's purchases in an untimely and improper manner.

83.   Furthermore, the Company manipulated its Estimates at Completion ("EAC"), a critical measure in determining the revenue and income to be reported on long-term construction-type projects.   On long-term construction or production-type contracts, revenues and costs are generally recognized on the basis of the percentage of the contract that is complete, or the percentage-of-completion method.  In the accounting literature, ASC 605, *Revenue Recognition,*

35

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

leveraging SOP 81-1, *Accounting for Performance of Construction-Type and Certain Production-Type Contracts*, asserts that to use percentage-of-completion accounting, the seller must be able to make reasonably dependable estimates. Estimates of total contract revenue and costs (*i.e.*, the EAC) are considered reasonably dependable if minimum total revenue and maximum total cost can be properly estimated. If the EAC is not properly measured, the timing of revenues, expenses and associated income, is directly impacted and, in some instances, revenue and income may need to be deferred until completion of the contract, assuming such revenue has been earned.

84.     Defendants' practices also violated the False Claims Act by, among other things, mislabeling, miscoding, and submitting unallowed billing to the government. Under the Federal False Claims Act, the government may recover losses due to fraud and abuse by persons seeking payment from the United States. *See* S. Rep. No. 345, 99 Cong., 2d Sess. at 2 (1986), reprinted in 1986 U.S.C.C.A.N 5266.

85.     The False Claims Act makes it unlawful for any person to knowingly present a false or fraudulent claim, record or statement to the government for payment or approval. *See* 31 U.S.C. § 3729. Improper coding is a basis for liability under the False Claims Act. The False Claims Act, 31 U.S.C. §§ 3729-3733, imposes significant penalties on violators, such as fines for ***each individual***

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

*violation* (currently a minimum $11,803 and maximum $23,331 per each violation)[28] and *treble-damages* liability to the United States on an individual or entity that knowingly presents a false or fraudulent claim for payment or approval to the government.

### E.   Raytheon Acknowledges Wrongdoing

86.   The severity and significance of Raytheon's misconduct cannot be understated.  Raytheon is being criminally investigated by the U.S. Department of Justice in connection with its overcharges, accounting manipulations and flimsy internal controls.  On October 8, 2020, Raytheon received a criminal subpoena from the U.S. Department of Justice seeking information and documents in connection with an investigation relating to financial accounting, internal controls over financial reporting, and cost reporting regarding Raytheon Company's Missiles & Defense business since 2009.[29]

87.   Just recently, on March 24, 2021, the U.S. Department of Justice slapped Raytheon with another criminal subpoena as part of the same investigation, relating to a contract awarded to Missiles & Defense in 2017.[30]

88.   Significantly,    Raytheon's    current    chief    executive    officer

---

[28]    https://www.federalregister.gov/documents/2021/01/11/2021-00230/civil-monetary-penalty-inflation-adjustment

[29] Raytheon's quarterly report on Form 10-Q for the quarter ended September 30, 2020, filed on October 27, 2020.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

acknowledged that Raytheon engaged in overpricing: "***It was alleged that we defectively priced some contracts . . . we've looked into it, we think there is potential liability for defective pricing clearly*** . . . ." He said the issues under criminal investigation are ***events that "should not have occurred . . . But they did"*** "[a]nd we're going to clean it up and move on."[31] He said that "the investigation includes potential civil liability for defective pricing for three contracts entered into between 2011 and 2013 by IDS. We provided for our best estimate related to this matter in connection with the finalization of purchase accounting during the quarter. Additionally, as part of the same investigation, we recently received a second subpoena relating to a different IDS contract from 2017."

## MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

89.     The Class Period begins on February 10, 2016, when the Company published its annual report on Form 10-K for the year ended December 31, 2015 (the "2015 10-K"). The 2015 10-K was signed by Defendants Kennedy, O'Brien and Wood, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Kennedy and O'Brien attesting to the accuracy of the financial

---

[30] Raytheon's quarterly report on Form 10-Q for the quarter ended March 31, 2021, filed on April 27, 2020.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. The 2015 10-K stated the following, in pertinent part, regarding the Company's internal controls and procedures:

> Conclusion of Evaluation—Based on this evaluation, **the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of December 31, 2015 were effective.**

(Emphasis added.)

90.     In a section signed by Defendants Kennedy and O'Brien, the 2015 10-K stated the following, in relevant part, regarding the "Management Report on Internal Control over Financial Reporting":

> Management is responsible for establishing and maintaining adequate internal control over financial reporting for the Company. In order to evaluate the effectiveness of internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act, management has conducted an assessment, including testing, using the criteria in Internal Control – Integrated Framework, issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in 2013. The Company's system of internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America . . .
>
> **Based on its assessment, management has concluded that the Company maintained effective internal control over financial reporting as of December 31, 2015, based on criteria in Internal Control – Integrated Framework, issued by the COSO in 2013.**

---

[31] April 27, 2021 Earnings Call with analysts for Q1 2021.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

(Emphases added).

91.     Defendants' representations in the two preceding paragraphs that Raytheon's internal controls over financial reporting were effective and that its disclosure controls and procedures were effective were materially false and misleading when made because at the time they were made, Raytheon in fact did not have effective internal controls over financial reporting, nor did it have effective disclosure controls and procedures.   Contrary to the Defendants' representations, Raytheon's internal controls and procedures did not provide reasonable assurances that transactions were properly executed and/or recorded. Indeed, Defendants failed to appropriately report various key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's agreed contracts with the government (as discussed in detail above), and failed to properly measure and manipulated the EAC on its long-term production contracts.

92.     The 2015 10-K provided the following regarding the Company's financial metrics:

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

**CONSOLIDATED STATEMENTS OF OPERATIONS**

| (In millions, except per share amounts) Years Ended December 31: | 2015 | 2014 | 2013 |
|---|---|---|---|
| Net sales | | | |
| Products | $ 19,443 | $ 19,126 | $ 19,855 |
| Services | 3,804 | 3,700 | 3,851 |
| Total net sales | 23,247 | 22,826 | 23,706 |
| Operating expenses | | | |
| Cost of sales—products | 14,447 | 14,260 | 15,292 |
| Cost of sales—services | 3,127 | 3,035 | 3,240 |
| General and administrative expenses | 2,660 | 2,352 | 2,236 |
| Total operating expenses | 20,234 | 19,647 | 20,768 |
| Operating income | 3,013 | 3,179 | 2,938 |

93.    The metrics related to net sales (revenues); operating expenses; and operating income presented in the paragraph above were materially false and misleading when made.  Defendants failed to appropriately report these key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's agreed contracts with the government (as discussed in detail above).

94.    Reported revenues for the Class Period were materially overstated because, as discussed above, the Company misused and misappropriated funds awarded to it by the DoD, violated protocols and parameters of its contracts in view of its obligations under FAR and DFARS, and even manipulated information it was required to provide to the Federal government through its agencies DCAA and DCMA.  Raytheon knew it had violated its contracts and was not, therefore, entitled to the benefits of the revenue it was reporting in connection with such contracts.  Additionally, because the Company was manipulating the EACs on its

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

long-term contracts, it violated ASC 605 for failure to properly estimate costs related to those long-term contracts and, therefore, misreported the timing and amounts of its associated revenue (and income) recognition in connection therewith.

95.     Operating expenses were materially overstated for many of the same reasons described above, especially with respect to instances, among others, where the Company overcharged the DoD for materials or other supplies on jobs, overpaid for contractors in the absence of the proper and required bidding process, improperly engaged and made payments to forbidden contractors and improperly determined and intentionally manipulated the EAC on long-term production contracts (which is determined using expenses to date on the project and expected future expenses to complete the project).

96.     Operating income, which is the outflow of net sales less operating expenses, was materially overstated for the same foregoing reasons.

97.     The 2015 10-K also stated: "In 2015, MS booked . . . $267 million for Tomahawk for the U.S. Navy and an international customer . . . and $104 million for production of Javelin missiles for the U.S. Army and international customers."

98.     The statements regarding the Tomahawk and Javelin projects were materially false and misleading when made because revenues from the projects

were significantly overstated due to Raytheon intentionally slowing down the projects for purposes of manipulating the EACs and obtaining additional funding.

99.    On April 28, 2016, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended April 3, 2016 (the "1Q16 10-Q"). The 1Q16 10-Q was signed by Defendant Wood and contained SOX certifications signed by Defendants Kennedy and O'Brien attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

100.   The 1Q16 10-Q stated the following regarding the Company's controls and procedures:

> Conclusion of Evaluation—Based on this evaluation, ***the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of April 3, 2016 were effective.***

(Emphasis added.)

101.   Defendants' representations that Raytheon's disclosure controls and procedures were effective were materially false and misleading when made because at the time they were made, Raytheon in fact did not have effective disclosure controls and procedures.  Contrary to the Defendants' representations, Raytheon's internal controls and procedures did not provide reasonable assurances that transactions were properly executed and/or recorded.  Indeed, Defendants

43

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

failed to appropriately report various key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's agreed contracts with the government (as discussed in detail above), and failed to properly measure and manipulated the EAC on its long-term production contracts.

102.   Pertaining to Raytheon's financial metrics, the 1Q16 10-Q provided the following:

**CONSOLIDATED STATEMENTS OF OPERATIONS (UNAUDITED)**

| | | Three Months Ended | |
|---|---|---|---|
| (In millions, except per share amounts) | | Apr 3, 2016 | Mar 29, 2015 |
| Net sales | | | |
| Products | $ | 4,789 | $   4,387 |
| Services | | 974 | 901 |
| Total net sales | | 5,763 | 5,288 |
| Operating expenses | | | |
| Cost of sales—products | | 3,598 | 3,096 |
| Cost of sales—services | | 802 | 737 |
| General and administrative expenses | | 751 | 615 |
| Total operating expenses | | 5,151 | 4,448 |
| Operating income | | 612 | 840 |

103.   The metrics related to net sales (revenues); operating expenses; and operating income presented in the paragraph above were materially false and misleading when made.   Defendants failed to appropriately report these key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's agreed contracts with the government (as discussed in detail above).

44

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

104.   Reported revenues for the Class Period were materially overstated because, as discussed above, the Company misused and misappropriated funds awarded to it by the DoD, violated protocols and parameters of its contracts in view of its obligations under FAR and DFARS, and even manipulated information it was required to provide to the Federal government through its agencies DCAA and DCMA.  Raytheon knew it had violated its contracts and was not, therefore, entitled to the benefits of the revenue it was reporting in connection with such contracts.  Additionally, because the Company was manipulating the EACs on its long-term contracts, it violated ASC 605 for the failure to properly estimate costs related to those long-term contracts and, therefore, misreported the timing and amounts of its associated revenue (and income) recognition in connection therewith.

105.   Operating expenses were materially overstated for many of the same reasons described above, especially with respect to instances, among others, where the Company overcharged the DoD for materials or other supplies on jobs, overpaid for contractors in the absence of the proper and required bidding process, improperly engaged and made payments to forbidden contractors and improperly determined and intentionally manipulated the EAC on long-term production contracts (which is determined using expenses to date on the project and expected future expenses to complete the project).

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

106.   Operating income, which is the outflow of net sales less operating expenses, was materially overstated for the same foregoing reasons.

107.   The 1Q16 10-Q also stated: "In the first quarter of 2015, MS booked . . . $231 million for Tomahawk for the U.S. Navy[.]"

108.   The statement regarding the Tomahawk project was materially false and misleading when made because revenues from the project were significantly overstated due to Raytheon intentionally slowing down the project for purposes of manipulating the EACs and obtaining additional funding.

109.   On July 28, 2016, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended July 3, 2016 (the "2Q16 10-Q"). The 2Q16 10-Q was signed by Defendant Wood and contained SOX certifications signed by Defendants Kennedy and O'Brien attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

110.   The 2Q16 10-Q stated the following regarding the Company's controls and procedures:

> Conclusion of Evaluation—Based on this evaluation, **the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of July 3, 2016 were effective.**

(emphasis added.)

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

111.   Defendants' representations that Raytheon's disclosure controls and procedures were effective were materially false and misleading when made because at the time they were made, Raytheon in fact did not have effective disclosure controls and procedures.   Contrary to the Defendants' representations, Raytheon's internal controls and procedures did not provide reasonable assurances that transactions were properly executed and/or recorded.   Indeed, Defendants failed to appropriately report various key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's agreed contracts with the government (as discussed in detail above), and failed to properly measure and manipulated the EAC on its long-term production contracts.

112.   Pertaining to Raytheon's financial metrics, the 2Q16 10-Q provided the following:

**CONSOLIDATED STATEMENTS OF OPERATIONS (UNAUDITED)**

| | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| (In millions, except per share amounts) | **Jul 3, 2016** | Jun 28, 2015 | **Jul 3, 2016** | Jun 28, 2015 |
| Net sales | | | | |
|    Products | $ **5,037** | $ 4,894 | $ **9,826** | $ 9,281 |
|    Services | **998** | 954 | **1,972** | 1,855 |
| Total net sales | **6,035** | 5,848 | **11,798** | 11,136 |
| Operating expenses | | | | |
|    Cost of sales—products | **3,566** | 3,727 | **7,164** | 6,823 |
|    Cost of sales—services | **814** | 798 | **1,616** | 1,535 |
|    General and administrative expenses | **695** | 675 | **1,446** | 1,290 |
| Total operating expenses | **5,075** | 5,200 | **10,226** | 9,648 |
| Operating income | **960** | 648 | **1,572** | 1,488 |

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

113. The metrics related to net sales (revenues); operating expenses; and operating income presented in the paragraph above were materially false and misleading when made. Defendants failed to appropriately report these key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's agreed contracts with the government (as discussed in detail above).

114. Reported revenues for the Class Period were materially overstated because, as discussed above, the Company misused and misappropriated funds awarded to it by the DoD, violated protocols and parameters of its contracts in view of its obligations under FAR and DFARS, and even manipulated information it was required to provide to the Federal government through its agencies DCAA and DCMA. Raytheon knew it had violated its contracts and was not, therefore, entitled to the benefits of the revenue it was reporting in connection with such contracts. Additionally, because the Company was manipulating the EACs on its long-term contracts, it violated ASC 605 for the failure to properly estimate costs related to those long-term contracts and, therefore, misreported the timing and amounts of its associated revenue (and income) recognition in connection therewith.

115. Operating expenses were materially overstated for many of the same reasons described above, especially with respect to instances, among others, where

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

the Company overcharged the DoD for materials or other supplies on jobs, overpaid for contractors in the absence of the proper and required bidding process, improperly engaged and made payments to forbidden contractors and improperly determined and intentionally manipulated the EAC on long-term production contracts (which is determined using expenses to date on the project and expected future expenses to complete the project).

116.   Operating income, which is the outflow of net sales less operating expenses, was materially overstated for the same foregoing reasons.

117.   The 2Q16 10-Q also stated: "[I]n the first six months of 2015, MS booked . . . $231 million for Tomahawk for the U.S. Navy[.]"

118.   The statement regarding the Tomahawk project was materially false and misleading when made because revenues from the project were significantly overstated due to Raytheon intentionally slowing down the project for purposes of manipulating the EACs and obtaining additional funding.

119.   On October 27, 2016, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended October 2, 2016 (the "3Q16 10-Q"). The 3Q16 10-Q was signed by Defendant Wood and contained SOX certifications signed by Defendants Kennedy and O'Brien attesting to the accuracy of the financial statements contained therein, the disclosure of any material

49

changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

120.   The 3Q16 10-Q stated the following regarding the Company's controls and procedures:

> Conclusion of Evaluation—Based on this evaluation, **the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of October 2, 2016 were effective.**

(emphasis added.)

121.   Defendants' representations that Raytheon's disclosure controls and procedures were effective were materially false and misleading when made because at the time they were made, Raytheon in fact did not have effective disclosure controls and procedures.   Contrary to the Defendants' representations, Raytheon's internal controls and procedures did not provide reasonable assurances that transactions were properly executed and/or recorded.   Indeed, Defendants failed to appropriately report various key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's agreed contracts with the government (as discussed in detail above), and failed to properly measure and manipulated the EAC on its long-term production contracts.

122.   Pertaining to Raytheon's financial metrics, the 3Q16 10-Q provided the following:

50

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

**CONSOLIDATED STATEMENTS OF OPERATIONS (UNAUDITED)**

| | Three Months Ended | | Nine Months Ended | |
|---|---|---|---|---|
| (In millions, except per share amounts) | Oct 2, 2016 | Sep 27, 2015 | Oct 2, 2016 | Sep 27, 2015 |
| Net sales | | | | |
| Products | $ 5,058 | $ 4,831 | $ 14,884 | $ 14,112 |
| Services | 975 | 952 | 2,947 | 2,807 |
| Total net sales | 6,033 | 5,783 | 17,831 | 16,919 |
| Operating expenses | | | | |
| Cost of sales—products | 3,725 | 3,635 | 10,889 | 10,458 |
| Cost of sales—services | 787 | 773 | 2,403 | 2,308 |
| General and administrative expenses | 715 | 678 | 2,161 | 1,968 |
| Total operating expenses | 5,227 | 5,086 | 15,453 | 14,734 |
| Operating income | 806 | 697 | 2,378 | 2,185 |

123.   The metrics related to net sales (revenues); operating expenses; and operating income presented in the paragraph above were materially false and misleading when made.   Defendants failed to appropriately report these key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's agreed contracts with the government (as discussed in detail above).

124.   Reported revenues for the Class Period were materially overstated because, as discussed above, the Company misused and misappropriated funds awarded to it by the DoD, violated protocols and parameters of its contracts in view of its obligations under FAR and DFARS, and even manipulated information it was required to provide to the Federal government through its agencies DCAA and DCMA.   Raytheon knew it had violated its contracts and was not, therefore, entitled to the benefits of the revenue it was reporting in connection with such contracts.   Additionally, because the Company was manipulating the EACs on its

51

long-term contracts, it violated ASC 605 for the failure to properly estimate costs related to those long-term contracts and, therefore, misreported the timing and amounts of its associated revenue (and income) recognition in connection therewith.

125.   Operating expenses were materially overstated for many of the same reasons described above, especially with respect to instances, among others, where the Company overcharged the DoD for materials or other supplies on jobs, overpaid for contractors in the absence of the proper and required bidding process, improperly engaged and made payments to forbidden contractors and improperly determined and intentionally manipulated the EAC on long-term production contracts (which is determined using expenses to date on the project and expected future expenses to complete the project).

126.   Operating income, which is the outflow of net sales less operating expenses, was materially overstated for the same foregoing reasons.

127.   The 3Q16 10-Q also stated:  "[I]n the first nine months of 2015, MS booked . . . $231 million for Tomahawk for the U.S. Navy [.]"

128.   The statement regarding the Tomahawk project was materially false and misleading when made because revenues from the project were significantly overstated due to Raytheon intentionally slowing down the project for purposes of manipulating the EACs and obtaining additional funding.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

129.   On February 15, 2017, the Company published its annual report on Form 10-K for the year ended December 31, 2016 (the "2016 10-K").  The 2016 10-K was signed by Defendants Kennedy, O'Brien, and Wood, and contained SOX certifications signed by Defendants Kennedy and O'Brien attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

130.   In a section titled "Management Report on Internal Control Over Financial Reporting," which was signed by Defendants Kennedy and O'Brien, the 2016 10-K stated the following, in relevant part:

> Management is responsible for establishing and maintaining adequate internal control over financial reporting for the Company. In order to evaluate the effectiveness of internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act, management has conducted an assessment, including testing, using the criteria in Internal Control – Integrated Framework, issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in 2013. The Company's system of internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America. . . .
>
> **Based on its assessment, management has concluded that the Company maintained effective internal control over financial reporting as of December 31, 2016, based on criteria in Internal Control – Integrated Framework, issued by the COSO in 2013.**

(Emphasis added.)

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

131. The 2016 10-K stated the following regarding the Company's controls and procedures:

> Conclusion of Evaluation—Based on this evaluation, **the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of December 31, 2016 were effective.**

(emphasis added.)

132. Defendants' representations in the two preceding paragraphs that Raytheon's internal controls over financial reporting were effective and that its disclosure controls and procedures were effective were materially false and misleading when made because at the time they were made, Raytheon in fact did not have effective internal controls over financial reporting, nor did it have effective disclosure controls and procedures.   Contrary to the Defendants' representations, Raytheon's internal controls and procedures did not provide reasonable assurances that transactions were properly executed and/or recorded. Indeed, Defendants failed to appropriately report various key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's agreed contracts with the government (as discussed in detail above), and failed to properly measure and manipulated the EAC on its long-term production contracts.

133. The 2016 10-K provided the following, in pertinent part, regarding the Company's financial metrics:

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

**CONSOLIDATED STATEMENTS OF OPERATIONS**

| (In millions, except per share amounts) Years Ended December 31: | 2016 | 2015 | 2014 |
|---|---|---|---|
| Net sales | | | |
| Products | $ 20,166 | $ 19,443 | $ 19,126 |
| Services | 3,903 | 3,804 | 3,700 |
| Total net sales | 24,069 | 23,247 | 22,826 |
| Operating expenses | | | |
| Cost of sales—products | 14,767 | 14,447 | 14,260 |
| Cost of sales—services | 3,180 | 3,127 | 3,035 |
| General and administrative expenses | 2,882 | 2,660 | 2,352 |
| Total operating expenses | 20,829 | 20,234 | 19,647 |
| Operating income | 3,240 | 3,013 | 3,179 |

134. The metrics related to net sales (revenues); operating expenses; and operating income presented in the paragraph above were materially false and misleading when made. Defendants failed to appropriately report these key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's agreed contracts with the government (as discussed in detail above).

135. Reported revenues for the Class Period were materially overstated because, as discussed above, the Company misused and misappropriated funds awarded to it by the DoD, violated protocols and parameters of its contracts in view of its obligations under FAR and DFARS, and even manipulated information it was required to provide to the Federal government through its agencies DCAA and DCMA. Raytheon knew it had violated its contracts and was not, therefore, entitled to the benefits of the revenue it was reporting in connection with such contracts. Additionally, because the Company was manipulating the EACs on its

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

1
2
3
4
5

long-term contracts, it violated ASC 605 for the failure to properly estimate costs related to those long-term contracts and, therefore, misreported the timing and amounts of its associated revenue (and income) recognition in connection therewith.

6
7
8
9
10
11
12
13
14
15
16

136.   Operating expenses were materially overstated for many of the same reasons described above, especially with respect to instances, among others, where the Company overcharged the DoD for materials or other supplies on jobs, overpaid for contractors in the absence of the proper and required bidding process, improperly engaged and made payments to forbidden contractors and improperly determined and intentionally manipulated the EAC on long-term production contracts (which is determined using expenses to date on the project and expected future expenses to complete the project).

17
18
19

137.   Operating income, which is the outflow of net sales less operating expenses, was materially overstated for the same foregoing reasons.

20
21
22

138.   The 2016 10-K also stated: "In 2016, MS booked . . . $367 million for Tomahawk for the U.S. Navy and international customers[.]"

23
24
25
26
27

139.   The statement regarding the Tomahawk project was materially false and misleading when made because revenues from the project were significantly overstated due to Raytheon intentionally slowing down the project for purposes of manipulating the EACs and obtaining additional funding.

28

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

140.   On April 27, 2017, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended April 2, 2017 (the "1Q17 10-Q"). The 1Q17 10-Q was signed by Defendant Wood and contained SOX certifications signed by Defendants Kennedy and O'Brien attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

141.   The 1Q17 10-Q stated the following regarding the Company's controls and procedures:

> Conclusion of Evaluation—Based on this evaluation, ***the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of April 2, 2017 were effective.***

142.   Defendants' representations that Raytheon's disclosure controls and procedures were effective were materially false and misleading when made because at the time they were made, Raytheon in fact did not have effective disclosure controls and procedures.  Contrary to the Defendants' representations, Raytheon's internal controls and procedures did not provide reasonable assurances that transactions were properly executed and/or recorded.  Indeed, Defendants failed to appropriately report various key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's agreed contracts with the government (as discussed in

57

detail above), and failed to properly measure and manipulated the EAC on its long-term production contracts.

143.   Pertaining to Raytheon's financial metrics, the 1Q17 10-Q provided the following:

**CONSOLIDATED STATEMENTS OF OPERATIONS (UNAUDITED)**

|  |  | Three Months Ended | |
| --- | --- | --- | --- |
| (In millions, except per share amounts) | | Apr 2, 2017 | Apr 3, 2016 |
| Net sales | | | |
| Products | $ | 5,044 | $ 4,826 |
| Services | | 956 | 976 |
| Total net sales | | 6,000 | 5,802 |
| Operating expenses | | | |
| Cost of sales—products | | 3,756 | 3,639 |
| Cost of sales—services | | 774 | 802 |
| General and administrative expenses | | 729 | 748 |
| Total operating expenses | | 5,259 | 5,189 |
| Operating income | | 741 | 613 |

144.   The metrics related to net sales (revenues); operating expenses; and operating income presented in the paragraph above were materially false and misleading when made.   Defendants failed to appropriately report these key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's agreed contracts with the government (as discussed in detail above).

145.   Reported revenues for the Class Period were materially overstated because, as discussed above, the Company misused and misappropriated funds awarded to it by the DoD, violated protocols and parameters of its contracts in view of its obligations under FAR and DFARS, and even manipulated information

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10
11

it was required to provide to the Federal government through its agencies DCAA and DCMA.  Raytheon knew it had violated its contracts and was not, therefore, entitled to the benefits of the revenue it was reporting in connection with such contracts.  Additionally, because the Company was manipulating the EACs on its long-term contracts, it violated ASC 605 for the failure to properly estimate costs related to those long-term contracts and, therefore, misreported the timing and amounts of its associated revenue (and income) recognition in connection therewith.

12
13
14
15
16
17
18
19
20
21
22

146.   Operating expenses were materially overstated for many of the same reasons described above, especially with respect to instances, among others, where the Company overcharged the DoD for materials or other supplies on jobs, overpaid for contractors in the absence of the proper and required bidding process, improperly engaged and made payments to forbidden contractors and improperly determined and intentionally manipulated the EAC on long-term production contracts (which is determined using expenses to date on the project and expected future expenses to complete the project).

23
24
25

147.   Operating income, which is the outflow of net sales less operating expenses, was materially overstated for the same foregoing reasons.

26
27
28

148.   On July 27, 2017, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended July 2, 2017 (the "2Q17 10-

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

Q"). The 2Q17 10-Q was signed by Defendant Wood and contained SOX certifications signed by Defendants Kennedy and O'Brien attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

149.   The 2Q17 10-Q stated the following regarding the Company's controls and procedures:

> Conclusion of Evaluation—Based on this evaluation, **the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of July 2, 2017 were effective.**

(emphasis added.)

150.   Defendants' representations that Raytheon's disclosure controls and procedures were effective were materially false and misleading when made because at the time they were made, Raytheon in fact did not have effective disclosure controls and procedures.  Contrary to the Defendants' representations, Raytheon's internal controls and procedures did not provide reasonable assurances that transactions were properly executed and/or recorded.  Indeed, Defendants failed to appropriately report various key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's agreed contracts with the government (as discussed in

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

detail above), and failed to properly measure and manipulated the EAC on its long-term production contracts.

151.  Pertaining to Raytheon's financial metrics, the 2Q17 10-Q provided the following:

**CONSOLIDATED STATEMENTS OF OPERATIONS (UNAUDITED)**

| | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| (In millions, except per share amounts) | Jul 2, 2017 | Jul 3, 2016 | Jul 2, 2017 | Jul 3, 2016 |
| Net sales | | | | |
| Products | $    5,275 | $    5,032 | $    10,319 | $    9,858 |
| Services | 1,006 | 997 | 1,962 | 1,973 |
| Total net sales | 6,281 | 6,029 | 12,281 | 11,831 |
| Operating expenses | | | | |
| Cost of sales—products | 3,877 | 3,549 | 7,633 | 7,188 |
| Cost of sales—services | 808 | 813 | 1,582 | 1,615 |
| General and administrative expenses | 747 | 695 | 1,476 | 1,443 |
| Total operating expenses | 5,432 | 5,057 | 10,691 | 10,246 |
| Operating income | 849 | 972 | 1,590 | 1,585 |

152.  The metrics related to net sales (revenues); operating expenses; and operating income presented in the paragraph above were materially false and misleading when made.  Defendants failed to appropriately report these key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's agreed contracts with the government (as discussed in detail above).

153.  Reported revenues for the Class Period were materially overstated because, as discussed above, the Company misused and misappropriated funds awarded to it by the DoD, violated protocols and parameters of its contracts in view of its obligations under FAR and DFARS, and even manipulated information

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

it was required to provide to the Federal government through its agencies DCAA and DCMA.  Raytheon knew it had violated its contracts and was not, therefore, entitled to the benefits of the revenue it was reporting in connection with such contracts.  Additionally, because the Company was manipulating the EACs on its long-term contracts, it violated ASC 605 for the failure to properly estimate costs related to those long-term contracts and, therefore, misreported the timing and amounts of its associated revenue (and income) recognition in connection therewith.

154.   Operating expenses were materially overstated for many of the same reasons described above, especially with respect to instances, among others, where the Company overcharged the DoD for materials or other supplies on jobs, overpaid for contractors in the absence of the proper and required bidding process, improperly engaged and made payments to forbidden contractors and improperly determined and intentionally manipulated the EAC on long-term production contracts (which is determined using expenses to date on the project and expected future expenses to complete the project).

155.   Operating income, which is the outflow of net sales less operating expenses, was materially overstated for the same foregoing reasons.

156.   On October 26, 2017, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended October 1, 2017 (the "3Q17

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

10-Q"). The 3Q17 10-Q was signed by Defendant Wood and contained SOX certifications signed by Defendants Kennedy and O'Brien attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

157.   The 3Q17 10-Q stated the following regarding the Company's controls and procedures:

> Conclusion of Evaluation—Based on this evaluation, ***the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of October 1, 2017 were effective.***

(emphasis added.)

158.   Defendants' representations that Raytheon's disclosure controls and procedures were effective were materially false and misleading when made because at the time they were made, Raytheon in fact did not have effective disclosure controls and procedures.  Contrary to the Defendants' representations, Raytheon's internal controls and procedures did not provide reasonable assurances that transactions were properly executed and/or recorded.  Indeed, Defendants failed to appropriately report various key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's agreed contracts with the government (as discussed in

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

detail above), and failed to properly measure and manipulated the EAC on its long-term production contracts.

159.   Pertaining to Raytheon's financial metrics, the 3Q17 10-Q provided the following:

**CONSOLIDATED STATEMENTS OF OPERATIONS (UNAUDITED)**

| | Three Months Ended | | Nine Months Ended | |
|---|---|---|---|---|
| (In millions, except per share amounts) | Oct 1, 2017 | Oct 2, 2016 | Oct 1, 2017 | Oct 2, 2016 |
| Net sales | | | | |
| Products | $     5,305 | $     5,061 | $     15,656 | $     14,990 |
| Services | 979 | 953 | 2,909 | 2,855 |
| Total net sales | 6,284 | 6,014 | 18,565 | 17,845 |
| Operating expenses | | | | |
| Cost of sales—products | 3,872 | 3,705 | 11,531 | 10,948 |
| Cost of sales—services | 818 | 769 | 2,374 | 2,329 |
| General and administrative expenses | 736 | 710 | 2,212 | 2,153 |
| Total operating expenses | 5,426 | 5,184 | 16,117 | 15,430 |
| Operating income | 858 | 830 | 2,448 | 2,415 |

160.   The metrics related to net sales (revenues); operating expenses; and operating income presented in the paragraph above were materially false and misleading when made.   Defendants failed to appropriately report these key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's agreed contracts with the government (as discussed in detail above).

161.   Reported revenues for the Class Period were materially overstated because, as discussed above, the Company misused and misappropriated funds awarded to it by the DoD, violated protocols and parameters of its contracts in view of its obligations under FAR and DFARS, and even manipulated information

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

it was required to provide to the Federal government through its agencies DCAA and DCMA.  Raytheon knew it had violated its contracts and was not, therefore, entitled to the benefits of the revenue it was reporting in connection with such contracts.  Additionally, because the Company was manipulating the EACs on its long-term contracts, it violated ASC 605 for the failure to properly estimate costs related to those long-term contracts and, therefore, misreported the timing and amounts of its associated revenue (and income) recognition in connection therewith.

162.   Operating expenses were materially overstated for many of the same reasons described above, especially with respect to instances, among others, where the Company overcharged the DoD for materials or other supplies on jobs, overpaid for contractors in the absence of the proper and required bidding process, improperly engaged and made payments to forbidden contractors and improperly determined and intentionally manipulated the EAC on long-term production contracts (which is determined using expenses to date on the project and expected future expenses to complete the project).

163.   Operating income, which is the outflow of net sales less operating expenses, was materially overstated for the same foregoing reasons.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

164.   The 3Q17 10-Q also stated: "In the third quarter of 2017, MS booked . . . $145 million for Tomahawk for the U.S. Navy [.] . . $91 million for Javelin for the U.S. Army and international customers[.]"

165.   The statements regarding the Tomahawk and Javelin projects were materially false and misleading when made because revenues from the projects were significantly overstated due to Raytheon intentionally slowing down the projects for purposes of manipulating the EACs and obtaining additional funding.

166.   On February 14, 2018, the Company published its annual report on Form 10-K for the year ended December 31, 2017 (the "2017 10-K").  The 2017 10-K was signed by Defendants Kennedy, O'Brien, and Wood, and contained SOX certifications signed by Defendants Kennedy and O'Brien attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

167.   In a section titled "Management Report on Internal Control Over Financial Reporting," which was signed by Defendants Kennedy and O'Brien, the 2017 10-K stated the following, in relevant part:

> Management is responsible for establishing and maintaining adequate internal control over financial reporting for the Company. In order to evaluate the effectiveness of internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act, management has conducted an assessment, including testing, using the criteria in Internal Control – Integrated Framework, issued by the Committee of

66

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

Sponsoring Organizations of the Treadway Commission (COSO) in 2013. The Company's system of internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America. . . .

***Based on its assessment, management has concluded that the Company maintained effective internal control over financial reporting as of December 31, 2017, based on criteria in Internal Control – Integrated Framework, issued by the COSO in 2013***.

(Emphasis added.)

168.   The 2017 10-K stated the following regarding the Company's controls and procedures:

Conclusion of Evaluation—Based on this evaluation, ***the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of December 31, 2017 were effective***.

(Emphasis added.)

169.   Defendants' representations in the two preceding paragraphs that Raytheon's internal controls over financial reporting were effective and that its disclosure controls and procedures were effective were materially false and misleading when made because at the time they were made, Raytheon in fact did not have effective internal controls over financial reporting, nor did it have effective disclosure controls and procedures.   Contrary to the Defendants' representations, Raytheon's internal controls and procedures did not provide reasonable assurances that transactions were properly executed and/or recorded.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Indeed, Defendants failed to appropriately report various key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's agreed contracts with the government (as discussed in detail above), and failed to properly measure and manipulated the EAC on its long-term production contracts.

170.   The 2017 10-K provided the following, in pertinent part, regarding the Company's financial metrics:

**CONSOLIDATED STATEMENTS OF OPERATIONS**

| (In millions, except per share amounts) Years Ended December 31: | 2017 | 2016 | 2015 |
|---|---|---|---|
| Net sales | | | |
| Products | $ 21,416 | $ 20,309 | $ 19,623 |
| Services | 3,932 | 3,815 | 3,698 |
| Total net sales | 25,348 | 24,124 | 23,321 |
| Operating expenses | | | |
| Cost of sales—products | 15,872 | 14,853 | 14,563 |
| Cost of sales—services | 3,204 | 3,112 | 3,045 |
| General and administrative expenses | 2,954 | 2,864 | 2,646 |
| Total operating expenses | 22,030 | 20,829 | 20,254 |
| Operating income | 3,318 | 3,295 | 3,067 |

171.   The metrics related to net sales (revenues); operating expenses; and operating income presented in the paragraph above were materially false and misleading when made.   Defendants failed to appropriately report these key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's agreed contracts with the government (as discussed in detail above).

172.   Reported revenues for the Class Period were materially overstated because, as discussed above, the Company misused and misappropriated funds

68

awarded to it by the DoD, violated protocols and parameters of its contracts in view of its obligations under FAR and DFARS, and even manipulated information it was required to provide to the Federal government through its agencies DCAA and DCMA. Raytheon knew it had violated its contracts and was not, therefore, entitled to the benefits of the revenue it was reporting in connection with such contracts. Additionally, because the Company was manipulating the EACs on its long-term contracts, it violated ASC 605 for the failure to properly estimate costs related to those long-term contracts and, therefore, misreported the timing and amounts of its associated revenue (and income) recognition in connection therewith.

173. Operating expenses were materially overstated for many of the same reasons described above, especially with respect to instances, among others, where the Company overcharged the DoD for materials or other supplies on jobs, overpaid for contractors in the absence of the proper and required bidding process, improperly engaged and made payments to forbidden contractors and improperly determined and intentionally manipulated the EAC on long-term production contracts (which is determined using expenses to date on the project and expected future expenses to complete the project).

174. Operating income, which is the outflow of net sales less operating expenses, was materially overstated for the same foregoing reasons.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

175. The 2017 10-K also stated: "In 2017, MS booked . . . $424 million for Tomahawk for the U.S. Navy and international customers . . . [and] $135 million for Javelin for the U.S. Army and international customers[.]"

176. The statements regarding the Tomahawk and Javelin projects were materially false and misleading when made because revenues from the projects were significantly overstated due to Raytheon intentionally slowing down the projects for purposes of manipulating the EACs and obtaining additional funding.

177. On April 26, 2018, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended April 1, 2018 (the "1Q18 10-Q"). The 1Q18 10-Q was signed by Defendant Wood and contained SOX certifications signed by Defendants Kennedy and O'Brien attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

178. The 1Q18 10-Q stated the following regarding the Company's controls and procedures:

> Conclusion of Evaluation—Based on this evaluation, **the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of April 1, 2018 were effective.**

(emphasis added.)

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

179.   Defendants' representations that Raytheon's disclosure controls and procedures were effective were materially false and misleading when made because at the time they were made, Raytheon in fact did not have effective disclosure controls and procedures.  Contrary to the Defendants' representations, Raytheon's internal controls and procedures did not provide reasonable assurances that transactions were properly executed and/or recorded.  Indeed, Defendants failed to appropriately report various key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's agreed contracts with the government (as discussed in detail above), and failed to properly measure and manipulated the EAC on its long-term production contracts.

180.   Pertaining to Raytheon's financial metrics, the 1Q18 10-Q provided the following:

**CONSOLIDATED STATEMENTS OF OPERATIONS (UNAUDITED)**

| | Three Months Ended | |
|---|---|---|
| (In millions, except per share amounts) | Apr 1, 2018 | Apr 2, 2017 |
| Net sales | | |
| Products | $    5,254 | $    5,044 |
| Services | 1,013 | 956 |
| Total net sales | 6,267 | 6,000 |
| Operating expenses | | |
| Cost of sales—products | 3,737 | 3,617 |
| Cost of sales—services | 795 | 749 |
| General and administrative expenses | 694 | 686 |
| Total operating expenses | 5,226 | 5,052 |
| Operating income | 1,041 | 948 |

71

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

181.   The metrics related to net sales (revenues); operating expenses; and operating income presented in the paragraph above were materially false and misleading when made.   Defendants failed to appropriately report these key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's agreed contracts with the government (as discussed in detail above).

182.   Reported revenues for the Class Period were materially overstated because, as discussed above, the Company misused and misappropriated funds awarded to it by the DoD, violated protocols and parameters of its contracts in view of its obligations under FAR and DFARS, and even manipulated information it was required to provide to the Federal government through its agencies DCAA and DCMA.   Raytheon knew it had violated its contracts and was not, therefore, entitled to the benefits of the revenue it was reporting in connection with such contracts.   Additionally, because the Company was manipulating the EACs on its long-term contracts, it violated ASC 605 for the failure to properly estimate costs related to those long-term contracts and, therefore, misreported the timing and amounts of its associated revenue (and income) recognition in connection therewith.

183.   Operating expenses were materially overstated for many of the same reasons described above, especially with respect to instances, among others, where

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

the Company overcharged the DoD for materials or other supplies on jobs, overpaid for contractors in the absence of the proper and required bidding process, improperly engaged and made payments to forbidden contractors and improperly determined and intentionally manipulated the EAC on long-term production contracts (which is determined using expenses to date on the project and expected future expenses to complete the project).

184.   Operating income, which is the outflow of net sales less operating expenses, was materially overstated for the same foregoing reasons.

185.   On July 26, 2018, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended July 1, 2018 (the "2Q18 10-Q"). The 2Q18 10-Q was signed by Defendant Wood and contained SOX certifications signed by Defendants Kennedy and O'Brien attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

186.   The 2Q18 10-Q stated the following regarding the Company's controls and procedures:

> Conclusion of Evaluation—Based on this evaluation, ***the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of July 1, 2018 were effective.***

(emphasis added.)

73

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

187. Defendants' representations that Raytheon's disclosure controls and procedures were effective were materially false and misleading when made because at the time they were made, Raytheon in fact did not have effective disclosure controls and procedures. Contrary to the Defendants' representations, Raytheon's internal controls and procedures did not provide reasonable assurances that transactions were properly executed and/or recorded. Indeed, Defendants failed to appropriately report various key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's agreed contracts with the government (as discussed in detail above), and failed to properly measure and manipulated the EAC on its long-term production contracts.

188. Pertaining to Raytheon's financial metrics, the 2Q18 10-Q provided the following:

**CONSOLIDATED STATEMENTS OF OPERATIONS (UNAUDITED)**

| | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| (In millions, except per share amounts) | Jul 1, 2018 | Jul 2, 2017 | Jul 1, 2018 | Jul 2, 2017 |
| Net sales | | | | |
| Products | $ 5,507 | $ 5,275 | $ 10,761 | $ 10,319 |
| Services | 1,118 | 1,006 | 2,131 | 1,962 |
| Total net sales | 6,625 | 6,281 | 12,892 | 12,281 |
| Operating expenses | | | | |
| Cost of sales—products | 3,903 | 3,740 | 7,640 | 7,357 |
| Cost of sales—services | 874 | 781 | 1,669 | 1,530 |
| General and administrative expenses | 748 | 705 | 1,442 | 1,391 |
| Total operating expenses | 5,525 | 5,226 | 10,751 | 10,278 |
| Operating income | 1,100 | 1,055 | 2,141 | 2,003 |

74

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

189.   The metrics related to net sales (revenues); operating expenses; and operating income presented in the paragraph above were materially false and misleading when made.   Defendants failed to appropriately report these key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's agreed contracts with the government (as discussed in detail above).

190.   Reported revenues for the Class Period were materially overstated because, as discussed above, the Company misused and misappropriated funds awarded to it by the DoD, violated protocols and parameters of its contracts in view of its obligations under FAR and DFARS, and even manipulated information it was required to provide to the Federal government through its agencies DCAA and DCMA.   Raytheon knew it had violated its contracts and was not, therefore, entitled to the benefits of the revenue it was reporting in connection with such contracts.   Additionally, because the Company was manipulating the EACs on its long-term contracts, it violated ASC 605 for the failure to properly estimate costs related to those long-term contracts and, therefore, misreported the timing and amounts of its associated revenue (and income) recognition in connection therewith.

191.   Operating expenses were materially overstated for many of the same reasons described above, especially with respect to instances, among others, where

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

the Company overcharged the DoD for materials or other supplies on jobs, overpaid for contractors in the absence of the proper and required bidding process, improperly engaged and made payments to forbidden contractors and improperly determined and intentionally manipulated the EAC on long-term production contracts (which is determined using expenses to date on the project and expected future expenses to complete the project).

192.   Operating income, which is the outflow of net sales less operating expenses, was materially overstated for the same foregoing reasons.

193.   The 2Q18 10-Q also stated: "In the second quarter of 2018, MS booked . . . $167 million for Tomahawk for the U.S. Navy, U.S. Air Force and international customers[.]"

194.   The statement regarding the Tomahawk project was materially false and misleading when made because revenues from the project were significantly overstated due to Raytheon intentionally slowing down the project for purposes of manipulating the EACs and obtaining additional funding.

195.   On October 25, 2018, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended September 30, 2018 (the "3Q18 10-Q"). The 3Q18 10-Q was signed by Defendant Wood and contained SOX certifications signed by Defendants Kennedy and O'Brien attesting to the accuracy of the financial statements contained therein, the disclosure of any

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

196.   The 3Q18 10-Q stated the following regarding the Company's controls and procedures:

> Conclusion of Evaluation—Based on this evaluation, ***the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of September 30, 2018 were effective.***

(emphasis added.)

197.   Defendants' representations that Raytheon's disclosure controls and procedures were effective were materially false and misleading when made because at the time they were made, Raytheon in fact did not have effective disclosure controls and procedures.  Contrary to the Defendants' representations, Raytheon's internal controls and procedures did not provide reasonable assurances that transactions were properly executed and/or recorded.  Indeed, Defendants failed to appropriately report various key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's agreed contracts with the government (as discussed in detail above), and failed to properly measure and manipulated the EAC on its long-term production contracts.

198.   Pertaining to Raytheon's financial metrics, the 3Q18 10-Q provided the following:

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

**CONSOLIDATED STATEMENTS OF OPERATIONS (UNAUDITED)**

| | Three Months Ended | | Nine Months Ended | |
|---|---|---|---|---|
| (In millions, except per share amounts) | Sep 30, 2018 | Oct 1, 2017 | Sep 30, 2018 | Oct 1, 2017 |
| Net sales | | | | |
| Products | $ 5,656 | $ 5,305 | $ 16,417 | $ 15,656 |
| Services | 1,150 | 979 | 3,281 | 2,909 |
| Total net sales | 6,806 | 6,284 | 19,698 | 18,565 |
| Operating expenses | | | | |
| Cost of sales—products | 3,970 | 3,683 | 11,610 | 11,066 |
| Cost of sales—services | 901 | 785 | 2,570 | 2,289 |
| General and administrative expenses | 752 | 688 | 2,194 | 2,079 |
| Total operating expenses | 5,623 | 5,156 | 16,374 | 15,434 |
| Operating income | 1,183 | 1,128 | 3,324 | 3,131 |

199.   The metrics related to net sales (revenues); operating expenses; and operating income presented in the paragraph above were materially false and misleading when made.   Defendants failed to appropriately report these key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's agreed contracts with the government (as discussed in detail above).

200.   Reported revenues for the Class Period were materially overstated because, as discussed above, the Company misused and misappropriated funds awarded to it by the DoD, violated protocols and parameters of its contracts in view of its obligations under FAR and DFARS, and even manipulated information it was required to provide to the Federal government through its agencies DCAA and DCMA.   Raytheon knew it had violated its contracts and was not, therefore, entitled to the benefits of the revenue it was reporting in connection with such contracts.   Additionally, because the Company was manipulating the EACs on its

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

long-term contracts, it violated ASC 605 for the failure to properly estimate costs related to those long-term contracts and, therefore, misreported the timing and amounts of its associated revenue (and income) recognition in connection therewith.

201. Operating expenses were materially overstated for many of the same reasons described above, especially with respect to instances, among others, where the Company overcharged the DoD for materials or other supplies on jobs, overpaid for contractors in the absence of the proper and required bidding process, improperly engaged and made payments to forbidden contractors and improperly determined and intentionally manipulated the EAC on long-term production contracts (which is determined using expenses to date on the project and expected future expenses to complete the project).

202. Operating income, which is the outflow of net sales less operating expenses, was materially overstated for the same foregoing reasons.

203. The 3Q18 10-Q also stated: "In the third quarter of 2018, MS booked . . . $115 million for Javelin for the U.S. Army and international customers[.] and "[I]n the first nine months of 2018, MS booked . . . $224 million for Tomahawk for the U.S. Navy, U.S. Air Force and international customers[.]"

204. The statements regarding the Tomahawk and Javelin projects were materially false and misleading when made because revenues from the projects

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

were significantly overstated due to Raytheon intentionally slowing down the projects for purposes of manipulating the EACs and obtaining additional funding.

205.   On February 13, 2019, the Company published its annual report on Form 10-K for the year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K was signed by Defendants Kennedy, O'Brien, and Wood, and contained SOX certifications signed by Defendants Kennedy and O'Brien attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

206.   In a section titled "Management Report on Internal Control Over Financial Reporting," which was signed by Defendants Kennedy and O'Brien, the 2018 10-K stated the following, in relevant part:

> Management is responsible for establishing and maintaining adequate internal control over financial reporting for the Company. In order to evaluate the effectiveness of internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act, management has conducted an assessment, including testing, using the criteria in Internal Control – Integrated Framework, issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in 2013. The Company's system of internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America. . . .
>
> ***Based on its assessment, management has concluded that the Company maintained effective internal control over financial***

80

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

*reporting as of December 31, 2018, based on criteria in Internal Control – Integrated Framework, issued by the COSO in 2013*.

(Emphasis added.)

207.   The 2018 10-K stated the following regarding the Company's controls and procedures:

Conclusion of Evaluation—Based on this evaluation, ***the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of December 31, 2018 were effective***.

(Emphasis added).

208.   Defendants' representations in the two preceding paragraphs that Raytheon's internal controls over financial reporting were effective and that its disclosure controls and procedures were effective were materially false and misleading when made because at the time they were made, Raytheon in fact did not have effective internal controls over financial reporting, nor did it have effective disclosure controls and procedures.   Contrary to the Defendants' representations, Raytheon's internal controls and procedures did not provide reasonable assurances that transactions were properly executed and/or recorded. Indeed, Defendants failed to appropriately report various key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's agreed contracts with the government (as discussed in detail above), and failed to properly measure and manipulated the EAC on its long-term production contracts.

81

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

209.   The 2018 10-K provided the following regarding the Company's financial metrics:

**CONSOLIDATED STATEMENTS OF OPERATIONS**

| (In millions, except per share amounts) Years Ended December 31: | 2018 | 2017 | 2016 |
|---|---|---|---|
| Net sales | | | |
| Products | $ 22,633 | $ 21,416 | $ 20,309 |
| Services | 4,425 | 3,932 | 3,815 |
| Total net sales | 27,058 | 25,348 | 24,124 |
| Operating expenses | | | |
| Cost of sales—products | 16,108 | 15,252 | 14,462 |
| Cost of sales—services | 3,465 | 3,088 | 3,045 |
| General and administrative expenses | 2,947 | 2,777 | 2,721 |
| Total operating expenses | 22,520 | 21,117 | 20,228 |
| Operating income | 4,538 | 4,231 | 3,896 |

210.   The metrics related to net sales (revenues); operating expenses; and operating income presented in the paragraph above were materially false and misleading when made.   Defendants failed to appropriately report these key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's agreed contracts with the government (as discussed in detail above).

211.   Reported revenues for the Class Period were materially overstated because, as discussed above, the Company misused and misappropriated funds awarded to it by the DoD, violated protocols and parameters of its contracts in view of its obligations under FAR and DFARS, and even manipulated information it was required to provide to the Federal government through its agencies DCAA and DCMA.   Raytheon knew it had violated its contracts and was not, therefore, entitled to the benefits of the revenue it was reporting in connection with such

82

contracts.  Additionally, because the Company was manipulating the EACs on its long-term contracts, it violated ASC 605 for the failure to properly estimate costs related to those long-term contracts and, therefore, misreported the timing and amounts of its associated revenue (and income) recognition in connection therewith.

212.   Operating expenses were materially overstated for many of the same reasons described above, especially with respect to instances, among others, where the Company overcharged the DoD for materials or other supplies on jobs, overpaid for contractors in the absence of the proper and required bidding process, improperly engaged and made payments to forbidden contractors and improperly determined and intentionally manipulated the EAC on long-term production contracts (which is determined using expenses to date on the project and expected future expenses to complete the project).

213.   Operating income, which is the outflow of net sales less operating expenses, was materially overstated for the same foregoing reasons.

214.   The 2018 10-K also stated: "In 2018, MS booked . . . $226 million for Tomahawk for the U.S. Navy and Air Force and international customers . . . [and] $164 million for Javelin for the U.S. Army and international customers[.]"

215.   The statements regarding the Tomahawk and Javelin projects were materially false and misleading when made because revenues from the projects

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

were significantly overstated due to Raytheon intentionally slowing down the projects for purposes of manipulating the EACs and obtaining additional funding.

216. On April 25, 2019, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended March 31, 2019 (the "1Q19 10-Q"). The 1Q19 10-Q was signed by Defendant Wood and contained SOX certifications signed by Defendants Kennedy and O'Brien attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

217. The 1Q19 10-Q stated the following regarding the Company's controls and procedures:

> Conclusion of Evaluation—Based on this evaluation, **the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of March 31, 2019 were effective.**

(emphasis added.)

218. Defendants' representations that Raytheon's disclosure controls and procedures were effective were materially false and misleading when made because at the time they were made, Raytheon in fact did not have effective disclosure controls and procedures.  Contrary to the Defendants' representations, Raytheon's internal controls and procedures did not provide reasonable assurances that transactions were properly executed and/or recorded.  Indeed, Defendants

84

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

failed to appropriately report various key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's agreed contracts with the government (as discussed in detail above), and failed to properly measure and manipulated the EAC on its long-term production contracts.

219.   Pertaining to Raytheon's financial metrics, the 1Q19 10-Q provided the following:

**CONSOLIDATED STATEMENTS OF OPERATIONS (UNAUDITED)**

|  | | Three Months Ended | |
|---|---|---|---|
| (In millions, except per share amounts) | | Mar 31, 2019 | Apr 1, 2018 |
| Net sales | | | |
| Products | $ | 5,562 | $     5,254 |
| Services | | 1,167 | 1,013 |
| Total net sales | | 6,729 | 6,267 |
| Operating expenses | | | |
| Cost of sales—products | | 4,002 | 3,737 |
| Cost of sales—services | | 875 | 795 |
| General and administrative expenses | | 739 | 694 |
| Total operating expenses | | 5,616 | 5,226 |
| Operating income | | 1,113 | 1,041 |

220.   The metrics related to net sales (revenues); operating expenses; and operating income presented in the paragraph above were materially false and misleading when made.   Defendants failed to appropriately report these key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's agreed contracts with the government (as discussed in detail above).

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

221.   Reported revenues for the Class Period were materially overstated because, as discussed above, the Company misused and misappropriated funds awarded to it by the DoD, violated protocols and parameters of its contracts in view of its obligations under FAR and DFARS, and even manipulated information it was required to provide to the Federal government through its agencies DCAA and DCMA.  Raytheon knew it had violated its contracts and was not, therefore, entitled to the benefits of the revenue it was reporting in connection with such contracts.  Additionally, because the Company was manipulating the EACs on its long-term contracts, it violated ASC 605 for the failure to properly estimate costs related to those long-term contracts and, therefore, misreported the timing and amounts of its associated revenue (and income) recognition in connection therewith.

222.   Operating expenses were materially overstated for many of the same reasons described above, especially with respect to instances, among others, where the Company overcharged the DoD for materials or other supplies on jobs, overpaid for contractors in the absence of the proper and required bidding process, improperly engaged and made payments to forbidden contractors and improperly determined and intentionally manipulated the EAC on long-term production contracts (which is determined using expenses to date on the project and expected future expenses to complete the project).

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

223.   Operating income, which is the outflow of net sales less operating expenses, was materially overstated for the same foregoing reasons.

224.   On July 25, 2019, the Company filed with the SEC its quarterly report on Form 10- Q for the quarterly period ended June 30, 2019 (the "2Q19 10-Q"). The 2Q19 10-Q was signed by Defendant Wood and contained SOX certifications signed by Defendants Kennedy and O'Brien attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

225.   The 2Q19 10-Q stated the following regarding the Company's controls and procedures:

> Conclusion of Evaluation—Based on this evaluation, **the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of June 30, 2019 were effective.**

(emphasis added.)

226.   Defendants' representations that Raytheon's disclosure controls and procedures were effective were materially false and misleading when made because at the time they were made, Raytheon in fact did not have effective disclosure controls and procedures.  Contrary to the Defendants' representations, Raytheon's internal controls and procedures did not provide reasonable assurances that transactions were properly executed and/or recorded.  Indeed, Defendants

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

failed to appropriately report various key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's agreed contracts with the government (as discussed in detail above), and failed to properly measure and manipulated the EAC on its long-term production contracts.

227.   Pertaining to Raytheon's financial metrics, the 2Q19 10-Q provided the following:

**CONSOLIDATED STATEMENTS OF OPERATIONS (UNAUDITED)**

| | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| (In millions, except per share amounts) | Jun 30, 2019 | Jul 1, 2018 | Jun 30, 2019 | Jul 1, 2018 |
| Net sales | | | | |
|     Products | $ 5,994 | $ 5,507 | $ 11,556 | $ 10,761 |
|     Services | 1,165 | 1,118 | 2,332 | 2,131 |
| Total net sales | 7,159 | 6,625 | 13,888 | 12,892 |
| Operating expenses | | | | |
|     Cost of sales—products | 4,302 | 3,903 | 8,304 | 7,640 |
|     Cost of sales—services | 903 | 874 | 1,778 | 1,669 |
|     General and administrative expenses | 778 | 748 | 1,517 | 1,442 |
| Total operating expenses | 5,983 | 5,525 | 11,599 | 10,751 |
| Operating income | 1,176 | 1,100 | 2,289 | 2,141 |

228.   The metrics related to net sales (revenues); operating expenses; and operating income presented in the paragraph above were materially false and misleading when made.   Defendants failed to appropriately report these key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's agreed contracts with the government (as discussed in detail above).

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

229.   Reported revenues for the Class Period were materially overstated because, as discussed above, the Company misused and misappropriated funds awarded to it by the DoD, violated protocols and parameters of its contracts in view of its obligations under FAR and DFARS, and even manipulated information it was required to provide to the Federal government through its agencies DCAA and DCMA.  Raytheon knew it had violated its contracts and was not, therefore, entitled to the benefits of the revenue it was reporting in connection with such contracts.  Additionally, because the Company was manipulating the EACs on its long-term contracts, it violated ASC 605 for the failure to properly estimate costs related to those long-term contracts and, therefore, misreported the timing and amounts of its associated revenue (and income) recognition in connection therewith.

230.   Operating expenses were materially overstated for many of the same reasons described above, especially with respect to instances, among others, where the Company overcharged the DoD for materials or other supplies on jobs, overpaid for contractors in the absence of the proper and required bidding process, improperly engaged and made payments to forbidden contractors and improperly determined and intentionally manipulated the EAC on long-term production contracts (which is determined using expenses to date on the project and expected future expenses to complete the project).

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

231.   Operating income, which is the outflow of net sales less operating expenses, was materially overstated for the same foregoing reasons.

232.   The 2Q19 10-Q also stated: "In the second quarter of 2018, MS booked . . . $167 million for Tomahawk for the U.S. Navy, U.S. Air Force and international customers[.]"

233.   The statement regarding the Tomahawk project was materially false and misleading when made because revenues from the project were significantly overstated due to Raytheon intentionally slowing down the project for purposes of manipulating the EACs and obtaining additional funding.

234.   On October 24, 2019, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended September 29, 2019 (the "3Q19 10-Q"). The 3Q19 10-Q was signed by Defendant Wood and contained SOX certifications signed by Defendants Kennedy and O'Brien attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

235.   The 3Q19 10-Q stated the following regarding the Company's controls and procedures:

> Conclusion of Evaluation—Based on this evaluation, **the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of September 29, 2019 were effective.**

90

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

(emphasis added.)

236.   Defendants' representations that Raytheon's disclosure controls and procedures were effective were materially false and misleading when made because at the time they were made, Raytheon in fact did not have effective disclosure controls and procedures.  Contrary to the Defendants' representations, Raytheon's internal controls and procedures did not provide reasonable assurances that transactions were properly executed and/or recorded.  Indeed, Defendants failed to appropriately report various key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's agreed contracts with the government (as discussed in detail above), and failed to properly measure and manipulated the EAC on its long-term production contracts.

237.   Pertaining to Raytheon's financial metrics, the 3Q19 10-Q provided the following:

**CONSOLIDATED STATEMENTS OF OPERATIONS (UNAUDITED)**

| | Three Months Ended | | Nine Months Ended | |
|---|---|---|---|---|
| (In millions, except per share amounts) | Sep 29, 2019 | Sep 30, 2018 | Sep 29, 2019 | Sep 30, 2018 |
| Net sales | | | | |
| Products | $ 6,187 | $ 5,656 | $ 17,743 | $ 16,417 |
| Services | 1,259 | 1,150 | 3,591 | 3,281 |
| Total net sales | 7,446 | 6,806 | 21,334 | 19,698 |
| Operating expenses | | | | |
| Cost of sales—products | 4,522 | 3,970 | 12,826 | 11,610 |
| Cost of sales—services | 977 | 901 | 2,755 | 2,570 |
| General and administrative expenses | 741 | 752 | 2,258 | 2,194 |
| Total operating expenses | 6,240 | 5,623 | 17,839 | 16,374 |
| Operating income | 1,206 | 1,183 | 3,495 | 3,324 |

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

238. The metrics related to net sales (revenues); operating expenses; and operating income presented in the paragraph above were materially false and misleading when made.  Defendants failed to appropriately report these key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's agreed contracts with the government (as discussed in detail above).

239. Reported revenues for the Class Period were materially overstated because, as discussed above, the Company misused and misappropriated funds awarded to it by the DoD, violated protocols and parameters of its contracts in view of its obligations under FAR and DFARS, and even manipulated information it was required to provide to the Federal government through its agencies DCAA and DCMA.  Raytheon knew it had violated its contracts and was not, therefore, entitled to the benefits of the revenue it was reporting in connection with such contracts.  Additionally, because the Company was manipulating the EACs on its long-term contracts, it violated ASC 605 for the failure to properly estimate costs related to those long-term contracts and, therefore, misreported the timing and amounts of its associated revenue (and income) recognition in connection therewith.

240. Operating expenses were materially overstated for many of the same reasons described above, especially with respect to instances, among others, where

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

the Company overcharged the DoD for materials or other supplies on jobs, overpaid for contractors in the absence of the proper and required bidding process, improperly engaged and made payments to forbidden contractors and improperly determined and intentionally manipulated the EAC on long-term production contracts (which is determined using expenses to date on the project and expected future expenses to complete the project).

241.  Operating income, which is the outflow of net sales less operating expenses, was materially overstated for the same foregoing reasons.

242.  The 3Q19 10-Q also stated:  "In the third quarter of 2019, MS booked . . .  $391 million for Tomahawk for the U.S. Navy and an international customer[.]" and "In the third quarter of 2018, MS booked . . .  $115 million for Javelin for the U.S. Army and international customers[.]" and "[I]n the first nine months of 2018, MS booked . . . $224 million for Tomahawk for the U.S. Navy, Air Force and international customers[.]"

243.  The statements regarding the Tomahawk and Javelin projects were materially false and misleading when made because revenues from the projects were significantly overstated due to Raytheon intentionally slowing down the projects for purposes of manipulating the EACs and obtaining additional funding.

244.  On February 12, 2020, the Company published its annual report on Form 10-K for the year ended December 31, 2019 (the "2019 10-K").  The 2019

93

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

10-K was signed by Defendants Kennedy, O'Brien, and Wood, and contained SOX certifications signed by Defendants Kennedy and O'Brien attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

245.   In a section titled "Management Report on Internal Control Over Financial Reporting," which was signed by Defendants Kennedy and O'Brien, the 2019 10-K stated the following, in relevant part:

> Management is responsible for establishing and maintaining adequate internal control over financial reporting for the Company. In order to evaluate the effectiveness of internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act, management has conducted an assessment, including testing, using the criteria in Internal Control – Integrated Framework, issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in 2013. The Company's system of internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America. . . .
>
> ***Based on its assessment, management has concluded that the Company maintained effective internal control over financial reporting as of December 31, 2019, based on criteria in Internal Control – Integrated Framework, issued by the COSO in 2013***.

(Emphasis added.)

246.   The 2019 10-K stated the following regarding the Company's controls and procedures:

94

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

*Conclusion of Evaluation—Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of December 31, 2019 were effective*.

247.   Defendants' representations in the two preceding paragraphs that Raytheon's internal controls over financial reporting were effective and that its disclosure controls and procedures were effective were materially false and misleading when made because at the time they were made, Raytheon in fact did not have effective internal controls over financial reporting, nor did it have effective disclosure controls and procedures.   Contrary to the Defendants' representations, Raytheon's internal controls and procedures did not provide reasonable assurances that transactions were properly executed and/or recorded. Indeed, Defendants failed to appropriately report various key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's agreed contracts with the government (as discussed in detail above), and failed to properly measure and manipulated the EAC on its long-term production contracts.

248.   The 2019 10-K provided the following regarding the Company's financial metrics:

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

**CONSOLIDATED STATEMENTS OF OPERATIONS**

| (In millions, except per share amounts) Years Ended December 31: | 2019 | 2018 | 2017 |
|---|---|---|---|
| Net sales | | | |
| Products | $ 24,435 | $ 22,633 | $ 21,416 |
| Services | 4,741 | 4,425 | 3,932 |
| Total net sales | 29,176 | 27,058 | 25,348 |
| Operating expenses | | | |
| Cost of sales—products | 17,747 | 16,108 | 15,252 |
| Cost of sales—services | 3,666 | 3,465 | 3,088 |
| General and administrative expenses | 2,989 | 2,947 | 2,777 |
| Total operating expenses | 24,402 | 22,520 | 21,117 |
| Operating income | 4,774 | 4,538 | 4,231 |

249.   The metrics related to net sales (revenues); operating expenses; and operating income presented in the paragraph above were materially false and misleading when made.   Defendants failed to appropriately report these key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's agreed contracts with the government (as discussed in detail above).

250.   Reported revenues for the Class Period were materially overstated because, as discussed above, the Company misused and misappropriated funds awarded to it by the DoD, violated protocols and parameters of its contracts in view of its obligations under FAR and DFARS, and even manipulated information it was required to provide to the Federal government through its agencies DCAA and DCMA.   Raytheon knew it had violated its contracts and was not, therefore, entitled to the benefits of the revenue it was reporting in connection with such contracts.   Additionally, because the Company was manipulating the EACs on its

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

long-term contracts, it violated ASC 605 for the failure to properly estimate costs related to those long-term contracts and, therefore, misreported the timing and amounts of its associated revenue (and income) recognition in connection therewith.

251.   Operating expenses were materially overstated for many of the same reasons described above, especially with respect to instances, among others, where the Company overcharged the DoD for materials or other supplies on jobs, overpaid for contractors in the absence of the proper and required bidding process, improperly engaged and made payments to forbidden contractors and improperly determined and intentionally manipulated the EAC on long-term production contracts (which is determined using expenses to date on the project and expected future expenses to complete the project).

252.   Operating income, which is the outflow of net sales less operating expenses, was materially overstated for the same foregoing reasons.

253.   The 2019 10-K also stated: "In 2019, MS booked . . . $504 million for Tomahawk for the U.S. Navy and an international customer[.]

254.   The statements regarding the Tomahawk project were materially false and misleading when made because revenues from the project were significantly overstated due to Raytheon intentionally slowing down the project for purposes of manipulating the EACs and obtaining additional funding.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

255.   On July 29, 2020, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended June 30, 2020 (the "2Q20 10-Q"). The 2Q20 10-Q was signed by Defendants O'Brien and Wood and contained SOX certifications signed by Defendants O'Brien and Wood attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

256.   The 2Q20 10-Q stated the following regarding the Company's controls and procedures:

> On April 3, 2020, we completed the Raytheon Merger and prior to the merger, we completed the Separation Transactions. We have incorporated Raytheon's controls to the extent that they are better suited for Raytheon's operations and extended our oversight and monitoring processes that support our internal control over financial reporting to include Raytheon's operations. We are continuing to integrate the operations of Raytheon into our overall internal control over financial reporting process. ***There has been no other change in our internal control over financial reporting during the quarter ended June 30, 2020 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.***

257.   Defendants' representations related to Raytheon's internal controls over financial reporting were materially false and misleading when made because at the time they were made, Raytheon in fact did not have effective disclosure controls and procedures.  Contrary to the Defendants' representations, Raytheon's internal controls and procedures did not provide reasonable assurances that

98

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

transactions were properly executed and/or recorded.  Indeed, Defendants failed to appropriately report various key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's agreed contracts with the government (as discussed in detail above), and failed to properly measure and manipulated the EAC on its long-term production contracts.

258.   Pertaining to Raytheon's financial metrics, the 2Q20 10-Q provided the following:

**CONDENSED CONSOLIDATED STATEMENT OF OPERATIONS**

| | Quarter Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| *(dollars in millions, except per share amounts)* | 2020 | 2019 | 2020 | 2019 |
| Net Sales: | | | | |
| Product sales | $     10,768 | $     8,389 | $     18,933 | $     16,424 |
| Service sales | 3,293 | 2,940 | 6,488 | 5,858 |
| Total Net Sales | 14,061 | 11,329 | 25,421 | 22,282 |
| Costs and Expenses: | | | | |
| Cost of products sold | 9,620 | 6,736 | 16,249 | 13,399 |
| Cost of services sold | 2,594 | 1,818 | 4,537 | 3,574 |
| Research and development | 695 | 605 | 1,230 | 1,192 |
| Selling, general and administrative | 1,811 | 902 | 2,788 | 1,770 |
| Total Costs and Expenses | 14,720 | 10,061 | 24,804 | 19,935 |
| Goodwill impairment | (3,183) | — | (3,183) | — |
| Other income (expense), net | 82 | 118 | 101 | 181 |
| Operating profit (loss) | (3,760) | 1,386 | (2,465) | 2,528 |

259.   The metrics related to net sales (revenues); operating expenses; and operating income (operating profit or loss) presented in the paragraph above were materially false and misleading when made.  Defendants failed to appropriately report these key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's agreed contracts with the government (as discussed in detail above).

99

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

260.   Reported revenues for the Class Period were materially overstated because, as discussed above, the Company misused and misappropriated funds awarded to it by the DoD, violated protocols and parameters of its contracts in view of its obligations under FAR and DFARS, and even manipulated information it was required to provide to the Federal government through its agencies DCAA and DCMA.  Raytheon knew it had violated its contracts and was not, therefore, entitled to the benefits of the revenue it was reporting in connection with such contracts.  Additionally, because the Company was manipulating the EACs on its long-term contracts, it violated ASC 605 for the failure to properly estimate costs related to those long-term contracts and, therefore, misreported the timing and amounts of its associated revenue (and income) recognition in connection therewith.

261.   Operating expenses were materially overstated for many of the same reasons described above, especially with respect to instances, among others, where the Company overcharged the DoD for materials or other supplies on jobs, overpaid for contractors in the absence of the proper and required bidding process, improperly engaged and made payments to forbidden contractors and improperly determined and intentionally manipulated the EAC on long-term production contracts (which is determined using expenses to date on the project and expected future expenses to complete the project).

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

262.   Operating income (operating profit or loss), which is the outflow of net sales less operating expenses, was materially overstated for the same foregoing reasons.

## THE TRUTH EMERGES

263.   On October 27, 2020, during after-market hours, Raytheon filed its quarterly report on Form 10-Q with the SEC for the quarter ended September 30, 2020 (the "3Q20 10-Q").  The 3Q20 10-Q announced a criminal investigation by the DOJ into the Company, stating, in pertinent part:

> ***On October 8, 2020, the Company received a criminal subpoena from the DOJ seeking information and documents in connection with an investigation relating to financial accounting, internal controls over financial reporting, and cost reporting regarding Raytheon Company's Missiles & Defense business since 2009.*** We are cooperating fully with the DOJ's investigation. At this time, the Company is unable to predict the outcome of the investigation. Based on the information available to date, however, we do not believe the results of this inquiry will have a material adverse effect on our financial condition, results of operations or liquidity.

(Emphasis added.)

264.   On this news, the price of Raytheon shares fell $4.19 per share, or approximately 7%, to close at $52.34 per share on October 28, 2020, on unusually heavy trading volume, damaging investors.

265.   Also on October 28, 2020, *Bloomberg* published a news article titled "Raytheon Sinks After Disclosing U.S. Probe of Defense Books."  The article noted that "Raytheon Technologies Corp. fell after the company disclosed a

101

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

demand from the U.S. Department of Justice for records dating back more than a decade from the company's missile business."   It explained that "[t]he criminal subpoena was dated Oct. 8 and Raytheon is cooperating, according to a company regulatory filing Tuesday. Federal prosecutors are seeking documents and information in a probe of accounting and other reporting matters within Raytheon's Missiles & Defense business since 2009, according to the filing," said *Bloomberg*.

266.   Additionally, on October 28, 2020, *Fox Business* published an article titled "Raytheon discloses criminal subpoena from Justice Department."   The article stated that "[t]he request for information dates back to 2009 and pertains to 'financial accounting, internal controls over financial reporting, and cost reporting' regarding Raytheon's missiles and defense unit."   The article reported that upon such news, shares were trading more than 6% lower near the end of Wednesday's [October 28] trading session."

267.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

### ADDITIONAL EVENTS AFTER THE END
### OF THE CLASS PERIOD

268.   On April 27, 2021, Raytheon announced that it has received another criminal subpoena from the Justice Department in connection with its

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

investigation into defective pricing of several contracts awarded to the Company's missiles and defense business.

269.   During an April 27, 2021 call with analysts, Neil Mitchill, Raytheon's chief financial officer, said the DOJ investigation relates to the company's legacy integrated defense systems business, which is now part of the missiles and defense unit.   Mitchill said the DOJ investigation includes three contracts between 2011 and 2013.   He stated that the second criminal subpoena focuses on a Raytheon contract from 2017.   The DOJ investigation is not limited to these three contracts.

270.   During the same call, Greg Hayes, Raytheon's current chief executive, acknowledged that Raytheon engaged in overpricing:

> **It was alleged that we defectively priced some contracts.   We've looked into it; we think there is potential liability for defective pricing.**

271.   Hayes acknowledged that "**we've looked into it, we think there is potential liability for defective pricing clearly** . . . ."   He said the issues under criminal investigation are events that "**should not have occurred . . . But they did**" "**[a]nd we're going to clean it up and move on**."

### ADDITIONAL SCIENTER ALLEGATIONS

272.   During the class period, the Individual Defendants realized substantial benefits from their disposal of Raytheon stock while the Defendants

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

continued to make false and misleading statements to investors. Their net proceeds were grossly disproportionate to the net proceeds that the Individual Defendants received in the equivalent time period pre-dating the Class Period, and thus were inconsistent with their trading history.

273.   Defendant Kennedy received over $6.2 million in net proceeds during the equivalent pre-class period of May 25, 2011 to February 9, 2016 while receiving almost $24 million in net proceeds during the class period, representing about a 280% increase more than pre-class period.

274.   Defendant O'Brien received about $642,000 in net proceeds during the equivalent pre class period of May 25, 2011 to February 9, 2016, while receiving over $7.4 million in net proceeds during the class period, an increase of over 1,000% compared to the pre-class period.

275.   Defendant Wood received almost $3.6 million in net proceeds during the equivalent pre-class period of May 25, 2011 to February 9, 2016, while receiving over $5.6 million in net proceeds during the class period, representing about a 56% increase more than pre-class period.

276.   Accordingly, the Individual Defendants' behavior in entering into the Class Period stock sales further raises a strong inference of scienter.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

277. On April 27, 2016, the Boston Globe published a story titled "Raytheon CEO gets big bump in compensation" leading into the Class Period.[32] The article stated that "Raytheon Co. chief executive Thomas Kennedy received $20.4 million in total compensation last year, *a 49 percent jump from 2014*."[33]  It noted that "[t]he head of the Waltham-based defense contracting giant took home $1.2 million in salary and $8.1 million in stock awards, according to an annual proxy filing with securities regulators."[34]  Kennedy "also received a bigger cash bonus, at $3 million."[35]  According to the article, [t]he largest bump in Kennedy's pay was in the value of his pension and retirement plans, which nearly tripled, to $7.6 million."[36]  Kennedy "also received $406,917 in perks, including personal use of Raytheon aircraft."[37] "In addition, he was provided a car allowance, driving services, financial planning services, home security, and had expenses covered related to his spouse's attendance at business events at the company's request."[38]

---

[32] https://www.bostonglobe.com/business/2016/04/27/raytheon-ceo-gets-million-compensation-nearly-percent-jump-from/F5RL5ES3yl96ACwdNKMC8K/story.html

[33] *Id*.  (emphasis added).

[34] *Id*.

[35] *Id*.

[36] *Id*.

[37] *Id*.

[38] *Id*.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

278.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Raytheon securities during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Raytheon and its subsidiaries, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

279.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Raytheon securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

280.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

281.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

282.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a)      whether the Exchange Act was violated by Defendants' acts as alleged herein;

b)      whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business of the Company;

c)      whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d)      whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

e)      whether Defendants acted knowingly or recklessly in issuing false filings;

f)      whether the prices of Raytheon securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

g)      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

283.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

284.  Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a)      Raytheon shares met the requirements for listing, and were listed and actively traded on the NYSE, an efficient market;

b)      as a public issuer, the Company filed periodic public reports;

c)      Raytheon regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

d)      Raytheon's securities were liquid and traded with moderate to heavy volume during the Class Period; and

e)      the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

285.   Based on the foregoing, the market for Raytheon securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the Company's securities, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

286.   Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

287.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

288.   This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

289.   During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

290.   Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Raytheon securities during the Class Period.

110

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

291.   Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.   These Defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of Raytheon's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

292.   The Individual Defendants, who are or were the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Raytheon personnel to members of the investing public, including Plaintiff and the Class.

293.   As a result of the foregoing, the market price of Raytheon securities was artificially inflated during the Class Period.   In ignorance of the falsity of

Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Raytheon securities during the Class Period in purchasing Raytheon securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

294.   Had Plaintiff and the other members of the Class been aware that the market price of Raytheon's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Raytheon's securities at the artificially inflated prices that they did, or at all.

295.   As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

296.   By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of Raytheon's securities during the Class Period.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

297.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

298.   During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Raytheon's business affairs.  Because of their senior positions, the Individual Defendants knew the adverse non-public information about the Company's false financial statements.

299.   As officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Raytheon's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

300.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Raytheon disseminated in the marketplace during the Class Period concerning the Company's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts

complained of herein.  The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Raytheon securities.

301.  By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of Plaintiff and the Class, prays for judgment and relief as follows:

A.      Declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Lead Counsel;

B.      Awarding damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

C.      Awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated:  September 27, 2021          Respectfully submitted,

**POMERANTZ LLP**
By: */s/ Jeremy A. Lieberman*
Jeremy A. Lieberman (admitted *pro hac vice*)
Emma Gilmore (admitted *pro hac vice*)
Villi Shteyn (admitted *pro hac vice*)
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
egilmore@pomlaw.com
vshteyn@pomlaw.com

***Lead Counsel for Lead Plaintiff***

**KELLER ROHRBACK L.L.P.**
Gary A. Gotto
3101 N. Central Avenue, Suite 1400
Phoenix, Arizona 85012
Telephone: (602) 248-0088
Facsimile: (602) 248-2822
ggotto@kellerrohrback.com

***Liaison Counsel for Lead Plaintiff***

115

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I hereby certify that on September 27, 2021, the attached document was electronically transmitted to the Clerk of the Court using the CM/ECF System which will send notification of such filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

*/s/Emma Gilmore*
Emma Gilmore

116

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS