Jeremy A. Lieberman (admitted *pro hac vice*)
Emma Gilmore (admitted *pro hac vice*)
Villi Shteyn (admitted *pro hac vice*)
Pomerantz LLP
600 Third Avenue
New York, New York 10016
Tel: (212) 661-1100
Fax: (212) 661-8665
*jalieberman@pomlaw.com*

***Lead Counsel for Lead Plaintiff State
Teachers Retirement System of Ohio***

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA**

| | |
|---|---|
| Pranay K Bajjuri, Individually and on Behalf of All Others Similarly Situated, | No. CV-20-00468-TUC-JCH |
| Plaintiff, | |
| v. | <u>CLASS ACTION</u> |
| Raytheon Technologies Corporation f/k/a Raytheon Company; Thomas A. Kennedy; Anthony F. O'Brien; and Michael J. Wood, | |
| Defendants. | |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE
CONSOLIDATED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................................ 1

II.     FACTUAL BACKGROUND ..................................................................................... 2

        A.      Raytheon Repeatedly Violated The Contracts Awarded By Its Biggest
                Customer ......................................................................................................... 2

        B.      Despite These Machinations, Defendants Repeatedly Mispresented The
                Effectiveness Of Raytheon's Internal Controls Over Financial Reporting
                And Misreported Key Financial Metrics............................................................ 4

        C.      Raytheon Acknowledged Wrongdoing And Announced That It Is Under
                Criminal Investigation .................................................................................... 4

III.    ARGUMENT .............................................................................................................. 5

        A.      Standards Governing A Motion To Dismiss Under Rule 12(b)(6) ............... 5

        B.      Defendants' Inflated Financial Metrics Are Actionable ............................... 5

                1.      Falsity Is Sufficiently Particularized....................................................... 5

                2.      The Accounts Of The Confidential Witnesses Are Sufficiently
                        Credible ............................................................................................ 8

                3.      Materiality Is Sufficiently Pleaded ...................................................... 9

        C.      Defendants' Statements About The Effectiveness Of Raytheon's Internal
                Controls Are Actionable................................................................................ 13

        D.      The Complaint Adequately Pleads Scienter................................................. 16

                1.      Defendants' Violations Of GAAP Support A Strong Inference Of
                        Scienter ............................................................................................. 17

                2.      The Individual Defendants' Knowledge Of Raytheon's Core
                        Operations, As Well As Kennedy And O'Brien's Certifications Of
                        The Company's Financial Statements Support A Strong Inference Of
                        Scienter ............................................................................................. 18

                3.      The Scienter Of The Individual Defendants, And Of Raytheon's
                        Senior Director Of Internal Audit, Is Imputed To Raytheon ........... 22

                4.      The Complaint Also Pleads Motive .................................................. 23

        E.      Loss Causation Is Properly Pleaded............................................................. 27

                1.      The Complaint Adequately Alleges Loss Causation ....................... 27

                2.      The "Quick Recovery" In Raytheon's Stock Price Does Not Negate
                        Loss Causation At The Pleading Stage ............................................ 30

IV.     CONCLUSION ......................................................................................................... 33

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrams v. MiMedx Grp., Inc.*,
37 F. Supp. 3d 1271 (N.D. Ga. 2014)........................................................................... 32

*Acticon AG v. China North East Petroleum Holdings Ltd.*,
692 F.3d 34 (2d Cir. 2012)......................................................................... 30, 31, 32, 33

*Affiliated Ute Citizens v. United States*,
406 U.S. 128 (1972).......................................................................................................31

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002)...........................................................................................11

*In re Allergan Generic Drug Pricing Sec. Litig.*,
2019 WL 3562134 (D.N.J. Aug. 6, 2019) ....................................................................32

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ...........................................................................................15

*Backe v. Novatel Wireless, Inc.*,
642 F. Supp. 2d 1169 (S.D. Cal. 2009).........................................................................10

*Baird v. BlackRock Institutional Tr. Co.*,
2021 WL 681468 (N.D. Cal. Jan. 28, 2021)................................................................. 33

*In re Barrick Gold Sec. Litig.*,
2015 WL 1514597 (S.D.N.Y. Apr. 1, 2015) ................................................................13

*Barrie v. Intervoice-Brite, Inc.*,
397 F.3d 249 (5th Cir. 2005) ........................................................................................26

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)......................................................................................................... 9

*Batwin v. Occam Networks, Inc.*,
2008 WL 2676364 (C.D. Cal. July 1, 2008).......................................................... 11, 26

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)......................................................................................................... 5

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ................................................................................. 9, 18

*Broadway Gate Master Fund, Ltd. v. Ocwen Fin. Corp.*,
  2016 WL 9413421 (S.D. Fla. June 29, 2016) ............................................................ 32

*In re Cabletron Sys., Inc.*,
  311 F.3d 11 (1st Cir. 2002) ........................................................................................ 10

*In re Cadence Design Sys., Inc. Sec. Litig.*,
  692 F. Supp. 2d 1181 (N.D. Cal. 2010) ....................................................................... 9

*In re Campbell Soup Co. Sec. Litig.*,
  145 F. Supp. 2d 574 (D.N.J. 2001) ............................................................................ 16

*Caremark, Inc. v. Coram Healthcare Corp.*,
  113 F.3d 645 (7th Cir. 1997) ..................................................................................... 27

*In re ChinaCast Educ. Corp. Sec. Litig.*,
  809 F.3d 471 (9th Cir. 2015) ..................................................................................... 23

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
  399 F.3d 651 (6th Cir. 2005) ................................................................................. 8, 11

*Collier v. ModusLink Glob. Sols., Inc.*,
  9 F. Supp. 3d 61 (D. Mass. 2014) .............................................................................. 18

*Commc'ns Workers of Am. Plan for Emps' Pensions & Death Benefits v.
  CSK AutoCorp.*,
  525 F. Supp. 2d 1116 (D. Ariz. 2007) ....................................................................... 17

*In re Constar Int'l Inc. Sec. Litig.*,
  585 F.3d 774 (3d Cir. 2009) ...................................................................................... 12

*In re Daou Sys., Inc. Sec. Litig.*,
  411 F.3d 1006 (9th Cir. 2005) ............................................................................... 8, 17

*De Vito v. Liquid Holdings Grp., Inc.*,
  2018 WL 6891832 (D.N.J. Dec. 31, 2018) ................................................................ 16

*In re Diamond Foods, Inc., Sec. Litig.*,
  2012 WL 6000923 (N.D. Cal. Nov. 30, 2012) ........................................................... 22

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) ................................................................................................... 27

iii

*In re Extreme Networks, Inc. Sec. Litig.*,
   2018 WL 1411129 (N.D. Cal. Mar. 21, 2018)................................................................ 8

*Feiner v. SS&C Techs., Inc.*,
   11 F. Supp. 2d 204 (D. Conn. 1998)............................................................................ 11

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
   270 F.3d 645 (8th Cir. 2001) ....................................................................................... 26

*Fouad v. Isilon Sys., Inc.*,
   2008 WL 5412397 (W.D. Wash. Dec. 29, 2008) ..................................................... 17, 20

*Frank v. Dana Corp.*,
   646 F.3d 954 (6th Cir. 2011) ....................................................................................... 18

*Garbini v. Prot. One, Inc.*,
   49 F. App'x 169 (9th Cir. 2002) ................................................................................... 29

*In re Genworth Fin. Inc. Sec. Litig.*,
   103 F. Supp. 3d 759 (E.D. Va. 2015) ........................................................................... 13

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) ...................................................................................... 33

*Glazer Cap. Mgmt., LP v. Magistri*,
   549 F.3d 736 (9th Cir. 2008) ....................................................................................... 21

*In re Grupo Televisa Sec. Litig.*,
   368 F. Supp. 3d 711 (S.D.N.Y. 2019) .......................................................................... 14

*Hatamian v. Advanced Micro Devices, Inc.*,
   87 F. Supp. 3d 1149 (N.D. Cal. 2015).......................................................................... 8

*Highfields Cap. I, LP v. SeaWorld Ent., Inc.*,
   2022 WL 1037210 (S.D. Cal. Apr. 6, 2022).................................................................. 33

*Howard v. Everex Sys., Inc.*
   228 F.3d 1057 (9th Cir. 2000) ................................................................................ 13, 14

*In re Immune Response Sec. Litig.*,
   375 F. Supp. 2d 983 (S.D. Cal. 2005)........................................................................... 15

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
   818 F.3d 85 (2d Cir. 2016)........................................................................................... 10

iv

*Interpublic Grp. of Cos., Inc. v. Fratarcangelo*,
2002 WL 31682389 (S.D.N.Y. Nov. 26, 2002)............................................................. 11

*In re Invision Technologies, Inc., Sec. Litig.*,
2006 WL 538752 (N.D. Cal. Jan. 24, 2006) ................................................................. 13

*KMIEC v. Powerwave Techs., Inc.*,
2013 WL 10106769 (C.D. Cal. Oct. 23, 2013)............................................................. 17

*In re Lason, Inc. Sec. Litig.*,
143 F. Supp. 2d 855 (E.D. Mich. 2001)....................................................................... 11

*In re LDK Solar Sec. Litig.*,
584 F. Supp. 2d 1230 (N.D. Cal. 2008) ............................................................. 9, 11, 22

*In re LendingClub Sec. Litig.*,
254 F. Supp. 3d 1107 (N.D. Cal. 2017) ....................................................................... 21

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
416 F.3d 940 (9th Cir. 2005) ....................................................................................... 15

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) ............................................................... 9, 27, 28, 29

*Lomingkit v. Apollo Education Grp. Inc.*,
275 F.Supp.3d 1139 (D. Ariz. 2017) .......................................................................... 16

*Lopez v. Smith*,
203 F.3d 1122 (9th Cir. 2000) ..................................................................................... 33

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015) ................................................................................. 23, 27

*Luna v. Marvell Tech. Grp. Ltd.*,
2016 WL 5930655 (N.D. Cal. Oct. 12, 2016) ............................................................. 14

*Marksman Partners, L.P. v. Chantal Pharm. Corp.*,
927 F. Supp. 1297 (C.D. Cal. 1996) ........................................................................... 11

*In re Marsh & Mclennan Cos., Inc. Sec. Litig.*,
501 F. Supp. 2d 452 (S.D.N.Y. 2006) ......................................................................... 23

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)............................................................................................ 5, 10, 17

v

*Mauss v. Nuvavsive, Inc.*,
   2015 WL 10857519 (S.D. Cal. Aug. 28, 2015) .......................................................... 12

*McIntire v. China Mediaexpress Holdings, Inc.*,
   927 F. Supp. 2d 105 (S.D.N.Y. 2013) ....................................................................... 18

*In re Medicis Pharm. Corp. Sec. Litig.*,
   2010 WL 3154863 (D. Ariz. Aug. 9, 2010)................................................................ 18

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ............................................................................ 30, 32

*Middlesex Ret. Sys. v. Quest Software Inc.*,
   527 F. Supp. 2d 1164 (C.D. Cal. 2007) ......................................................... 24, 25, 26

*Mineworkers Pension Scheme v. First Solar Inc.*,
   881 F.3d 750 (9th Cir. 2018) .............................................................................. 27, 30

*Morgan v. AXT, Inc.*,
   2005 WL 2347125 (N.D. Cal. Sept. 23, 2005) .......................................................... 14

*In re MRV Commc'ns, Inc. Derivative Litig.*,
   2010 WL 5313442 (C.D. Cal. Dec. 27, 2010) ........................................................... 17

*Mulderrig v. Amyris, Inc.*,
   492 F.Supp.3d 999 (N.D. Cal. 2020) .................................................................. 23, 24

*Nathanson v. Polycom, Inc.*,
   87 F. Supp. 3d 966 (N.D. Cal. 2015) ........................................................................ 32

*In re New Century*,
   588 F. Supp. 2d 1206 (C.D. Cal. 2008) .............................................................. 13, 22

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W.
   Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ........................................................................... *passim*

*North Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld,
   Inc.*,
   929 F. Supp. 2d 740 (M.D. Tenn. 2013)............................................................. 14, 32

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004) .................................................................................. 24

*Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*,
   780 F. App'x 480 (9th Cir. 2019) ............................................................................... 9

*In re Omnicare, Inc. Sec. Litig.*,
    769 F.3d 455 (6th Cir. 2014) ................................................................................ 22, 23

*In re Omnivision Techs., Inc. Sec. Litig.*,
    937 F. Supp. 2d 1090 (N.D. Cal. 2013) ...................................................................... 19

*Pennsylvania Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*,
    874 F. Supp. 2d 341 (S.D.N.Y. 2012) .......................................................................... 23

*Pennsylvania Pub. Sch. Emps' Ret. Sys. v. Bank of Am. Corp.*,
    939 F. Supp. 2d 445 (S.D.N.Y. 2013) .......................................................................... 11

*In re PMA Cap. Corp. Sec. Litig.*,
    2005 WL 1806503 (E.D. Pa. July 27, 2005) ................................................................. 14

*Provenz v. Miller*,
    102 F.3d 1478 (9th Cir. 1996) .................................................................................... 22

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) .................................................................................. 9, 16

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014) ........................................................................ 16, 18, 22

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993) .................................................................................................... 22

*Reynolds v. Ocwen Loan Servicing LLC*,
    2017 WL 4653037 (D. Ariz. Aug. 18, 2017) ................................................................. 12

*Roberts v. Zuora, Inc.*,
    2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) ................................................................. 8

*S. Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ...................................................................................... 18

*S.E.C. v. Baxter*,
    2007 WL 2013958 (N.D. Cal. July 11, 2007) ................................................................. 14

*S.E.C. v. Leslie*,
    2012 WL 116562 (N.D. Cal. Jan. 13, 2012) ................................................................. 11

*S.E.C. v. Todd*,
    642 F.3d 1207 (9th Cir. 2011) .................................................................................... 10

*Scott v. ZST Digital Networks, Inc.*,
  2012 WL 538279 (C.D. Cal. Feb. 14, 2012) ........................................................ 17, 21

*SEC v. Reyes*,
  491 F. Supp. 2d 906 (N.D. Cal. 2007) .......................................................... 10

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
  365 F.3d 353 (5th Cir. 2004) ........................................................ 23

*In re SunPower Sec. Litig.*,
  2011 WL 7404238 (N.D. Cal. Dec. 19, 2011)........................................................ 19, 21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)........................................................ 5, 16, 17, 23

*Thomas v. Magnachip Semiconductor Corp.*,
  167 F. Supp. 3d 1029 (N.D. Cal. 2016)........................................................ 21

*Turocy v. El Pollo Loco Holdings, Inc.*,
  2017 WL 3328543 (C.D. Cal. Aug. 4, 2017)........................................................ 25

*U.S. Sec. & Exch. Comm'n v. Brookstreet Sec. Corp.*,
  584 F. App'x 689 (9th Cir. 2014) ........................................................ 16

*In re UTStarcom, Inc. Sec. Litig.*,
  617 F. Supp. 2d 964 (N.D. Cal. 2009)........................................................ 20

*Van Noppen v. InnerWorkings, Inc.*,
  136 F. Supp. 3d 922 (N.D. Ill. 2015)........................................................ 10

*In re VeriFone Holdings, Inc. Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012) ........................................................ 13, 20

*In re Viropharma Inc. Sec. Litig.*,
  21 F. Supp. 3d 458 (E.D. Pa. 2014) ........................................................ 25

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab.
  Litig.*,
  2017 WL 6041723 (N.D. Cal. Dec. 6, 2017)........................................................ 22, 23

*Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc.*,
  28 F. Supp. 3d 93 (D. Mass. 2014)........................................................ 7

*Washtenaw Cnty. Emps' Ret. Sys. v. Celera Corp.*,
  2012 WL 3835078 (N.D. Cal. Sept. 4, 2012) ........................................................ 9

*Williamson v. United States*,
    512 U.S. 594 (1994)............................................................................................. 8

*In re Wilmington Tr. Sec. Litig.*,
    29 F. Supp. 3d 432 (D. Del. 2014)..................................................................... 11

*Wochos v. Tesla Inc.*,
    985 F.3d 1180 (2d Cir. 2021) ..................................................................... 13, 30, 33

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009), *as amended* (Feb. 10, 2009)......................................... 24

**Statutes**

15 U.S.C. § 78j(b)........................................................................................... *passim*

15 U.S.C. § 78t ................................................................................................ 33

False Claims Act................................................................................................ 12

Private Securities Litigation Reform Act of 1995........................................................ 16, 31

**Rules**

Fed R. Civ P 8(a) ............................................................................................... 27

Fed R. Civ. P 12(b)(6) ......................................................................................... 5

**Other Authorities**

PCAOB Interim Standard AU Section 110.03.................................................................. 12

PRESS RELEASE, COLLINS AEROSPACE, COLLINS AEROSPACE
    TO UPGRADE U.S. AIR FORCE F-15 FLEET WITH ACES 5®
    EJECTION SEATS (OCT. 29, 2020),
    https://www.collinsaerospace.com/newsroom/News/2020/10/Collins-
    upgrade-US-Air-Force-fleet-ACES-5-ejection-seats ................................................... 33

Mark Mitchell & Jeffery M. Netter, *The Role of Financial Economics in
    Securities Fraud Cases: Applications at the Securities and Exchange
    Commission,* 49 BUS. LAW. 545 (1994) ................................................................. 31

ix

## I.   INTRODUCTION[1]

Raytheon purports to be an aerospace and defense company providing advanced systems and services for commercial, military, and government customers worldwide. ¶28. Among the Company's four main operational divisions is its Missiles and Defense segment, which designs, develops, integrates, and produces missile and combat systems for the armed forces of the United States ("U.S.") and allied nations. *Id*. Throughout the Class Period (defined to cover the period from February 10, 2016, to October 27, 2020), the vast majority of Raytheon's revenues (over 67%) derived from long-term contracts it received from the U.S. government. ¶¶1, 35.

In its public filings with the Securities and Exchange Commission ("SEC"), Raytheon acknowledged to investors that its contracts with the U.S. government were subject to various government regulations that "impose[d] a broad range of requirements . . . [such as] procurement, import and export, security, contract pricing and cost, contract termination and adjustment, audit and product integrity requirements." ¶36. Raytheon's "failure to comply with th[ose] . . . requirements could result in reductions to the value of contracts, contract modifications or termination, cash withholds on contract payments, forfeiture of profits, and the assessment of penalties and fines, and could lead to suspension or debarment, for cause, from U.S. government contracting or subcontracting for a period of time." *Id*.

Unbeknownst to investors, during the Class Period Raytheon repeatedly engaged in egregious misconduct in relation to its contracts with the government. ¶4. This wrongdoing led to false and misleading Company filings with the SEC, including the improper reporting and disclosure of unearned revenue. *Id*. The misconduct included improper practices designed to overcharge the government. *Id*. Specifically, Raytheon double-

---

[1] "¶_" refers to the Consolidated Class Action Complaint ("Complaint") (Dkt. No. 34).

charged the government by miscoding labor charges, purchased and mislabeled goods as services to charge a higher markup and avoid certain registration and oversight requirements, and made unnecessary purchases, without the required authority from the government, for materials that were scheduled to arrive after the end date of task orders. *Id*. Raytheon also misappropriated funds, failed to submit sub-contracts for competitive bidding, deliberately prolonged projects to inflate Estimates at Completion ("EAC"),[2] and conducted business with companies barred by presidential executive orders. *Id*.

This misconduct resulted in a gross overstatement of many important financial metrics such as revenues, operating income, and operating expenses. *Id*. Raytheon is now the subject of a sprawling criminal investigation by the U.S. Department of Justice, and has recently admitted that mispricing of government contracts has occurred. *Id.* ¶¶8, 10. When the truth finally came out, Raytheon's investors lost hundreds of millions in monetary damages. *Id.* ¶9.

## II.   FACTUAL BACKGROUND

### A.   Raytheon Repeatedly Violated The Contracts Awarded By Its Biggest Customer

Several corroborating confidential witnesses ("CWs") detail the misconduct at Raytheon.  For example, CW1, who worked at Raytheon as a Purchasing Agent and Subcontracts Manager auditing procurement group pre-award and post-award purchase order files to ensure compliance with U.S. government requirements, recounted that he witnessed many instances of wrongdoing at Raytheon related to a government contract worth approximately $11.5 billion.  ¶¶40-41.  The contract's life spanned throughout the Class Period.  According to CW1, the misconduct related to this contract alone, which continued until mid-2018, included failure to submit sub-contracts to a competitive bidding

---

[2] The term Estimates at Completion is a critical measure in determining the revenue and income to be reported on long-term construction-type contracts.  ¶83.

process as required by federal acts and regulations, resulting in Raytheon improperly overcharging the government. ¶42. Raytheon also miscoded for labor charges related to this contract. ¶43. CW1 explained that labor, which should have been billed just as part of overhead, was billed through direct charges, leading to double-charging the government. *Id.* There was other misconduct related to the contract, including improper use of competitor costs, unapproved labor charges, improper misappropriation of funds, unnecessary orders, inflated Estimates at Completion, improper procurements from countries subject to bans under presidential executive orders, and improper advanced billing of the U.S. government. ¶¶45, 48.

CW2, an auditor responsible for ensuring that Raytheon complied with U.S. guidelines for "fair and reasonable" pricing, corroborated CW1's account that Raytheon violated Federal Acquisition Regulations and Defense Federal Acquisition Regulations by failing to place bids through a competitive process. ¶¶50-54. Likewise, CW3, a Raytheon Senior Financial Analyst who worked across all of the projects Raytheon handled, including Missiles and Defense, corroborated CW'1s account that the Company was inflating Estimates at Completion. ¶55. CW3 explained that these manipulations happened on "almost every project" CW3 was privy to at Raytheon, and that the contracts were valued in the high millions. *Id.*

Other CWs reported similar wrongdoings, which sparked government investigations. For example, CW4, a Principal Finance Analyst in Raytheon's Financial Controls Department working in the Missile Systems division, recounted that shortly after s/he started her job at Raytheon in mid-2019, s/he learned from a colleague that Raytheon was being investigated by the U.S. Department of Justice ("DOJ") and that there were issues with Estimates at Completion. ¶58. CW5, the Vice President of Business Development at Raytheon's Missile Systems also explained that in mid-2018, s/he learned

3

from a former colleague and friend still employed at Raytheon that an internal audit at the Company showed at least $250 million of false labor charges made on several contracts related to Raytheon's naval weapons system. ¶¶59-60. Similar misconduct was reported by CW6, who learned in late 2018 or early 2019 from another colleague that several Raytheon employees were "fudging numbers" on contracts. ¶61.

**B.    Despite These Machinations, Defendants Repeatedly Mispresented The Effectiveness Of Raytheon's Internal Controls Over Financial Reporting And Misreported Key Financial Metrics**

During the Class Period, Raytheon filed reports, forms, and other documents with the SEC that contained false and misleading statements regarding the effectiveness of the Company's internal controls and procedures. For example, Raytheon consistently represented that its "disclosure controls and procedures" during the relevant time "were effective." ¶74. Contrary to the Defendants' representations, Raytheon's internal controls over financial reporting were not effective, and did not provide reasonable assurances that transactions were properly executed and/or recorded. *Id.* at 76. For example, during the Class Period, Defendants failed to appropriately report various key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's contracts with the government. *See, e.g.,* ¶¶76, 94, 135, 172, 211, 250. Because of such misuse, misappropriation, and violations of parameters, Raytheon was not entitled to the benefits of the revenue it generated thereunder. ¶76.

**C.    Raytheon Acknowledged Wrongdoing And Announced That It Is Under Criminal Investigation**

On October 27, 2020, Raytheon informed investors that it received a criminal subpoena from the DOJ, seeking information and documents in connection with an investigation relating to financial accounting, internal controls over financing, and cost reporting regarding its Missiles & Defense business since 2009. ¶8. In response to this

4

shocking news, the Company's stock price tumbled $4.19 per share, or approximately 7%, on unusually heavy trading volume, damaging investors.  ¶9.

Then, on April 27, 2021, Raytheon announced it received another criminal subpoena from the DOJ in connection with its investigation into defective pricing of several government contracts.  ¶10.  On a conference call held on the same day, Raytheon's current CEO, Greg Hayes, admitted Raytheon engaged in wrongdoing.  Hayes affirmed that "[i]t was alleged that we defectively priced some contracts.  *We've looked into it, we think there is potential liability for defective pricing clearly*."  He said the issues under the criminal investigations are events that "*should not have occurred . . . But they did*."  *Id*.

## III.    ARGUMENT

### A.    Standards Governing A Motion To Dismiss Under Rule 12(b)(6)

When deciding a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the Court must "consider the complaint in its entirety" and, in doing so, "accept all factual allegations in the complaint as true."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("Tellabs").  At the pleading stage, a plaintiff "need only allege 'enough facts to state a claim to relief that is plausible on its face.'"  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

### B.    Defendants' Inflated Financial Metrics Are Actionable

#### 1.    Falsity Is Sufficiently Particularized

During the Class Period, Defendants reported financial metrics related to net sales (revenues), operating expenses, and operating income that were materially false and misleading when made.  Defendants claim that the Complaint "fails to plead 'specific facts indicating' why the specific financial statements at issue were false at those specific periods in time" and that Plaintiff "makes no effort to tie any particular allegation of wrongdoing

5

to any particular quarterly filing-let alone any particular line item." (Defs' Br. at 15-16). But the Complaint pleads precisely such information. The Complaint identifies the inflated net sales/revenues, operating expenses, and operating income for each applicable quarter, each applicable six-month and ninth-month period, and each applicable year affected during the Class Period. For example, for the three months ended July 3, 2016, the Complaint pleads inflated net sales/revenues of $6.035 billion, inflated operating expense of $5.075 billion, and inflated operating income of $960 million. ¶112. For the six months ended July 3, 2016, the Complaint pleads inflated net sales/revenues of $11.798 billion, inflated operating expense of $10.226 billion, and inflated operating income of $1.572 billion. *Id*. For the quarter ended September 29, 2019, the Complaint pleads inflated net sales/revenues of $7.446 billion, inflated operating expense of $6.240 billion, and inflated operating income of $1.206 billion. ¶237 (also setting forth numbers for the nine months ended September 29, 2019).

Moreover, the Complaint alleges why these line metrics were misleading when made. The Complaint explains that the framework to generally accepted accounting principles in the United States ("GAAP") includes what are referred to as Statements of Financial Accounting Concepts, or FASCONs. ¶77. FASCON No. 5, Recognition and Measurement in Financial Statements of Business Enterprises ("FASCON 5") includes particular language regarding the recognition of revenues and expenses in an income statement. *Id*. With respect to revenue, FASCON 5 states that revenues are not recognized until earned. *Id*. If an entity has not conformed with the terms of a contract, or has misrepresented or withheld information from a customer (in this case, the U.S. government), an entity may not be entitled to the benefits of the services it purports to have provided, rendering the recognition of such revenue/net sales improper. ¶78. Similarly, the SEC, in Topic 10, Revenue Recognition, references the same basic premise as it

6

pertains to revenue recognition, drawing directly from FASCON 5, stating, "[r]evenue should not be recognized until it is realized or realizable and earned."  ¶79.

As pleaded, during the Class Period, Raytheon improperly recorded revenues it was not entitled to record as a result of its violations related to the Company's contracts with the U.S. government.  ¶80.  Accordingly, Raytheon's reported revenues for the Class Period were materially overstated because, as discussed above, the Company misused and misappropriated funds awarded to it by the Department of Defense, violated protocols and parameters of its contracts in view of its obligations under FAR and DFARS, and even manipulated information it was required to provide to the federal government through its agencies DCAA and DCMA.  *See also*, *e.g.*, ¶239.  Raytheon knew it had violated its contracts and was not, therefore, entitled to the benefits of the revenue it was reporting.  *Id*.

Additionally, because the Company was manipulating the EACs on its long-term contracts, it violated ASC 605 (Revenue Recognition concerning Accounting for Performance of Construction-Type and Certain Production-Type Contracts) for failure to properly estimate costs related to those long-term contracts and, therefore, misreported the timing and amounts of its associated revenue (and income) recognition in connection therewith.  *Id*.[3]  The Complaint also explains why Raytheon's operating expenses and operating income were overstated.  ¶¶240-41.

These allegations suffice, as Plaintiff is not required to identify other minutiae at the pleading stage.  "[W]hile it is true that the Plaintiffs cannot allege by exactly how much the revenues were inflated, this ought not prevent them from surviving the motion to dismiss," as "there is not much more the Plaintiffs can do right now, considering that" such minutiae is uniquely in Defendants' possession at this stage of the proceedings. *Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 105-07 (D. Mass.

---

[3] The Complaint discusses the mechanics of ASC 605. ¶83.

7

2014); *see similarly City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 681 (6th Cir. 2005) ("[t]he precise information as to dollar amount is presumably available thus far only to [defendants] and may well emerge in discovery.")

Here, moreover, Defendants actually ***admitted*** that the misconduct occurred. ¶¶270-71.  Given these admissions, Plaintiff's claims are alleged with adequate particularity as "reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true."  *Williamson v. United States*, 512 U.S. 594, 599 (1994).

### 2.     The Accounts Of The Confidential Witnesses Are Sufficiently Credible

The confidential witnesses also support falsity.  They are described with sufficient particularity to support the probability that a person in their position would possess the information alleged.  *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1015 (9th Cir. 2005). The Complaint describes their job titles, employment timeframe, job responsibilities, and specific observations about the misconduct.  *See, e.g.*, ¶¶40-62.  Moreover, the confidential witnesses' allegations corroborate one another, bolstering their reliability.  *In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129 at *27 (N.D. Cal. Mar. 21, 2018); *Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1163 (N.D. Cal. 2015).  Their reliability is further corroborated by Defendants' own admissions that the misconduct occurred.  Despite these indicia of reliability, Defendants attack the witnesses as "none is alleged to have had even a single interaction with the individual defendants."  (Defendants' Memorandum of Points and Authorities (Dkt. No. 41) ("Defs' Br.") at 18-19).  But courts are clear that confidential witnesses need not have direct contact with defendants for their allegations to be deemed credible.  *Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *10-11 (N.D. Cal. Apr. 28, 2020) (rejecting defendants' argument that the confidential witness allegations should not be credited because they lacked direct contact with the defendants);

8

*see similarly Washtenaw Cnty. Emps' Ret. Sys. v. Celera Corp.*, 2012 WL 3835078, at *3 (N.D. Cal. Sept. 4, 2012) .[4]

Moreover, courts do not require that the confidential witnesses observe facts "first-hand" as long as they are described sufficiently to support the conclusion that they were "in a position to infer" or "could reasonably deduce" the facts attributed to them. *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008); *In re Cadence Design Sys., Inc. Sec. Litig.*, 692 F. Supp. 2d 1181, 1188 (N.D. Cal. 2010) ("'[P]ersonal knowledge' . . . is not a hard-and-fast requirement."); *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1243 (N.D. Cal. 2008) (same).[5]

Defendants' other attacks on the confidential witnesses also fail.   Although Defendants argue that certain confidential witnesses' allegations are unreliable because they include hearsay, (Defs' Br. at 21), allegations that relay information heard or gleaned from others *can* support an inference of scienter.  *Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484-85 n.5 (9th Cir. 2019); *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016).

### 3.      Materiality Is Sufficiently Pleaded

Contrary to Defendants' contention, Defendants' violations are material.   An omission or misstatement is material if a "'reasonable investor' would have considered [it] significant" in making investment decisions.  *Basic Inc. v. Levinson*, 485 U.S. 224, 232

---

[4] Relatedly, courts are also clear that confidential witnesses need not be within any specific proximity or degree of reporting to the Individual Defendants for their statements to support an inference of scienter.  *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1139, 1145 (9th Cir. 2017) (finding statements of "five lower-level [] employees" supported a strong inference of scienter).

[5] Defendants' proposed standard that a confidential witness can only be deemed credible if the individual holds a "high-level" position would also inappropriately insulate defendants in securities class actions because it would arbitrarily limit the pool of potential whistleblowers for no reason other than an employee's standing in the corporate totem pole, irrespective of the fraud-revealing information the person possesses.

9

(1988).  Materiality is an "inherently fact-specific finding" that considers whether the subject information alters the "total mix" of information available to investors.  *Matrixx*, 563 U.S. at 38-39; *SEC v. Reyes*, 491 F. Supp. 2d 906, 909 (N.D. Cal. 2007) ("Only if the established omissions are so obviously [un]important to an investor, that reasonable minds cannot differ on the question of materiality is the ultimate issue of materiality appropriately resolved 'as a matter of law' . . . ").

Here, a reasonable investor would have deemed material the fact that Raytheon was consistently overcharging the U.S. government, Raytheon's most important customer.  *See*, *e.g.*, *Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1190 (S.D. Cal. 2009) (cancellation of contract with largest customer material to investors).  Moreover, Defendants' assertion that the Company's financial metrics were immaterial because of their supposedly  minor impact on the Company's overall financials (Defs' Br. at 16) also ignores that the Complaint pleads GAAP violations that are deemed material because "[a]ccurate earnings figures are vital aspects of the 'total mix of information' which investors would consult when evaluating [a company's] stock." *In re Cabletron Sys., Inc.*, 311 F.3d 11, 35 (1st Cir. 2002); *see similarly Van Noppen v. InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 951 (N.D. Ill. 2015) (complaint sustained based upon a restatement of only $2.2 million for issuer with annual revenues of approximately $800 million).

Defendants' formulaic approach of relying on a single numerical benchmark cannot be squared with Supreme Court precedent.  *Matrixx*, 563 U.S. at 28, 30 ("bright-line" and "categorical" rules "would 'artificially exclud[e]' information that 'would otherwise be considered significant to the trading decision of a reasonable investor.'"  *See also Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96 (2d Cir. 2016) ("We reject SAIC's materiality argument, which asks us to consider quantitative factors only in the narrowest light . . . "); *S.E.C. v. Todd*, 642 F.3d 1207, 1221 (9th Cir. 2011) ("how officers and directors of a public

10

corporation describe revenue growth to investors is important"). Indeed, courts in this Circuit have consistently held "[t]hat even quantitatively small amounts can still present a materially misleading picture of a company's health." *S.E.C. v. Leslie*, 2012 WL 116562, at *6 (N.D. Cal. Jan. 13, 2012).[6] Moreover, discovery will likely show that the precise amount of overstatements will satisfy even Defendants' numerical benchmark. *See* Compl. ¶55 (explaining that the manipulations affected almost every project).

The simple fact that Raytheon did not restate its financials (Defs' Br. at 17) does not undercut Plaintiff's allegations. The failure to restate "does not indicate, much less prove, the accuracy of those figures." *Feiner v. SS&C Techs., Inc.*, 11 F. Supp. 2d 204, 209 (D. Conn. 1998); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 84 (1st Cir. 2002) (rejecting defendants' argument that without a restatement or admission no liability could attach because it would shift responsibility to accountants from courts and would allow officers and directors unwarranted degree of control over whether they are sued because they must agree to a restatement); *City of Monroe*, 399 F.3d at 682 (actionable GAAP violations alleged without restatement); *In re Lason, Inc. Sec. Litig.*, 143 F. Supp. 2d 855, 858 (E.D. Mich. 2001) (same); *In re Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d 432, 445 (D. Del. 2014) (same); *Pennsylvania Pub. Sch. Emps' Ret. Sys. v. Bank of Am. Corp.*, 939 F. Supp. 2d 445, 452-53 (S.D.N.Y. 2013) (same).

Likewise, "[t]he fact that [the Company's] independent auditor may have approved the accounting methods will not shield [the Company] from liability for deception such methods may have caused." *Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F.

[6] "[V]arious '[q]ualitative factors may cause misstatements of quantitatively small amounts to be material.'" *Leslie,* 2012 WL 116562, at *6; *Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *21 (C.D. Cal. July 1, 2008) (finding financial statements to be materially misleading even though "the difference between the revenue reported and the revenue restated is de minimis"); *Interpublic Grp. of Cos., Inc. v. Fratarcangelo*, 2002 WL 31682389, at *11 (S.D.N.Y. Nov. 26, 2002) (denying summary judgment despite defendant's argument that the alleged revenue overstatement was a "minuscule 0.14%").

11

Supp. 1297, 1314 n.13 (C.D. Cal. 1996); *see also LDK Solar*, 584 F. Supp. 2d at 1246 (denying motion to dismiss where "unqualified [audit] opinion did not necessarily exonerate [defendant]"); *see also* PCAOB Interim Standard AU Section 110.03 (accuracy of financial statements, and the establishment and maintenance of internal controls, are "management's responsibility"); SEC Regulation S-K Item 308 (management responsible for establishing and maintaining internal controls).  Moreover, there is no evidence that the auditors knew of the illicit conduct.  The materiality of defendants' omissions and misrepresentations is further confirmed by the fact that Raytheon's stock price plunged when the truth was eventually disclosed. ¶¶263-64; *see also No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 949 (9th Cir. 2003) ("the fact that a firm's stock price does significantly change is strong evidence of materiality"); *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 783 (3d Cir. 2009) (same).

Defendants' practices of, among other things, mislabeling, miscoding, and submitting unallowed billing to the government,  also violated the False Claims Act ("FCA") ¶¶84-85.  These machinations threatened to expose the Company to criminal and civil prosecution, the imposition of fines and penalties, and/or the exclusion from participation in government contracting.  Indeed, Defendants' illicit practices culminated in several criminal subpoenas to date, and the Company's admission that defective pricing occurred. ¶¶263, 268, 270-71.[7]

---

[7] Plaintiff does not have to allege an independent, *per se* violation of the False Claims Act. *Mauss v. Nuvavsive, Inc.*, 2015 WL 10857519, at *8 (S.D. Cal. Aug. 28, 2015). Defendants' citation to *Reynolds v. Ocwen Loan Servicing LLC,* 2017 WL 4653037, at *2 (D. Ariz. Aug. 18, 2017), a case involving an attempt to halt a non-judicial foreclosure and trustee sale of a piece of property, is entirely misplaced because the court there found that "properly introduced [and judicially noticed] official [state] records contradict[ed] the allegations" in the complaint. Raytheon presents no judicially noticeable documents showing that Raytheon did not violate the FCA.

### C.   Defendants' Statements About The Effectiveness Of Raytheon's Internal Controls Are Actionable

In addition to publishing inflated financial metrics on which the unsuspected investors relied, during the Class Period Defendants misleadingly vouched that Raytheon's financial controls were effective.  *See*, *e.g.*, ¶234 ("Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of September 29, 2019, were effective)"; *see also* ¶245.   These representations were contextualized by reference to GAAP.  *See, e.g.*, ¶245.   Courts routinely find that misrepresentations about internal controls are actionable.  *See, e.g.*, *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 709 (9th Cir. 2012) (upholding claims based upon Sarbanes-Oxley certifications where "[t]he logical inference" was that defendants' "priority was meeting projections even at the expense of accuracy"); *In re New Century*, 588 F. Supp. 2d 1206, 1226 (C.D. Cal. 2008) (finding that "Defendants made material false and misleading statements regarding the adequacy of internal controls"); *In re Barrick Gold Sec. Litig.*, 2015 WL 1514597, at *14 (S.D.N.Y. Apr. 1, 2015) ("certification of internal controls and financial statements can give rise to a securities fraud claim" when defendants "were reckless" in that "they failed to read" reports "before certifying a lack of material weakness in internal controls"); *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 782 (E.D. Va. 2015) (certification was misleading in light of plaintiffs' allegation that defendants were misapplying GAAP); *cf. Howard v. Everex Sys.*, Inc. 228 F.3d 1057, 1061-63 (9th Cir. 2000) (explaining the importance of liability for those signing corporate filings).[8]

---

[8]  Defendants quibble that the "plaintiff mischaracterizes the disclosure" because Raytheon did not say "that Raytheon's internal controls . . . were effective" but instead said that "management ha[d] concluded" that the controls were effective (Defs' Br. at 12).  This is a red herring.  What matters is that Raytheon assured investors that its *internal controls were effective*.  Such "conclusion" was admittedly based on an evaluation conducted by the Individual Defendants, and the Complaint alleges that the Individual Defendants knew that the internal controls were not effective because they failed to prevent false financial

Defendants' representations were false and misleading because at the time they were made, Raytheon in fact did not have effective internal controls over financial reporting, nor did it have effective disclosure controls and procedures. *See*, *e.g.*, ¶¶226, 247. Indeed, as described above, Defendants failed to appropriately report under GAAP various key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's contracts with the government, and failed to properly measure and manipulated the EAC on its long-term production contracts. *Id*. Such "accounting violations give rise to a plausible inference of the lack of internal review of these transaction [sic] as well as the lack of any accounting controls." *North Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 780 (M.D. Tenn. 2013) (certifications "expressly reflect the signatories' assurances to investors of adequate internal control of [the Company's] finances, including accounting and GAAP compliance"); *see also S.E.C. v. Baxter*, 2007 WL 2013958, at *4-5 (N.D. Cal. July 11, 2007) (defendants' statements regarding compliance with GAAP were false and misleading where allegations included that financial results did not accurately reflect the company's operations); *In re Grupo Televisa Sec. Litig.*, 368 F. Supp. 3d 711, 720-21 (S.D.N.Y. 2019) (misstatements concerning the design and efficacy of internal controls are actionable); *In re PMA Cap. Corp. Sec. Litig.*, 2005 WL 1806503, at *10 (E.D. Pa. July 27, 2005) (statements regarding compliance with GAAP and adequacy of internal controls were false and misleading where company's reserves were materially understated).[9]

---

reporting. Nothing more is required. Defendants' cases are entirely inapposite. In *Wochos v. Tesla Inc.*, 985 F.3d 1180, 1193 (2d Cir. 2021), unlike here, plaintiff "claim[ed] that "the words used in a statement ha[d] some special or nuanced meaning that differ[ed] from what the literal words suggest[ed]." In *In re Invision Technologies, Inc., Sec. Litig.*, 2006 WL 538752, at *6 (N.D. Cal. Jan. 24, 2006), "Plaintiffs' allegations d[id] not in any way contract" or contradict the SOX certifications.

[9] The cases on which Defendants rely are inapposite. In *Luna v. Marvell Tech. Grp. Ltd.*, 2016 WL 5930655, at *11-13 (N.D. Cal. Oct. 12, 2016), the complaint failed to plead

Defendants further argue that they are excused from any alleged misrepresentations of internal controls because Raytheon's "independent auditor concurred each year" (Defs' Br. at 12). But, as discussed, the fact that an independent auditor may have concurred does not absolve Defendants from liability. Moreover, no evidence exists that the auditors knew of the illicit conduct.

Defendants also seek to escape liability by pointing to generic language that routinely appears in filings that companies make with the SEC, such as internal controls provide "only reasonable, not absolute, assurances of achieving the desired objectives" and unidentified "inherent limitations in all control systems." (Defs' Br. a 14-15). But any cautionary language must be "meaningful" to investors. To be "meaningful," a cautionary statement cannot state as possibilities events which have, in fact, already occurred. Meaningful cautionary language must precisely address the substance of the challenged statement or omission and "discredit the alleged misrepresentations to such an extent that 'the risk of real deception drops to nil.'" *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1033, 1035 (S.D. Cal. 2005); *see also Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005). Where, as here, a potential risk has actually materialized, *i.e.*, the internal controls were not working effectively, Raytheon's

falsity because none of the findings of the Audit Committee on which Defendants relied "clearly contradict[ed]" the statements regarding the effectiveness of the company's internal controls, and the Audit Committee indicated that it had "identified no fraudulent activity." Similarly, in *Morgan v. AXT, Inc.*, 2005 WL 2347125, at *14-15 (N.D. Cal. Sept. 23, 2005), the complaint contained only "generic allegations" of accounting violations, and failed to allege any improper transactions. Defendants' remaining cases (Defs' Br. at 13-14) involve only vague assertions regarding the existence of deficient controls. Here, in contrast, the Complaint describes the violations, pleads specific contracts tainted by the violations, describes how the violations occurred, what GAAP provisions were affected, how the violations resulted in inaccurate financial metrics that were reported to investors as a result of the ineffective controls, and alleges that Defendants knew that the internal controls were not effective. Moreover, Defendants admitted that the misconduct occurred.

15

generic warnings were not meaningful.  *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703–04 (9th Cir. 2021).[10]

Defendants' factual dispute is also undermined by the market's shock when the truth was finally revealed, showing that the investors were surprised.  *See. Am. W. Holding Corp.*, 320 F.3d at 935 (market reaction supports finding of materiality); *De Vito v. Liquid Holdings Grp., Inc.*, 2018 WL 6891832, at *30 (D.N.J. Dec. 31, 2018) (stock movement after disclosure is a proxy for materiality); *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 589 (D.N.J. 2001) (same).

Moreover, the PSLRA's "safe harbor" only applies to forward-looking statements.  *See Quality Sys.,* 865 F.3d 1130, 1141.  Defendants do not claim that any of their statements are forward-looking.  Furthermore, the safe harbor does not apply since Plaintiff pleads actual knowledge. *Id*.

**D.     The Complaint Adequately Pleads Scienter**

To plead scienter, a plaintiff must allege that the defendant acted intentionally or with deliberate recklessness.  *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014).  "The relevant inquiry is 'whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets

---

[10] Here, to be meaningful, Defendants should have warned investors that Raytheon's internal controls over financial reporting failed to prevent and detect significant fraud and overbilling with respect to government contracts, which triggered misstatements of several important financial metrics, *i.e.*, net sales/revenues, operating expenses, and operating income. Defendants gave investors no such meaningful warnings. Defendants' boilerplate disclosures were not warnings "transmitted to the public with a degree of intensity and credibility sufficient to effectively counter-balance any misleading impression created by [defendants'] one-sided representations." *U.S. Sec. & Exch. Comm'n v. Brookstreet Sec. Corp.*, 584 F. App'x 689, 690-91 (9th Cir. 2014). *Lomingkit v. Apollo Education Grp. Inc.*, 275 F.Supp.3d 1139, 1162 (D. Ariz. 2017) (Defs. Br. at 13) is not to the contrary. There, Defendants actually disclosed the allegedly omitted facts. If the Court were to accept Defendants' argument that the routine boiler-plate disclosures placate Defendants, it would effectively nullify any 10(b) claims based on false allegations and omissions related to internal controls. This is not the law.

16

that standard.'" *Id.* "The inference . . . need not be irrefutable . . . or even the 'most plausible.'" *Tellabs*, 551 U.S. at 324. It need only be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.; see also Matrixx*, 563 U.S. at 29. A tie goes to the plaintiff. *Commc'ns Workers of Am. Plan for Emps' Pensions & Death Benefits v. CSK AutoCorp.*, 525 F. Supp. 2d 1116, 1120 (D. Ariz. 2007).

### 1.    Defendants' Violations Of GAAP Support A Strong Inference Of Scienter

"Violations of GAAP standards can . . . provide evidence of scienter." *Daou*, 411 F.3d at 1016; *see also KMIEC v. Powerwave Techs., Inc.,* 2013 WL 10106769, at *3-4 (C.D. Cal. Oct. 23, 2013) (strong inference of scienter created through evidence that defendants violated GAAP). It has long been held that accounting errors can give rise to an inference that the defendant acted intentionally or recklessly. *Scott v. ZST Digital Networks, Inc.*, 2012 WL 538279, at *9 n.2 (C.D. Cal. Feb. 14, 2012); *see also Fouad v. Isilon Sys., Inc.*, 2008 WL 5412397, at *10 (W.D. Wash. Dec. 29, 2008) ("the Court is unconvinced by Defendants' argument that [the CEO and CFO] might not have known how and when the revenue on these transactions was being recognized"); *In re MRV Commc'ns, Inc. Derivative Litig.*, 2010 WL 5313442, at *4 (C.D. Cal. Dec. 27, 2010) (refusing to find more plausible defendants' suggestion that "inference of misconduct" is negated because these "experienced, well-educated, high ranking, corporate decision-makers" were somehow "ignorant of basic accounting principles and financial reporting requirements").

Here, Defendants reported net sales/revenue figures that were inflated because the Company was breaching government contracts as a result of the misuse and misappropriation of funds related to those contracts. *See, e.g.*, ¶182. Under GAAP, Defendants were not entitled to the benefits of those revenues. *Id*. Moreover, the Company was manipulating the EACs on its long-term contracts, misreporting the amount and timing

17

of when such revenues were recognized, in direct breach of ASC 605. *Id.* Defendants ultimately admitted that misconduct such as defective pricing occurred. ¶10. These GAAP violations support an inference of scienter. *See McIntire v. China Mediaexpress Holdings, Inc.*, 927 F. Supp. 2d 105, 126 (S.D.N.Y. 2013) ("[C]ourts have recognized that accounting manipulations [such as those] involving premature revenue recognition . . . are especially indicative of conscious misbehavior since such violations do not commonly occur inadvertently, but instead suggest a conscious decision to improperly recognize revenue").

This inference is further strengthened by the fact that the DOJ is investigating Raytheon's accounting practices. ¶263; *see also See Frank v. Dana Corp.*, 646 F.3d 954, 960-962 (6th Cir. 2011) (when viewed holistically with other scienter allegations, the CFO's "retirement . . . within months of the time that [the company] first discovered its accounting errors" along with "the investigation into [the company's] accounting practices by the Securities and Exchange Commission" support a strong inference of scienter); *Collier v. ModusLink Glob. Sols., Inc.*, 9 F. Supp. 3d 61, 76 (D. Mass. 2014) (the resignations of the individual defendants, the alleged lack of internal controls and the SEC's inquiry into the company "paint a picture that strongly suggests Defendant's fraudulent intent").

**2.    The Individual Defendants' Knowledge Of Raytheon's Core Operations, As Well As Kennedy And O'Brien's Certifications Of The Company's Financial Statements Support A Strong Inference Of Scienter**

In the Ninth Circuit a court can "impute scienter based on the inference that key officers have knowledge of the 'core operations' of the company." *Malone*, 747 F.3d at 575, citing *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784-86 (9th Cir. 2008); *Berson*, 527 F.3d at 988 ("[The CEO and CFO] were directly responsible for Applied Signal's day-to-day operations, so it is hard to believe that they would not have known about stop-work orders that allegedly halted tens of millions of dollars of the company's work."). This

18

rationale has been adopted by multiple District Courts in upholding allegations analogous to those at issue here. *See*, *e.g.*, *In re Medicis Pharm. Corp. Sec. Litig.*, 2010 WL 3154863, at *6 (D. Ariz. Aug. 9, 2010) ("given the importance of reserves to Medicis's business, Plaintiffs have adequately pled particular facts demonstrating that the executive Defendants were all well aware of SFAS 48, which governs revenue recognition where a right of return exists, and the Company's interpretation of that provision"); *In re SunPower Sec. Litig.*, 2011 WL 7404238, at *5 (N.D. Cal. Dec. 19, 2011) ("Under a 'holistic' view, a reasonable person could deem there to be a cogent and compelling inference that SunPower's officers were aware of the accounting manipulation."); *In re Omnivision Techs., Inc. Sec. Litig.*, 937 F. Supp. 2d 1090, 1110-13 (N.D. Cal. 2013) (finding scienter based upon core operations knowledge after holistic review of the complaint's allegations).

Here, the core operations inference is warranted as the U.S. government was Raytheon's biggest and most important customer, responsible for approximately 70% of Raytheon's sales throughout the Class Period. *See* ¶35. The Complaint alleges misconduct with respect to not one, but *multiple* contracts with the U.S. government, including one contract alone worth approximately $11.5 billion dollars. *See, e.g.*, ¶41. And Defendants themselves admitted that several contracts with the U.S. government were tainted with wrongdoing. ¶¶270-71. As the Complaint cogently explains, any failure by Raytheon to comply with the requirements applicable to government contracts would have jeopardized the crux of Raytheon's business, with penalties ranging the gamut from reduction in the values of the contracts to bars from future government contracts. ¶3. Accordingly, it would be "absurd to suggest" that the Individual Defendants—the CEO, CFO, and the Controller of Raytheon—had zero knowledge of the misconduct throughout the Class Period. *See Am. W. Holding Corp.*, 320 F.3d at 941 n.21 (it is "absurd to suggest" that defendants would not have been aware of a matter of central importance to the Company).

19

Indeed, the Complaint alleges through the accounts of confidential witnesses that several very high-level Raytheon employees were fudging the numbers to ensure Raytheon met its profit margins (and the employees got their bonuses). ¶60. These high-level employees included Todd Callahan, the Deputy Vice President of Naval Weapon Systems, Richard MacDonald, the Program Manager for Close-in Weapon System, and Tina Fay, the Contract Director for the entire product line. *Id.* Greg White, the Chief Financial Officer overseeing Raytheon's Missile Systems, was terminated in mid-2018. *Id*. White reported to Lawrence Taylor, the Vice President overseeing Raytheon's Missile Systems. *Id*. ***Taylor, in turn, reported to Raytheon's CEO, Defendant Kennedy***. *Id*. ***The Pentagon was also looking into the misconduct, and they wanted answers***. ¶61. ***Taylor was eventually terminated in March 2019***. *Id*. Given these facts, it is absurd to suggest that the Individual Defendants did not know about the misconduct. At a minimum, these defendants were highly reckless in issuing misleading financial metrics and vouching for the accuracy of Raytheon's internal controls. ***Notably, Defendants continued making such misrepresentations even after mid-2018, when White was terminated*** (¶¶185-215), ***and even after March 2019, when Taylor was terminated***. (¶¶216-62). On these facts, it is absurd to suggest that the Individual Defendants were clueless, particularly when White and Taylor were at the top of the corporate apex, White reported to Taylor, and Taylor reported directly to Defendant Kennedy.

The terminations of White and Taylor around the time the Pentagon was investigating the misconduct also contribute to a strong inference of scienter. *See, e.g.*, *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009); *Isilon Sys.,* 2008 WL 5412397, at *11.

Defendants Kennedy and O'Brien's Sarbanes Oxley ("SOX") certifications (*see, e.g.*, ¶¶75, 89), when considered with the rest of the Complaint's allegations, further

support scienter.  *See, e.g., VeriFone*, 704 F.3d at 707-708 (as part of a holistic analysis of all the scienter allegations, the signing of SOX Certifications added to a strong inference of defendants' scienter); *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 747 (9th Cir. 2008) (false SOX certifications are "probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements"); *ZST Digital,* 2012 WL 538279, at *9 n.2 ("the Court finds that the Individual Defendants' signatures certifying the Company's financial statements, along with the critical importance of the financial information being certified, support a finding of scienter"); *SunPower*, 2011 WL 7404238, at *5 (finding that the signing of SOX certifications added to the inference of defendants' scienter); *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1043-44 (N.D. Cal. 2016) (ongoing SEC investigation, the dismissal of high-level officers at the time accounting violations were announced, the signing of certifications attesting to the accuracy of false financial statements and the fundamental nature of the accounting violations and their effect on the Company's revenue all contributed to a finding that a strong inference of scienter was adequately pled).

COSO—Raytheon's chosen framework for complying with SOX—imposes significant and specific oversight obligations on the Individual Defendants. ¶¶66-68, n.21. The Individual Defendants were therefore required to monitor the control activities of the entire Company, and were required to pay particularly close attention to make sure adequate internal controls were in place.  The Individual Defendants did so (or were deliberately reckless in not doing so).  *See*, *e.g.*, *In re LendingClub Sec. Litig.*, 254 F. Supp. 3d 1107, 1122 (N.D. Cal. 2017) (holding the CFO could not "escape allegations of scienter" as to internal controls over financial reporting as it "fell squarely within her oversight" and it would be "absurd" for the CFO "to have been blind to these weaknesses and improprieties when the company assured investors its controls performed adequately

21

and effectively"). Moreover, any inference that the Individual Defendants somehow did not know about the material weakness in internal controls "is directly contradicted by the fact that [each Defendants] specifically addressed [internal controls] in [their] statement[s]." *Reese*, 747 F.3d at 572 (defendant" 'bridge[d] the [scienter] gap' . . . by referencing the data directly").

Defendants' reliance on its "independent auditors" (Defs' Br. at 25) provides them no shelter. Management, not outside auditors, are responsible for the Company's financial statements. *See Reves v. Ernst & Young*, 507 U.S. 170, 190-91 (1993); *see In re New Century*, 588 F. Supp. 2d at 1231 ("a clean outside audit opinion does not rule out a finding of scienter"); *In re Diamond Foods, Inc., Sec. Litig.*, 2012 WL 6000923, at *8 (N.D. Cal. Nov. 30, 2012) (unqualified audit opinion does not negate scienter inference); *LDK Solar*, 584 F. Supp. 2d at 1246 (denying motion to dismiss where "unqualified [audit] opinion did not necessarily exonerate [defendant]"). *See also supra* at 11-12. At best, this raises an affirmative defense that is inappropriate at the motion to dismiss stage. *See Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996).

### 3. The Scienter Of The Individual Defendants, And Of Raytheon's Other Senior Management, Is Imputed To Raytheon

The scienter of a corporation may be pleaded by establishing the knowledge or deliberate recklessness of the corporate representative who either made the misrepresentation or who had some involvement with or authority over the statements, and/or "could have corrected them." *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 2017 WL 6041723, at *9 (N.D. Cal. Dec. 6, 2017); *see also In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 476 (6th Cir. 2014) (holding that the scienter not only of "[t]he individual agent who uttered or issued the misrepresentation" but also of "[a]ny high managerial agent or member of the board of directors who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance"

22

can be "probative for purposes of determining whether a misrepresentation made by a corporation was made by it with the requisite scienter under Section 10(b)"); *see also Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 366 (5th Cir. 2004); *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015).[11]

Here, the Individual Defendants signed and/or certified Raytheon's filings with the SEC, which contained the alleged false and misleading statements. *See, e.g.*, ¶¶89, 99, 109, 119, 129. Accordingly, their scienter is imputed to Raytheon. *See In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 477-78 (9th Cir. 2015) (imputing CEO's scienter to the company).

The Court may also impute the scienter of Raytheon's Senior Director of Internal Audit, Thomas Sanglier, to the Company. As the Complaint alleges, CW1 repeatedly reported the misconduct s/he witnessed to Sanglier. ¶47. As Raytheon's Senior Director of Internal Audit, Sanglier "tolerated the misrepresentation[s] after [their] utterance or issuance" and/or "could have corrected them." *Omnicare*, 769 F.3d at 476; *Volkswagen*, 2017 WL 6041723, at *9. The scienter of Callahan, MacDonald and Fay (*see supra* at 20) can similarly be imputed to Raytheon.

### 4.    The Complaint Also Pleads Motive

While not required for an inference of scienter, the Complaint also pleads motive. *Tellabs*, 551 U.S. at 310 ("The absence of a motive allegation, however, is not fatal."). For example, in *Mulderrig v. Amyris, Inc.*, 492 F.Supp.3d 999 (N.D. Cal. 2020), plaintiffs alleged that the defendant profited from stock sales made during the class period, having

---

[11]  This applies even if the management-level employees did not actually make the alleged misrepresentations and are not named as defendants in the litigation. *See   Pennsylvania Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 371-72 (S.D.N.Y. 2012); *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006).

sold 27,550 shares of personally held Amyris stock for proceeds of $186,655.55. *Id*. at 1029. Plaintiffs also alleged that those sales were unusual since defendant's only other sale within the prior five years was for proceeds of $83,172. *Id*. at 1029-30. The court explained that "[a] defendant's stock sales may be probative of scienter when coupled with a 'meaningful trading history' for purposes of comparison to the stock sales within the class period." *Id*. at 1030, quoting *Zucco Partners, LLC v. Digimarc Corp.,*, 552 F.3d 981, 1005 (9th Cir. 2009), *as amended* (Feb. 10, 2009). Accordingly, the court found that "the allegations of [defendant's] sales during the class period and the significant uptick compared with his prior sales history are supportive of scienter." *Id*. The court gave no credence to "defendants' [argument] that plaintiffs have not alleged the percentage of shares sold such that the allegation is not probative of scienter" because "the Ninth Circuit has held that the percentage of total stock is not dispositive as to whether stock sales are indicative of scienter." *Id*. at 1030 n.23, citing *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) (finding sale representing just 2.1% of holdings suspicious given the large amount of proceeds ripped from the sales); *see also Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1185 (C.D. Cal. 2007) (no requirement that percentages be pleaded in every circumstance).[12]

[12] Defendants argue that there is "no instructive comparison to be made between stock sales in the 'equivalent pre-class period' and stock sales in the alleged class period" because the alleged Class Period's start date of February 10, 2016, merely reflects the application of the relevant five-year statute of repose (Defs' Br. at 28). This argument is unavailing. Here, the Complaint plausibly alleges that the wrongdoing occurred *before* the beginning of the Class Period (*see, e.g.*, ¶88 (admitting wrongdoing on contracts from 2011 and 2013); ¶46 (CW1 describing that he was ordered to "fix" contracts in 2015); ¶265 (indicating that misconduct may have started as early as 2009, the date from which the DOJ is seeking documents and information). Accordingly, it is entirely appropriate for Plaintiff to select the statute of repose as a reference. *See Quest*, 527 F. Supp. 2d at 1186-87.

24

Here, as in *Mulderrig*, the Complaint alleges that during the Class Period, the Individual Defendants realized substantial benefits from their disposal of Raytheon stock while the Defendants continued to make false and misleading statements to investors. ¶272. The Individual Defendants' net proceeds were grossly disproportionate to the net proceeds they received in the equivalent time period pre-dating the Class Period, and thus were inconsistent with their trading history. *Id*. For example, Defendant Kennedy received over $6.2 million in net proceeds during the equivalent pre-Class Period of May 25, 2011, to February 9, 2016, while receiving almost $24 million in net proceeds during the Class Period, representing about a 280% increase more than pre-Class Period. *Id.* at 273. Similarly, Defendant O'Brien received about $642,000 in net proceeds during the equivalent pre-Class Period of May 25, 2011, to February 9, 2016, while receiving over $7.4 million in net proceeds during the Class Period, an increase of over 1,000% compared to the pre-Class Period. *Id*. at 274.[13] Likewise, Defendant Wood received almost $3.6 million in net proceeds during the equivalent pre-Class Period of May 25, 2011, to February 9, 2016, while receiving over $5.6 million in net proceeds during the Class Period, representing about a 56% increase more than pre-Class Period. *Id.* at 275. These allegations are probative of scienter. *See also In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 473–74 (E.D. Pa. 2014) ($8 million in proceeds during the class period compared

---

[13] Defendants assert that O'Brien only began reporting his stock transactions in March 2015 (Defs' Br. at 28). While O'Brien certainly has possession of his trading records before March 2015, he does not argue that his trading history in the five years preceding the Class Period reflects that his proceeds during that time were significantly lower than the $7.4 million he pocketed during the Class Period. Moreover, at the motion to dismiss stage, courts draw all inferences in plaintiffs' favor. *Turocy v. El Pollo Loco Holdings, Inc.*, 2017 WL 3328543, at *11 (C.D. Cal. Aug. 4, 2017).

25

to roughly $400,000 in proceeds from prior period supported an inference of scienter). Contrary to Defendants' contention, the Complaint alleges that the suspicious transactions were made during the Class Period, at the time Defendants were publishing false and misleading statements, keeping Raytheon's stock artificially inflated. *See, e.g.*, ¶¶89-262, 272-76; *see also* ¶¶263-67 (reflecting drops in stock price when the truth emerged).

Defendants argue the Class Period is too long for an inference of scienter (Defs.' Br. at 29) but courts have found that suspicious stock sales supported an inference of scienter for comparable class periods. *Quest Software Inc.*, 527 F. Supp. 2d at 1168, 1187 (just under 5 years); *Batwin*, 2008 WL 2676364, at *15 (3.5 years).

Here, moreover, the Complaint alleges that Defendant Kennedy obtained a huge bump in compensation leading into the Class Period.  ¶¶277.  Kennedy received $20.4 million in total compensation at the end of 2015, a 49% jump from 2014.  While not sufficient on its own, together with the rest of the allegations, this astronomical increase strengthens the inference of scienter. *See, e.g.*, *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 264 (5th Cir. 2005) (holding that "defendants' bonuses and stock sales profits" coupled with "the allegations of knowledge and severe recklessness" adequately alleged scienter); *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 661 (8th Cir. 2001) (noting that the amount of an executive's compensation package coupled with an overstatement of earnings that would increase such compensation is circumstantial evidence of motive).

26

### E.    Loss Causation Is Properly Pleaded

Loss causation is subject only to Rule 8(a)'s notice pleading requirements.  *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005).[14]  The Complaint easily meets this standard.

#### 1.    The Complaint Adequately Alleges Loss Causation

In *Mineworkers Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) ("*First Solar*"), the Ninth Circuit clarified the standard for loss causation after the district court noted that there were two lines of competing authority.  *Id*. at 752-53.  The first line of authority—including the cases Defendants rely on—took a more restrictive approach to loss causation that essentially required disclosure of the fraud.  *Id*.  The second line of authority took a broader approach, requiring only a causal connection between the facts misrepresented and the loss suffered, without revelation of the fraud itself.  *Id*.  The Ninth Circuit adopted the broad approach, holding that the loss causation inquiry "requires no more than the familiar test for proximate cause."  *Id*. at 753.  The Court explained that "[b]ecause loss causation is simply a variant of proximate cause, the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss."  *Id*. at 753.  *First Solar* emphasized that "loss causation is a context-dependent inquiry as there are an infinite variety of ways for a tort to cause a loss."  *Id*., quoting *Lloyd*, 811 F.3d at 1210.  For example, "[a] plaintiff may also prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss."  *Id*. at 754.

In *Lloyd*, the plaintiff pleaded loss causation by alleging that defendant CVB's fraudulent conduct led to an SEC subpoena concerning its lending practices, and when the

---

[14] *Accord*, *Loreley Fin. (Jersey) No. 3 Ltd*, 797 F.3d at 187 (plaintiffs' burden of pleading loss causation "is not a heavy one"); *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649 (7th Cir. 1997) (same).

27

market learned of the subpoena, the stock price dropped in response.  811 F.3d at 1210-11. The market's fears about the subpoena were confirmed weeks later by CVB's disclosure that it was writing off $34 in loans to its largest borrower.  *Id*.  This subsequent confirming event had only a negligible impact on the company's stock price.  *Id*.  The Ninth Circuit found that these allegations—the announcement of a criminal subpoena, followed quickly by a drop in its stock price, and later accompanied by a confirmatory event with negligible impact on the company's stock price—sufficiently pleaded loss causation.  *Id*.  The Court explained that although the stock dropped precipitously the day after the subpoena was announced, it hardly moved after the confirmatory disclosure, signifying that CVB's "investors understood the SEC announcement as at least a partial disclosure of the inaccuracy of the previous" representations.  *Id*. at 1210.  Nothing more was required to plead loss causation as "[i]ndeed, any other rule would allow a defendant to escape liability by first announcing a government investigation and then waiting until the market reacted before revealing that prior representations under investigation were false."  *Id*.

So, too, here, nothing more is required to plead loss causation.  As in *Lloyd*, the Complaint alleges that on October 27, 2020, Raytheon disclosed that it received a criminal subpoena from the DOJ seeking information and documents in connection with an investigation relating to financial accounting, internal controls over financial reporting, and the cost reporting regarding Raytheon's Missiles and Defense business since 2009.  ¶263.  On this news, Raytheon's shares plummeted approximately 7% the next day.  ¶264.  News commentators specifically linked the price drop to the disclosure of the criminal subpoena.  *See, e.g.*, ¶¶265-66.  Then, on April 27, 2021, Raytheon announced that it received another criminal subpoena from the DOJ, expanding the inquiry into additional contracts.  ¶¶268-69.  During a call with analysts held the same day discussing the subpoenas, Raytheon's current Chief Executive Officer Greg Hayes admitted that Raytheon engaged in the

28

misconduct alleged, such as overpricing of government contracts.  ¶¶270-71.  Following the April 27, 2021, disclosures, the "market reacted hardly at all," *Lloyd*, 811 F.3d at 1210, and the Complaint does not allege any significant market reaction on April 28, 2021.[15]  As in *Lloyd*, these allegations satisfy loss causation at the pleading stage.  As in *Lloyd*, Raytheon's investors "understood the [first DOJ subpoena] as at least a partial disclosure of the inaccuracy" of Defendants' prior representations. *Id*.

Defendants attempt to confuse the Court by claiming that the contracts scrutinized by the DOJ are "older" contracts from 2011 through 2013, but fail to acknowledge that Raytheon's contracts with the government are of a very long duration and extended throughout the Class Period.  *See*, *e.g.*, 2019 10-K at 92 ("The vast majority of our revenues are from ***long-term contracts*** . . . with the U.S. government"); ¶¶41-42 (describing tainted contract that spanned throughout the Class Period), ¶¶50-54 (describing misconduct from October 2016 to December 2018); ¶57 (describing improper bookings from 2014-2017 on long-term Tomahawk and Javelin projects).  Indeed, the DOJ made clear that it is investigating Raytheon's misconduct, including defective pricing, ***since 2009***; nowhere does the DOJ state that misconduct does not expand beyond 2013, nor does it state that it is limited only to a few contracts.  *See*, *e.g.*, ¶¶269 (explaining that the DOJ is also investigating a 2017 contract, and that the investigation is not limited to the three contracts mentioned); *see also* Dkt. No. 41-10 p.9 (Raytheon acknowledging that the DOJ investigation "***includes***" defective pricing for several identified contracts).  At the pleading stage, Defendants are not entitled to an inference in their favor, let alone one that is directly contradicted by the Complaint's allegations. *Garbini v. Prot. One, Inc.*, 49 F. App'x 169, 170 (9th Cir. 2002) (stating that all inferences regarding loss causation must be drawn in favor of the plaintiff at the motion to dismiss stage).

_____

[15] Defendants admit that Hayes' statements "had no adverse impact on RTX's stock price at the time" they were made.  Defs' Br. at 32.

29

## 2. The "Quick Recovery" In Raytheon's Stock Price Does Not Negate Loss Causation At The Pleading Stage

Citing *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1197-98 (9th Cir. 2021), Defendants argue that the allegedly quick price recovery of Raytheon's stock after the corrective disclosures automatically negates any loss causation. Defendants are wrong. *First*, *Wochos* relied on dicta in *Metzler*. *Id*. at 1197. That discussion was confined to its unique facts, where plaintiffs tried to plead loss causation through "euphemism." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.,* 540 F.3d 1049, 1064 (9th Cir. 2008). In *Metzler*, plaintiffs argued that the market understood the corrective disclosure about fraudulent conduct at one campus as a revelation of widespread fraud at the remaining 88 campuses, and defendants argued that the quick price recovery negated that inference. *Id*. at 1065. Moreover, a subsequent corrective disclosure "contained a far more plausible reason" for the accompanying drop in the stock's price—the company failed to hit prior earnings estimates (rather than a revelation of fraud). *Id*.

*Second*, as discussed above, *First Solar*, decided after *Metzler*, adopted a broader approach to loss causation, considering and rejecting that a disclosure precipitating a stock price decline must reveal a "fraud" or the existence of false statements. *First Solar*, 881 F.3d at 753. Under *First Solar*, Plaintiff needs to plead only that Defendants' fraud was causally connected to the loss. Plaintiff has done so here.

*Third*, the Court in *Wochos* did not have the benefit of a robust briefing on loss causation. An automatic rule nullifying loss causation at the pleading stage whenever the stock quickly recovers would turn traditional economic principles and the statutory provisions applicable to federal securities law claims on their head. The Second Circuit directly tackled this issue in *Acticon AG v. China North East Petroleum Holdings Ltd.*, 692 F.3d 34 (2d Cir. 2012), finding no reason to alter the status quo. The *Acticon* Court explained that "traditionally, economic loss in Section 10(b) cases has been determined by

30

use of the 'out-of-pocket' measure for damages[,]" meaning "'a defrauded buyer of securities is entitled to recover only the excess of what he paid over the value of what he got.'" *Id*. at 38.   The out-of-pocket measure of damages was adopted by the Supreme Court in 1972. *See Affiliated Ute Citizens v. United States*, 406 U.S. 128, 155 (1972).[16]

In the PSLRA, Congress included a "bounce back" provision capping the amount of damages a plaintiff may recover in a securities fraud action, which "shall not exceed the difference between the purchase or sale price paid…by the plaintiff for the subject security and the mean trading price of that security during the 90–day period beginning on the date on which the information correcting the misstatement or omission…is disseminated to the market." *Acticon*, 692 F.3d at 38-39.  As such, under the PSLRA, the ***only*** provision for limiting an investor's losses as a result of an increase in share price after the Class Period is by reference to the Plaintiff's purchases as compared to the PSLRA "bounce back" price. Foreclosing recovery for a harmed investor on the basis that the stock quickly recovered "is inconsistent with the traditional out-of-pocket measure of damages…and with the PLSRA's bounce-back provision." *Id*. at 41.  As shown in Lead Plaintiff's damages analysis (Dkt. No. 36-3) and PSLRA certification (Dkt. No. 18-3), Lead Plaintiff purchased shares well above the bounce-back period mean trading price and has significant cognizable losses under the PSLRA.

Moreover, as *Acticon* explained, "a share of stock that has regained its value after a period of decline is not functionally equivalent to an inflated share that has never lost

---

[16] "Because the efficient market hypothesis, supported by considerable empirical evidence, suggests that stock prices react quickly to the release of new information, in many cases, the event window will be relatively short--as short as one trading day." Mark Mitchell & Jeffery M. Netter, *The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission*, 49 BUS. LAW. 545, 556–58 (1994).  In other words, in an efficient market, the true value of a stock is usually measured by stock price reactions immediately after the corrective disclosure.

31

value." *Id*. Importantly, "it is improper to offset gains that the plaintiff recovers after the fraud becomes known against losses caused by the revelation of the fraud ***if the stock recovers value for completely unrelated reasons***. Such a holding would place the plaintiff in a worse position than he would have been absent the fraud." *Id*. (emphasis added); accord, *Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 985 (N.D. Cal. 2015) (rejecting defendants' reliance on dicta in *Metzler*, and finding that "basic economic principles preclude dismissing a complaint on these grounds [that the stock gained back its value]").[17]

Here, as in *Acticon*, this Court "do[es] not know whether the [Raytheon] price rebounds represent the market's reactions to the disclosure of the alleged fraud or whether they represent unrelated gains." *Id*. at 41. Indeed, because Raytheon's stock price dropped immediately after the announcement of the first criminal subpoena and did not drop after the revelation of the second criminal subpoena or Raytheon's admission of wrongdoing, the most logical inference is that any gains in Raytheon's stock after the Class Period were unrelated to the fraud as the investors already processed the news related to the misconduct. Defendants do not explain what caused Raytheon's price to recover after October 28, 2020. It could have been "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together" have nothing to do with the corrective disclosures. *Acticon*, 692 F.3d at 40. For example, on October 29, 2020, the Journal of Aerospace, Defense Industry and Veterans News, a reputable publication with wide readership, reported that *Collins Aerospace Systems*, a unit of Raytheon, was awarded a $700 million firm-fixed-price

---

[17] *Acticon*'s thorough reasoning has been embraced by many district courts familiar with the decision. *See*, *e.g.*, *In re Allergan Generic Drug Pricing Sec. Litig.*, 2019 WL 3562134, at *14 (D.N.J. Aug. 6, 2019) (explaining that recovery within two trading days after correction does not negate loss causation); *Broadway Gate Master Fund, Ltd. v. Ocwen Fin. Corp.*, 2016 WL 9413421, at *6 (S.D. Fla. June 29, 2016) (same); *Abrams v. MiMedx Grp., Inc.*, 37 F. Supp. 3d 1271, 1276–77 (N.D. Ga. 2014) (same); *Copperweld*, 929 F. Supp. 2d at 788 (same).

32

contract related to certain aircraft.[18]  Thus, Raytheon's stock rebound was correlated with positive news unrelated to the investors' initial decision to purchase the stock.

In sum, the Court "do[es] not know [at this stage] whether it is proper to offset the price recovery against [Raytheon's] losses in determining [Raytheon's] economic loss." *Id.* at 41.  "Accordingly, the recovery does not negate the inference that [Raytheon's] shareholders] ha[ve] suffered an economic loss."  *Id*.  This result is consistent with the well-established principle that "loss causation becomes most critical at the proof stage" and "it is normally inappropriate to rule on loss causation at the pleading stage."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).  Indeed, even after *Wochos*, the district courts in the Ninth Circuit defer to the experts on loss causation.  *See*, *e.g.*, *Baird v. BlackRock Institutional Tr. Co.*, 2021 WL 681468, at *1 (N.D. Cal. Jan. 28, 2021) (stating that loss causation involves "weighing the credibility of the parties' respective experts and their methodologies" and that disagreement on the experts' methodologies "involves weighing expert credibility and is therefore not appropriate at the summary judgment stage"); *Highfields Cap. I, LP v. SeaWorld Ent., Inc.*, 2022 WL 1037210, at *14–15 (S.D. Cal. Apr. 6, 2022) (denying defendants' motion to exclude an expert report on loss causation at the summary judgment stage).

## IV.   CONCLUSION

For the foregoing reasons, the Court should deny the motion in its entirety. Additionally, as Plaintiff has adequately alleged the Section 10(b) claim, its Section 20(a) claim should also be upheld.  *See e.g.*, *Am. W. Holding Corp.*, 320 F.3d at 945.  Should the Court grant the motion in any respect, Plaintiff respectfully seeks leave to amend. *See Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000).

---

[18] *See* https://www.collinsaerospace.com/newsroom/News/2020/10/Collins-upgrade-US-Air-Force-fleet-ACES-5-ejection-seats, last accessed May 11, 2022.

33

Dated: May 20, 2022

Respectfully submitted,

**POMERANTZ LLP**
By: */s/ Jeremy A. Lieberman*
Jeremy A. Lieberman (admitted *pro hac vice*)
Emma Gilmore (admitted *pro hac vice*)
Villi Shteyn (admitted *pro hac vice*)
600 Third Avenue
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
egilmore@pomlaw.com
vshteyn@pomlaw.com

*Lead Counsel for Lead Plaintiff State Teachers Retirement System of Ohio*

**KELLER ROHRBACK L.L.P.**
Gary A. Gotto (No. 007401)
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel.: (602) 230-6322
Facsimile: (602) 248-2822
ggotto@kellerrohrback.com

*Liaison Counsel for Lead Plaintiff State Teachers Retirement System of Ohio*

34

**CERTIFICATE OF SERVICE**

I hereby certify that on May 20, 2022, the attached document was electronically transmitted to the Clerk of the Court using the CM/ECF System which will send notification of such filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

*/s/Emma Gilmore*
Emma Gilmore