IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Pranay K. Bajjuri, et al.,

        Plaintiffs,                    CV-20-468-TUC-JCH

    vs.

Raytheon Technologies Corporation, et al.,   October 4, 2022
                                   9:03 a.m.
        Defendants.              Tucson, Arizona

REPORTER'S OFFICIAL TRANSCRIPT OF PROCEEDINGS

HEARING ON MOTION TO DISMISS

(PROCEEDINGS HELD VIA ZOOM)

BEFORE THE HONORABLE JOHN C. HINDERAKER
UNITED STATES DISTRICT JUDGE

Court Reporter:       Erica R. McQuillen, RDR, CRR
                     Official Court Reporter
                     405 W. Congress Street
                     Tucson, Arizona 85701
                     (520)205-4267

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

A P P E A R A N C E S

Present via Zoom for Plaintiffs State Teachers Retirement System of Ohio:

Jeremy A. Lieberman
Emma Gilmore
Villi A. Shteyn
Pomerantz LLP
600 Third Avenue
20th Floor
New York, New York 10016

Present via Zoom for Defendants:

Graham William Meli
Adam Liron Goodman
Simon Joseph Williams
Wachtell Lipton Rosen & Katz
51 West 52nd Street
New York, New York 10019

Cory L. Braddock
Snell & Wilmer, LLP
One Arizona Center
400 East Van Buren
Suite 1900
Phoenix, Arizona 85004

Also present via Zoom:

Steven A. Greenspan
Seth Huttner

UNITED STATES DISTRICT COURT

P R O C E E D I N G S

THE CLERK:  In Civil Matter 20-468, Bajjuri, et al., v. Raytheon, et al., on for a motion hearing.

THE COURT:  Let's just have the parties announce with the plaintiff going first, please, and tell me who's going to be arguing on behalf of the plaintiff when you do that.

MR. LIEBERMAN:  Good morning, Your Honor.  Jeremy Lieberman, Pomerantz LLP, on behalf of the State Teachers Retirement System of Ohio.  I'll be lead arguing for the plaintiff.

THE COURT:  All right.  Who's there with you, Mr. Lieberman, so we know?

MR. LIEBERMAN:  With me is Emma Gilmore --

(Video feed interruption.)

THE COURT:  Did you freeze on us, Mr. Lieberman?  Mr. Lieberman, have we lost you?

(Off the record to address the video feed
        interruption.)

THE COURT:  All right.  Mr. Lieberman, we had some technical difficulties on this side.  Can you speak so I know that I can hear you again?

MR. LIEBERMAN:  Sure.  Jeremy Lieberman, Pomerantz LLP, on behalf of the plaintiffs.

THE COURT:  All right.  And who else is there on

behalf of the plaintiffs in terms of counsel?

MR. LIEBERMAN:  I have with me Emma Gilmore and Villi Shteyn, Pomerantz LLP.

THE COURT:  All right.  Thank you.

On behalf of the defendant?

MR. MELI:  Your Honor, it's Graham Meli from Wachtell, Lipton, Rosen & Katz.  I'll be taking the lead on the argument this morning.  I also have with me my colleagues Adam Goodman and Simon Williams, as well as Cory Braddock from the Snell & Wilmer firm, and we have two of our clients on the line, Steven Greenspan and Seth Huttner from Raytheon Technologies Corporation.

THE COURT:  All right.  Thank you.

So we've got two motions on for hearing today.  The first is Document Number 42 in the docket.  That is the defendants' request for judicial notice, et cetera.

I don't believe that we got a response from the plaintiff on that.  Mr. Lieberman, am I to understand from that that there's no opposition from the plaintiff to that motion?

MR. LIEBERMAN:  That's correct, Your Honor.  The motion is unopposed.

THE COURT:  All right.  So then in that case, when we issue an order on this, we'll go ahead and grant that, and then that's Docket Exhibits 1 through 10, so the Court will

take judicial notice or incorporate those documents as the case may be.

So that resolves that, and let's move on now to defendants' motion to dismiss. That's Document Number 41 in the docket.

Mr. Meli? Did I say that right?

MR. MELI: You did. Thank you, Your Honor.

THE COURT: All right. So it's your motion. For everybody's understanding, I read all of the briefs. My background, today is actually my two-year anniversary of being sworn in on the federal bench. When I was a commercial litigator, I never handled securities fraud cases. I handled lots of commercial litigation that had fraud aspects to them, but this is my first securities fraud case.

I've been through all the briefs. I've read them. I've read probably a dozen cases from the Ninth Circuit. But I would be the first to admit that I still have some work to do in terms of digging into the record and taking a closer look at some of these things before we get an order out, but I think I'm up to speed enough to ask some decent questions.

And so with that, why don't you go ahead and get started, Mr. Meli, and then I'll give you questions as they come.

MR. MELI: Sure, Your Honor. Thank you.

So with the background that you just identified I

think where I'm going to start is a good place.  As we laid out in our papers, a motion to dismiss in a securities fraud case like this one is unlike most other motions to dismiss in federal court.  As the Ninth Circuit has said, in few other areas are motions to dismiss so powerful, and that is by congressional design.

THE COURT:  And Mr. Meli, I've looked pretty closely at the standard of review or the standard here that applies in the context of a motion to dismiss.  I think I have a pretty good grasp of that.

Let me just ask, in terms of internal controls, can you tell me more about what internal controls are and what internal controls you understand to be in play here with Raytheon.  My understanding of the plaintiffs' theory is that internal controls that should have been in place to prevent employees from overbilling Raytheon customers were not actually in place or were not effective.

Can you just tell me a little bit more about what are internal controls, what representations your client made about those, and what should I understand about internal controls?

MR. MELI:  Sure, Your Honor.

So with respect to internal controls, I think the first thing that we should understand is what the -- what internal controls are intended to be.  Internal controls, as

we explained in our papers, the standard comes from the SEC and what's called the COSO Integrated Framework.  Both of those sources made clear that internal controls are, quote, designed to provide reasonable assurance about the reliability of financial reporting.  They're designed to reduce risk, not eliminate it, and that is critical to the nature of the claim that we understand plaintiffs to be making here.

The theory as we understand it that plaintiffs are articulating is basically that there were problems with at least certain contracts at Raytheon, and then the company received a subpoena from DOJ relating to those -- to those contracts.

So the theory is, in effect, the internal roles must have been ineffective as a result of what was seen with the subpoena from the DOJ, but our position is that that doesn't follow, that that misses what internal controls actually -- actually are.

The existence of some problem does not mean that the company lacked effective internal controls because, as I said, what the SEC says and the COSO Integrated Framework is that internal controls are designed to reduce risk with respect to the financial statements.

With respect to what the allegations are as to what statements about internal controls were actually false here, that's -- that's the critical thing.  For there to be a

UNITED STATES DISTRICT COURT

securities fraud claim, there must be an allegation that a statement that was made was false at the time it was made.

The statements that are challenged here, as I understand it, with respect to internal controls, are Raytheon's statements, and these are fairly boilerplate statements in financial reporting that's required of public companies.  It's a statement that management has concluded that the company's controls were effective.  It's not a statement that the controls were effective but that management reached that conclusion.

THE COURT:  So let me ask you about that, because there's some good arguments, I think, in your briefs, and this is one that sort of troubles me.  Isn't it -- as you put it, it's boilerplate language.  Isn't this language intended to tell the market that there are effective internal controls in place?

And it strikes me as a little bit cute to say that, just because there is this qualifying language that says "executives concluded," that that somehow changes the meaning of that and that investors should draw some different conclusion from that language.

Isn't it really an affirmative, and wouldn't Raytheon want people to believe that, yes, they do have effective internal controls in place, and that's absolutely the representation that the company and its executives are

making?

MR. MELI:  Well, a couple things on that, Your Honor.  First, I do think that the language of the representation is important.  The plaintiff says that this is sort of a quibble, that there's a difference between saying internal controls are effective and management has concluded that internal controls are effective.  We think it's more than a quibble.  The plain English of the sentence is different.  To say that management has concluded something is the case, that statement is only false at the time it was made if management did not actually reach that conclusion at the time they made the statement.

Just think about the English of the sentence, Your Honor.  If I said to you --

THE COURT:  I get it.  I get it.  But I mean, I just think what would an investor's reaction be, and we don't have to -- I think there is -- there is a statement of fact embedded in that statement, which is the internal controls are effective, and my sense is that's what a reasonable investor would draw from that, and so we don't need to belabor that point.

But in terms of whether or not there were effective internal controls, what does Raytheon do, what do the executives do, to make sure there are effective internal controls in place?

MR. MELI:  Well, I -- well, first, Your Honor, just to conclude on that other point, there is case law that has found this distinction to be -- to be meaningful, and I just refer Your Honor to the Luna case from the Northern District of California.

But as to what Raytheon does, I think that's a critical point in the motion as well.  This is obviously a pleading motion where the plaintiff has a burden to plead what they think is the reason that the statements were false, and as we argue in our papers, they don't say anything about what Raytheon does to reach that conclusion.  They don't say anything about what the internal controls actually are, nor do they say what they claim to be the failure of the internal controls other than the mere fact that there are certain problems that have come to light via these subpoenas.

And that, we think, is the critical -- is one of the critical points, in addition to what was actually said.  The mere fact that a subpoena was issued doesn't in and of itself indicate that internal controls fail.  There's been no finding that internal controls have failed, unlike in a case like Luna that I just mentioned where there was a finding that internal controls had failed, but the Court nevertheless dismissed the case because the Court found that that failure did not render false at the time the statement was made, the statement that management had concluded that controls were effective.

UNITED STATES DISTRICT COURT

So Your Honor, I think that the answer to your question, unfortunately, is it's not in the -- it's not in the pleading record, which is where it needs to be if the plaintiff wants to make an allegation that the statement with respect to the internal controls were false.

THE COURT:  All right.  The other question I have, and I might have -- I have about 20 to 25 minutes for each side, so I might have you reserve some of your time, Mr. Lieberman (sic), but the other question I had for you that I really wanted to get to was about loss causation, and you -- your side cites the Wochos case pretty heavily, and it seems like a good case for you.

The other case, though, that -- the Ninth Circuit jurisprudence on this is a little bit, you know, it's not totally consistent, from what I can see, but the other case that I think is better for the plaintiff is First Solar, and your side never really gets to First Solar.

How do you reconcile First Solar with Wochos?

MR. MELI:  Yes, so I think that First Solar is completely consistent with Wochos, and we cite Wochos because it's the more recent of the Ninth Circuit cases.  The ultimate standard of what constitutes loss causation in the Ninth Circuit is stated in Wochos, and they are actually quoting First Solar for this, that the loss needs to have been caused by the very facts about which the defendant allegedly lied.

That's the standard.

And we think that, while First Solar talks about had there been a distinction in the earlier case law, ultimately they come down on the side of there needs to be a loss that was caused by the facts about which the defendant lied. And that's entirely consistent with Wochos and the exact language we cite Wochos for where they are taking that language from First Solar. So we think that the two cases in that regard are entirely consistent.

Wochos obviously also has this additional point which is not addressed in First Solar at all, which is what is the impact of a recovery of the stock price after a modest drop, and we think that, obviously, that was the holding just last year from the Ninth Circuit. First Solar was before that, obviously had nothing to say about it. The most recent and definitive statement of the Ninth Circuit on that point is that, when you have only a modest drop of the stock followed by a sustained recovery, that loss causation cannot be found on the pleadings, and even in that case the Court found that it couldn't even grant leave to amend on that point because obviously there's nothing the plaintiff could do to change the stock price history.

THE COURT: Well, let's assume for the sake of argument that I agree with you. Is it possible that, if a plaintiff were to allege additional facts that explain --

because it's not in the pleadings, but there is some statement made, I think, in the briefing about a reason for the recovery that explains that recovery.  So isn't it possible that there's a sudden dip followed by particularly good news that results in a recovery and that still there has been some loss that was proximately caused by the, let's say, bad news that came out to the market, isn't it possible that that's still -- there is still a way to prove loss causation?  Those facts weren't available in Wochos, but if they were available here, plaintiff could still state a claim.

MR. MELI:  Well, those, those facts obviously aren't pled.  I'm not going to rule out the possibility that there may be a case where that could occur.  We don't think that there is any reason to believe that to be the case here.  Wochos didn't talk about what was the reason for the recovery.  It talked about what we think is the critical point here, which is, what is the allegation of what caused the loss, and what Wochos said is that, when you have a quick recovery after a loss, it sort of severs the inference that the modest drop in the first place was caused by the revelation of any misstatements.

And I think that the context here, and Wochos uses that word "context," I think is important in understanding why we don't think it would be possible to allege anything like that here.  This is not only a situation where there was a

revelation of a misstatement and we're relying on Wochos to say, well, there's no loss causation because, after that misstatement was revealed, there was a bounceback.  It's more than that here.

As we talk about, we don't believe there was any revelation of a misstatement here at all.  The stock drop did not coincide with the kind of thing you often see in these cases, somebody restates their earnings or something like that, where they've told the market, we said something, it turned out that was wrong.

There was nothing like that here, so I think that that makes the contextual analysis of what was the inference that can be drawn from the stock drop and the quick recovery all the more powerful here that there is no such inference that can be drawn.

THE COURT:  All right.  Those were the questions I had for you.  Do you -- I'll give you a minute or two, if you want to take it, to just follow-up with any issues, the other points you want to make sure that you emphasize.

MR. MELI:  Your Honor, just with respect to scienter, because you didn't ask a question about scienter, if I could just briefly touch on that.  Scienter is obviously also an element that the Ninth Circuit has said is critical in these securities fraud cases, and we think the allegations of scienter here are really lacking, and in addition to the

arguments about loss causation and about falsity, which each one of those we believe is sufficient to dismiss the case, scienter is yet another ground on which to dismiss the case.

(Video feed interruption.)

THE COURT: All right. And I do have some questions about scienter, and I am going to let you reserve time, and I will come back to you after I've spoken to Mr. Lieberman -- excuse me, yes -- Mr. Lieberman about this, so thank you Mr. Meli.

Mr. Lieberman, going to the sort of overall theory of the case, could you walk me through it? As I understand it, first there's this -- these representations about internal controls, and those are the fraudulent representations --

Did we lose them?

I don't know if you can hear us, but we've lost you. We're going to try to get you back here.

(Off the record to address the video feed
interruption.)

MR. MELI: -- grounds that we have identified for --

THE COURT: Hang on. Mr. Meli, I lost you there, I think. I was speaking over you. I'm not sure if you cut out, but the last point I heard you made was just about scienter, so I think we had a glitch on our end, so I'll let you again finish up, if you were saying something else.

MR. MELI: Apologies, Your Honor, if that was on my

end.

THE COURT:  I think that was on my end, so apologies.

MR. MELI:  Okay.  Your Honor, I was just saying that you hadn't asked the question about scienter, so I just wanted to make sure that we -- we don't overlook that we believe scienter is yet another ground on which to dismiss this complaint.  The Ninth Circuit has said that scienter is a critical factor in the securities fraud analysis, and it's often a ground on which these complaints are dismissed.  We think the allegations of scienter here are very much lacking.

There are no allegations about what the individual defendants knew, what information was available to them, and that distinguishes this case significantly from other cases in this nature where there is at least an effort to make allegations about what was known to the individual defendants, whether that be through confidential witnesses who say things like, I know how the CFO went about signing off on that statement about internal controls, and he didn't -- he didn't take it seriously, things like that.

There's nothing of that nature alleged here, and we think that is yet another very clear ground to dismiss this complaint, which we lay out in further detail in our papers.

THE COURT:  All right.  Thank you, Mr. Meli.

Mr. Lieberman, can you hear me okay?

MR. LIEBERMAN:  Yes.  Loud and clear, Your Honor.

THE COURT:  All right.  So I want to go back to sort of where I started with Mr. Meli.  I understand, I think, big picture what internal controls are, but what inferences -- what plausible inferences do you think the Court should draw about -- and I want to understand what the theory is about internal controls, how they failed, when they failed, and can you flesh some of that out for me.

MR. LIEBERMAN:  Sure.  I mean, internal controls under COSO, COSO Framework, are that you need to ensure that the documentation within a company and which ultimately leads to the reporting of revenues are properly documented and are not the subject of fraud.  And so all the CWs, from CW1 to CW7, paint a picture of a company that sorely failed that requirement.

You have CW1, he's speaking on just one contract, which is 11.5 billion, but he admits in several instances of fraud, whether it be labor charges that were double-billed to the U.S. Government, whether it be expanding the estimates at completion, whether it be the estimates at completion -- whether it be purchasing orders after a project is completed in order to overcharge the Government, and obviously them being told --

THE COURT:  So am I to infer, then, from this, am I to infer, then, from this that there is essentially a

companywide decision made or a practice of bilking customers that stretch back over the better part of a decade?  Is that the theory of the plaintiff?

MR. LIEBERMAN:  Oh, that's what we allege from our CWs, and so it's not just CW1.  CW2 says there was a -- the bidding process was basically gimmicked in order to select those favored vendors, and when we're talking about the customer, the customer we're talking about here is the U.S. Government.  70 percent of the company's revenues came from U.S. Government.  It has specific legislations as to how they should be bidding, how the cost should be properly justified, and CW2 paints a picture of bidding processes which were rigged to favor certain favored vendors.  Certain vendors were put in the green category to be favored --

THE COURT:  All right.  So -- and I have some questions about the confidential witnesses, and I'll get to those, but moving ahead to the actual disclosures, I think it was October 2020, there is a disclosure about a DOJ investigation, and then in April there is some follow-up from one of the executives that says, yes, and I'm paraphrasing, essentially, we have issues with three contracts, and there's a fourth contract that's now in play.

How -- so what I've got now as I look at this is four contracts where there's been sort of a corrective statement that there's problems with these four contracts.

How does that tie back to or how does the statements of the confidential witnesses actually tie into those four contracts? Where is there anything in the complaint that ties them together? What's the connection?

MR. LIEBERMAN: Sure. I mean, the -- I mean, you have CWs discussing broad, in the missile division, going from CW5, from CW2 as well, a number of CWs discussing fraud within the division. They discuss also a DOJ investigation, that that was triggered in mid-2019, looking at estimates at completion. And so there's clearly a DOJ investigation which preceded the announcements, and that DOJ investigation advances to a criminal subpoena in October of 2020.

And so that -- it ties in very neatly into the allegations of the complaint. There is a -- there are numerous confirming testimonies by CWs, all corroborating one another, about problems with overbilling the Government, drawing out estimates at completion, failure to do bids, overcharging labor costs.

CW after CW after CW provides significant detail. There is an internal audit by the company detailing $250 million in false labor charges, and that ultimately consummates into a DOJ investigation in 2019, as alleged by CW4 and which obviously escalates to a criminal subpoena.

So it's a straight line from the CW allegations, which we think the CW allegations paint a much more in-depth

picture of the fraud, and then the company has only admitted to wrongdoing on four respective contracts, but it's enough to, for loss causation purposes, once there is an admission at least on some wrongdoing, which bears on what we allege from CW1 through CW7, this was a companywide practice.

As CW3 alleges --

THE COURT:  So let me break in there.  So which of the confidential witnesses do you contend was closely enough involved with Raytheon's financial reporting and internal controls to say that widespread fraud was occurring at that level?

MR. LIEBERMAN:  Sure.  Just looking at CW3, she worked across all projects that Raytheon handled, and she observed that it was common practice for Raytheon to get extensions for its projects and missile estimates at completion --

THE COURT:  So I don't have that in front of me. Tell me, what was CW3's position within the company, and can -- do you have allegations about where she was within the organizational chart that I imagine must be out there somewhere?

Because that's -- that was one of the things, when I looked at the confidential witness statements, that was one of the things is I didn't feel like I really understood where these folks fit within the company, and I wasn't -- I didn't

feel satisfied that they would really have knowledge about what was happening with executives who were dealing at sort of the highest level of the company.

MR. LIEBERMAN:  Well, I mean, so there's a distinction.  There is, first of all, would the -- would the CW know about fraudulent practices.  You don't have to be speaking to an executive to know that.  CW1 and CW2 both worked in audit capacities where they're analyzing compliance with Government regulations.  And CW3, I'll focus on CW3.  Let me just get to the complaint.  Excuse me.  CW3, paragraph 55.

THE COURT:  Say that again, please.

MR. LIEBERMAN:  I'm sorry, Your Honor.  Paragraph 55 --

THE COURT:  Okay.

MR. LIEBERMAN:  -- page 22 of the complaint.

THE COURT:  All right.  And I do have that.  I'll turn to that, but what was her position?  Or I believe it's a her.

MR. LIEBERMAN:  We just -- we didn't, you know, disclose the gender, but she was a senior financial analyst at Raytheon, and so --

THE COURT:  So --

MR. LIEBERMAN:  -- that's someone who would know --

THE COURT:  So what is a senior financial analyst and where does that actually fit in within the Raytheon org

chart?  How do I know from this allegation or how do I infer from this allegation that she was actually in a position to know what the executives knew or what the executives were actually doing and what they were doing with respect to looking at the internal controls?

MR. LIEBERMAN:  So for purposes of the CW3, CW3 is relevant to tell you what was the common practice at Raytheon.  The common practice was to delay and push off estimates at completion.  So they wouldn't tell you necessarily what the executives knew.  They would tell you about the fraudulent practices.

We can start, as far as what executives knew, we can start with CW1.  CW1 was a -- let's get to the page.  CW1, one second, was a purchasing agent, a subcontracts manager from June 2009 until August 2018, and his -- her duties included auditing procurement group prewar and postwar purchases for an $11.5 billion contract.

Importantly, though, CW1 elevated his allegations of fraud to the senior executives of internal audit at the company.  He also elevated his allegations of fraud to the head of ethics at the company.  And so that's -- and that's Thomas Sanglier and Garth Chandler, respectively.  And so you have an allegation that CW1 was essentially a whistleblower going to executives and telling them there is significant fraud with respect to this project.

If you want to talk also about the involvement of the executives, then we can focus also on CW5. CW5 discusses an audit, an internal audit, detailing $250 million worth of labor charge fraud to the U.S. Government that involved high-level executives, Todd Callahan, Deputy Vice President of Naval Weapons Systems --

THE COURT: But didn't CW5 -- so did CW5 actually observe this, or did she hear about it from a former colleague and friend?

MR. LIEBERMAN: She said she heard it, that's true, but again, when you have --

THE COURT: So if it's hearsay, why should the Court credit that?

MR. LIEBERMAN: But hearsay for -- this isn't a -- we're not going to trial, Your Honor. This is pleadings --

THE COURT: Okay. But -- so let's move ahead. Let's talk about that, because this is a strange sort of, you know, analysis on the motion to dismiss, and when I read the Tellabs case, when we get into scienter, it talks about, you know, looking at the inference that the plaintiff is asking the Court to draw and comparing it to other possible inferences, which I understand to be possible theories of the case about scienter.

And I imagine what the theory of the case, and I probably should have asked Mr. Meli this, is that, to the

extent there were problems with these three or four contracts, these were isolated problems that related to those three or four contracts.  The DOJ investigated.  This is what we know at this point about the DOJ investigation.  And so isn't it more plausible to conclude that, in a company of Raytheon's nature and size, that rather than a companywide conspiracy to bilk the Government, it was really more isolated to just a couple of contracts?

Isn't -- doesn't that strike you -- I mean, isn't that what I'm trying to compare when I'm looking at maybe an innocent or nonactionable explanation versus the malicious inference that you want me to draw, and isn't that second inference more plausible?

MR. LIEBERMAN:  Well, if we're only looking at what the company has admitted, possibly, Your Honor, because the company only admitted to fraud with respect to four contracts.  But that's not what's alleged in the complaint.  You have from CW1 through CW7 painting a much broader picture of fraud at the company.

When you have a -- CW3 says across all contracts that she worked on, she observed fraud with respect to estimates at completion.  That's also the -- that comports with the allegations of fraud by CW1.  And CW5 talks about a massive fraud, not just of a few dollars, of $250 million by the missile systems division.

So what's painted is -- and that's also comported by CW6 and CW7, who also discuss glaring internal control failures at the company.  So it's -- and CW2 as well talks about consistent failures with respect to competitive bidding processes.  So if that was all we had was four contracts, then we might be in a different discussion, Your Honor.  What we have is, is a picture, a detailed picture, from CW1 through CW7, discussing a practice of fraud of the company with respect to overbilling the U.S. Government, not isolated instances.

And then what you have is the company admitting at the end of the class period, well, we have an issue with four contracts.  And that's very interesting.  Obviously the company is pretty delayed in what they're admitting to.  When it came to their corrective disclosure in October, they didn't even say -- they didn't admit to any wrongdoing, and they didn't say anything regarding the contours of the investigation, even though they knew about this investigation from mid-2019.

And I asked, Your Honor, how is it possible that any executive would be unaware of a DOJ investigation?  Once the DOJ gets in there in mid-2019, it has to be that every single executive is aware of that fact.  And once they're aware of that fact, they better be doing a full investigation into wrongdoing of the company, and if they haven't done that,

UNITED STATES DISTRICT COURT

that's recklessness.

And so you have a company that knows, as of mid-2019, never disclosing to investors, Your Honor, that there is a DOJ investigation, never disclosing that to investors, finally fessing up that they received a criminal subpoena, that it had been elevated to a criminal subpoena in October 2020, and then only in April saying, well, we have an issue with three contracts, and now, that was the first subpoena, now we've got another problem with a fourth contract.

What you obviously have is a company that's very late and delayed in disclosing the contours of the fraud, and so we would say that we don't look at -- we're not crediting defendants' admission here with respect to our pleadings. We're crediting --

THE COURT:  Well, doesn't that -- if the DOJ is investigating -- sorry to break in, but if the DOJ is investigating, and they're looking at internal controls, which I believe was what the initial announcement said, and they've only identified or the company only identifies three to four problematic contracts, and we know there is an ongoing DOJ investigation, doesn't that undercut the notion that there is a companywide problem?

MR. LIEBERMAN:  No, Your Honor, because we don't know what else the company's going to admit.  We don't know

how large -- these three or four contracts could be of significant size, and we allege a fraud.  We're not only basing our allegations on the company's self-serving admissions.  We have CWs 1 through 7 that are contradicting the company's own admissions, that are saying that this is a much more widespread fraud than the company has admitted to, and we would say, Your Honor, at this stage, looking at the company's conduct to date, when they didn't even admit to the onset of the investigation, that their late, self-serving admissions should not be credited here.

THE COURT:  All right.

MR. LIEBERMAN:  That's not --

THE COURT:  Let me get to the other topic I want to ask you about to make sure I get these last couple questions in.

So loss causation is another issue.  The Wochos case seems like it's right on point.  I do agree with you to some degree that it's not the deepest analysis, but the facts are very similar to this case, are they not, and why doesn't Wochos control?  And if I conclude at this point Wochos does control, are there additional facts that the plaintiff might be able to allege to distinguish this case from Wochos down the road?

MR. LIEBERMAN:  Yeah, absolutely, Your Honor, and I appreciate Your Honor bringing it up.

First of all, Wochos very clearly, which my adversary didn't mention, Wochos says, when there is an immediate -- "immediate."  That's the word used in Wochos, "immediate stock price increase."  You don't have here an immediate stock price increase.

THE COURT:  It's less than a week.  It's less than a week.

MR. LIEBERMAN:  In the stock market, Your Honor, billions of dollars, trillions of dollars, are made and lost in a week.  And "immediate" means -- Wochos has very little analysis and actually contradicts a lot of prior Ninth Circuit precedent.  You need to stick to the facts of what Wochos had pointed to, and Wochos pointed to an immediate stock price increase.  Here we have it took several days.  That is a distinction, Your Honor.

There are several investors who lost money selling right after the corrective disclosure within those four days.  Are they not allowed to gain recovery because the share price increased on day five?  Wochos doesn't even address that issue, and so it's important to distinguish Wochos by its own terms.  That's one.

Two is that, if you look at the allegation, we didn't allege in the complaint, A, that there was a contract for $700 million, which clearly would have impacted the share price of Raytheon, but also what we would allege is that, if

you look at Raytheon's performance compared to the market index -- have we lost Your Honor?

THE COURT:  No, no.  I'm still with you.

MR. LIEBERMAN:  Oh, perfect, perfect.

Okay.  If you compare Raytheon's performance from the day of the corrective disclosure until November 3rd, it increased by .9 percent.  If you compare the performance of the sector, the S&P Aerospace sector, it increased by 3.9 percent.  What it tells you is that Raytheon is underperforming its market, and any -- any financial economist will tell you, you don't look at our raw stock price.  Every expert --

THE COURT:  Mr. Lieberman, Mr. Lieberman, that's helpful, but what I understand you to be saying, those facts that you just mentioned to me, those are not in the complaint, but those, if there were an amended complaint, you know, just for discussion's sake, those are facts that the plaintiff would seek to add?

MR. LIEBERMAN:  Absolutely, Your Honor.

And just, if I could finish the thought, if we look at the 90 days after the class period, it's even more stark. Raytheon had increased 17 percent true, but this S&P Aerospace Index went up 33 percent.  Once again, Raytheon is underperforming the market, which is what we would say is evidence that the fraud was still impacting the share price.

And so if there were an opportunity to amend, we certainly would take that opportunity to allege these facts.

THE COURT: All right. So I do want to give Mr. Meli another chance, but before I do that, why don't you take a couple minutes to wrap up and make sure, if there's any other points you wanted to emphasize, that you have a chance to do that.

MR. LIEBERMAN: Sure. Just to address my adversary's comments regarding scienter, again, we have to look at the totality of the allegations here, which are vast. You have allegations of insider trading, $24 million made by Kennedy, you have $7.4 million made by O'Brien, and you have $5.6 million made by Wood. All of them, if you compare to their preclass periods, are significantly larger.

Defendants say, well, you can't look at preclass because the fraud extended to the prior period, but the impact of the fraud and its impact on revenues only increases over time, and defendants have every incentive, particularly when there are internal and external investigations ongoing, to dump those shares at a profit when they know about these other matters. That's A.

B --

THE COURT: So let's talk about stock sales. This is another question I had. I don't -- is there -- because these windows of time are big. I would expect where there's,

you know, an announcement to come out that's going to hurt the stock price, you'd see a bunch of sales immediately before that, and that's what the -- sounds to me like the prototypical case where stocks sales would be particularly probative. I don't really have that, because what I hear is there's this big window of time when sales are occurring.

So is there any way to narrow that down? Is it in the complaint now? Can it be done? And number two, what do I take from the fact that, you know, there's a dip, and then the stock keeps going up, and at the end of the day, these insiders that you say were selling the stock in anticipation of a loss would have been better off holding it, arguably?

MR. LIEBERMAN: Well, Your Honor, what we would say is that of course we can take another look at the allegations if given leave to replead. What we would say is look at the time of the internal investigation in 2018 and then look at the stock sales then. Look at the time of the stock sales in mid-2019, when they know that the DOJ is investigating.

All of those are times when the executives know -- they know two things: A, there is some bad news about to come out; and B, they know that their careers at this company may be quite short, which actually occurred with both Kennedy and O'Brien. They both were terminated or resigned in 2021.

And so you have the allegations regarding insider sales. Of course the context of the sales is appropriate.

Courts have said look at the comparable period, and we would say the wide window makes sense here because it was a long and aggregating fraud.  But if given the leave to replead, we would attempt, Your Honor, to give more precision to the timing on that.

But we don't only have stock sales.  We also have resignations.  We have O'Brien and Kennedy's resignations.  We have the --

THE COURT:  So how do those -- because I saw those, and it wasn't clear to me exactly how that ties into everything.  What I see is executives who were responsible at some level for financial statements resigning, but how does that -- I mean, where are the allegations that allow the Court to infer or make inferences that that relates all back to this, you know, theory of widespread fraud within the company?

MR. LIEBERMAN:  Well, you don't usually have a company announce that there's a resignation because one committed fraud.  Usually the inference is looking at the timing of the revelations or looking at the timing of allegations and then looking at the time of the resignations.

And here you have O'Brien and Kennedy shortly --

(Video feed interruption.)

THE COURT:  Shoot.  I think I lost him.

Can you hear me?  If you hear me, I lost you.  Hold that thought.  We're going to try to get you back.

(Off the record to address the video feed interruption.)

MR. LIEBERMAN:  -- that that inference is simply implausible --

THE COURT:  Mr. Lieberman, Mr. Lieberman, I'm sorry. We dropped you again.  I apologize, but I dropped you probably about a minute and a half ago where you were talking about O'Brien and Kennedy, so I'll let you finish that thought, and then I want to go back to Mr. Meli.

MR. LIEBERMAN:  Okay.  Your Honor, that was my highest moment.

THE COURT:  So you gotta do it again, but you've had practice, so you should be --

MR. LIEBERMAN:  Yeah.  Okay.  Great, Your Honor. Fair enough.

What we would say is that, if you look at O'Brien and Kennedy's resignations after the DOJ investigation -- and that's of course allowing that inference to be made just looking at the timing.  But it's not only O'Brien and Kennedy. It's Greg White.  It's Lawrence Taylor, who works for the highest executives in the missiles division.  And after the internal audit occurs, they're terminated per the allegations of the complaint.

And so when you have those resignations with the stock sales, the fact of the DOJ investigation itself tells

you, how did the company executives not know that the DOJ was investigating those issues?  All they had to do was, once they learned of the investigation, they clearly either knew about that, and then they would have to get their hands on the internal audit, which occurred in mid-2018, and clearly they could have learned or were reckless in not learning about the fraud alleged by the CWs and clearly did not do anything to disclose that to investors while touting this company's internal controls.

THE COURT:  All right.  Thank you, Mr. Lieberman.

Mr. Meli, we'll give you the last crack at this. You have a little less than 10 minutes, so why don't you go ahead and just take that time to respond to issues raised by Mr. Lieberman that you want to respond to.

MR. MELI:  Sure.  Let me start, Your Honor, with Wochos on loss causation.  On the issue of should they be permitted leave to amend, I think it's critical, again, Your Honor, Mr. Lieberman talks about a lot of facts he thinks he could plead on this point.  Wochos, the Ninth Circuit didn't allow that.  They said, look at the stocks.  There was a modest drop followed by a recovery.  The Court did not have to allow leave to amend there.  So while Mr. Lieberman is saying a lot of things outside the complaint, the Ninth Circuit law suggests that he should not be permitted to replead those things.

He also talks about -- he's talking about a lot of things generally that the confidential witnesses said or otherwise.  I think another critical point on the loss causation issue, though, is that these are not things that were ever revealed to the market.  In looking at whether there was any plausible allegation of loss causation here, you have to look at what was the reaction of the stock to something that was revealed to the market.  Was there a revelation of some fact to the market that caused the stock price to go down?

And what Confidential Witness 1 said or Confidential Witness 3 said, these are not things that the stock was reacting to on October 28th.  The only thing that the stock could plausibly have been reacting to on October 28th was the disclosure of the subpoena the night before, and the law we think is clear that that is not sufficient to constitute -- to constitute loss causation.

So we think there is no reason that they should be allowed to replead with respect to loss causation, or anything else for that matter, but certainly with respect to loss causation, the Wochos case is very clear that leave to amend should not have been permitted with respect to that.

You talked with Mr. Lieberman quite a bit about the confidential witnesses.  I think there is -- Your Honor hit on some important points with respect to the confidential

witnesses, in particular, the extent to which we don't know anything about them, where they sit in the corporate structure, who they reported to, or where they got their information from.

A lot of weight is put on Confidential Witness 5, for example. I think this is where Mr. Lieberman is getting the information supposedly about the DOJ investigation and the $250 million number he throws out. But that information is pled entirely as being something that a friend told -- unidentified friend told Confidential Witness 5.

The Ninth Circuit is very clear that confidential witnesses have to have personal knowledge of the events they report. They have to be in a position to possess the information alleged. Those are quotes from the Zucco Partners case. Yes, there have been circumstances where the Court has credited hearsay, but only in situations where there were other indicia of reliability that we think are just completely lacking here, for the reasons we said in our complaint.

The Ninth Circuit also said last year in the National Elevator case that we cite, which I think is very important here, is that the confidential witness statements need to demonstrate, quote, that the public statements were false. The question here is not, did someone who sits somewhere in the company see something funny with some contract? The question is, is the statement that's alleged to

be false, is that falsity supported by the confidential witness allegation?

And in a situation where you have someone sitting in some unspecified place within the company who is never alleged to have spoken to the CFO or to anyone who signed the internal control certifications or to anyone who was responsible for public financial reporting, there's no allegation that supports the conclusion that those witnesses have alleged with particularity that the public statements were false.

Also with respect to the confidential witnesses, there's a lot of weight put on Confidential Witness 3, for example.  We noted in our papers that Confidential Witness 3 left the company before, before the class period even began, and that is, we think, fatal to crediting anything that witness has to say with respect to supposed fraud during the class period.  And there are just many other inconsistencies and really just lack of information about the confidential witnesses that we identified throughout our papers.

On your question about --

THE COURT:  Yeah, and this may be a question you're going to, but go back to the Tellabs issue and scienter and this notion that there's -- the Court has to weigh competing inferences, and I think in one case they were referred to as malicious inferences versus innocent inferences, so I'll use those terms.

What is the innocent inference that the defense wants the Court to look at or consider?

MR. MELI:  So you're exactly right, Your Honor.  The way the Tellabs case puts it is the inference of fraudulent intent has to be at least as compelling as any other competing inference, and that's not a normal pleading standard.  That's not just have they plausibly alleged something.  It has to be a stronger inference.

In terms of what the -- what the innocent inference here is, I think it could be any number of things that are more plausible than what they've alleged.  It could be that, as you've said, this related to a few older contracts that were a relatively small percentage of the company's overall business, and the senior executives just didn't know about them.

Remember what this company is.  This is a company that, it's undisputed, has tens of thousands of contracts.  No one of those contracts is more than five percent of its overall business.  So the idea that this is something that they just -- it's impossible to believe that they didn't know about this is just not supported by the factual pleading.

It's very different than, for example, they cite this case Berson v. Applied Signal, which may be a case that Your Honor read from the Ninth Circuit, where there was something that the Court said it was devastating to the

company's revenues, and how could the defendants' not have known about that.  This is not that.

And again, this is something we haven't touched on, which is materiality.  We address this a lot in our brief.  They have to allege not just false statements but material false statements, and the Ninth Circuit is very clear that you have to allege the amount by which you're claiming some statement was misstated, and there's nothing in their complaint to allow anyone to draw the inference that there was any material amount misstated in any financial statement here.

To the contrary, the thing they like to pound the table with, Mr. Hayes' statements in April of 2021, he said these were one-off issues, and they're not expected to be material.

So there's just nothing beyond --

(Video feed interruption.)

THE COURT:  Darn it.

(Off the record to address the video feed interruption.)

MR. MELI:  -- but I don't know if that would be helpful.

THE COURT:  Mr. Meli, I lost you.  You were -- you had mentioned the statement, I think it was in disclosure or a phone call, about one-off, these were one-offs, and that's where I lost you.

I've got some sentencings coming in, so I'm going to have to just give you another minute to wrap up, and then I've got to move on to my next matter, so go ahead.

MR. MELI:  Yeah, I think all I was saying, Your Honor, is that the things that they talk about being one-offs, there's just no allegation here that any of these misstatements was material, let alone that it was at a level that would have led the individual defendants to know that their statements about the adequacy of internal controls was false.

And then finally, I was just going to touch, Your Honor, on the stock sales, but I think we can rest on our papers for that.  There's just no allegations about the timing or how the timing of any sales tied to any -- any misstatements, which is required under the law in the Ninth Circuit.

THE COURT:  All right.

MR. MELI:  Thank you, Your Honor.

THE COURT:  Thank you, Mr. Meli.

And I want to apologize to everyone for the technical difficulties we had, and I appreciate your patience in working through those.

So I -- as I indicated at the beginning, I still have a lot of work to do on this, but I appreciate this.  This has helped me, and it's helped me get into this case and into

this matter.  So we will stay focused on this, and we'll get you a ruling as quickly as we can.

So again, thank you.  Everybody have a good day. We're adjourned.

(Proceedings conclude at 9:56 a.m.)

C E R T I F I C A T E


I, Erica R. McQuillen, Federal Official Realtime Reporter, in and for the United States District Court for the District of Arizona, do hereby certify that, pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 5th day of October, 2022.


s/Erica R. McQuillen
Erica R. McQuillen, RDR, CRR
Federal Official Court Reporter

UNITED STATES DISTRICT COURT