**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Pranay K Bajjuri, et al., | No. CV-20-00468-TUC-JCH |
| Plaintiffs, | **ORDER** |
| v. | |
| Raytheon Technologies Corporation, et al., | |
| Defendants. | |

Before the Court is Defendants' ("Raytheon" and certain of its individual "Officers") Motion to Dismiss the Consolidated Class Action Complaint ("Motion I") (Doc. 41) and Request for Judicial Notice in Support of Motion I ("Motion II") (Doc. 42). For the reasons below, the Court grants both Motions and dismisses this case without prejudice.

## I.    BACKGROUND AND OVERVIEW

On October 30, 2020, Plaintiff Bajjuri brought a federal securities class action suit against Raytheon and the Officers. (Doc. 1.) The suit claimed Raytheon and the Officers made false and misleading statements through Raytheon's financial statements and by certifying Raytheon's financial controls were effective. (Doc. 1.) In July 2021, the Court consolidated Bajjuri's case with a related case, retained Bajjuri as the lead case, (Doc. 30), and the newly consolidated Plaintiffs filed their first amended complaint ("the Complaint"). (Doc. 34.) In March 2022, Raytheon filed Motion I, (Doc. 41), and Motion II (Doc. 42). On October 4, 2022, the Court heard oral argument on these Motions. (Doc. 48; Doc. 54 (Hearing Transcript).)

Seen from 40,000 feet, the Complaint's allegations appear quite serious. The Complaint alleges that Raytheon repeatedly and intentionally defrauded the U.S. government, Raytheon's largest customer, by overcharging contracts and violating numerous statutes and processes designed to control government costs. The Complaint alleges this misconduct was so pervasive it affected almost all contracts and divisions at Raytheon, was conducted in conspiracy with many of Raytheon's subcontractors, and extends back even before the Class Period (February 10, 2016, to October 27, 2020). The Complaint also alleges that Raytheon repeatedly and intentionally defrauded investors by representing Raytheon's internal controls over financial reporting were effective, and by filing financial statements overstating Raytheon's most important financial metrics, like revenue and net income. Finally, Raytheon's misconduct culminated in a criminal subpoena from the Department of Justice ("DOJ") that, when disclosed, resulted in a "precipitous" drop in Raytheon's stock price and the CEO's confession of wrongdoing.

On closer examination of the Complaint—and unedited samples of the documents it incorporates—a different and more benign view of the facts emerges. For example, the CEO's confession and the DOJ investigation focused on four contracts out of tens of thousands Raytheon performs annually. The "precipitous" stock drop following Raytheon's disclosure of DOJ's investigation was a 7% drop that the stock recovered four trading days later. Moreover, Raytheon's stock had already been falling for two days before the disclosure, and Raytheon's disclosure of the DOJ investigation also disclosed that the COVID-19 pandemic was significantly disrupting Raytheon's aerospace business, enough to require termination of 15,000 employees. Finally, the Complaint's allegations of widespread fraud are based largely on unreliable confidential witness accounts. Those few allegations that one or two witnesses corroborate support only the view that Raytheon's misconduct was limited to a few contracts and a few employees.

This more benign view is ultimately dispositive because it yields a stronger and more plausible picture of the facts than the Complaint. Ordinarily, plausibility is the heart of a 12(b)(6) pleading inquiry: whether the facts plausibly give rise to an inference of

wrongdoing. But the law requires more when pleading securities fraud. In the securities context, the Court considers not only whether a complaint raises a plausible inference of wrongdoing, but also compares that inference to other, more benign inferences. Unless a complaint's inferences are at least as plausible as the more benign inferences—that is, unless the complaint raises not just an inference, but a *strong* inference—the motion to dismiss must be granted.

As explained below, Plaintiffs do not carry their burden under the heightened securities fraud standard, and so the Court dismisses their Complaint without prejudice.

## II.   LEGAL STANDARD

### a.   Fed. R. Civ. P. 12(b)(6) Failure to State a Claim

When deciding a motion to dismiss for failure to state a claim, the Court must "consider the complaint in its entirety" and, in doing so, "accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). At the pleading stage, a plaintiff "need only allege 'enough facts to state a claim to relief that is plausible on its face.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

### b.   Securities Fraud under Securities Exchange Act §§ 10(b) and 20(a)

Plaintiffs' claims arise under the Securities Exchange Act of 1934 ("SEA") §§ 10(b) (Count I) and 20(a) (Count II), and under the Securities Exchange Commission ("SEC") Rule 10b-5. SEA § 10(b) makes it unlawful to employ any "manipulative or deceptive device" in connection with the purchase or sale of a security, or to contravene "such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEA § 20(a) extends § 10(b) liability to "controlling" individuals. 15 U.S.C. § 78t(a). And SEC Rule 10b-5 prohibits "any act, practice, or course of business" that operates as a "fraud or deceit" in connection with the purchase or sale of a security. 17 C.F.R. § 240.10b-5(c).

Securities fraud complaints must meet heightened pleading requirements. *Nguyen* v. *Endologix, Inc.*, 962 F.3d 405, 413 (9th Cir. 2020). One source of these higher standards

is Fed. R. Civ. P. 9(b), which requires a plaintiff to state facts alleging fraud "with particularity." *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). Another source is the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which was enacted in part to "curb perceived abuses of the § 10(b) private action—'nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers.'" *Tellabs*, 551 U.S. at 320 (quoting *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006)). Under the PSLRA, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

Under the PSLRA and Federal Rule of Civil Procedure 9(b), a plaintiff pleading securities fraud under SEA § 10(b) must adequately allege "(1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Nguyen*, 962 F.3d at 413; *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014) ("Rule 9(b) applies to all elements of a securities fraud action"); *see also* 15 U.S.C. §§ 78j(b), 78u-4(b)(1); 17 C.F.R. § 240.10b-5.

## III.   ANALYSIS

The Court begins with a housekeeping item. In Motion II, Raytheon asks the Court to notice materials attached to Motion I as Exhibits 1–10. (Doc. 42.) Plaintiffs raised no objection at oral argument. (Doc. 54 at 4:21–22.) Exhibits 1–4, 5, 8, and 10 are public SEC filings referenced repeatedly in the Complaint, Exhibits 6 and 9 are transcripts of earnings calls preceding Raytheon's October 2020 and April 2021 quarterly reports, and Exhibit 7 is a history of Raytheon's stock price from April 3, 2020, to March 18, 2022. (Doc. 42.) The Court may consider materials outside a complaint when they are incorporated into the complaint by reference or when the Court takes judicial notice of them. *Tellabs*, 551 U.S. at 322. A document is incorporated if a complaint refers to it extensively. *Khoja v. Orexigen*

*Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). The Court may also take judicial notice of publicly available financial documents, such as SEC filings, earnings call transcripts, and a company's reported stock price history. *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008). The Court therefore grants Motion II, (Doc. 42), and takes judicial notice of ECF Docs. 41-2 through 41-11.

## COUNT I

Motion I asserts three independent grounds under § 10(b) for granting Count I: (1) the Complaint fails to plead a materially false or misleading statement with particularity; (2) the Complaint fails to plead scienter; and (3) the Complaint fails to plead loss causation. (Doc. 41 at 2–4.)[1]

### a. Falsity

To plead a materially false or misleading statement, a complaint must (1) "specify each statement alleged to have been misleading," (2) "specify . . . the reason or reasons why the statement is misleading," and (3) "if an allegation regarding a statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

### i. Statements alleged to have been false or misleading

The Complaint alleges two statements Raytheon made about its internal financial controls were materially false or misleading. The statements appear in Raytheon's annual and quarterly financial reports during the Class Period. Each describes Raytheon's internal financial controls as "effective." The first statement reads, "Based on its assessment [of Raytheon's internal controls over financial reporting], management has concluded that the Company maintained effective internal control over financial reporting as of December 31, 2015, based on criteria in Internal Control – Integrated Framework, issued by the COSO in 2013." (Doc. 34 ¶¶ 90, 130, 131, 167, 206, 245.) The second statement reads, "Conclusion of Evaluation—Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of

---

[1] Page citations are to the ECF document page unless otherwise noted.

December 31, 2015 were effective." (Doc. 34 ¶¶ 89, 100, 110, 120, 131, 141, 149, 157, 168, 178, 186, 196, 207, 217, 225, 235, 246 (emphasis omitted).)

The Complaint also alleges virtually all Raytheon's financial statements for the Class Period were materially false and misleading. Specifically, the Complaint refers to all "net sales (revenues)[,] operating expenses[,] and operating income" metrics, (Doc. 34 ¶¶ 93, 103, 113, 123, 134, 144, 152, 160, 171, 181, 189, 199, 210, 220, 228, 238, 249, 259), as well as all financial "statements regarding Tomahawk [and Javelin missile] projects." (Doc. 34 ¶¶ 98, 108, 118, 128, 139, 165, 176, 194, 204, 215, 233, 243, 254.)

The Court finds that these are sufficiently specific descriptions of statements alleged to have been false or misleading under 15 U.S.C. § 78u-4(b)(1).

### ii. Reasons why the alleged statements are false or misleading

The Complaint provides four reasons why Raytheon's statements about its internal controls, costs, and revenues were materially false and misleading. First, Raytheon violated government contracts and improperly recorded revenues and other metrics by "using improper billing procedures, intentionally prolonging projects and making unnecessary orders, failing to submit sub-contracts for competitive bidding, misappropriating funds, conducting business with companies in direct violation of presidential orders, and doctoring contracts to conceal misconduct." (Doc. 34 ¶ 80.) Second, Raytheon failed to properly measure and "manipulated its Estimates at Completion ["EAC"].[2] (Doc. 34 ¶¶ 83, 91, 94, 95, 98, 101, 104, 105, 108, 111, 114, 115, 118, 121, 124, 125, 128, 132, 135, 136, 139, 142, 145, 146, 150, 153, 154, 158, 161, 162, 165, 169, 172, 173, 176, 179, 182, 183, 187, 190, 191, 194, 197, 200, 201, 204, 208, 212, 215, 218, 221, 222, 226, 229, 230, 233, 236, 239, 240, 243, 247, 250, 251, 254, 257, 260, 261.) Third, Raytheon "misused and misappropriated funds awarded to it by the [U.S. Department of Defense ("DOD")], violated protocols and parameters of its contracts . . . under [Federal Acquisition

---

[2] An "Estimate at Completion" is a project-management forecasting tool used to determine the progress of a project's budget.

Regulations ("FAR")] and [Defense Federal Acquisition Regulations ("DFAR")],[3] and even manipulated information it was required to provide to . . . [the Defense Contract Audit Agency ("DCAA") and Defense Contract Management Agency ("DCMA")]." (Doc. 34 ¶¶ 94, 104, 114, 124, 135, 145, 153, 161, 182, 190, 200, 211, 221, 229, 239, 250, 260.) And fourth, Raytheon "overcharged the DOD for materials or other supplies on jobs, overpaid for contractors in the absence of the proper or required bidding process, [and] improperly engaged and made payments to forbidden contractors." (Doc. 34 ¶¶ 95, 105, 115, 125, 136, 146, 154, 162, 173, 183, 191, 201, 212, 222, 230, 240, 251, 261.)

Viewing them as true, the Court finds these reasons sufficiently explain why Raytheon's statements were false or misleading.

### iii.   Particular facts supporting these reasons

Plaintiffs plead the foregoing reasons on information and belief, (*see* Doc. 34 at 3), and so the Complaint must state with particularity all facts on which the reasons are based. 15 U.S.C. § 78u-4(b)(1). Throughout the Complaint, Plaintiffs support their reasons with a parenthetical stating "as discussed in detail above." (Doc. 34 ¶¶ 76, 91, 93, 101, 103, 111, 113, 121, 123, 132, 134, 144, 152, 160, 169, 171, 179, 181, 187, 189, 197, 199, 208, 210, 218, 220, 226, 228, 236, 238, 247, 249, 257, 259.) Given its widespread use and placement, the Court interprets this parenthetical as having two possible references: (1) Raytheon's disclosures of the DOJ investigation and certain statements by its CEO, (Doc. 34 ¶¶ 86–88), and (2) statements by seven confidential witnesses (Doc. 34 ¶¶ 40–62).

### 1.   DOJ Investigation Disclosures & CEO Statements

Plaintiffs first category of particular facts is the DOJ investigation disclosures and certain earnings-call statements by Raytheon's CEO. Specifically, Plaintiffs identify three bases for Plaintiffs' claim that Raytheon made false or misleading statements. (Doc. 34 ¶¶ 86–88; Doc. 43 at 18.)

Plaintiffs' first basis for claiming false or misleading statements is Raytheon's

---

[3] FAR and DFAR are guidelines for "fair and reasonable pricing" mandated for companies doing business with the DOD. (Doc. 34 at 22.)

disclosure on October 27, 2020, that it received a DOJ subpoena. (Doc. 34 ¶ 8.) The subpoena sought "information and documents in connection with an investigation relating to financial accounting, internal controls over financing, and cost reporting regarding [Raytheon's] Missiles & Defense business since 2009." (Doc. 34 ¶ 8.) Raytheon's disclosure further stated, "Based on the information available to date . . . we do not believe the results of this inquiry will have a material adverse effect on our financial condition, results of operations or liquidity." (Doc. 41-3 at 50.)

Plaintiffs' second basis for claiming false or misleading statements is Raytheon's disclosure on April 27, 2021, that it received another DOJ subpoena. (Doc. 34 ¶ 10.) This disclosure stated:

> The [DOJ] investigation includes potential civil defective pricing claims for three [Missiles and Defense] contracts entered into between 2011 and 2013. As part of the same investigation, . . . [Raytheon] received a second criminal subpoena from the DOJ seeking documents relating to a different [Missiles and Defense] contract entered into in 2017.

(Doc. 41-9 at 31.) The disclosure acknowledged "there is a meaningful risk of civil liability for damages, interest and potential penalties," and concluded "[b]ased on the information to date, however, we do not believe the results of the investigation . . . will have a material adverse effect on our financial condition, results or liquidity." (*Id.*)

Plaintiffs' third basis for claiming false or misleading statements is certain remarks Raytheon's CEO made on an April 27, 2021, earnings call. (Doc. 34 ¶ 10.) During the call, a member of Citigroup's research division asked the CEO to clarify Raytheon's quarterly report statement that the "DOJ items" were immaterial. (Doc. 41-10 at 12.) The Citigroup representative also asked the CEO to say whether any "connective tissue" or "narrative" existed between the DOJ items. (*Id.*) Raytheon's CEO replied:

> I would tell you, again, the dollar amounts are not going to be material in our view today. These -- again, these are older contracts, where it was alleged that we defectively priced some contracts. Again, I can't get into much more detail than that. But again, we've looked into it. We think there is potential liability for defective pricing. Clearly, we've provided for that this quarter. And we're going to continue to work with DOJ to bring these things to a resolution.

I would tell you, these investigations take time. We're still going through doing some work. But we don't believe there's going to be any ongoing impact to any of the businesses as a result of these investigations. We think these were one-off events that occurred -- should not have occurred, but they did. And we're going to clean it up and move on. (*Id.*)

### 2.  Confidential Witness Statements

Seven confidential witness statements form Plaintiffs' second category of particular facts supporting their claim of false and misleading statements. (*See* Doc. 34 ¶¶ 40–62.) Plaintiffs filed their original complaint three days after the October 27, 2020 report revealing DOJ's first subpoena. (*See* Doc. 1 at 14–15, 21.) Eleven months later, Plaintiffs' amended Complaint largely reiterates the original complaint but adds, among other things, allegations by seven confidential witnesses. (*See* Doc. 34 ¶¶ 40–62.) Although these confidential witness statements were added after the original complaint, they appear to provide most of its basis.

The Court will credit confidential witness statements "where the confidential witnesses are described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged," *Zucco Partners*, 552 F.3d at 995 (internal quotations marks and citation omitted), and where the complaint contains "adequate corroborating details," *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005) (citation omitted). These details may include "the level of detail provided . . . , the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of sources, and similar indicia." *Id.*

With this guidance in mind, the Court reviews Plaintiffs confidential witness statements in turn and together. *See Tellabs*, 551 U.S. at 322. The Court will then analyze those witness statements that prove reliable together with Raytheon's disclosures and its CEO's remarks under the 15 U.S.C. § 78u-4(b)(1) requirement to state "material" facts "with particularity."

///

### a.  Confidential Witness 1 ("CW1")

CW1 worked as a "Purchasing Agent and Subcontracts Manager" from July 2009 until August 2018, when CW1 was allegedly terminated for reporting misconduct. (Doc. 34 ¶¶ 40, 47). After termination, CW1 filed several whistleblower complaints with the DOD. (Doc. 34 ¶ 49.) CW1's duties included "auditing procurement group pre-award and post-award purchase order files for Contractor Purchasing System Review ('CPSR')."[4] (Doc. 34 ¶ 40.) Because the Complaint provides CW1's title and job description, CW1 is described with sufficient particularity to consider CW1's allegations. *See, e.g.*, *Daou*, 411 F.3d at 1015 (crediting confidential witnesses that were numbered and given job descriptions and responsibilities). But there is a fundamental weakness with CW1 and the other witnesses that Plaintiffs may wish to address if they choose to amend the Complaint. The confidential witness statements could be strengthened by providing orienting information about each witness's place in Raytheon's large organization. Throughout the Class Period, Raytheon employed 60,000–70,000 people. (Doc. 41-2 at 38.) In that context, titles and job descriptions do not orient the Court as well as they might with a smaller company or with titles like "CFO" or "COO" that need no explanation.

CW1 alleges "many instances of wrongdoing . . . related to a government contract worth approximately $11.5 billion" and spanning throughout the Class Period. (Doc. 34 ¶ 41.) The contract provided various training support services for the DOD. (Doc. 34 ¶ 41.) CW1 alleges misconduct under this contract including (1) failure to submit 155 sub-contracts to a competitive bidding process, (2) miscoding labor as a direct charge, (3) failure to provide Individual Work Authorizations to a procurement group, (4) failure to receive long-lead material purchase authority for materials delivered after certain task

---

[4] The Court takes judicial notice of the publicly available CPSR Guidebook. CPSR is performed by the Defense Contract Management Agency ("DCMA") and seeks to evaluate "the efficiency and effectiveness with which a contractor spends government funds and complies with applicable contract terms, regulations, and government policy when subcontracting." DOD DCMA CPSR Guidebook (Sept. 10, 2021), https://www.dcma.mil/Portals/31/Documents/CPSR/CPSR_Guidebook_091021.pdf.

orders' performance end date, (5) improper procurement from Chinese companies doing business with North Korea, in violation of presidential executive orders, and (6) doctoring dates and information on "certain contracts in advance of government reviews and audits," in conspiracy with the sub-contractors. (Doc. 34 ¶¶ 41–46.)

Beyond the support services contract, CW1 alleges (1) "Operations & Maintenance Funding" was misappropriated toward "Military Construction" in order to avoid requisite approvals and oversight, (2) suppliers were improperly advanced payments, allowing Raytheon to bill the government and book revenues earlier than permitted, (3) Raytheon violated the Truth In Negotiations Act ("TINA") by obtaining competitor cost data "under the table" and using it to secure awards, and (4) CW1 was fired for reporting this misconduct to Raytheon's "Senior Director of Internal Audit" and its "Director of Ethics and Business Conduct." (Doc. 34 ¶ 48.)

CW1's allegations about the support services contract have sufficient indicia of reliability to credit them, such as the level of detail alleged and the relationship between the allegations and CW1's job title and responsibilities. But CW1's allegations beyond the support services contract lack adequate corroborating details because they are not clearly related to CW1's job title or description. The Court therefore will credit CW1's allegations about the support services contract but not with respect to the other misconduct alleged.

**b.  Confidential Witness 2 ("CW2")**

CW2 was a "Senior Princip[al] Financial Analyst" from October 2016 to December 2018. (Doc. 34 ¶ 50.) CW2 reported to "the" Senior Finance Manager, and the Complaint details the names of both persons in the role of Senior Finance Manager during CW2's tenure. (Doc. 34 ¶ 50.) Finally, the Complaint describes CW2's employment scope as "Global Business Services, working across all of Raytheon's divisions," and CW2's job responsibilities as including "Internal Auditor who 'vetted [Raytheon's] proposals from vendors and contractors and other companies." (Doc. 34 ¶ 50.) The Complaint states that CW2's job responsibilities also included "review[ing] proposals to ensure that they were financially sound [and] compliant with FAR and DFAR, and [reviewing] audit proposals

that met and/or exceeded the [TINA] threshold of $750,000 submitted through supply chain management. [CW2] also audited proposals and other cost-saving initiatives." (Doc. 34 ¶ 51.) Because the Complaint provides CW2's title, reporting lines, and job description, CW2 is described with sufficient particularity to consider CW2's allegations. The Complaint does not clarify whether "the" Senior Finance Manager is a single position within Raytheon, what is the function of Raytheon's Global Business Services unit, and what are "all Raytheon's divisions."

CW2 principally alleges that Raytheon failed to use a competitive bidding process in awarding certain supplier contracts but nevertheless maintained the appearance of doing so. (Doc. 34 ¶ 52.) CW2 explained that competitive bidding for subcontracts has the "benefit" of showing the government that a company is "using due diligence to follow the regulations, the guidelines they set in place." (Doc. 34 ¶ 52.) CW2 implies—but never states explicitly—that competitive bidding for subcontracts is required under FAR or DFAR guidelines to minimize government costs. (Doc. 34 ¶ 50.) CW2 further alleges that Raytheon uses a color-coding system for its suppliers; those marked green "are good, yellow means 'Go,' and Red means 'No.'" (Doc. 34 ¶ 53.) CW2 alleges that "[m]ost of the suppliers Raytheon used were either green or red, and only a handful were yellow," but could not explain "how a supplier could get out of the red category and go to the green one, or why Raytheon didn't just cut off the suppliers in the red category." (Doc. 34 ¶ 54.) CW2 alleges that rather than solicit competitive bids from different suppliers, Raytheon instead "favored" certain aerospace, defense, and missile suppliers they used repeatedly and placed them "in the green category, irrespective of whether they qualified for the green rating." (Doc. 34 ¶ 53.) CW2 estimated that "maybe about 30 percent" of the green suppliers shouldn't have been green. (Doc. 34 ¶ 54.) CW2 did not explain the basis for stating that certain suppliers shouldn't have been green. CW2 also did not explain the tension between that statement and CW2's inability to explain Raytheon's continued use of red suppliers or the criteria for a red supplier to become green. (*See* Doc. 34 ¶ 54.) Finally, CW2 also alleges unspecified "obstacles" when working, being told "to keep my mouth shut," and that CW2's

- 12 -

superior said, "Just do your job. Don't ask questions." (Doc. 34 ¶ 54.)

Although CW2's allegations are sufficiently detailed, the Court finds CW2's confusion about the color-coding system renders CW2's allegations insufficiently reliable to credit on their own.

### c.   Confidential Witness 3 ("CW3")

CW3 worked as a "Senior Financial Analyst" from July 2012 to October 2015. (Doc. 34 ¶ 55.) CW3's scope of employment was "across all of the projects Raytheon handled, including Missiles and Defense." (Doc. 34 ¶ 55.) Because the Complaint provides CW3's title and job description, CW3 is described with sufficient particularity to consider CW3's allegations. The Complaint does not clarify the relative rank of a "Senior Financial Analyst," or whether "across all projects" includes literally every Raytheon contract.

CW3 alleges Raytheon "flowed down" its Estimates at Completion, which means Raytheon slowed down the project "to get more money and more government funds." (Doc. 34 ¶ 55.) CW3 alleges that Raytheon "had all of the essential tools and funding" to complete a project but nonetheless "would say, 'It's going to take longer. We need additional funds.'" (Doc. 34 ¶ 55.) Specifically, CW3 alleges that Raytheon would slow down its Tomahawk and Javelin missile projects and that the projects "could have been done sooner." (Doc. 34 ¶ 56.) Finally, CW3 alleges that it was "common practice for Raytheon to get extensions for its projects and miss its Estimates at Completion," and that "almost every" project was slowed down as it "was kind of becoming the norm around the place." (Doc. 34 ¶ 55.)

Although CW3's allegations are sufficiently detailed, they are insufficiently reliable to credit on their own because CW3's job title and responsibilities do not clearly relate to CW3's assessment that various projects could have been done sooner.

### d.   Confidential Witness 4 ("CW4")

CW4 was a "Principal Finance Analyst" in Raytheon's "Financial Controls Department" from mid-2019 to fall 2020, reporting to the Finance Manager of Hypersonic Weapons and Strategy. (Doc. 34 ¶ 58.) CW4 "handled all of the financial controls and earn value" for "government contracts." (*Id.*) Because the Complaint provides CW4's title and

job description, CW4 is described with sufficient particularity to consider CW4's allegations. The Complaint does not clarify the relative rank of a "Principal Finance Analyst," what if any relationship that position has to a "Senior Financial Analyst," whether Raytheon has one or many Financial Controls Departments, or the relative rank of the "Finance Manager" to which CW4 reported.

CW4 alleges that shortly after joining Raytheon in mid-2019, CW4 learned from a colleague that Raytheon was being investigated by the DOJ and "there were issues with EACs." (Doc. 34 ¶ 58.) CW4 does not allege how handling "all the financial controls" for government projects and measuring their value create a base of personal knowledge about EACs. And although reliance on hearsay is not "automatically disqualify[ing]," hearsay may be credited only where "sufficiently reliable, plausible, or coherent." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016) (crediting statements by a COO that were specific in time, context, and details, and involved important communications between a CEO and his Board).

The Court therefore finds that CW4's allegations are not sufficiently detailed or reliable on their own to credit them.

### e.  Confidential Witness 5 ("CW5")

CW5 was a Vice President of Business Development in Raytheon's Air Warfare Systems from December 2015 to mid-2017, reporting to Raytheon's Vice President of Business Development for Missile Systems. (Doc. 34 ¶ 59.) Because the Complaint provides CW5's title and job description, and because that title involves an obviously high-level position, CW5 is described with sufficient particularity to consider CW5's allegations.

CW5's alleges that, after leaving Raytheon in mid-2017, "a former colleague and friend still employed at Raytheon" told CW5 that (1) an internal audit showed $250 million in false labor charges in several contracts within Raytheon's Missile Systems, and (2) that several high-level Raytheon employees "'fudged the numbers' to ensure Raytheon met its profit margins (and the employees got their bonuses)." (Doc. 34 ¶¶ 59, 60; Doc. 54 at 23:10–11.) These high-level employees included the "Deputy Vice President of Naval

- 14 -

Weapon Systems," the "Program Manager for Close-in Weapon Systems," and the "Contract Director" for "the entire product line." (Doc. 34 ¶ 60.) CW5 does not say which colleague and friend made the declaration, how that person was positioned to know the information, or where that person got the information. CW5 also does not provide helpful orienting information about the job titles of the three high-level employees. CW5's deficiencies are significant because CW5's statements are hearsay. (Doc. 54 at 23:10–11.)

The Court therefore finds that, as with CW4, CW5's allegations are not sufficiently detailed or reliable on their own to credit them.

### f.   Confidential Witness 6 ("CW6")

CW6 worked in Raytheon's "Executive Communications and Employee Engagement" division from December 2016 to April 2020. (Doc. 34 ¶ 61.) CW6's responsibilities included "among other things" writing speeches for the "president of [Raytheon]" and editing Raytheon's newsletter. (Doc. 34 ¶ 61.) Because the Complaint provides CW6's job description and reporting line, CW6 is described with sufficient particularity to consider CW6's allegations. The Complaint does not clarify CW6's job title, or the relative rank or role of "the president" of Raytheon.

CW6 alleges that in late 2018 or early 2019, a colleague told CW6 that "several Raytheon employees" were "fudging numbers" on the contracts, and that "the Pentagon was also looking into it, and they wanted answers." (Doc. 34 ¶ 61.) CW6 does not say which colleague made the declaration, how that person was positioned to know the information, where the person got the information, or what relationship the employees who fudged numbers had to the Officers. These deficiencies are significant because CW6's statements are hearsay.

The Court therefore finds that, as with CW4 and CW5, CW6's allegations are not sufficiently detailed or reliable on their own to credit them.

### g.   Confidential Witness 7 ("CW7")

CW7 worked as a "Director of Digital Transformation" from October 2019 to October 2020. (Doc. 34 ¶ 62.) CW7's responsibilities included "reengineering" Raytheon's

servers and "separating UTC from its parent company" after UTC merged with Raytheon. (Doc. 34 ¶ 62.) Because the Complaint provides CW7's job title and description, CW7 is described with sufficient particularity to consider CW7's allegations. The Complaint does not clarify the relative rank of a "Director" of Digital Transformation or where CW7 sat within Raytheon's corporate structure.

CW7 alleges that (1) "everything about Raytheon is shady," (2) "it's a** covering all the way around," (3) Raytheon keeps no records of what "hundreds of millions dollars" spent on outside contractors is for, (4) Raytheon paid "hundreds of millions of dollars" in "funny money" to outside vendors, (5) Raytheon has no control over its contractors and no accountability, and (6) "months and months" passed without contractors doing their work. (Doc. 34 ¶ 62.) CW7's allegations are somewhat detailed but largely uninformed impressions. *See Police Ret. Sys. Of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014) (sales representative allegation based on three months' experience was merely the "impression of a low-level employee[,] unsubstantiated [and] without substance or context."). The Complaint does not establish how CW7's role upgrading servers provided a basis for his sweeping pronouncements on Raytheon's management of contractors or financial practices. This is significant because CW7's assertion that Raytheon had "no" system of contractor accountability and control is facially implausible given Raytheon's compliance obligations to the government and the apparently large number of employees dedicated to ensuring government compliance.

The Court therefore finds that, as with CW2–CW6, CW7's allegations are not sufficiently detailed or reliable on their own to credit them.

### h. Combined Confidential Witness Allegations

Having reviewed the confidential witness statements individually, the Court next considers them together. *See Tellabs*, 551 U.S. at 322 (considering the "Complaint in its entirety"). At various points, the Complaint describes the confidential witnesses as "corroborating" each other and Plaintiffs' theory of widespread fraud. (Doc. 34 at 2, 17, ¶¶ 58, 61.) The Complaint also implies that the witness statements are connected. (*See* Doc.

34 ¶¶ 52 ("CW2 witnessed similar misconduct"), 55 ("CW3 also witnessed misconduct"), 58 ("CW4 corroborates the information supplied by the other witnesses"), 59 ("CW5 also recounted wrongdoing"), 61 ("The information supplied by these [witnesses] is also corroborated by CW6"). Under *Daou*, the number of sources and "the corroborative nature of other facts alleged (including from other sources)" bolsters the reliability of these sources. 411 F.3d at 1015 (citation omitted).

At the outset, the Court disagrees with the Complaint's implication that the witness statements corroborate each other and Plaintiffs' cause of action because all involve misconduct. The witness statements corroborate each other only when they share specific facts or elements. The witness statements corroborate Plaintiffs' cause of action only when they share specific facts or elements with Plaintiffs' cause of action. Plaintiffs' cause of action is not based on general misconduct, but rather specifically on misconduct revealed by the DOJ investigation into Raytheon's financial accounting, internal controls over financing, and cost reporting within Raytheon's Missiles and Defense business since 2009. Therefore, witness statements corroborate Plaintiffs' cause of action when they relate to financial accounting, internal controls over financing, and cost reporting within Raytheon's Missiles and Defense business.

Only certain aspects of the witness statements corroborate each other. For example, of CW1's many allegations, only a few are repeated in some manner by other witnesses. CW1 alleges Raytheon failed to submit at least 155 sub-contracts to a competitive bidding process in a support services contract with the DOD. (Doc. 34 ¶ 41, 42.) CW1 also alleges Raytheon conspired with subcontractors to give the appearance of competitive bidding by doctoring dates and information on "certain" subcontracts ahead of periodic government audits. (Doc. 34 ¶ 46.) CW2 similarly alleges Raytheon gave the false appearance of competitive bidding by placing "maybe about 30 percent" of "favored" defense and missile suppliers in a green category "irrespective of whether they qualified for the green rating." (Doc. 34 ¶ 52, 53.) CW1 alleges that Raytheon overcharged the government within a support services contract by miscoding labor charges, mislabeling certain goods as

services, and inflating EACs. (Doc. 34 ¶¶ 43, 44.) CW3 similarly alleges that Raytheon overcharged the government by charging labor to contracts when no labor was performed, (Doc. 34 ¶ 60), and missing EACs by unnecessarily slowing down "almost every project." (Doc. 34 ¶ 55.) CW4 similarly alleges hearing from a colleague that there were "issues" with EACs subject to a DOJ investigation. (Doc. 34 ¶ 58.) Finally, CW5 alleges hearing from a former colleague that an internal audit found three employees in Raytheon's Missiles and Defense business had "fudged the numbers" by charging $250 million in false labor on several naval weapons contracts. (Doc. 34 ¶ 60.) CW6 similarly alleges hearing from a colleague that several Raytheon employees were "fudging numbers" on contracts. (Doc. 34 ¶ 61.)

The witness statements also corroborate only certain aspects of Plaintiffs' cause of action. For example, CW2 alleges Raytheon avoided competitive bidding among "about 30%" of its defense and missile subcontractors through a color rating system. (Doc. 34 ¶ 53.) CW3 similarly alleges that Raytheon slowed down Tomahawk and Javelin missiles projects, which presumably were within Raytheon's Missiles segment. (Doc. 34 ¶ 55, 56.) CW5 similarly alleges hearing from a former colleague that an internal audit "showed at least $250 million of false labor charges on several contracts related to Raytheon's naval weapons system, which at the time was part of the Missile Systems." (Doc. 34 ¶ 59.) And CW7 alleges that Raytheon is "shady," which could potentially speak to a pervasive culture of misconduct also expressed by CW3 (slowing down contracts was "becoming the norm around the place"), CW2 (when facing obstacles learned to "keep my mouth shut because it didn't matter"), and CW1 (fired for reporting misconduct).

In conclusion, the Court's evaluation of Plaintiffs' witness statements reveals that only a few are sufficiently reliable to credit. Only reliable statements can state "material" facts "with particularity" under 15 U.S.C. § 78u-4(b)(1). These reliable witness statements—along with Raytheon's disclosures and CEO earnings-call remarks—are the Complaint's foundation for claiming Raytheon made false or misleading statements. Having identified the Complaint's foundation, the Court turns to its § 78u-4(b)(1) analysis.

1

**iv.  Plaintiffs do not sufficiently allege materiality.**

Plaintiffs' reasons for pleading Raytheon's statements were false or misleading do not survive the Court's § 78u-4(b)(1) inquiry because they fail to allege materiality. Although "[d]etermining materiality in securities fraud cases 'should ordinarily be left to the trier of fact[,]'" *SEC v. Phan*, 500 F.3d 895, 908 (9th Cir. 2007) (quoting *In re Apple Computer Secs. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989)), the Court is not instructed to end all § 78u-4(b)(1) investigation where a plaintiff pleads any level of misconduct, no matter how vague or apparently minor. That would set the bar for pleading a materially false or misleading statement far too low—Plaintiffs could then plead a single instance of misconduct to defeat a motion to dismiss on that basis. Rather, Plaintiffs "must show with particularity how the [misconduct] affected the company's financial statements and whether they were material in light of the company's overall financial position." *Or. Pub. Emps. Ret. Fund*, 774 F.3d at 609 (citation omitted). Mere "conclusory statements . . . and unwarranted inferences are insufficient [to state a claim]." *In re Cutera Secs. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010). The relevant inquiry is whether Plaintiffs plausibly allege a "*substantial* likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having *significantly* altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (emphasis added) (giving the summary judgment standard); *Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988) (adopting the *TSC Industries* standard in a § 10(b) and Rule 10b-5 context). Therefore, when assessing materiality the Court engages in "delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him." *Siracusano*, 585 F.3d at 1178.

Here, Plaintiffs do not quantify the extent to which Raytheon's misconduct resulted in financial misstatements. For example, Plaintiffs allege Raytheon improperly recorded revenues (*e.g.* Doc. 34 ¶ 80), but do not say how much revenue was improperly recorded. Conclusory characterizations that the misstatements were "material," "gross," or "significant," (*see, e.g.*, Doc. 34 ¶¶ 4, 98), do not suffice. It also does not suffice to

accompany conclusory characterizations with general statements about how much revenue Raytheon earned, leaving it to the Court to infer that if reported revenues were material, any accompanying misconduct must also have been material. (*See, e.g.*, Doc. 34 ¶ 50.) Plaintiffs allege Raytheon failed to measure or manipulated its EACs by slowing down projects, (*e.g.* Doc. 34 ¶ 83), but do not say how many contracts were involved or the degree to which the projects were slowed down. Plaintiffs allege Raytheon misappropriated funds and violated FAR and DFAR protocols by avoiding competitive bidding, (*e.g.* Doc. 34 ¶¶ 42, 94), but do not say what funds were misappropriated or which contracts were affected. And Plaintiffs allege Raytheon overcharged DOD, overpaid for contractors due to lack of competitive bidding, and made payments to forbidden contractors, (*e.g.* Doc. 34 ¶ 95), but do not say which materials or jobs were impacted, or how many supplies or contractors. Without this information, Plaintiffs cannot allege a substantial likelihood that a reasonable investor would find the information material given Raytheon's overall financial position.

Plaintiffs' attempts to provide details through Raytheon's disclosures are similarly unavailing. In fact, Raytheon's disclosures directly undermine Plaintiffs' argument. Both disclosures and the CEO's earnings-call remarks stated that DOJ's investigation would not have a material impact on Raytheon's financial condition. The April 2021 disclosure and earnings-call remarks both described the investigation as involving three contracts from 2011–2013 and one from 2017—at least not obviously something a reasonable investor would be alarmed about given Raytheon's "tens of thousands" of contracts per year. The context of the disclosures also undermines Plaintiffs' attempt to plead materiality. The October 2020 disclosure mentioned the COVID-19 pandemic more than seventy times, stating "[o]ur business and operations and the industries in which we operate have been significantly impacted by [COVID-19]," and "our airline customers have reported significant reductions in fleet utilization . . . and have deferred and, in some cases, cancelled new aircraft deliveries." (Doc. 41-3 at 14.) On an accompanying earnings call the same day, Raytheon's CEO stated, "We're taking the difficult but necessary actions to reduce headcount . . . . We'll reduce about 20% of our commercial aero headcount; that's about

15,000 positions. We're also taking out [an additional 5,000 contractor and corporate positions]." (Doc. 41-7 at 6.) Both disclosures revealed Raytheon's assets exceeded $160 billion and quarterly net sales were more than $15 billion. (Doc. 41-3 at 6, 8; Doc. 41-9 at 5, 7.) And both disclosures included assurances from an independent auditor that Raytheon's financial statements were accurate. (Doc. 41-3 at 56; Doc. 41-9 at 36.) Given this context, Plaintiffs have not met their burden of alleging a substantial likelihood of significantly altering the total information mix of information available to investors.

Plaintiffs' attempt to provide details through the confidential witness statements is also unsuccessful. What the witness statements have in common does not plausibly allege materiality. CW1's and CW2's allegations that Raytheon gave the false appearance of competitive bidding fail to describe any overcharges at all—rather, they rest on an unstated assumption that because competitive bidding typically results in lower costs, the absence of competitive bidding they observed in "at least 155 sub-contracts" and "maybe about 30 percent" of Raytheon's subcontractors resulted in materially higher costs. Similarly, CW1's, CW3's, and CW4's allegations of overcharging fail to state or even estimate the degree of these overcharges. CW3's claim that Raytheon unnecessarily slowed down "almost every project" gets closest to pleading materiality but cannot be fully credited because no other confidential witness claimed overcharging at that scale. Finally, CW5's and CW6's allegations that they heard from colleagues about a few employees fudging numbers on several naval weapons contracts, even with the posited $250 million figure, does not plausibly allege a substantial likelihood of material misconduct given Raytheon's more than 60,000 employees, tens of thousands of annual contracts, and almost $30 billion in annual sales. (*See* Doc. 41-2 at 38.)

What the witness statements have in common with Plaintiffs' cause of action also does not plausibly allege materiality. Even giving full credit to CW2's allegations of false competitive bidding with 30% of Raytheon's missiles and defense subcontractors, CW3's allegations of slowed down Tomahawk and Javelin projects, and CW5's hearsay allegation that several contracts within Raytheon's missiles and defense segment were fudged by $250

million—even then the Court cannot determine whether the alleged violations were minor and technical or widespread and significant without more detail. Likewise, the witnesses' various implications that Raytheon permitted a culture of widespread misconduct either are not tied to Plaintiffs' cause of action, do not account for Raytheon's large compliance and audit divisions, or do not estimate an effect that a reasonable investor would be substantially likely to find significantly altered the total mix of available information. Moreover, full credit is not warranted for the more detailed allegations. CW2 was not familiar enough with the subcontractor color-coding system to determine widespread issues with it. CW3's discussion of Tomahawk and Javelin overstatements is corroborated by no other witness. And CW5's allegations are based on an unknown former colleague's statements, corroborated only by another witness's hearsay, and potentially inconsequential given Raytheon's size.

### v.   Plaintiffs do not state the Complaint's basis with particularity.

Plaintiffs' reasons for pleading Raytheon's statements were false or misleading also do not survive the Court's § 78u-4(b)(1) inquiry because they are insufficiently particular. Particularity is not established by contending that "virtually every statement made . . . during the Class Period related to the company's financial . . . performance was, by definition, false." *Metzler*, 540 F.3d at 1070. Particularity also requires more than general allegations that certain practices resulted in a false or misleading report. *Daou*, 411 F.3d at 1007 (citation omitted). Rather, Plaintiffs must identify 'the who, what, when, where, and how of the misconduct charged,' as well as 'what is false or misleading about [the purportedly fraudulent] statement, and why it is false.'" *Cafasso, United States ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (alteration in original) (quoting *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010)).

Here, Plaintiffs claim that widespread fraud at Raytheon resulted in overstatement of virtually all Raytheon's finances for an unknown period of time, rendering all statements about effective internal controls false or misleading. That claim is like the insufficiently particular claim in *Metzler*, where plaintiffs alleged all of a college's financial results were

false and misleading as the result of a company-wide scheme to inflate enrollment figures and misappropriate financial aid funding. *Metzler*, 540 F.3d at 1070. In their Response, Plaintiffs underline several allegations in an attempt to clarify why the Complaint was not insufficiently particularized:

> The Complaint identifies the inflated net sales/revenues, operating expenses, and operating income for each applicable quarter, each applicable six-month and nin[e]-month period, and each applicable year affected during the Class Period. For example, for the three months ended July 3, 2016, the Complaint pleads inflated net sales/revenues of $6.035 billion, inflated operating expense of $5.075 billion, and inflated operating income of $960 million. ¶ 112. For the six months ended July 3, 2016, the Complaint pleads inflated net sales/revenues of $11.798 billion, inflated operating expense of $10.226 billion, and inflated operating income of $1.572 billion. *Id.* For the quarter ended September 29, 2019, the Complaint pleads inflated net sales/revenues of $7.446 billion, inflated operating expense of $6.240 billion, and inflated operating income of $1.206 billion. ¶ 237 (also setting forth numbers for the nine months ended September 29, 2019).

(Doc. 43 at 16.) But this response inadvertently underlines precisely what is wrong with the Complaint: it mistakes a specific reference to specific documents for pleading a fact with particularity. *Daou* provides a helpful contrast. In *Daou*, the court reversed a district court order granting a motion to dismiss under different circumstances. There, the plaintiffs asserted that defendants ignored their stated method of revenue recognition. *Daou*, 411 F.3d at 1017. The *Daou* court credited detailed allegations, directly corroborated by several credible confidential witnesses, that the individual defendants would manually adjust the project percent-completion metric upward without reference to how much of the project was actually complete. *Id.* at 1018. That is very different from Plaintiffs' case. Here, the confidential witness accounts are loosely connected and largely unreliable. Plaintiffs ask the Court to infer from them, in essence, that some of the alleged misconduct must have affected Raytheon's financial reporting at some point to some extent. To accept that inference would permit improperly general allegations.

Plaintiffs' effort to clarify why Raytheon's line metrics were misleading is similarly unavailing. The Response repeats the Complaint's section describing some of Raytheon's

accounting framework and then, without explanation, repeats several of the Complaint's conclusory allegations that Raytheon "improperly recorded revenues," "misused and misappropriated [DOD] funds," "violated . . . its obligations under FAR and FARS," and "manipulated information [provided] to the federal government." (Doc. 43 at 16–17.) This approach—placing uncontested information next to general or conclusory allegations without explaining the connection—is found throughout the Complaint. For example, CW3 alleges that the Tomahawk and Javelin missile projects "could have been done sooner." (Doc. 34 ¶ 56.) In the next paragraph, the Complaint lists all income Raytheon earned from these projects between 2014 and 2019. (Doc. 34 ¶ 57.) What is lacking in both the Complaint and the Response is the connection between the specific allegation and the estimated extent to which it impacted a specific line item or financial statement.

The confidential witness allegations of myriad improper practices are also insufficiently particular because they either do not support Plaintiffs' theory, are insufficiently reliable, or lack specificity. If CW5's and CW6's hearsay allegations were credited, for example, they would suggest misconduct by only a few employees in a few contracts. That is similar to Raytheon's two disclosures and earnings call remarks, which directly undercut Plaintiffs' theory because they implicate investigations of misconduct in only four contracts. More importantly, many of the confidential witnesses lack a clear foundation for their allegations, notwithstanding their provided job title and scope.

CW1 is illustrative. The Complaint does not describe CW1's place in Raytheon's organization or who CW1 reported to. Given that Raytheon employed between 60,000 and 70,000 people during the Class Period, CW1's title of "Manager" and selected duty is less helpful in assessing CW1's allegations than it might be in a smaller company. The Complaint also does not articulate a connection between CW1's title, selected duty, and the Complaint's allegations of ineffective financial reporting and disclosure controls, manipulation of contract revenue and cost estimates, and misrepresentation of key financial measures. The Complaint does not allege that CW1 was involved with financial reporting or assessing Raytheon's internal controls. Instead, the Complaint implies (and Plaintiffs'

Response reiterates) that CW1 helped to "ensure compliance with U.S. government requirements." (Doc. 34 ¶¶ 40–49; Doc. 43 at 12.). Given this vague description, several questions remain: How much of Raytheon's business was CW1 privy to? How did CW1 conduct an "evaluation" of purchase-order files, and were these evaluations reported to anyone within the Officers' ambit? Were CW1's purchase-order file audits supported or supplemented by financial or legal divisions within Raytheon? If not, what training did CW1 receive to identify financial and legal issues? If the "government requirements" that underlay CW1's audits were the DCMA's CSPR, were CW1's audits coextensive with CSPR guidelines and review, or more limited? Without pleading particular facts to answer these questions, the foundation of CW1's many allegations is unclear.

CW3's and CW4's accounts suffer similar issues. As with CW1, the Complaint provides no information about CW3's and CW4's reporting lines or place within Raytheon's large organization. Is a "Senior Financial Analyst" working across all Raytheon projects (CW3) within the same group as a "Senior Principal Financial Analyst" working across all Raytheon divisions and reporting to "the" Senior Finance Manager (CW2)? The Complaint does not say. The Court also notes that CW3 did not work at Raytheon during the Class Period. Although that fact does not defeat all relevance given the long-term nature of many Raytheon contracts, it does weaken CW3's reliability further.

For the reasons above, the Court finds that, without more, Plaintiffs' allegations do not sufficiently allege "materially" false or misleading statements "with particularity" under the PLSRA's heightened pleading standards. Although this is independently sufficient to grant Motion I, the Court considers below the other contested § 10(b) elements, scienter and loss causation.

**b. Scienter**

To adequately plead scienter, a complaint must allege at least one of the individual defendant Officers "made false or misleading statements either intentionally or with deliberate recklessness." *Zucco Partners*, 552 F.3d at 991 (citing *Daou*, 411 F.3d at 1014–15). Plaintiffs must allege "a highly unreasonable omission, involving not merely simple,

1   or even inexcusable negligence, but an extreme departure from the standards of ordinary

2   care, and which presents a danger of misleading buyers or sellers that is either known to

3   the defendant or is so obvious that the actor must have been aware of it." *Id.* Following

4   *Tellabs*, courts in this circuit conduct a dual inquiry: first, determining whether any of the

5   plaintiff's allegations, standing alone, create a strong inference of scienter; and second, if

6   the allegations are individually insufficient, conducting a "holistic" review of the same

7   allegations to determine whether they combine to create a strong inference of intentional

8   conduct or deliberate recklessness. *Id.* at 992.

9       Under the PSLRA, a complaint must "state with particularity facts giving rise to a

10  strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-

11  4(b)(2)(A). The PSLRA's "strong inference" requirement "has teeth." *Nguyen*, 962 F.3d at

12  413. It "unequivocally raised the bar for pleading scienter." *Tellabs*, 551 U.S. at 321

13  (quotations omitted) (alteration adopted). Given the substantial costs that securities fraud

14  litigation can impose, the "strong inference" standard reflects Congress's attempt to halt

15  early on securities litigation that lacks merit or is even abusive, while allowing plaintiffs

16  with potentially winning claims to proceed to discovery. *See id.* at 323–24. A complaint

17  survives the PSLRA's "strong inference" standard "only if a reasonable person would deem

18  the inference of scienter cogent and at least as compelling as any opposing inference one

19  could draw from the facts alleged." *Id.* at 324.

20      Here, Plaintiffs plead the Officers' conduct was intentional or deliberately reckless

21  based on the following: (1) the seven confidential witness statements; (2) alleged violations

22  of Generally Accepted Accounting Practices ("GAAP"); (3) the DOJ investigation; (4)

23  Raytheon's Sarbanes-Oxley certifications; (5) the Officers' personal stock sales during the

24  Class Period; (6) the termination of Raytheon's Missile Systems CFO in 2018 and VP 2019;

25  and (7) that U.S. government contracts form the core of Raytheon's operation. Following

26  *Tellabs*, the Court addresses each of these allegations in turn, then together.

### i. Confidential Witness Statements

28      The seven confidential witness statements form the primary basis for Plaintiffs'

argument that the Officers' conduct was intentional or deliberately reckless. The Court analyzes confidential witness statements for scienter much like it analyzes them for falsity. For that reason, some of the Court's analysis will draw on the foregoing falsity section III(a)(iii)(2) above. A complaint relying on confidential witness statements for scienter must pass two hurdles: (1) the confidential witnesses must be described with sufficient particularity to establish their reliability and personal knowledge; and (2) the witness's statements must be indicative of scienter. *Zucco Partners*, 552 F.3d at 995 (citing *Daou*). In *Zucco Partners*, the Court carefully followed the *Daou* standard for evaluating each confidential witness. *Id.* The Court concluded that the witnesses were described with "a large degree of specificity" because their job description and responsibilities were provided. *Id.* More specifically, the witnesses worked directly on the accounting software system alleged to have been manipulated, one reported to the president of the company's biggest divisions, another was the vice president of that section, and another reported directly to the CEO. *Id.* But the Court also concluded the witness statements were insufficiently based on their personal knowledge because they were "not positioned to know the information alleged, many report[ed] only unreliable hearsay, and others allege[d] conclusory assertions of scienter." *Id.* (noting also that two were not employed at the company during the period in question and had only secondhand information, and other allegations were vague). Armed with *Daou*'s prongs and *Zucco Partner*'s instruction, the Court again considers Plaintiffs' confidential witnesses in turn and together.

Here, and as discussed above in Section III(a)(iii)(2), the Complaint describes the confidential witnesses with sufficient particularity because it provides a job title and description for each. But CW4, CW5, CW6, and CW7 cannot survive *Daou*'s first prong because their accounts are not based on personal knowledge—the first three are based on hearsay without other indicia of reliability, and CW7's role upgrading servers does not provide a sufficient basis to evaluate Raytheon's subcontractor management or financial procedures. The remaining witnesses—CW1, CW2, and CW3—cannot survive *Daou*'s second prong even if they clear the first because none of them allege that they either

reported to the Officers, had any interaction with the Officers, or that any of the Officers knew about any misconduct. Their accounts therefore do not indicate the Officers' scienter.

The confidential witness accounts are no more probative when taken together. Limited corroborating aspects of their accounts produce some indication that Raytheon gave the false appearance of competitive bidding and overcharged certain contracts by slowing them down more than necessary, and that a few employees fudged several contracts. These combined allegations still do not plausibly allege the Officers' scienter because, like in *Zucco Partners*, the allegations are largely from people either poorly positioned to know the information alleged, based on unreliable hearsay, or conclusory. None specifically allege scienter. Perhaps most important, even when combined and viewed favorably for Plaintiffs, the witness accounts are still less plausible than the competing, benign inference urged by Raytheon that any misconduct involved only a few contracts, and the Officers were unaware until they began investigating alongside the DOJ. (Doc. 54 at 38:11–15.)

### ii.  Alleged GAAP Violations

Certain alleged GAAP violations form the second basis for Plaintiffs' argument that the Officers' conduct was intentional or deliberately reckless. The Complaint alleges that Raytheon committed several GAAP violations indicative of scienter, specifically by (1) reporting revenue before it was earned and (2) manipulating Estimates at Completion. (Doc. 34 at 35–36, 72–74; Doc. 43 at 27–28.) Publishing inaccurate accounting figures or failing to follow GAAP, without more, is not sufficient to establish scienter. *Lloyd*, 811 F.3d at 1207. To raise a strong inference of scienter, the Complaint must allege facts demonstrating that defendants "knowingly and recklessly engaged in an improper accounting practice"—for example, that a company's external auditors counseled against a practice or that a company's CFO was aware that the practice was improper. *Id.* (citing *Metzler*, 540 F.3d at 1068–69).

Here, the alleged GAAP violations do not raise a strong inference of scienter. First, Plaintiffs do not allege particularized facts showing the extent of the violations. The

Complaint states that Raytheon (1) overcharged the government with improper billing procedures, (2) intentionally prolonged projects and made unnecessary orders, (3) failed to submit sub-contracts for competitive bidding, (4) misappropriated funds, (5) conducted business with companies in violation of executive orders, and (6) doctored contracts to conceal misconduct. (Doc. 34 ¶ 80.) These allegations appear to come entirely from the confidential witness statements, and consequently suffer the limitations already detailed above in Sections III(a)(iii)(2) and III(b)(i). Moreover, the allegations fail to describe the extent to which the practices impacted Raytheon's financial statements. Overstating "revenues in violation of GAAP may support a plaintiff's claim of fraud," but only if the plaintiff shows "with particularity how the adjustments affected the company's financial statements and whether they were material in light of the company's overall financial position." *Or. Pub. Emps. Ret. Fund*, 774 F.3d at 609 (citation omitted). Merely stating that revenue figures "were materially overstated" (*e.g.* Doc. 34 ¶ 94) or "were inflated" (Doc. 43 at 27) is insufficiently particular because it does not permit evaluation of whether the alleged GAAP violations were minor or isolated, or instead widespread and significant.

Second, Plaintiffs do not allege that external auditors counseled against Raytheon's practices. In fact, an independent auditor certified Raytheon's controls and procedures every year of the Class Period. (*See, e.g.*, Doc. 41-2 at 87–89.) In 2019, for example, Raytheon's independent-auditor report highlighted revenue recognition as a "Critical Audit Matter" and stated that:

> Due to the nature of the work required to be performed on many of the Company's performance obligations, the estimation of total revenue and cost at completion is complex, subject to many variables and requires significant judgment by management on a contract by contract basis.
> . . . .
> [Continuing to detail these procedures and ultimately concluding:] In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2019 and 2018, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2019 in conformity with accounting principles generally accepted in the United States of America.

(Doc. 41-2 at 88.) Plaintiffs cite several cases for the proposition that independent auditor opinions do not rule out or negate an inference of scienter. (Doc. 43 at 42.) Fair enough. But the Court views the independent auditor report merely as one of several things that weaken the inference Raytheon's Officers knew they were violating GAAP. An independent audit report may not "rule out" scienter, but it certainly increases the lengths to which the Officers' fraud would have to go to avoid detection. That, in turn, decreases the force of Plaintiffs' observation that, in essence, GAAP violations require intent.

Finally, Plaintiffs do not specifically allege that the CFO or any of the individual Officers were aware that Raytheon's practices were improper—only that they must have been given the severity of the violations. For all these reasons, the Court finds that the Complaint's allegations of GAAP violations are insufficient on their own to support a strong inference of scienter.

### iii.  DOJ Investigation

The DOJ investigation disclosure forms the third basis for Plaintiffs' argument that the Officers' conduct was intentional or deliberately reckless. Plaintiffs' Response seeks to clarify the Complaint by stating that the DOJ investigation strengthens an inference of scienter. (Doc. 43 at 18.) Plaintiffs' out-of-circuit citation for this principle supports the uncontroversial principle found in *Tellabs* that the Court must conduct a holistic analysis and consider the Complaint in its entirety. *Compare Tellabs*, 551 U.S. at 322, *with Frank v. Dana Corp.*, 646 F.3d 954, 960–62 (6th Cir. 2011); *Collier v. ModusLink Glob. Sols., Inc.*, 9 F. Supp. 3d 61, 76 (D. Mass. 2014). But an investigation, standing alone, is not enough to raise any inference of scienter, much less a strong inference. *Zamir v. Bridgepoint Educ., Inc.*, 2018 WL 1258108 (S.D. Cal. Mar. 12, 2018) (citing *In re Maxim Integrated Prods., Inc. Sec Litig.*, 639 F. Supp. 2d 1038, 1047 (N.D. Cal 2009); *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1162 (C.D. Cal. 2007)). The Court will therefore only consider the DOJ investigation in the context of the *Tellabs* holistic analysis below.

///

#### iv.   Sarbanes-Oxley certifications

The Officers' Sarbanes-Oxley certifications form the fourth basis for Plaintiffs' argument that the Officers' conduct was intentional or deliberately reckless. Plaintiffs' Response seeks to clarify the Complaint by emphasizing the Officers' Sarbanes-Oxley certifications support scienter "when considered with the rest of the Complaint." (Doc. 43 at 20–21.) The Court understands this as a concession that the certifications add nothing to an inference of scienter individually. *See also Zucco Partners*, 552 F.3d at 1003–04 ("[R]equired certifications under Sarbanes–Oxley . . . add nothing substantial to the scienter calculus . . . . [and] are not sufficient, without more, to raise a strong inference of scienter."). The Court will therefore only consider the Officers' Sarbanes-Oxley certifications in the context of the *Tellabs* holistic analysis below.

#### v.   Officers stock sales during the Class Period

The Officers' personal stock sales form the fifth basis for Plaintiffs' argument that the Officers' conduct was intentional or deliberately reckless. In a section titled "Additional Scienter Allegations," the Complaint alleges that the Officers' disposal of Raytheon stock during the Class Period supports a strong inference of scienter. (*See* Doc. 34 ¶¶ 272–277.) The Complaint further alleges these stock sales were inconsistent with the Officers' trading history because the net proceeds from these sales were grossly disproportionate to the net proceeds the Officers received in "the equivalent time period pre-dating the Class Period." (Doc. 34 ¶ 272.) The Complaint then compares the net proceeds of each Officer's stock sales between 2011 and 2016 with the net proceeds of their stock sales between 2016 and 2020 (the Class Period). (Doc. 34 ¶¶ 273–275.) Finally, the Complaint cites a 2016 newspaper article reporting one Officer's total compensation increased 49% from 2014. (Doc. 34 ¶ 277.)

Stock sales may provide circumstantial evidence of scienter when they are "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Ronconi v. Larkin*, 253 F.3d 423, 437 (9th Cir. 2001). To determine whether sales were "dramatically out of line," courts

assess three factors: "(1) the amount and percentage of the shares sold; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's trading history." *Metzler*, 540 F.3d at 1067. To help this analysis, the Complaint must "provide a meaningful trading history for purposes of comparison to the stock sales within the class period." *Zucco Partners*, 552 F.3d at 1005 (internal quotation marks and citation omitted).

Here, Plaintiffs fail to provide essential information to support their claim. The Complaint does not provide the amount and percentage of the shares the Officers sold, only the net proceeds from those shares. The Complaint also does not discuss the timing of these sales except to show that the net proceeds between 2011 and 2016 were lower than the net proceeds between 2016 and 2020. The Complaint also does not explain how the sales were inconsistent with the Officers' trading history except in reference to the net proceeds of these sales. But net proceeds are a function of a stock's value, which changes over time. A stock sale at any time likely would yield net proceeds different from any other time. Different net proceeds therefore cannot be evidence of an inconsistent trading history. That may be why the Ninth Circuit factors do not include net proceeds. Finally, the Complaint also does not explain how an increase in an Officer's "total compensation" is related to that Officer's trading history or otherwise relevant. Because Plaintiffs have failed to allege any facts showing that the Officers' stock sales were "dramatically out of line" with their trading history, the Court finds that the stock sales do not support a strong inference of scienter.[5]

///

---

[5] If Plaintiffs choose to amend, they will want to provide substantially more information about the Officers' stock sales. This might include how close the Officers' sales were in time to the DOJ investigation disclosure, or whether a sale was followed by a buyback during the dip. Plaintiffs will also want to explain how the Officers' stock sales in the five years preceding the Class Period provide a meaningful comparison if company-wide fraud was ongoing well before the Class Period began. (*See generally* Doc. 34 (not alleging when the fraud began); *see also* Doc. 26-1 at 3 ("Raytheon's malfeasance likely preceded the start of the Class Period by six to seven years, considering that the DOJ subpoena . . . seeks information . . . going back to 2009.")). Unless the fraud began at the start of the Class Period, sales preceding the Class Period would provide no meaningful comparison because they would also be suspect.

### vi.  Raytheon's Missile Systems CFO and VP Terminations

Two high-level employee terminations in 2018 and 2019 form the sixth basis for Plaintiffs' argument that the Officers' conduct was intentional or deliberately reckless. The Complaint implies and the Response clarifies that the termination of Raytheon's Missile Systems CFO and VP support a strong inference of scienter. (Doc. 34 ¶¶ 60–61; Doc. 43 at 30.) Plaintiffs state that Raytheon's Missile Systems CFO was terminated "around [2018, when CW5 heard from a former colleague that three employees were 'fudging the number' and had added $250 million in false labor charges on several contracts]." (*Id.*) Plaintiffs also state the Missile Systems CFO reported to the Missile Systems VP, who was terminated in 2019. (*Id.*) And Plaintiffs emphasize the Missile Systems VP reported to one of the Officers. (*Id.*) Particularized allegations that a termination was "uncharacteristic when compared to . . . typical hiring and termination patterns" or "accompanied by suspicious circumstances" may support an inference of scienter. *Zucco Partners*, 552 F.3d at 1002. In *Zucco Partners*, the complaint alleged scienter based on the CFO's retirement just before disclosure of improper accounting and lack of financial controls, and two controllers' resignations during the class period. *Id.* The *Zucco Partners* court declined to infer scienter because the complaint did not allege details about the termination, and the accounts were "based on vague hearsay allegations." *Id.*

The employee-termination allegations come from CW5 and CW6, whose limitations due to hearsay are discussed above. But even crediting them for a moment, they do not support a strong inference of scienter. Plaintiffs want the Court to infer that the Missile System CFO and VP were fired because they facilitated or directed the fraud within their segment. But even if the Court accepts that inference, it directly undermines Plaintiffs' theory that the Officers themselves were participating in or recklessly disregarding widespread misconduct. Terminating wrongdoers for committing fraud is the opposite of recklessly disregarding fraud. Plaintiffs similarly do not explain why terminations for fraud suggest the Officers were complicit. And Plaintiffs do not explain how the terminations support an inference the Officers knew their internal controls or financial statements were

misleading—if anything, an internal audit uncovering fraud supports the benign inference that internal controls were working as intended to root out bad behavior. The Court must weigh Plaintiffs' inference against all competing, benign inferences. Here, the more plausible inference is that the CFO and VP terminations either were unrelated to fraud involving several contracts in their segment or were a consequence of their failure to uncover the fraud before an internal audit did. Either way, these benign inferences are more plausible than the inference that the terminations were for participation in fraud—and certainly more plausible than the convoluted inference that the Officers somehow both participated in or disregarded the fraud while also taking steps to address it. For these reasons, the Court finds that, even when credited despite their appearance in vague hearsay allegations, the Missile Systems CFO and VP terminations do not support a strong inference of scienter.

### vii.   "Core Operations" theory

Plaintiffs' Response raises a "core operations" theory not found in the Complaint but drawing on several of its allegations. (Doc. 43 at 18–22.) This theory forms the seventh basis for Plaintiffs' argument that the Officers' conduct was intentional or deliberately reckless. The Court construes Plaintiffs' argument as clarifying an aspect of "the Complaint in its entirety."

The Court may in unusual cases infer scienter solely because the alleged wrongdoing involves a company's "core operations," or when the complaint alleges the individual defendants actually knew of the disputed core documents. *City of Dearborn Heights Act 345 Police & Fire Retirement System v. Align Technology, Inc.*, 856 F.3d 605, 620 (9th Cir. 2014). Generally, allegations about "management's role in a corporate structure and the importance of the corporate information about which management made false or misleading statements" create a strong inference of scienter only "when made in conjunction with detailed and specific allegations about management's exposure to factual information within the company." *Id.* (citing *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008)). But occasionally, in the "exceedingly rare" case where misconduct is

"patently obvious" and it would be "absurd" to suggest that management was without knowledge of it, the Court may infer scienter based solely on the fact that the allegations involve the company's "core operations." *S. Ferry LP, No. 2*, 542 F.3d at 785 n.3, 786; *see also Police Ret. Sys.*, 759 F.3d at 1063. Alternately, the Court may infer scienter based solely on a core operations theory if the plaintiffs allege that the individual defendants actually knew of the disputed core operations. *See, e.g.*, *Daou*, 411 F.3d at 1022–23.

Plaintiffs argue that because the U.S. government was Raytheon's biggest and most important customer, and because the alleged misconduct involved multiple U.S. government contracts, and because the Officers admitted that several of these contracts were "tainted with wrongdoing," it would be "absurd to suggest" that the Officers did not know about "the misconduct" during the Class Period.[6] (Doc. 43 at 19, citing Doc. 34 ¶¶ 35, 41, 270–271).) Plaintiffs' argument is unpersuasive for two reasons. First, "absurdity" is a very high bar not reached in cases with more extreme facts than this one. *See, e.g.*, *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063–64 (9th Cir. 2014) (affirming no scienter where allegations concerned company's "flagship product" and "two largest customers"). Second, the U.S. government's importance to Raytheon's business does not imply that the Officers oversaw every contract. The government is a large Raytheon customer—constituting more than 60% of Raytheon's business, which involves "tens of thousands" of contracts. In that context, alleging misconduct in "multiple" contracts does not give rise to any inference that the Officers must have known about it, much less a strong inference. Plaintiffs' allegations also do not sufficiently plead that the Officers actually knew of the disputed information. Of course, it would be "absurd to suggest" the Officers did not

---

[6] Plaintiffs' reference to "the misconduct" is ambiguous. It could refer to (1) the misconduct the Officers "admitted to," (Doc. 34 ¶ 10 (citing the April 27, 2021 earnings call remarks)), (2) the misconduct involving "multiple U.S. government contracts," (*Id.* ¶¶ 40–49 (CW1), 59–60 (CW5)), (3) the "egregious misconduct" involving "several improper practices designed to overcharge the government" that "resulted in a gross overstatement" of Raytheon's financial statements, (Doc. 34 ¶ 4, 50–57 (CW2 & CW3)), or (4) all of the above. This defect is characteristic of the Complaint, which relies on ambiguity and implication to achieve what its specific allegations cannot.

actually know of the top-line metrics involved in their financial statements. But Plaintiffs' claim rests on actual knowledge of individual contracts that contributed to top-line reporting errors, not knowledge of top-line metrics. In that respect this case is unlike *Daou*, for example, where a successful core operations theory involved top executives admitting they were involved in "every detail" of the company, and where the plaintiffs alleged the defendants monitored the specific data in the allegedly false statements. 411 F.3d at 1022–23. This case is more like *Zucco Partners*, where a core operations theory was unsuccessful because the complaint merely alleged that senior management "closely reviewed the accounting numbers" and discussed a related component. 552 F.3d at 1000.

For these reasons, the Court finds that although Raytheon's alleged misbehavior involved its "core operations," that fact is insufficient on its own to give rise to a strong inference of scienter.

### viii.   *Tellabs* holistic analysis

The final question in the scienter analysis is whether the whole of the Complaint is greater than the sum of its parts. The Court considers, on one hand, whether all Plaintiffs' allegations together give rise to the inference that the Officers made false or misleading statements intentionally or with deliberate recklessness. If so, the Court then compares that inference to the competing benign inference that the misconduct was limited to a few employees and a few contracts, and the Officers took steps to address the misconduct when it was discovered. If Plaintiffs' inference is at least as compelling as the benign inference, the Court must deny Motion I as to the scienter element.

When viewed in its entirety, the Complaint pleads both too much and too little to establish scienter. The Complaint pleads too much because it does not sufficiently connect its many allegations to create an inference that Raytheon is pervaded by fraudulent behavior. The Complaint asks the Court to infer that Raytheon's Officers—and an unknown but potentially very large number of employees—intentionally concealed systemic, "egregious" misconduct, causing "gross" misstatements of financial metrics and internal financial controls. The Court could only reach that inference through several steps. First,

the seven confidential witness statements must be read as alleging widespread but loosely defined misconduct. The witnesses, after all, are apparently spread widely throughout Raytheon's business. Generally, they all allege bad behavior of some kind or another, in some part of Raytheon's business or another, affecting some contract or another, and stretching back indefinitely far into the past. To reach the Complaint's widest aperture, the Court must ignore the details of these accounts and instead treat each as symptomatic, and all as indicating a fraud so large it does not fit into any single account.

Next, the Court must view the DOJ investigation as linked to this widespread misconduct—not only, as stated in the October 2020 disclosure, limited to Raytheon's missiles and defense business or, as stated in the April 2021 disclosure, focused on three or four contracts, or even limited to the Class Period. Rather, the Court must conclude that the DOJ conducted its investigation "as a result of" *all* misconduct alleged—and quite a lot more implied—in the Complaint. (Doc. 34 ¶ 8.)

Next, the Court must connect the confidential witness accounts (spanning 2009–2020) and the DOJ's 2020 investigation with the termination of Raytheon's Missile Systems CFO in 2018, VP in 2019, and the Officers' stock sales throughout 2016–2020. In this view, the widespread misconduct only partially glimpsed by each witness, and triggering the DOJ's investigation, also permitted the Officers to reap the benefit of Raytheon's improperly inflated value while simultaneously requiring the Officers to terminate the Missile Systems CFO and VP. Were the CFO and VP in on the scheme, but then fired when they threatened to go public? Was hush money involved? The Court can only imagine.

Finally, the Court must keep the preceding steps in mind while inferring that because the Officers signed Sarbanes-Oxley certifications, and because the GAAP violations alleged do not occur without intent, and because the U.S. government is Raytheon's biggest customer, that the Officers either must have known or recklessly disregarded the fact that they were defrauding the public by permitting widespread misconduct and improperly inflating revenue.

On closer inspection, Plaintiff's allegations do not combine as described above to

reach Plaintiffs' preferred inference. The confidential witness statements do not all refer to *widespread* misconduct. CW1 primarily alleges multiple instances of misconduct in a single contract. CW4, CW5, and CW6 allege overhearing issues stemming from the DOJ investigation, several contracts within Raytheon's Missile Systems, and several employees "fudging numbers." The remaining witnesses do not all refer to *the same* misconduct. CW2 alleges that 30% of Raytheon's suppliers were coded green when they shouldn't have been to avoid competitive bidding. CW3 alleges that "almost every project" was slowed down to increase Raytheon's billing. And CW7 alleges "a** covering" and "funny money" related to Raytheon's outside contractors. The disclosure of the DOJ investigation never mentioned widespread misconduct; it was limited to Missiles and Defense, then even more limited to focus on a few Missiles and Defense contracts. Plaintiffs do not allege specific enough facts to tie the timing of any of the Officers stock sales to the Complaint's events or explain how the Officers' alleged complicity in the fraud fits with the termination of the Missile Systems CFO and VP. And Plaintiffs allege no facts connecting the Officers to any specific contract where misconduct was alleged or to any specific GAAP violation. Instead, Plaintiffs ask the Court to resolve these issues for them by inferring widespread fraud from a mess of competing inferences. The Court declines to do so.

Even if the Court followed the Plaintiffs' winding path to the inference that Raytheon not only permitted but actively fostered widespread, egregious fraud, the Court must then consider competing inferences. The most obvious—and the one suggested by Raytheon—is that any misconduct involved only a few contracts out of "tens of thousands" annually, only a few employees out of more than 60,000, and the Officers were not aware of the misconduct either until Raytheon's internal controls discovered it or until Raytheon began investigating alongside the DOJ. (Doc. 54 at 38:11–15.) That inference is more compelling than Plaintiffs' because it fits the facts more neatly and resolves the various tensions in Plaintiffs' account, such as the firing of Raytheon's Missile Systems CFO and VP. For those reasons, the Complaint pleads too much when it seeks to infer a widespread fraud theory.

The Complaint also pleads too little because what allegations it does connect do not state a cause of action. The confidential witnesses, for example, corroborate each other to allege only that Raytheon gave the false appearance of competitive bidding and overcharged certain contracts by slowing them down more than necessary, and that a few employees fudged several contracts. The DOJ investigation says nothing about either theory but might be connected to the contracts CW5 and CW6 overheard were being investigated. The Complaint says nothing specifically connecting those accounts and the investigation, however. Similarly, the Complaint says nothing specifically connecting the Missile Systems CFP and VP terminations with CW5's and CW6's accounts, though it implies that these terminations were related.

Granting for the sake of argument that these allegations are in fact all connected, they undermine Plaintiffs' other allegations and their argument for scienter. If the corroborated confidential witness accounts refer to the same contracts that launched the DOJ investigation and caused the Missile Systems CFO's and VP's termination, then the Complaint plausibly alleges only that several contracts worth an unknown amount were manipulated by several employees privately motivated to get their bonuses. (Doc. 34 ¶ 60.) But that theory undermines CW1's allegations that Raytheon's fraud was aided by Raytheon's suppliers, CW2's allegations that Raytheon's fraud extended to 30% of those suppliers, CW3's allegations that Raytheon's fraud extended to every contract CW3 worked on, and CW7's allegations that Raytheon's fraud extended to the entire company. The more limited theory also undermines Plaintiffs' allegations that the Officers were complicit in the fraud because the limited theory instead suggests that the Officers were unaware of the fraud until after the contracts were manipulated, and that the Officers took steps to address the issue when they became aware. What allegations remain—the Sarbanes-Oxley certifications, GAAP violations, and "core operation" theory—do not add anything.

As discussed above, Plaintiffs' allegations regarding Sarbanes-Oxley certifications, GAAP violations, and the "core operation" theory are individually insufficient to support a strong inference of scienter. Although the *Tellabs* holistic analysis may breathe new life

into these categories generally, it does not here. For example, the "core operation" theory may be successful when combined with "detailed and specific allegations about management's exposure to factual information within the company." *S. Ferry LP*, 542 F.3d at 785 (scienter established where individual defendants discussed the relevant technology and integrations in detail on several occasions); *Dearborn Heights*, 856 F.3d at 620 (no scienter where individual defendants' awareness of parent company's financial information did not establish exposure to a subsidiary acquisition's financial information). But here, Plaintiffs do not say the Officers were involved in any of the specific contracts alleged to have contributed to Raytheon's misstatements. Rather, Plaintiffs ask the Court to infer that the Officers must have been aware of these contracts in enough detail either to know of the misconduct or to have recklessly disregarded it because the lifetime value of one contract was $11.5 billion, (*see* Doc. 43 at 19), and because several contracts involved misconduct by a "Deputy Vice President," "Program Manager," and "Contract Director" in Raytheon's missile systems division, (Doc. 43 at 20). That is insufficient. Without significantly more, Plaintiffs' inference is less compelling than the benign inference that, in a company as large as Raytheon, the Officers were not familiar with the details of each contract to know of or disregard fraud within them.

For all these reasons, Plaintiffs allege too little because those few of the Complaint's many allegations that are at least implicitly connected undermine Plaintiffs' other allegations and their argument for scienter. Plaintiffs also allege too much because their theory of widespread or rampant fraud is not supported by their allegations. And either way, Plaintiffs do not advance an inference at least as compelling as Defendants' inference. The Court therefore finds Plaintiffs' allegations do not give rise to a strong inference of the Officers' scienter. Although this is independently sufficient to grant Motion I, the Court considers below the last remaining contested § 10(b) element, loss causation.

### c. Loss Causation

In the Ninth Circuit, Rule 9(b)'s heightened standard requiring particularity "applies to all elements of a securities fraud action, including loss causation." *Or. Pub. Emps.*

*Retirement Fund*, 775 F.3d at 605. Loss causation is "a variant of proximate cause," and turns on "whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Lloyd*, 811 F.3d at 1210 (causation sufficiently plead where share price fell 22% and never recovered). The central inquiry is whether a plaintiff's loss was caused by "the very facts about which the defendant lied." *Mineworkers' Pension Scheme v. First Solar, Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (per curiam) (citation omitted). This inquiry is naturally "fact-specific," *id.*, but may find loss causation allegations insufficient where a "modest" drop in the stock prices coincides with the disclosure of certain news but then "recover[s] very shortly after." *Wochos v. Tesla*, 985 F.3d 1180, 1197 (9th Cir. 2021) (citing *Metzler*, 540 F.3d at 1064–65).

*Metzler* is instructive. There, Plaintiff Metzler alleged that Defendant Corinthian's colleges were pervaded by fraudulent practices designed to maximize their federal Title IV funding. *Metzler*, 540 F.3d at 1055. Metzler further alleged Corinthian violated GAAP principles by improperly recognizing revenue. *Id.* at 1056. Metzler further alleged that because Corinthian's fraud was pervasive, virtually every class-period financial statement was false. *Id.* Metzler alleged its losses were caused by two disclosures that purportedly revealed Corinthian's fraudulent practices. *Id.* at 1059. The first was a newspaper article reporting a Department of Education investigation into one of Corinthian's campuses. *Id.* The second was a press release about a month later disclosing Corinthian had failed to hit prior earnings estimates and containing a passing reference to one of Metzler's alleged fraudulent practices. *Id.* After the first disclosure, Corinthian's stock fell 10 percent but rebounded within three trading days. *Id.* After the second disclosure, Corinthian's stock fell 45 percent. *Id.* Affirming under the more permissive Rule 8(a) pleading requirement, the court held that Metzler failed to plead loss causation. *Id.* at 1065. The court reasoned it was unwarranted to infer that Corinthian's disclosures revealed systematic fraud because Corinthian's stock recovered quickly after the first disclosure, and the second disclosure "contained a far more plausible reason" for the accompanying drop—missed earnings. *Id.*

*Wochos* followed *Metzler* in a similar context. In *Wochos*, Defendant Tesla's stock

fell 3.9% from $356.88 after a newspaper article revealed that Tesla was making its new Model 3 cars by hand and not on an automated assembly line. 985 F.3d at 1198. But the stock recovered immediately, rising the next day to $355.59 and trading over the next week between $350 and $360. *Id.* Citing *Metzler*, the *Wochos* court held that plaintiffs could not plead loss causation because "[t]he quick and sustained price recovery after the modest . . . drop refutes the inference that the alleged concealment . . . caused any material drop in the stock price." *Id.* (also citing *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010) ("To adequately plead loss causation . . . a plaintiff must allege that the 'share price *fell significantly* after the truth became known.'") (emphasis added in *Wochos*)).

The facts in this case are similar to *Metzler* and *Wochos*. Here, Plaintiffs allege that Raytheon was pervaded by fraudulent practices designed to overstate its revenue, overcharge the government, and defraud investors. (*See, e.g.*, Doc. 34 ¶ 4–6.) Plaintiffs further allege Raytheon violated GAAP principles by improperly recognizing revenue, (*see, e.g.*, Doc. 34 ¶¶ 77, 80), and that virtually every Class Period financial statement was false. (*See, e.g.*, Doc. 34 ¶¶ 81, 82.) Plaintiffs allege that "as a result of its misconduct," Raytheon received a DOJ subpoena investigating "information and documents in connection with an investigation relating to financial accounting, internal controls over financing, and cost reporting regarding [Raytheon's] Missiles & Defense business since 2009." (Doc. 34 ¶ 8.) Plaintiffs further allege that "[i]n response to th[e] shocking news" that Raytheon had received the subpoena, "the Company's stock price tumbled $4.19 per share, or approximately 7%, on unusually heavy trading volume, damaging investors." (Doc. 34 ¶¶ 9, 267.) As discussed above, the report disclosing the DOJ subpoena also mentioned the COVID-19 pandemic more than seventy times, describing it as "significantly impact[ing]" Raytheon's business, operations, and industry. (Doc. 41-2 at 14.) On an earnings call the same day, Raytheon's CEO said the pandemic would require Raytheon to reduce its commercial aerospace division by 20%, firing 15,000 employees. (Doc. 41-7 at 6.) Raytheon's stock rebounded the day after it dropped, recovered entirely within four trading days and never closed below its October 27, 2020 level again. (Doc.

41-8 at 5–12.) By March 18, 2022, the stock had grown more than 70 percent. (*Id.*)

As in *Metzler*, Plaintiffs' inferences that Raytheon's disclosure of the DOJ subpoena revealed widespread fraud are implausible because Raytheon's stock recovered in nearly the same time. As in *Metzler*, Raytheon's disclosure was accompanied by a far more plausible reason for the stock's decline—significant issues stemming from the COVID-19 pandemic. And as in *Wochos*, Raytheon's stock made a quick and *sustained* recovery because it never traded below its October 27, 2020 level again, and was substantially higher roughly two years later. Plaintiffs attempt to distinguish *Wochos* because it lacked "robust briefing on loss causation," but Plaintiffs' preferred case is out of circuit and not on point. (*See* Doc. 43 at 40.) Plaintiffs attempt to distinguish *Metzler* as involving "unique facts" amounting to pleading loss causation through "euphemism," and containing a "far more plausible reason" for the stock's drop. (*Id.*) But Plaintiffs inadvertently emphasize precisely why *Metzler* is persuasive: this case shares key facts with *Metzler*, like the presence of a more plausible explanation for the stock drop and a quick stock recovery.

Plaintiffs' attempts to bring this case under *First Solar* and *Lloyd* are also unpersuasive. *First Solar* stands only for the proposition that "there are an infinite variety of ways for a tort to cause a loss." 881 F.3d at 753. Far from choosing between competing lines of Ninth Circuit authority, the *First Solar* court denied the existence of any intra-circuit conflict and certified both "lines" as "variants of the basic proximate cause test." *Id.* at 754. Where, as here, Plaintiffs' claim is based on a modest drop that quickly recovers, accompanied by a much more plausible explanation, a "basic proximate cause test" leads to the same result as in *Metzler* and *Wochos*. Plaintiffs' use of *Lloyd* is also misplaced because *Lloyd* involved a much bigger drop, much more clearly connected to that plaintiff's theory. *Lloyd* also ratifies a rule unhelpful to Plaintiffs: "the announcement of a government investigation, without more, cannot meet the loss causation requirement." *Lloyd*, 811 F.3d at 1210 (citing *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014). That rule could not save the *Lloyd* defendant CVB because there "much more [was] alleged." *Id.* Specifically, CVB's stock fell more than 20% after disclosure of an SEC investigation. *Id.*

Analysts explicitly linked the investigation to CVB's loan exposure with its largest borrower. *Id.* CVB's stock then failed to react when CVB later confirmed that its largest borrower would in fact default. *Id.* The *Lloyd* court reasoned that the lack of stock market reaction confirmed that investors understood the SEC announcement as at least a partial disclosure of CVB's predicament. *Id.* Plaintiffs compare this case with *Lloyd*, pointing to the lack of stock price reaction after the April 2021 disclosure that the DOJ investigation involved up to four contracts. (Doc. 43 at 29.) But Plaintiffs also allege the October 2020 investigation revealed pervasive fraud—if anything, the stock price should have gone up in April 2021 when the investigation turned out to involve only a few contracts. More importantly, Plaintiffs do not allege any facts like in *Lloyd*, where analysts directly connected the disclosure with concerns about the CVB's biggest borrower. The two October 28, 2020 newspaper articles Plaintiffs cite in this case merely paraphrase Raytheon's disclosure without analyzing it, implying a connection but never articulating it. (*See* Doc. 34 ¶¶ 265, 266.) For these reasons, *Lloyd* is an inapt comparison that if anything cuts *against* Plaintiffs' position.

Finally, even setting aside *Metzler* and *Wochos*, Plaintiffs do not sufficiently plead loss causation under *First Solar* because they fail to connect the "very facts" Raytheon allegedly lied about with Plaintiffs' loss. Plaintiffs allege that Raytheon lied in all financial statements during the Class Period, and in all its statements that internal controls were effective. But Plaintiffs' loss allegedly comes from the DOJ disclosure of an investigation that turned out to involve only a few contracts, never resulted in restated earnings or any other financial restatements, never impacted an independent auditor's certification of Raytheon's controls, and which Raytheon repeatedly characterized as immaterial in light of its overall finances. Without specific, particularized allegations connecting Plaintiffs' theory of pervasive fraud and the stock drop after the DOJ investigation disclosure, Plaintiffs fail to plead loss causation even under the broadest proximate cause test.

The Court therefore finds that the Plaintiffs' allegations do not give rise to a strong inference of loss causation. Both independently and together with Plaintiffs' failure to

plausibly allege a strong inference of falsity and scienter, the Court finds ample reason to grant Motion I on Count I and dismiss this case without prejudice.

**COUNT II**

Section 20(a) of the SEA makes certain "controlling" individuals also liable for violations of § 10(b) and its underlying regulations. 15 U.S.C. § 78t(a). To plead a claim under § 20(a), a plaintiff must demonstrate "a primary violation of federal securities law." *Zucco Partners*, 552 F.3d at 990. Here, Plaintiffs' Count I failed to state a claim that Raytheon violated federal securities law. Motion I is therefore also granted on Count II.

**IV.   ORDER**

For these reasons,

**IT IS ORDERED GRANTING** Motion I (Doc. 41) without prejudice. Plaintiffs have leave to amend their Complaint (Doc. 34) no later than December 19, 2022. Defendants shall respond to any amended complaint no later than January 19, 2023. If Plaintiffs choose to amend, they are instructed to provide chambers and opposing counsel with a redline copy of the Complaint (Doc. 34) clearly identifying the changes made to it by the amended complaint. The redline copy may be emailed in Microsoft Word format to chambers when the amended complaint is filed, at "hinderaker_chambers @azd.uscourts.gov";

**IT IS FURTHER ORDERED GRANTING** Motion II (Doc. 42). The Court takes judicial notice of ECF Docs. 41-2 through 41-11.

Dated this 18th day of November, 2022.

Honorable John C. Hinderaker
United States District Judge