Jeremy A. Lieberman (admitted *pro hac vice*)
Emma Gilmore (admitted *pro hac vice*)
Villi Shteyn (admitted *pro hac vice*)
Pomerantz LLP
600 Third Avenue
New York, New York 10016
Tel: (212) 661-1100
Fax: (212) 661-8665
*jalieberman@pomlaw.com*

***Lead Counsel for Lead Plaintiff State
Teachers Retirement System of Ohio***

*[Additional Counsel on Signature Page]*

**UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA**

| | |
|---|---|
| Pranay K Bajjuri, Individually and on Behalf of All Others Similarly Situated, | No. CV-20-00468-TUC-JCH |
| Plaintiff, | |
| v. | CLASS ACTION |
| Raytheon Technologies Corporation f/k/a Raytheon Company; Thomas A. Kennedy; Anthony F. O'Brien; and Michael J. Wood, | |
| Defendants. | |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND
CONSOLIDATED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     FACTUAL BACKGROUND ............................................................................. 3

        A.      Raytheon Manipulated Significant Contracts Awarded by Its Biggest
                Customer ................................................................................................. 3

        B.      The SAC Clarifies That Each Year Raytheon Was Awarded Only a Few
                Large Contracts by the U.S. Government ............................................... 4

        C.      The SAC Supplies Additional Details About the CWs' Allegations ............ 5

        D.      Defendants Made Several Misrepresentations to Investors Masking These
                Machinations ......................................................................................... 7

        E.      Raytheon Eventually Acknowledged Wrongdoing and Announced That It
                Is Under Criminal Investigation Concerning Its Internal Controls and
                Manipulation of Government Contracts .................................................... 8

III.    ARGUMENT ..................................................................................................... 9

        A.      Defendants' Statements Are Actionable ................................................. 9

                1.      The Accounts of the Confidential Witnesses Are Sufficiently
                        Credible ..................................................................................... 9

                2.      Materiality Is Sufficiently Pleaded ............................................. 14

                3.      Defendants' Representations Touting Important Government
                        Bookings of Over $70 Million and the Risk Factor Warnings
                        Provided to Investors Were Misleadingly Incomplete ................... 19

        B.      The SAC Adequately Pleads Scienter ...................................................... 23

        C.      Loss Causation Is Properly Pleaded ........................................................ 26

IV.     CONCLUSION ................................................................................................ 33

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
554 F.3d 342 (3d Cir. 2009) ...................................................................................... 18

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002) ....................................................................................... 17

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) ................................................................................................... 28

*Azar v. Yelp, Inc.*,
2019 WL 285196 (N.D. Cal. Jan. 22, 2019) .............................................................. 32

*Backe v. Novatel Wireless, Inc.*,
642 F. Supp. 2d 1169 (S.D. Cal. 2009) ..................................................................... 19

*Baird v. BlackRock Institutional Tr. Co., N.A.*,
403 F. Supp. 3d 765 (N.D. Cal. 2019) ...................................................................... 29

*Batwin v. Occam Networks, Inc.*,
2008 WL 2676364 (C.D. Cal. July 1, 2008) .............................................................. 16

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ............................................................................... 13, 22

*Brendon v. Allegiant Travel Co.*,
412 F. Supp. 3d 1244 (D. Nev. 2019) ....................................................................... 33

*Christine Asia Co. v. Ma*,
718 F. App'x 20 (2d Cir. 2017) ................................................................................. 18

*City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*,
302 F. Supp. 3d 1028 (N.D. Cal. 2018) ..................................................................... 21

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005) ..................................................................................... 17

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012) ....................................................................... 18

*Collier v. ModusLink Glob. Sols., Inc.*,
9 F. Supp. 3d 61 (D. Mass. 2014) ............................................................................. 26

*Crowell v. Ionics*, *Inc.*, 343 F. Supp. 2d 1 (D. Mass. 2004) ............................................... 18

*Cutler v. Kirchner*,
696 F. App'x 809 (9th Cir. 2017) ................................................................ 22

*De Vito v. Liquid Holdings Grp., Inc.*,
2018 WL 6891832 (D.N.J. Dec. 31, 2018) .................................................... 18

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ..................................................................... 26, 31

*Emps' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
794 F.3d 297 (2d Cir. 2015) ..................................................................... 13

*Evanston Police Pension Fund v. McKesson Corp.*,
411 F. Supp. 3d 580 (N.D. Cal. 2019*)* ........................................................ 20

*Feiner v. SS&C Techs., Inc.*,
11 F. Supp. 2d 204 (D. Conn. 1998) .............................................................. 17

*Flynn v. Sientra, Inc.*,
2016 WL 3360676 (C.D. Cal. June 9, 2016) ................................................. 23

*Fouad v. Isilon Sys.*,
Inc., 2008 WL 5412397 (W.D. Wash. Dec. 29, 2008) ................................. 26

*Frank v. Dana Corp.*,
646 F.3d 954 (6th Cir. 2011) ..................................................................... 26

*Garbini v. Prot. One, Inc.*,
49 F. App'x 169 (9th Cir. 2002) ................................................................ 27

*Henning v. Orient Paper, Inc.*,
2011 WL 2909322 (C.D. Cal. July 20, 2011) .............................................. 24

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ..................................................................... 22

*In re: Bofi Holding, Inc. Sec. Litig.*,
2016 WL 5390533 (S.D. Cal. Sept. 27, 2016) ............................................. 14

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) ............................................................. 21, 28

*In re Cadence Design Sys., Inc. Sec. Litig.*,
692 F. Supp. 2d 1181 (N.D. Cal. 2010) ....................................................... 13

iii

*In re Campbell Soup Co. Sec. Litig.*,
145 F. Supp. 2d 574 (D.N.J. 2001) ............................................................................. 18

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) .................................................................................... 32

*In re Double Jump, Inc.*,
2022 WL 4390830 (Bankr. D. Nev. Sept. 22, 2022) .................................................. 29

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) .............................................................................. 26, 32

*In re Int'l Rectifier Corp. Sec. Litig.*,
2008 WL 9453468 (C.D. Cal. Dec. 31, 2008) ........................................................... 33

*In re Lason, Inc. Sec. Litig.*,
143 F. Supp. 2d 855 (E.D. Mich. 2001)...................................................................... 17

*In re LDK Solar Sec. Litig.*,
584 F. Supp. 2d 1230 (N.D. Cal. 2008) ..................................................................... 13

*In re Mylan N.V. Sec. Litig.*,
2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ........................................................... 23

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) .................................................................................... 13

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001)......................................................................................... 14

*In re Syncor Int'l Corp. Sec. Litig.*,
239 F. App'x 318 (9th Cir. 2007) ............................................................................... 20

*In re Twitter, Inc. Sec. Litig.*,
2020 WL 4187915 (N.D. Cal. Apr. 17, 2020) ........................................................... 17

*In re UTStarcom, Inc. Sec. Litig.*,
617 F. Supp. 2d 964 (N.D. Cal. 2009) ....................................................................... 25

*In re Williams Sec. Litig. - WCG Subclass*,
558 F.3d 1130 (10th Cir. 2009) .................................................................................. 21

*In re Wilmington Tr. Sec. Litig.*,
29 F. Supp. 3d 432 (D. Del. 2014).............................................................................. 17

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
818 F.3d 85 (2d Cir. 2016).................................................................................... 16, 24

iv

*Institutional Invs. Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009) .................................................................................. 14

*Interpublic Grp. of Cos., Inc. v. Fratarcangelo*,
    2002 WL 31682389 (S.D.N.Y. Nov. 26, 2002) ........................................................ 17

*Karinski v. Stamps.com, Inc.*,
    2020 WL 281716 (C.D. Cal. Jan. 17, 2020) ............................................................ 13

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ............................................................................ 19, 29

*Knox v. Yingli Green Energy Holding Co. Ltd.*,
    242 F. Supp. 3d 950 (C.D. Cal. 2017) ................................................................ 16, 17

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) .......................................................................... 13, 33

*Lopez v. Smith*,
    203 F.3d 1122 (9th Cir. 2000) ................................................................................ 33

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ........................................................................................... 16, 22

*Mauss v. Nuvavsive, Inc.*,
    2015 WL 10857519 (S.D. Cal. Aug. 28, 2015) ........................................................ 19

*McCabe v. Ernst & Young, LLP*,
    494 F.3d 418 (3d Cir. 2007) ................................................................................... 21

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
    164 F. Supp. 3d 568 (S.D.N.Y. 2016) ..................................................................... 23

*Mineworkers' Pension Scheme v. First Solar Inc.*,
    881 F.3d 750 (9th Cir. 2018) ............................................................................ 26, 27

*Nathanson v. Polycom, Inc.*,
    87 F. Supp. 3d 966 (N.D. Cal. 2015) ...................................................................... 16

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W.
    Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ............................................................................ 18, 33

*Noto v. 22nd Century Grp., Inc.*,
    35 F.4th 95 (2d Cir. 2022) ...................................................................................... 23

*Nursing Home Pension Fund v. Oracle Corp.*,
    2006 WL 8071391 (N.D. Cal. Dec. 20, 2006)................................................................ 31

*Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*,
    780 F. App'x 480 (9th Cir. 2019) .............................................................................. 13

*Pennsylvania Pub. Sch. Emps' Ret. Sys. v. Bank of Am. Corp.*,
    939 F. Supp. 2d 445 (S.D.N.Y. 2013) ......................................................................... 17

*Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Tchrs. Ret. Sys. v.
    Amedisys, Inc.*,
    769 F.3d 313 (5th Cir. 2014) ....................................................................................... 21

*Rabkin v. Lion Biotechnologies, Inc.*,
    2018 WL 905862 (N.D. Cal. Feb. 15, 2018) ............................................................... 22

*Reese v. Malone*,
    2009 WL 506820 (W.D. Wash. Feb. 27, 2009)...................................................... 18, 33

*Roberts v. Zuora, Inc.*,
    2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) ............................................................. 13

*Ross v. Career Educ. Corp.*,
    2012 WL 5363431 (N.D. Ill. Oct. 30, 2012) ............................................................... 24

*S.E.C. v. Leslie*,
    2012 WL 116562 (N.D. Cal. Jan. 13, 2012)................................................................ 16

*S.E.C. v. Platforms Wireless Int'l Corp.*,
    617 F.3d 1072 (9th Cir. 2010) .................................................................................... 17

*Schueneman v. Arena Pharms., Inc.*,
    840 F.3d 698 (9th Cir. 2016) ...................................................................................... 19

*Shenwick v. Twitter, Inc.*,
    282 F. Supp. 3d 1115 (N.D. Cal. 2017) ...................................................................... 14

*Siracusano v. Matrixx Initiatives, Inc.*,
    585 F.3d 1167 (9th Cir. 2009) .................................................................................... 22

*Strougo v. Barclays PLC*,
    105 F. Supp. 3d 330 (S.D.N.Y. 2015) ......................................................................... 17

*Thomas v. Magnachip Semiconductor Corp.*,
    167 F. Supp. 3d 1029 (N.D. Cal. 2016)...................................................................... 26

*Todd v. STAAR Surgical Co.*,
   2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) .............................................................. 14

*Washtenaw Cnty. Emps' Ret. Sys. v. Celera Corp.*,
   2012 WL 3835078 (N.D. Cal. Sept. 4, 2012) ............................................................. 13

*Wochos v. Tesla, Inc.*,
   985 F.3d 1180 (9th Cir. 2021) ................................................................................... 30

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009), *as amended* (Feb. 10, 2009).................................. 13, 25

**Statutes**

False Claims Act.......................................................................................................... 19

Private Securities Litigation Reform Act of 1995.................................................. 30, 31

**Other Authorities**

Aggarwal, Rajesh K., and Guojun Wu, "*Stock Market Manipulations*," The
   Journal of Business, vol. 79, no. 4, 2006, pp. 1915–53. ............................................ 30

MacKinlay, Craig A., *Event Studies in Economics and Finance*, The
   Journal of Economic Literature, vol. 35, no. 1, 1997, pp. 13-39................................ 31

Meulbroek, Lisa K, "*An Empirical Analysis of Illegal Insider Trading*,"
   The Journal of Finance, vol. 47, no. 5, 1992, pp. 1661–99. ....................................... 30

Weil, Roman L., Lentz, Daniel G., and Evans, Elizabeth A., *Litigation
   Services Handbook, the Role of the Financial Expert*, 6th Edition, May,
   2017............................................................................................................................ 31

## I.    INTRODUCTION

Raytheon purports to be an aerospace and defense company providing advanced systems and services for commercial, military, and government customers worldwide. ¶29[1] Throughout the Class Period (defined to cover the period from February 10, 2016, to October 27, 2020), the vast majority of Raytheon's revenues (over 67%) derived from long-term contracts it received from the U.S. government. ¶¶1, 36. In its public filings with the Securities and Exchange Commission ("SEC"), Raytheon acknowledged to investors that its contracts with the U.S. government were subject to various government regulations that "impose[d] a broad range of requirements . . . [such as] procurement, import and export, security, contract pricing and cost, contract termination and adjustment, audit and product integrity requirements." ¶37. Raytheon's "failure to comply with th[ose] . . . requirements could result in reductions to the value of contracts, contract modifications or termination, cash withholds on contract payments, forfeiture of profits, and the assessment of penalties and fines, and could lead to suspension or debarment, for cause, from U.S. government contracting or subcontracting for a period of time." *Id.*

Unbeknownst to investors, during the Class Period Raytheon violated its contracts with the government, by for example miscoding for labor charges and manipulating estimates at completion. ¶4. This wrongdoing led to false and misleading Company filings with the SEC, including the improper reporting and disclosure of unearned revenues. *Id.* Raytheon is now the subject of a sprawling criminal investigation by the U.S. Department of Justice and has recently admitted that mispricing of government contracts has occurred. ¶¶9, 11. When the truth finally emerged, Raytheon's stock price plummeted. *Id.* ¶309.

In its prior Order[2] dismissing the action with leave to amend, the Court found that

---

[1] "¶" or "¶¶" refers to the Second Consolidated Class Action Complaint ("Complaint") (Dkt. No. 56). "Mot." refers to Defendants' Motion to Dismiss the Second Consolidated Class Action Complaint (Dkt. No. 59).

[2] Order on Defendants' Motion to Dismiss, November 18, 2022, Dkt. No. 55 ("Order").

the complaint's allegations espouse a "more benign" inference that misconduct occurred in only four contracts out of tens of thousands Raytheon performs annually. Order at 2. That inference overwhelmingly influenced the Court's findings with respect to falsity, materiality, and scienter. The Second Amended Complaint ("SAC") dispels that view, alleging that while Raytheon may have had thousands of contracts, it was only granted a handful of large U.S. government contracts, *i.e.*, over $70 million, each year. Indeed, during the Class Period, the Raytheon Defendants repeatedly underscored their success in securing a handful of such contracts each year in their business segments.[3] The SAC also pleads additional types of false and misleading statements that concern these contract bookings and incomplete risk warnings that failed to disclose to investors that some of the risks stemming from violations of government contracts had already materialized. ¶¶253-256, 296-299. The SAC also adds clarifying details to the accounts of several confidential witnesses and provides corroborating accounts of additional confidential former employees attesting to the wrongdoing. ¶¶56, 58, 60-69, 71-73, 92-95. Furthermore, the SAC pleads Defendants' failure to disclose the internal and government investigations. *See e.g.*, ¶¶120, 234, 245, 256.

The SAC also plausibly pleads that the criminal investigation by the Department of Justice into the misconduct caused a loss of over $6 billion in Raytheon's market capitalization. ¶309. Analysts repeatedly linked this significant drop to the criminal inquiry as opposed to other extraneous factors such as the Covid pandemic. ¶¶310-13. Indeed, information about the pandemic's effect on Raytheon's operations was not "new" and had already been assimilated into the price of Raytheon's securities. ¶¶315-16. Moreover, in the days immediately after the announcement of the criminal investigation, Raytheon's stock price underperformed the industry index. ¶317.

---

[3] *See, e.g.*, ¶¶83, 85, 87; 2015 10-K at 53-54, 56, 58, 60; 2016 10-K at 54, 56, 58-59, 61.

2

Accordingly, Defendants' Motion should be dismissed in its entirely.

## II.    FACTUAL BACKGROUND

### A.    Raytheon Manipulated Significant Contracts Awarded by Its Biggest Customer

Several corroborating confidential witnesses ("CWs") detail the misconduct at Raytheon. For example, CW1, who worked at Raytheon as a Purchasing Agent and Subcontracts Manager auditing procurement group pre-award and post-award purchase order files to ensure compliance with U.S. government requirements, recounted that he witnessed many instances of wrongdoing at Raytheon related to a government contract worth approximately $11.5 billion. ¶¶41-42. The contract's life spanned throughout the Class Period. According to CW1, the misconduct related to this contract alone, which continued until mid-2018, included failure to submit sub-contracts to a competitive bidding process as required by federal law and regulations, resulting in Raytheon improperly overcharging the government. ¶43. Raytheon also miscoded for labor charges related to this contract. ¶44. There was other misconduct related to the contract, including inflated Estimates at Completion.  ¶¶46, 49.

CW2, an auditor responsible for ensuring that Raytheon complied with U.S. guidelines for "fair and reasonable" pricing, corroborated CW1's account that Raytheon violated Federal Acquisition Regulations and Defense Federal Acquisition Regulations by failing to place bids through a competitive process. ¶¶51-55. Likewise, CW3, a Raytheon Senior Financial Analyst who worked across all of the projects Raytheon handled, including Missiles and Defense, corroborated CW1's account that the Company was inflating Estimates at Completion. ¶56. CW3 explained that these manipulations happened on "almost every project" CW3 was privy to at Raytheon, and that the contracts were valued in the high millions. *Id.*

Other CWs reported similar wrongdoing, which sparked internal as well as

3

government investigations. For example, CW4, a Principal Finance Analyst in Raytheon's Financial Controls Department working in the Missile Systems division, recounted that shortly after s/he started her job at Raytheon in mid-2019, s/he learned from a colleague that Raytheon was being investigated by the U.S. Department of Justice ("DOJ") and that there were issues with Estimates at Completion. ¶60. CW5, the Vice President of Business Development at Raytheon's Missile Systems also explained that in mid-2018, s/he learned from a former colleague and friend still employed at Raytheon that an internal audit at the Company showed at least $250 million of false labor charges made on several contracts related to Raytheon's naval weapons system. ¶61. Similar misconduct was reported by CW11, who learned in late 2018 or early 2019 from another colleague that several Raytheon employees were "fudging numbers" on contracts. ¶90.

**B.      The SAC Clarifies That Each Year Raytheon Was Awarded Only A Few Large Contracts by the U.S. Government**

The SAC explains that while Raytheon may have "tens of thousands" of smaller contracts, there are very few large contracts where Raytheon is the prime contractor. CW10 conveyed this significant point. ¶73. CW10 (described below) explained that "prime contracts" are contracts that Raytheon obtains directly from the government. *Id*. CW10 pointed out that it is those prime contracts that are the ones that typically make more money for Raytheon. *Id*. In contrast to these few prime contracts that Raytheon has with the U.S. government, Raytheon has many smaller contracts that are given to it from other companies that have main contracts with the government. *Id*.

The clarification provided by CW10 is corroborated by Raytheon's own representations. For example, Raytheon's annual report on Form 10-K for the year ended December 31, 2016 states that "[Raytheon] serve[s] both domestic and international customers, ***primarily as a prime contractor*** or subcontractor on a broad portfolio of defense and related programs for government customers." (emphasis added). ¶75.

4

Importantly, during the Class Period, Raytheon singled out for investors only a ***handful of contracts***—the prime contracts, *i.e.*, worth over $70 million—that the Company was awarded each year by the U.S. government. *See*, *e.g.*, ¶¶83, 85, 87 (highlighting a handful of prime contracts for Raytheon's Integrated Defense Systems ("IDS") segment, which is now part of Missiles and Defense) (¶76, n.21). The DOJ investigation involves at least four Missile and Defense contracts that the U.S. government awarded Raytheon: three contracts awarded between 2011 and 2013, and the fourth awarded in 2017. ¶76. Notably, in each of those years, just a handful of important contracts were awarded by the U.S. government to Raytheon. *See* ¶77 (showing a handful of contracts awarded in 2011); ¶79 (showing a handful of contracts awarded in 2012); ¶81 (showing a handful of contracts awarded in 2013); ¶83 (showing a handful of contracts awarded in 2017).

### C.    The SAC Supplies Additional Details About the CWs' Allegations

CW3. The SAC clarifies that CW3 worked in Raytheon's Missile and Defense System. ¶56. S/he reported to the Finance Manager, Clayton Lesher. CW3's job responsibilities included creating an analysis of data, *i.e.*, working with project managers on budgets and forecasts and calculating Estimates at Completion. *Id*. It was CW3's job to determine how long each project would stay in each department; how long it would be in engineering and then onto the next phase. *Id*. CW3 explained that there were ten programs within Raytheon's Missiles and Defense, and CW3 worked on all of the programs, including the Javelin and Tomahawk programs. *Id*. CW3 explained that Raytheon benefitted from the intentional slow-down of the projects, because the government would reimburse Raytheon for the slowdown. ¶58. CW3 said the misconduct was significant because, if detected, it would cause Raytheon to lose contracts. *Id*.

CW4. The SAC clarifies that CW4 was a Principal Finance Analyst, which is the equivalent of Senior Finance Analyst. ¶60. CW4 reported to Trent Bell, the Finance Manager, a position that is a level below a Director in the corporate hierarchy. *Id*. CW4

5

handled all of the financial controls and "earn value" for government contracts, and all the roll-ups for the Estimates at Completion for the hypersonic missiles program. *Id*. CW4 was responsible for reviewing and rolling the EACs up the corporate chain, sending those numbers to the program managers, the finance managers, and the directors, who in turn provided the EACs to the executives within that business area, *i.e.*, the hypersonic missiles division. *Id*. CW4 recounted that shortly after s/he started his/her job in mid-2019, s/he learned from a colleague that Raytheon was being investigated by the U.S. Department of Justice and that "there were issues with EACs, Estimates at Completion." *Id*. The colleague was David Zincke, who was a Senior Manager in Material Program Management. *Id*.

CW5. The SAC clarifies that CW5 reported to Bob Fitzpatrick, the Vice President of Business Development for all of Raytheon's Missile Systems. ¶61. In mid-2018, CW5 learned from a former colleague and friend, Paul Hanson, still employed at Raytheon at that time, that an internal audit at the Company showed at least $250 million of false labor charges made on several contracts related to Raytheon's naval weapons system, which is now part of Missiles and Defense. *Id*.; *Compare* 2011 10-K at 4 *with* 2021 10-K at 6. Hanson was Director of Capture Management Excellence at Raytheon, and he reported directly to Vice President of Business Development Bob Fitzpatrick, and Stephen DuMont, who was Fitzpatrick's predecessor. *Id*. Fitzpatrick and DuMont reported directly to Taylor Lawrence, who was the Vice President overseeing Raytheon's Missile Systems. *Id*. Lawrence reported directly to Raytheon's CEO, Defendant Kennedy. *Id*.

According to CW5, several high-level Raytheon employees allegedly fudged the numbers to ensure Raytheon met its profit margins (and the employees got their bonuses). ¶62. These high-level employees included Todd Callahan, the Deputy Vice President of Naval Weapon Systems, Richard McDonnell, the Program Manager for Close-in Weapon System, and Tina Fay, the Contract Director for the entire product line. *Id*. Callahan

6

reported directly to Lawrence. *Id.* McDonnell and Fay reported directly to Callahan. *Id.* These three employees were fired due to this misconduct, as CW5 learned from Hanson. *Id.* Hanson knew they were fired because he saw Callahan, McDonnell, and Fay get marched out by security. *Id.* Also, one of Hanson's employees, a senior manager named Darcy McDonnell, was married to Richard McDonnell, and she told Hanson why they were fired: due to the misconduct. *Id.* Callahan, McDonnell and Fay were swapping labor charges amongst contracts. ¶63. They fraudulently reported labor charges against different contracts to float problems from one contract to another. *Id.*

### D. Defendants Made Several Misrepresentations to Investors, Masking These Machinations

In their filings with the SEC, Defendants specifically singled out for investors the largest and most important contracts Raytheon was awarded by the U.S. government. *See*, *e.g.*, ¶¶77, 79, 81, 83, 85, 87. These bookings were a handful but were significant for Raytheon to highlight because they involved contracts of over $70 million awarded by the Company's most important customer. Indeed, Raytheon referred to such bookings as "an important measure of future performance." 2017 10-K at 49; 2018 10-K at 48; 2019 10-K at 55. While touting critical bookings, Defendants failed to disclose that some of Raytheon's major contracts with the U.S. government were tainted with wrongdoing. The Raytheon Defendants learned of this wrongdoing at least as early as mid-2018, when an internal audit found over $250 million in false labor charges. ¶¶6, 61, 120. This was also around the time the Pentagon was investigating the misconduct, which resulted in firings of several high-level employees. ¶¶62-63, 90. Importantly, ***the misconduct was not disclosed to investors until years later***, in 2020, when Raytheon announced a criminal investigation by the DOJ. Moreover, in their public filings and in statements made from mid-2018 until the end of the Class Period, Defendants failed to disclose both the internal and DOJ investigations into Raytheon's misconduct.

7

Defendants also made false and misleading risk representations to investors, warning only generally that U.S. government contracts are subject to certain laws, regulations, and requirements, including contract pricing and cost, and that failure to comply with these regulations and requirements could result in reductions to the value of contracts and other penalties. *See*, *e.g.*, ¶¶255, 298. These warnings were misleadingly incomplete because they failed to disclose that Raytheon had already identified misconduct related to these contracts. Moreover, the DOJ was investigating the misconduct.

During the Class Period, Raytheon also filed reports, forms, and other documents with the SEC that contained false and misleading statements regarding the effectiveness of the Company's internal controls and procedures. For example, Raytheon consistently represented that its "disclosure controls and procedures" during the relevant time "were effective." ¶108. Contrary to the Defendants' representations, Raytheon's internal controls over financial reporting were not effective, and did not provide reasonable assurances that transactions were properly executed and/or recorded. ¶110. For example, during the Class Period, Defendants failed to appropriately report various key financial measures as a result of the misuse, misappropriation, and violations of the prescribed protocols and parameters of Raytheon's contracts with the government. *See*, *e.g.*, ¶¶110, 128, 150, 189, 247, 290. Because of such misuse, misappropriation, and violations of parameters, Raytheon was not entitled to the benefits of the revenue it generated thereunder. ¶110.

**E.    Raytheon Eventually Acknowledged Wrongdoing and Announced That It Is Under Criminal Investigation Concerning Its Internal Controls and Manipulation of Government Contracts**

On October 27, 2020, Raytheon informed investors that it received a criminal subpoena from the DOJ, seeking information and documents in connection with an investigation relating to financial accounting, internal controls over financing, and cost reporting regarding its Missiles & Defense business since 2009. ¶9. On this shocking news,

8

the Company's stock price tumbled $4.19 per share, or approximately 7%, on unusually heavy trading volume, wiping out ***$6.36 billion*** in market capitalization. ¶10, 309.

Then, on April 27, 2021, Raytheon announced it received another criminal subpoena from the DOJ in connection with its investigation into defective pricing of several government contracts. ¶11. On a conference call held on the same day, Raytheon's current CEO, Greg Hayes, admitted Raytheon engaged in wrongdoing. Hayes affirmed that "[i]t was alleged that we defectively priced some contracts. ***We've looked into it, we think there is potential liability for defective pricing clearly***." He said the issues under the criminal investigations are events that "***should not have occurred . . . But they did***." *Id.*

## III. ARGUMENT
### A. Defendants' Statements Are Actionable

The SAC alleges four categories of false and misleading statements: (i) statements highlighting important bookings of over $70 million that Raytheon was awarded by the U.S. government each year; (ii) risk factor statements; (iii) statements about inflated financial metrics; and (iv) statements about Raytheon's internal controls. Categories (i) and (ii) were not asserted in the prior complaint and are newly asserted. Defendants' representations across all categories are actionable given the SAC's new context.

#### 1. The Accounts of the Confidential Witnesses Are Sufficiently Credible

In its Order, the Court credited the allegations of CW1 about the support services contract as having sufficient indicia of reliability. Order at 11. The Court, however, found the allegations of CW2-CW7[4] unreliable on their *own*, pointing out some missing details that would have been helpful to the Court's analysis. Order at 10-16. As explained above, the Complaint provides the missing details for some of these witnesses and clarifies information supplied by those witnesses. *See supra* at 5-7. Significantly, the Complaint

---

[4] CW6 appears as CW11 in the SAC. ¶90. CW7 appears as CW12 in the SAC. ¶91.

9

also adds the accounts of additional corroborating witnesses.

New witness CW6.[5] CW6 corroborates CW5's account. ¶66. CW6 stated that Callahan, McDonnell, and Fay got fired and were "walked out" in October 2018 for trying to hide their cost overruns on their EACs. *Id.* CW6 explained that Callahan, McDonnell, and Fay were fudging the EACs so they wouldn't show how bad their numbers were. *Id.* They were taking money from different projects to beef up their management reserves because they were overspending. *Id.* CW6 said that Callahan, McDonnell and Fay were improperly moving the money around at the end of the project to hide cost overruns. *Id.*[6]

New witness CW7. According to CW7, Raytheon fired a "couple-dozen" Tucson-based employees, including senior leaders, when s/he was still at the company in 2018 for issues related to EACs, like "playing with the numbers" and "cooking the books."[7] ¶67. According to CW7, "it was a huge deal," and "a lot of high-level people were fired because

---

[5] CW6 was the Supplier and Control Program Manager for the Missiles & Defense division from August 2006 to October 2021 based in McKinney, Texas. ¶65. CW6 reported to Program Director Heather Shoup, who reported to Senior Director Joe Davis. *Id.* Davis reported to Eugene Jaramillo, Vice President Global Supply System Management. *Id.* CW6's job responsibilities included preparing EACs for the various projects he worked on, which included managing twelve program hardware portfolios worth $160 million. *Id.*

[6] Contrary to Defendants' contention, the accounts of CW5 and CW6 are not "flatly inconsistent" with those of CW3. (Mot. at 13). CW5 and CW6 both recount cost overruns related to labor charges and manipulations of those costs, which were discovered in 2018 (but were concealed from investors). CW5 explained that for "*some*" contracts (but not for all contracts), Raytheon gave an incentive fee if the contract was finished timely and with the right amount of hours. CW3 described misconduct he witnessed leading into the Class Period and related to other projects, the Javelin and Tomahawk projects. Moreover, CW5's statements are not self-contradictory (Mot. at 14). CW5 described false labor charges impacting several contracts totaling at least $250 million in 2018, including one large and important naval contract. ¶¶61, 64. This allegation is consistent with CW13's account, which stated that the misconduct identified in 2018 related to a U.S. navy contract worth over $200 million. ¶94.

[7] CW7 worked for Raytheon from September 2014 to November 2018 as a Principal Integrated Program Management Analyst in Missiles and Defense. ¶67. In this position, s/he supported Finance, Engineering, and other types of employees through research and analysis related to predicted costs and project schedules. *Id.* CW7 also worked on EACs. S/he reported to Senior Section Manager – Program Management Excellence Urshala Bowles, who reported to Department Manager Justin Bailes. *Id.*

10

of it." *Id.* One high-level employee who was implicated in the EAC issue was Vice President of Missile Systems Taylor Lawrence. *Id.* CW7 also said Tina Fay was implicated. Id. According to CW7, the naval air division (which is now under Missiles and Defense) was linked to the EAC issues. *Id.*

New witness CW8. CW8 explained that the DOJ investigation of the 2017 Raytheon contract led to the eventual ouster of several senior executives at the Company: Steve Murphy, the Vice President of Contracts, Offset & Localization for the Missiles & Defense division; Heather Asbell, the Chief Financial Officer for the Missiles & Defense division; and Sean Sabin, Raytheon's Vice President and General Counsel for the Missiles & Defense division.[8] ¶68.

New witness CW9: According to CW9, CFO of Contracts Heather Asbell, VP and General Counsel Sean Sabin and VP of Contracts Steve Murphy, all of whom worked in Missiles & Defense, left Raytheon due to "EAC-type accounting issues."[9] ¶69.

Raytheon hid from investors what led to the departure of the three senior executives. ¶70. The departures were announced in an internal email dated January 2022. *Id.* The email, sent by Raytheon's Missiles and Defense President Wesley Kremer, called it a "significant change" but did not elaborate on why the executives had left. *Id.*

New witness CW10. As described above, CW10 explained that Raytheon has very few prime contracts with the U.S. government.[10] ¶73. CW10 also stated that the ouster of

---

[8] CW8 worked at Raytheon from mid-2015 to mid-2022 and was the Contracts Manager, Missiles & Defense from mid-2021 to mid-2022. ¶68. Before that time, s/he was the Subcontracts Manager for Missiles & Defense. *Id.*

[9] CW9 worked for the Missiles & Defense division of Raytheon from December 2001 to October 2021 based in Tucson, Arizona. ¶69. S/he was Manager, Contracts from September 2017 to October 2021 and Senior Contracts Negotiator from March 2015 to September 2017. *Id.* CW9's job responsibilities included managing the contracts Raytheon was working on. *Id.*

[10] CW10 was the Senior Manager, Contracts/Hypersonics Portfolio Lead, Missiles & Defense for Raytheon from December 2021 to December 2022 and the Senior Manager,

11

Raytheon's executives Murphy, Asbell and Sabin was linked to the DOJ investigation. ¶72.

New witness CW13. According to CW13, Todd Callahan, Rick McDonnell, and Tina Fay were fired in October 2018 for "manipulating" EACs for a U.S. navy contract worth over $200 million.[11] ¶94.

New witness CW14. CW14 stated that one of the contracts that the DOJ is investigating for criminal wrongdoing relates to the Patriot Guided Enhanced Missile Program.[12] ¶95. Given the SAC's new allegations, the accounts of the confidential witnesses are reliable on their own or, at the very list, are reliable when considered with the totality of the other allegations asserted.[13]

---

Program Contracts for Intelligence & Space from 2020 to December 2021. ¶71. CW10's duties included leading the contracts team and all contract management activities for multiple Hypersonic programs/contracts portfolio, which included reviewing and analyzing EACs. *Id*. "I was what they called the contract police," CW10 said. CW10 explained that s/he had a high security clearance level, and s/he also attended monthly EAC meetings held by Raytheon Intelligence & Space President Roy Azevedo, where Vice President & Chief Operating Systems for Intelligence & Space, Dave Broadbent, was also present. *Id*. Azevedo reported directly to Raytheon's CEO, currently Greg Hayes. As part of his/her job, CW10 did the forensics on the EACs. *Id*.

[11] CW13 worked for the Missiles & Defense division of Raytheon from mid-2014 to mid-2020 based in Tucson, Arizona. ¶92. CW13 was Program Manager for the Stormbreaker Program from mid-2015 to mid-2020 and Lead Material Program Manager from mid-2014 to mid-2016. *Id*. CW13 reported to Director Alison Howlett. Howlett reported to Executive Director Trevor Dunlap. *Id*. Dunlap reported to Vice President Paul Ferraro. Ferraro reported to Wes Kramer, President of Missiles & Defense. *Id*. Ferraro reported to CEO Tom Kennedy and, after his departure, to CEO Gregory Hayes. *Id*. CW13's job responsibilities included overseeing EACs. *Id*.

[12] CW14 worked for the Missiles & Defense division from March 2007 to October 2022. ¶95. S/he was a Senior Contracts Negotiator from March 2007 to October 2019 and a Contract Manager from October 2019 to October 2022. *Id*. CW14 reported to the Senior Manager of Contracts Kelly Hill, who in turn reported to the Director of Contracts, Jim Natali. *Id*. Natali reported to the Senior Director of Contracts Joel Taves. *Id*. CW14's job responsibilities included negotiating contracts with the U.S. government for the Missiles and Defense division. *Id*.

[13] Courts are clear that confidential witnesses need not have direct contact with defendants for their allegations to be deemed credible. *Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *10-11 (N.D. Cal. Apr. 28, 2020) (rejecting defendants' argument that the confidential witness allegations should not be credited because they lacked direct contact with the

12

Courts do not require that the confidential witnesses observe facts "first-hand" as long as they are described sufficiently to support the conclusion that they were "in a position to infer" or "could reasonably deduce" the facts attributed to them. *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008); *In re Cadence Design Sys., Inc. Sec. Litig.*, 692 F. Supp. 2d 1181, 1188 (N.D. Cal. 2010) ("'[P]ersonal knowledge' . . . is not a hard-and-fast requirement."); *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1243 (N.D. Cal. 2008) (same).[14] Moreover, the confidential witnesses' allegations are not unreliable because they include hearsay, and courts routinely hold that allegations relaying information heard or gleaned from others *can* support an inference of scienter. *Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484-85 n.5 (9th Cir. 2019); *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 997 n.4 (9th Cir. 2009), *as amended* (Feb. 10, 2009) ("the fact that a confidential witness reports hearsay does not automatically disqualify his statement from consideration in the scienter calculus"). Here, moreover, the SAC discloses the names of the individuals from which the witnesses gleaned the information relayed.[15]

defendants); *see similarly Washtenaw Cnty. Emps' Ret. Sys. v. Celera Corp.*, 2012 WL 3835078, at \*3 (N.D. Cal. Sept. 4, 2012). And confidential witnesses need not be within any specific proximity or degree of reporting to the Individual Defendants for their statements to support an inference of scienter. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1139, 1145 (9th Cir. 2017) (finding statements of "five lower-level [] employees" supported a strong inference of scienter).

[14] Defendants' argument that a confidential witness can only be deemed credible if the individual holds a "high-level" position would also inappropriately insulate defendants in securities class actions because it would arbitrarily limit the pool of potential whistleblowers for no reason other than an employee's standing in the corporate totem pole, irrespective of the fraud-revealing information the person possesses. *See Karinski v. Stamps.com, Inc.*, 2020 WL 281716, at \*16 (C.D. Cal. Jan. 17, 2020) (crediting allegations from low-level employees); *Emps' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015) (same).

[15] Courts routinely credit allegations from witnesses that are not employed during the class period, in conjunction with other allegations. *See*, *e.g.*, *In re: Bofi Holding, Inc. Sec. Litig.*, 2016 WL 5390533, at \*10, n.5 (S.D. Cal. Sept. 27, 2016) (former employee that worked at

### 2.    Materiality Is Sufficiently Pleaded

The SAC sufficiently alleges materiality. As explained above, the SAC clarifies that while Raytheon may have thousands of contracts, these contracts are in fact more akin to subcontracts because they are not large contracts (*i.e.*, over $70 million) that the U.S. government awards Raytheon. Raytheon is awarded yearly only *a handful of contracts* by the U.S. government, and these contracts, which are over $70 million each, are repeatedly boasted by the Company to investors. Raytheon is under criminal investigation for defective pricing and inappropriate internal controls related to *four* contracts in Missiles and Defense that were awarded to the Company by the U.S. government: three contracts executed between 2011 and 2013 and one contract executed in 2017. ¶¶308, 320.

Other allegations show materiality given the SAC's clarifying context. For example, CW5 alleges that a mid-2018 internal audit uncovered approximately $250 million of false labor charges, including charges related to a large and important contract for Raytheon's naval systems, now part of Missiles and Defense. ¶¶61, 64; *see supra* at 6, 12. CW5 explained that naval systems did about one billion a year in business, so the $250 million of false labor charges was a significant part of that business. *Id*. Three very high-level employees were fired for their misconduct in connection with that key contract: Todd Callahan, then the Deputy Vice President of Naval Weapon Systems, Rick McDonnell, the Senior Director, Advanced Missile System Program Execution for CIWS [Close-in Weapon System], and Tina Fay, Contract Director for the entire product line. ¶¶62-64.

---

company before the class period corroborated pattern of misconduct established by other allegations); *Todd v. STAAR Surgical Co*., 2016 WL 6699284, at *7 (C.D. Cal. Apr. 12, 2016) ("[I]t simply does not follow that the Court must completely shut its eyes to such allegations [of pre-class period conduct] when examining the overall context in which such statements at issue were made."); *see similarly Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1125 n.8 (N.D. Cal. 2017); *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 249 n.13 (3d Cir. 2009); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).

14

New CW6 corroborates CW5's account, confirming that Callahan, McDonnell and Fay were terminated in October 2018 for manipulating the EACs and improperly moving money around at the end of the project to hide cost overruns. ¶66. Likewise, CW7 recounted that many high-level employees were fired in 2018 for fudging the EACs, and the manipulations were a "huge deal." ¶67. CW7 stated that Tina Fay and Taylor Lawrence, the Vice President overseeing Raytheon's Missile Systems at that time, were among the people implicated in the EAC manipulations, which were linked to the naval weapons systems. *Id*. CW13 similarly conveyed that Callahan, McDonnell and Fay were terminated in October 2018 for manipulating EACs for a U.S. navy contract worth over $200 million. ¶94. The manipulation of this sizeable contract alone supports materiality in light of the SAC's new context and allegations.[16]

Separately, CW14 explained that the DOJ investigation involves at least the Patriot Guided Enhanced Missile Program. ¶95. During the Class Period, the Raytheon Defendants repeatedly singled out Patriot contracts as one of the very few large contracts awarded to the Company by the U.S. government. ¶¶83, 85, 87. The SAC also pleads misconduct related to the Javelin and Tomahawk programs. As CW3 clarifies in the SAC, there were 10 programs in Missiles and Defense and CW3 worked on all of them, including on the Javelin and Tomahawk ones. ¶56. CW3 recounted manipulations of EACs (such as improper labor charges) for at least the Javelin and Tomahawk projects. *Id*. According to CW3, the misconduct was significant because it could potentially cause Raytheon to lose contracts with the government. ¶58. The Tomahawk project involved large and important contracts awarded to Raytheon by the U.S. government related to the U.S. Navy. ¶59. Raytheon highlighted these yearly contracts to investors, underscoring their importance.

---

[16] Indeed, Raytheon has already accrued a reserve of approximately $290 million relating to the investigation after the Company "determined that there is a probable risk of liabilities for damages, interest and penalties." ¶76.

15

¶212 (stating that in 2017, Raytheon booked $424 million for Tomahawk for the U.S. Navy). The fact that such important contracts were tainted with wrongdoing further contributes to a finding of materiality at the pleading stage.

Defendants' formulaic approach to materiality of relying on a single numerical benchmark cannot be squared with Supreme Court precedent. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 28, 30 (2011) ("bright-line" and "categorical" rules "would 'artificially exclud[e]' information that 'would otherwise be considered significant to the trading decision of a reasonable investor.'" *See also Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96 (2d Cir. 2016) ("We reject SAIC's materiality argument, which asks us to consider quantitative factors only in the narrowest light . . . ."). Courts in this Circuit have consistently held "[t]hat even quantitatively small amounts can still present a materially misleading picture of a company's health." *S.E.C. v. Leslie*, 2012 WL 116562, at *6 (N.D. Cal. Jan. 13, 2012). "[V]arious '[q]ualitative factors may cause misstatements of quantitatively small amounts to be material.'" *Id.*; *Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *21 (C.D. Cal. July 1, 2008) (financial statements were materially misleading even though "the difference between the revenue reported and the revenue restated is *de minimis*"); *Knox v. Yingli Green Energy Holding Co. Ltd.*, 242 F. Supp. 3d 950, 971-72 (C.D. Cal. 2017) (materiality despite Defendants' contention that the amount at issue was less than 5% of assets); *Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 973 (N.D. Cal. 2015) (materiality despite the amount at issue being a tiny fraction of total company operating expenses).[17]

---

[17] *See also Interpublic Grp. of Cos., Inc. v. Fratarcangelo*, 2002 WL 31682389, at *11 (S.D.N.Y. Nov. 26, 2002) (denying summary judgment despite defendant's argument that the alleged revenue overstatement was a "minuscule 0.14%"); *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 349 (S.D.N.Y. 2015) (finding materiality where the numerical threshold was 0.1% because "it is inappropriate to focus only on the revenue stream . . .").

16

Courts consider other factors in assessing materiality, such as whether the misstatement concerns a segment or other portion of the . . . business that has been identified as playing a significant role in the registrant's operations or involves concealment of an unlawful transaction. *Knox*, 242 F.Supp.3d at 971. Here, the four contracts under criminal investigation relate to the Missiles and Defense segment, one of the few key segments playing a significant role in Raytheon's operations, and *also* involves alleged unlawful conduct that is under criminal investigation by the U.S. government.

Defendants seek to evade liability by claiming that they do not think that the criminal investigation would have a material impact on Raytheon's financial condition. (Mot. at 17). For one, materiality is not limited to numerical thresholds or financial conditions. *See supra* at 16-17. For another, the ***Ninth Circuit has squarely rejected this type of argument***, underscoring that "if such a self-serving assertion could be viewed as controlling, there would never be a successful prosecution or claim for fraud." *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1094-95 (9th Cir. 2010); *see also In re Twitter, Inc. Sec. Litig.,* 2020 WL 4187915, at \*14 (N.D. Cal. Apr. 17, 2020) (Defendants' belief that a challenged statement is not misleading is self-serving and unavailing). "[S]elf-serving statements cannot be credited at the motion to dismiss stage." *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 17 (D. Mass. 2004). A reasonable investor would surely want to

---

The simple fact that Raytheon did not restate its financials (Mot. at 18) does not undercut Plaintiff's allegations. The failure to restate "does not indicate, much less prove, the accuracy of those figures." *Feiner v. SS&C Techs., Inc.*, 11 F. Supp. 2d 204, 209 (D. Conn. 1998); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 84 (1st Cir. 2002) (rejecting defendants' argument that without a restatement or admission no liability could attach because it would shift responsibility to accountants from courts and would allow officers and directors unwarranted degree of control over whether they are sued because they must agree to a restatement); *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 682 (6th Cir. 2005) (actionable GAAP violations alleged without restatement); *In re Lason, Inc. Sec. Litig.*, 143 F. Supp. 2d 855, 858 (E.D. Mich. 2001) (same); *In re Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d 432, 445 (D. Del. 2014) (same); *Pennsylvania Pub. Sch. Emps' Ret. Sys. v. Bank of Am. Corp.*, 939 F. Supp. 2d 445, 452-53 (S.D.N.Y. 2013) (same).

17

know that Raytheon manipulated four of the very few large Missile and Defense contracts the U.S. government awarded it.

Defendants' factual dispute on materiality is also undermined by the market's shock when the truth was finally revealed, showing that the investors were surprised. ¶¶308-09; *see No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003) (market reaction supports finding of materiality); *De Vito v. Liquid Holdings Grp., Inc.*, 2018 WL 6891832, at *30 (D.N.J. Dec. 31, 2018) (stock movement after disclosure is a proxy for materiality); *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 589 (D.N.J. 2001) (same). The SAC clarifies that the 7% drop was not just a trivial dent in the company's value but that it caused a market capitalization loss of ***over $6 billion***. ¶309. *See, e.g.*, *Reese v. Malone*, 2009 WL 506820, at *8 (W.D. Wash. Feb. 27, 2009) (2.8% market drop sufficient for loss causation where it represented a "$6+ billion market capitalization loss"); *Alaska Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 352 (3d Cir. 2009) ("And, of course, the materiality of the alleged misrepresentations is self-evident when we look at the market's negative reaction - to the tune of a nine-percent drop in stock price in three days ...."); *Christine Asia Co. v. Ma*, 718 F. App'x 20, 22 (2d Cir. 2017) (citing to "market reaction" of a 13% drop over 2 days to show "the importance of this information to investors"); *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 368 (S.D.N.Y. 2012) (share price decline of "almost 10%" supports materiality). This additional clarification supports a finding of materiality at the pleading stage.

On these facts, a reasonable investor would have found such misconduct material in deciding whether to purchase or sell Raytheon securities. *See Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1190 (S.D. Cal. 2009) (cancellation of contract with largest

18

customer material to investors). [18] Defendants' machinations threatened to expose Raytheon to criminal and civil prosecution, the imposition of fines and penalties, and/or the exclusion from participation in government contracting. Indeed, Defendants' illicit practices culminated in several criminal subpoenas to date and the Company's admission that defective pricing occurred. ¶¶308, 319, 321-22.[19]

### 3. Defendants' Representations Touting Important Government Bookings of Over $70 Million and the Risk Factor Warnings Provided to Investors Were Misleadingly Incomplete

In their annual reports filed during the Class Period, Defendants chose to tout the large bookings Raytheon obtained from the U.S. government that exceeded $70 million per contract. *See* ¶¶83, 85, 87, 253, 296. Having chosen to boast this information to investors, Defendants had a duty to disclose the whole truth. While the federal securities laws do not require companies to disclose every aspect of questionable conduct to investors, "once defendants [choose] to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1009 (9th Cir. 2018) (alterations in original); *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016).

It was misleading for Defendants to boast about multi-million-dollar contracts Raytheon was awarded by the U.S. government without disclosing the fact that some of

---

[18] Given the SAC's new allegations, Plaintiff respectfully submits that Defendants' representations concerning financial metrics and internal controls are also actionable. Raytheon's internal controls and procedures are currently the subject of a criminal investigation by the DOJ. ¶234. The statements about internal controls, in the context in which they were made, were materially false and misleadingly incomplete when made because Defendants failed to disclose that Raytheon already identified significant misconduct by mid-2018 in an internal audit. *See supra* at 7-8. Additionally, the DOJ was investigating the misconduct. ¶120.

[19] Relatedly, Defendants' misconduct also violated the False Claims Act ("FCA") ¶¶118-119. Plaintiff does not have to allege an independent, *per se* violation of the False Claims Act. *Mauss v. Nuvavsive, Inc.*, 2015 WL 10857519, at *8 (S.D. Cal. Aug. 28, 2015).

19

these very few large and important contracts were tainted by wrongdoing—a wrongdoing perpetrated by the top echelon at Raytheon. *See*, *e.g.*, *In re Syncor Int'l Corp. Sec. Litig.*, 239 F. App'x 318, 320 (9th Cir. 2007) ("By attributing Syncor's success solely to legitimate practices, defendants implicitly (and falsely) warranted that there were no illegal practices contributing to that success."); *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 599 (N.D. Cal. 2019*)* ("Having touted the good news . . . McKesson had a duty to also disclose that some portion of its increased profits was actually due to far riskier and less sustainable unlawful agreements.).")

Here, as explained above, Defendants knew at least as early as mid-2018 that manipulations occurred related to a very large contract with the U.S. government worth over $200 million, and that officials at a very-high level were involved in the wrongdoing. Despite such knowledge, Defendants failed to disclose these significant developments to investors when touting their large bookings. "Having touted the good news," the Raytheon Defendants "had a duty to also disclose that some" of these large contracts were tainted with wrongdoing, and that at least for some of these contracts the wrongdoing involved those at the very top. *Id*.

Defendants argue that Plaintiff pleads no plausible connection between the alleged investigations in mid-2018 and the disclosure of the DOJ subpoena (Mot. at 20). In effect, Defendants improperly inject a "mirror-image" requirement, *i.e.*, that the corrective disclosure precisely mirror the alleged misstatements or omissions. ***But this is not the law***. To be corrective, a disclosure "need not precisely mirror the earlier misrepresentation. . . It is enough if the disclosure reveals new facts that, taken as true, render some aspect of the defendant's prior statements false or misleading." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020) (citations omitted); *see also City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1046 (N.D. Cal. 2018)

20

("[A] corrective disclosure need not be a 'mirror image' disclosure—a direct admission that a previous statement is untrue."); *Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 322 (5th Cir. 2014) (observing that "to be corrective, a disclosure need only relate back rather than precisely mirror the earlier misrepresentation") (citing *In re Williams Sec. Litig. - WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009)); *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 428-29 (3d Cir. 2007) (loss causation satisfied "if the misrepresentation touches upon the reasons for the investment's decline in value").

Nevertheless, the SAC *does plead* a *plausible* connection between the internal investigation in mid-2018 and the announcement of the criminal subpoena.[20] For example, an internal audit found misconduct related to at least one large government contract worth over $200 million involving what is now the Missiles and Defense division. ¶94. On October 27, 2020, Raytheon received a criminal subpoena from the DOJ "in connection with an investigation relating to financial accounting, internal controls over financial reporting, and cost reporting regarding Raytheon Company's Missiles and Defense business since 2009." ¶308.

The SAC also alleges that Defendants made misleadingly incomplete representations about the risks associated with investing in Raytheon. Defendants stated that "U.S. government contracts generally are subject to" certain laws, regulations, and requirements, including contract pricing and cost, and that "failure to comply with these regulations and requirements *could* result in reductions to the value of contracts, contract modifications or termination, cash withholds on contract payments, forfeiture of profits, and the assessment of penalties and fines, and could lead to suspension or debarment, for cause, from U.S. government contracting or subcontracting for a period of time." *See*, *e.g.*,

---

[20] Likewise, the SAC alleges that the DOJ was investigating misconduct around that time. ¶120.

21

¶¶255, 298 (emphasis added). These statements, in the context in which they were made, were misleadingly incomplete because Defendants failed to disclose that Raytheon *already identified* significant misconduct by mid-2018 related to at least one large and important government contract. The failure to disclose these findings, which involved the top echelon at Raytheon, caused a reasonable investor to make an overly optimistic assessment of the risks associated with investing in Raytheon. "Risk disclosures that 'speak[] entirely of as-yet-unrealized risks and contingencies' and do not 'alert[] the reader that some of these risks may already have come to fruition' can mislead reasonable investors." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021) (finding that "the complaint plausibly alleges that Alphabet's warning in each Form 10-Q of risks that '*could*' or 'may' occur is misleading to a reasonable investor when Alphabet knew that those risks had materialized.") (emphasis added).

Defendants' purported warnings were misleading because they "disclosed a risk 'in the abstract' but omitted the fact that it had 'already . . . come to fruition.'" *Cutler v. Kirchner*, 696 F. App'x 809, 813 (9th Cir. 2017) (alteration in original); *see also Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1171, 1181 (9th Cir. 2009), *aff'd*, 563 U.S. 27, 37 (2011) ("Risk Factors" in a company's SEC filings were misleading when they warned of potential exposure to product liability claims but failed to disclose that the company has been sued); *Berson*, 527 F.3d at 987 (warning something "*might*" occur is "quite different" from stating it has "*in fact*" occurred; "[o]ne indicates a risk, the other a certainty . . . investors would treat the two differently"); *Rabkin v. Lion Biotechnologies, Inc.*, 2018 WL 905862, at *9 (N.D. Cal. Feb. 15, 2018) (risk disclosures misleading where they warned that the stock price might fluctuate but failed to disclose the company was paying for promotional articles to boost its stock price); *Flynn v. Sientra, Inc.*, 2016 WL 3360676, at *10-12 (C.D. Cal. June 9, 2016) (risk warnings of potential manufacturing

22

problems were misleading where serious regulatory issues had already transpired).

Separately, and additionally, the SAC also pleads that Defendants failed to disclose the DOJ and internal investigations, rendering their statements about internal controls, risks, and bookings false and misleading. ¶¶120, 234, 245, 254, 256, 259, 267, 277, 288, 297, 299. Raytheon had a duty to disclose the investigations because "the failure to disclose [the investigations] would cause a reasonable investor to make an overly optimistic assessment of the risk." *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 105 (2d Cir. 2022) (failure to disclose an SEC investigation was a material omission given the nature of the statements about the subject of the investigation). Plaintiff is not pleading an independent duty to disclose but rather "whether, in light of that Investigation, the statements [Defendants] chose to make were materially misleading." *See Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 584 (S.D.N.Y. 2016); *see also In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *12 (S.D.N.Y. Mar. 28, 2018) (statements materially misleading for failure to disclose "the existence of significant governmental scrutiny").

### B.    The SAC Adequately Pleads Scienter

The SAC changes the scienter calculus. Importantly, as discussed above, the SAC clarifies that Raytheon had very few large contracts with the U.S. government. Indeed, Raytheon touted to investors the handful of large contracts (over $70 million) that it was awarded by the U.S. government each year. Four government contracts in Raytheon's Missile and Defense business are the subject of the DOJ's criminal investigation. ¶¶308, 320. One large government contract worth over $200 million was manipulated, a fact that Raytheon discovered at least as of mid-2018, but hid from investors. The misconduct related to this contract alone resulted in the termination of several high-level employees, including Callahan, McDonnell, and Tina Fay. *See supra* at 15. Greg White, the Chief Financial Officer overseeing Raytheon's Missile Systems, was terminated in mid-2018.

23

¶61-63. White reported to Taylor, the Vice President overseeing Raytheon's Missile Systems. *Id*. Taylor, in turn, reported to Raytheon's CEO, Defendant Kennedy. *Id*. The Pentagon was also looking into the misconduct, and they wanted answers. ¶90. Taylor was eventually terminated in March 2019. *Id*. Given the new context of the SAC, it cannot be said that the Individual Defendants did not know about the misconduct ***at least as of mid-2018***. At a minimum, the Raytheon defendants were highly reckless in issuing misleading statements ***after mid-2018***, ***particularly when they continued to highlight the handful of large contracts awarded each year by the U.S. government*** but failed to disclose the misconduct, and when Defendants ***issued hopelessly incomplete risk warnings*** that failed to warn investors that some of the risks had already materialized.[21]

In its Order, the Court also underscored that the allegations in the first amended complaint gave rise to "the more plausible inference. . . that the CFO and VP terminations either were unrelated to fraud involving several contracts in their segment or were a consequence of their failure to uncover the fraud before an internal audit did." (Order at 34). The SAC pleads corroborating allegations that the terminations occurred because those individuals engaged in wrongdoing. CW5 explained that McDonnell, Callahan and Fay were fired in 2018 because they manipulated approximately $250 million in labor charges. ¶¶61-63. Callahan reported directly to Lawrence. ¶62. CW5 clarified that s/he learned these facts from Paul Hanson, and also explained Hanson's role at Raytheon. ¶61. Hanson was

---

[21] An internal investigation does not negate a scienter inference since a self-investigation may attempt to "whitewash" fraud. *Henning v. Orient Paper, Inc.*, 2011 WL 2909322, at *5 (C.D. Cal. July 20, 2011); *SAIC, Inc.*, 818 F.3d at 88, 96-97 (conducting an internal investigation did not negate scienter); *Ross v. Career Educ. Corp.*, 2012 WL 5363431, at *9 (N.D. Ill. Oct. 30, 2012) (rejecting defendants' argument that an internal investigation negated an inference of scienter because it was "equally plausible" that "defendants initiated the inquiry as an exercise in damage control and to head off further investigations"). Moreover, after they uncovered the wrongdoing, Defendants had a duty to make complete and accurate representations to investors but violated that duty. *See supra* at 19-20.

24

Director of Capture Management Excellence at Raytheon, and he reported directly to Vice President of Business Development Bob Fitzpatrick, and Stephen DuMont, who was Fitzpatrick's predecessor. *Id*. Fitzpatrick and DuMont reported directly to Lawrence. *Id*. Lawrence reported directly to Raytheon's CEO, Defendant Kennedy. ¶62. CW5 also explained how Hanson knew these facts: because he saw Callahan, McDonnell, and Fay get marched out by security. *Id*. Also, one of Hanson's employees, a senior manager named Darcy McDonnell, was married to Richard McDonnell (the employee who was fired), and she told Hanson why they were fired: for the misconduct. *Id*.

CW6 corroborates CW5, recounting that Callahan, McDonnell, and Fay got fired and were "walked out" in October 2018 for trying to hide their cost overruns on their EACs. ¶66. CW7 corroborates CW5 and CW6, noting that senior leaders were fired in 2018 for issues related to EACs, like "playing with the numbers" and "cooking the books," and that the people implicated included Taylor Lawrence and Tina Fay. ¶67. Likewise, CW13 corroborates CW5, CW6, and CW7, stating that Callahan, McDonnell and Fay were all fired in 2018 for manipulating EACs related to a U.S. navy contract worth over $200 million. ¶94. Lawrence was eventually terminated in March 2019. ¶90. In this new context, the terminations of the high-level individuals following the internal investigation and around the time the Pentagon was investigating the misconduct also contribute to a strong inference of scienter. *See*, *e.g.*, *Zucco*, 552 F.3d at 1002 (resignation contributes to an inference of scienter if plaintiffs "allege sufficient information to differentiate between a suspicious change in personnel and a benign one"); *In re UTStarcom, Inc. Sec. Litig*., 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009) (resignation or termination of senior employees in close proximity to initiation of internal and government investigations support scienter); *Fouad v. Isilon Sys*., Inc., 2008 WL 5412397, at *11 (W.D. Wash. Dec. 29, 2008) (same).

The inference is further strengthened by the fact that the DOJ is investigating

25

Raytheon's misconduct. ¶¶6, 120; *see also Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1043 (N.D. Cal. 2016) (SEC investigation is a "piece of the scienter puzzle"); *Frank v. Dana Corp.*, 646 F.3d 954, 960-962 (6th Cir. 2011) (when viewed holistically with other scienter allegations, the CFO's "retirement . . . within months of the time that [the company] first discovered its accounting errors" along with "the investigation into [the company's] accounting practices by the Securities and Exchange Commission" support a strong inference of scienter); *Collier v. ModusLink Glob. Sols., Inc.*, 9 F. Supp. 3d 61, 76 (D. Mass. 2014) (the resignations of the individual defendants, the alleged lack of internal controls and the SEC's inquiry into the company "paint a picture that strongly suggests Defendant's fraudulent intent").

As explained in Plaintiff's previous brief,[22] scienter is also sufficiently pleaded because the misconduct relates to the core operations of Raytheon's business particularly where, as here, the SAC clarifies that only a handful of large contracts (over $70 million) were awarded each year by the U.S. government to Raytheon. The Individual Defendants' Sarbanes Oxley certifications also support scienter.

### C.    Loss Causation Is Properly Pleaded

Pleading loss causation is "not meant to impose a great burden upon a plaintiff." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). "So long as the complaint alleges facts that, if taken as true, plausibly establish loss causation," dismissal is improper. *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). In *Mineworkers' Pension Scheme v. First Solar Inc.*, the Ninth Circuit held that loss causation involves "no more than the familiar test for proximate cause," and "there are an 'infinite variety' of ways for a tort to cause a loss." 881 F.3d 750, 753 (9th Cir. 2018). A plaintiff "need only show a 'causal connection' between the fraud and the loss." *Id*. "Disclosure of the fraud is not a

---

[22] Plaintiff's Opposition to Defendants' Motion to Dismiss the Consolidated Class Action Complaint, Dkt. No. 43 at 16-23.

sine qua non of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss." *Id*. All inferences regarding loss causation must be drawn in favor of the *plaintiff* at the motion to dismiss stage. *Garbini v. Prot. One, Inc.*, 49 F. App'x 169, 170 (9th Cir. 2002).

In its Order, the Court found that the complaint did not adequately plead loss causation because "Raytheon's disclosure was accompanied by a far more plausible reason for the stock's decline—significant issues stemming from the COVID-19 pandemic." Order at 43. The SAC clarifies that the COVID-19 pandemic cannot be a "more plausible reason for the stock's decline." The SAC alleges that Raytheon's disclosure that it would reduce its workforce by 15,000 positions, or 20%, did ***not*** contribute to ***the loss the Company experienced on October 28, which was due to the announcement of the criminal probe that was disclosed <u>after market hours</u> on October 27***. ¶315. This was ***new*** information that the market quickly assimilated the next day, on October 28. Significantly, Raytheon ***announced the force reduction of 15,000 on September 16, 2020***, <u>***weeks before***</u> disclosure of the DOJ criminal subpoena. *Id*. CBS News reported on September 17, 2020 that Raytheon CEO Hayes "announced the cuts Wednesday [September 16, 2020] during a virtual Morgan Stanley analyst conference," and that "[t]otal reductions at the Waltham, Massachusetts-based company are nearly double the total it initially announced in July." *Id*. CBS News linked the layoffs to industry-wide conditions caused by COVID, stating that "[a]viation is among the industries hardest hit by the global pandemic." *Id*.

That figure was later increased as reflected in the Company's earnings call with analysts ***before market open*** on October 27, 2020. *Id*. News media linked the great majority of Raytheon's job cuts to ongoing industry-wide effects of the pandemic. *Id*. For example, on October 27, 2020, Defense News reported "Raytheon laying off 20,000 amid commercial aviation slide." *Id*. Raytheon's increase in layoffs to 20,000 was discussed in

the Company's earnings call held with analysts *before market open* on October 27, 2020. *Id*. Therefore, the *market had at least one trading day to absorb this news* before Raytheon's after-market-close disclosure on the same date of the DOJ's criminal subpoena. *Id*. Because Raytheon traded in an efficient market, the news of these *layoffs already had been assimilated* into the price of Raytheon's securities by market open on October 28. *See*, *e.g.*, *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 472 (2013) ("in an efficient market, a misrepresentation's impact on market price is quickly nullified once the truth comes to light."); *BofI*, 977 F.3d at 794 ("in an efficient market . . . all publicly available information about the company, both positive and negative, is quickly incorporated into the stock price."). The criminal subpoena was announced *after market close* on October 27, and this *new* information was reflected to and caused the price of Raytheon's securities to fall significantly on October 28. ¶¶308-09. This point is corroborated by analyst commentary, which *specifically attributed the decline in Raytheon's stock price on October 28 to the disclosure of the criminal subpoena* as opposed to other factors. ¶¶310-13.

Moreover, *well before* disclosure of the DOJ subpoena after market close on October 27, 2020, Raytheon had made extensive disclosures about the current and expected future effects of the pandemic on the aviation industry and on Raytheon itself. ¶316. Statements appearing in Raytheon's third-quarter Form 10-Q about the impact of the pandemic on the aviation industry and RTX performance paralleled many such statements which already had been published in the Company's 10-Q released July 28, 2022. *Id*.

Additionally, and equally significant, Raytheon's stock price experienced some recovery following the decline on October 28, 2020, but as analysts reported it was *as a result of acts undertaken by its current CEO and by its Chairman*. ¶314. In an article titled "Raytheon Gains as CEO, Chairman Buy Shares After DOJ Subpoena," Bloomberg

28

reported that "Raytheon Technologies gained as much as 2.5% Friday [October 30, 2020] after its CEO bought shares the same day the company disclosed a criminal subpoena from the U.S. Department of Justice requesting records dating back more than a decade." *Id*. The article noted that [new] "CEO Gregory Hayes bought $3.01 million worth of shares on Oct. 28," and that "Chairman Thomas Kennedy bought $1 million worth of shares on Oct. 29 and director Dinesh Paliwal bought nearly $500,000 worth." *Id*.

Defendants claim that this is a "bizarre allegation" by Plaintiff (Mot. at 30), but it is, in fact, precisely what analysts told investors: "Raytheon Gains as CEO, Chairman Buy Shares After DOJ Subpoena" (discussing Bloomberg report). ¶314. Whether many shares supposedly "changed hands" those two days—a proposition that is not subject to judicial notice—is not the point.[23] The SAC alleges that the ***CEO and the Chairman*** of Raytheon purchased approximately $4 million worth of shares right after the stock price dropped as a result of the criminal subpoena. *Id*. Such buy-back helped the stock price recover. It is an unremarkable point that when insiders purchase stock in their own company in large amounts, investors tend to follow course. Academic research shows that insiders can manipulate the market through their own trading. For example, "[d]ata from SEC enforcement actions show that manipulators typically are plausibly informed parties (insiders, brokers, etc.)." Aggarwal, Rajesh K., and Guojun Wu, "Stock Market Manipulations," *The Journal of Business*, vol. 79, no. 4, 2006, pp. 1915–53. "Manipulation increases volatility, liquidity, and returns." *Id*. "Prices rise throughout the manipulation period and fall post-manipulation." *Id*. "Insider trading increases stock price accuracy by

---

[23] Judicial notice of supposed facts introduced "in an effort to rebut the factual allegations . . . set forth in the Complaint . . . must be denied." *In re Double Jump, Inc.*, 2022 WL 4390830, at *3 (Bankr. D. Nev. Sept. 22, 2022); *see also Baird v. BlackRock Institutional Tr. Co., N.A.*, 403 F. Supp. 3d 765, 775 (N.D. Cal. 2019). The Ninth Circuit squarely rejects this improper strategy. *Khoja,* 899 F.3d 988 at 1000 (9th Cir. 2018) ("[t]o the extent that the district court judicially noticed the . . . investors' call transcript for the purpose for which [it] was offered, *i.e.*, to determine what the investors knew . . . the district court abused its discretion.").

moving stock prices significantly." Meulbroek, Lisa K, "An Empirical Analysis of Illegal Insider Trading," *The Journal of Finance*, vol. 47, no. 5, 1992, pp. 1661–99. "The abnormal price movement on insider trading days is 40 to 50% of the subsequent price reaction to the public announcement of the inside information." *Id*. "Trade-specific characteristics, such as trade size, number of trades, or trade direction, as well as the total volume traded by the insider lead to the incorporation of the inside information into price." *Id*.

The SAC's new allegations matter. Under such circumstances, the inference that the October 28 drop was not caused by the subpoena is severely weakened. *Wochos v. Tesla, Inc.*, 985 F.3d 1180 (9th Cir. 2021) did not address the scenario presented here. Nor could it have foreclosed recovery in such cases, where the inference that something entirely divorced from the criminal subpoena caused the October 28 drop is severely weakened.

A subsequent increase in the price of Raytheon's securities also does not negate loss causation here because following disclosure of the DOJ criminal subpoena ***Raytheon underperformed the applicable industry index*** (the S&P Aerospace & Defense Select Index). ¶317. From market close on October 27, 2020, immediately before Raytheon disclosed the subpoena, to market close on November 3, 2020 (the first day that Raytheon's share price recovered to a level above its pre-disclosure price), the cumulative return for Raytheon was 0.9%, whereas the cumulative return on the industry index was more than four times that amount at 3.9%. *Id*. By market close on January 25, 2021, at the end of the 90-day lookback period prescribed by the PSLRA, the cumulative returns were 17.2% for Raytheon and 36.8% for the industry. *Id*.[24] As such, in the few days immediately following the October 28, 2020 corrective disclosure, Raytheon's share price significantly underperformed its peers, as a result of the disclosure relating to the criminal subpoena. *Id*.

---

[24] Defendants improperly cherry pick other dates unmoored to the efficient market theory and the PSLRA.

Contrary to Defendants' contention, these allegations are significant as experts routinely measure the movement in a security's price in the wake of a curative disclosure after controlling for market, industry, or other company-specific influences to determine the inflation in the price of a security. *See Litigation Services Handbook, the Role of the Financial Expert*, 6th Edition, Weil, Roman L., Lentz, Daniel G., and Evans, Elizabeth A, at 27 – 12; *see also* Journal of Economic Literature, *Event Studies in Economics and Finance*, MacKinlay, Craig A, at 18. The Supreme Court specifically acknowledges that industry comparisons are used to establish loss causation, or lack thereof. *See Dura*, 544 U.S. at 342-43 (explaining that where other factors, such as "new industry-specific ... facts, conditions, or other events" account for "some or all of" the lower price per share, loss causation is not established); *see similarly Nursing Home Pension Fund v. Oracle Corp*., 2006 WL 8071391, at *10-11, n.4 (N.D. Cal. Dec. 20, 2006). Thus, measuring losses without reference to the relevant industry is not scientific.

On these new facts, collectively, it cannot be said that the COVID pandemic was a "much more plausible explanation" for Raytheon's price decline on October 28, 2020. Indeed, as explained above, news analysts specifically linked the decline to the disclosure of the criminal subpoena, not to other factors. For example, on October 28, 2020, *Bloomberg* linked the decline to the disclosure of the subpoena, stating that "Raytheon *Sinks After Disclosing U.S. Probe of Defense Books*." ¶310. On October 28, 2020, *Bloomberg* published another news article titled "Raytheon Discloses Defense-Unit Criminal Subpoena; Shares Fall." ¶313. Similarly, Fox Business reported that on the disclosure of the criminal subpoena, Raytheon's shares were trading more than 6% lower near the end of Wednesday's October 28 trading session. ¶311.

Accordingly, Defendants' argument that Covid-related news was the cause of the October 28 decline in Raytheon's stock price is not even plausible. Even if it were a

31

plausible reason for the decline (and it is not), it cannot be the *only* plausible reason, as the SAC more than plausibly alleges that the decline was caused by the "new" information related to the criminal investigation. And it is black letter law that "in order to establish loss causation," a particular misrepresentation ***need not be the "sole reason"*** for the stock price decline. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005); *Azar v. Yelp, Inc.*, 2019 WL 285196, at *5, n.4 (N.D. Cal. Jan. 22, 2019) (loss causation is not negated just because the stock decline could be partially attributed to other causes).

Moreover, as discussed above, the ***SAC does not stand or fall on a theory of widespread fraud***. The SAC alleges that only a handful of large contracts (over $70 million) were awarded each year to Raytheon by the U.S. government, and the SAC identifies at least one contract over $200 million that was manipulated. At a minimum, these new allegations render the loss causation question fact specific and inappropriate for resolution at the pleading stage. *Gilead*, 536 F.3d at 1057 ("loss causation becomes most critical at the proof stage").

Considering the SAC's new allegations, Plaintiff sufficiently alleges a causation connection between the misrepresentations and omissions and the loss suffered. The Complaint alleges that on October 27, 2020, Raytheon disclosed that it received a criminal subpoena from the DOJ seeking information and documents in connection with an investigation relating to financial accounting, internal controls over financial reporting, and the cost reporting regarding Raytheon's Missiles and Defense business since 2009. ¶308. On this news, Raytheon's shares plummeted approximately 7% the next day. ¶309. As the SAC clarifies, the 7% drop was significant here because it resulted in a ***$6 billion loss*** of market capitalization. ¶309. Therefore, the drop must be considered in this context. *See*, *e.g.*, *Reese*, 2009 WL 506820, at *8 (where the complaint alleged a 2.8% market drop, rejecting "Defendants attempt to paint [the stock drop] as . . . a low percentage drop"

32

because "the decline represents a $6+ billion market capitalization loss"); *Brendon v. Allegiant Travel Co.,* 412 F. Supp. 3d 1244, 1264 (D. Nev. 2019) (finding loss causation sufficiently pled for each of the three drops alleged, ranging from 2% to 8.59%); *In re Int'l Rectifier Corp. Sec. Litig.*, 2008 WL 9453468, at *8 (C.D. Cal. Dec. 31, 2008) (sustaining a 5.1% drop). News commentators specifically linked the price drop to the disclosure of the criminal subpoena. ¶¶310-13.

Then, on April 27, 2021, Raytheon announced that it received another criminal subpoena from the DOJ, expanding the inquiry into additional contracts. ¶¶319. During a call with analysts held the same day, Raytheon's current Chief Executive Officer Greg Hayes admitted that Raytheon engaged in defective pricing of government contracts, including three contracts executed between 2011 and 2013 and one contract executed in 2017. ¶¶320-22. Following the April 27, 2021, disclosures, the "market reacted hardly at all," *Lloyd*, 811 F.3d at 1210, and the Complaint does not allege any significant market reaction on April 28, 2021. As in *Lloyd*, these allegations satisfy loss causation at the pleading stage. As in *Lloyd*, Raytheon's investors "understood the [first DOJ subpoena] as at least a partial disclosure of the inaccuracy" of Defendants' prior representations. *Id.*[25]

## IV.    CONCLUSION

The Court should deny the Motion in its entirety. Additionally, as Plaintiff has adequately alleged the Section 10(b) claim, its Section 20(a) claim should also be upheld. *See e.g.*, *Am. W. Holding Corp.*, 320 F.3d at 945.  Should the Court grant the Motion in any respect, Plaintiff respectfully seeks leave to amend. *See Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000).

Dated: February 21, 2023                    Respectfully submitted,

---

[25] *See also supra* at 20-21 (explaining that a corrective disclosure need not be a "mirror-image" of the alleged misrepresentation.

33

**POMERANTZ LLP**
By: */s/ Jeremy A. Lieberman*
Jeremy A. Lieberman (admitted *pro hac vice*)
Emma Gilmore (admitted *pro hac vice*)
Villi Shteyn (admitted *pro hac vice*)
600 Third Avenue
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
egilmore@pomlaw.com
vshteyn@pomlaw.com

*Lead Counsel for Lead Plaintiff State Teachers Retirement System of Ohio*

**KELLER ROHRBACK L.L.P.**
Gary A. Gotto (No. 007401)
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel.: (602) 230-6322
Facsimile: (602) 248-2822
ggotto@kellerrohrback.com

*Liaison Counsel for Lead Plaintiff State Teachers Retirement System of Ohio*

34

**CERTIFICATE OF SERVICE**

I hereby certify that on February 21, 2023, the attached document was electronically transmitted to the Clerk of the Court using the CM/ECF System which will send notification of such filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

*/s/Emma Gilmore*
Emma Gilmore

35