Jeffrey Willis (ASB #004870)
Cory L. Braddock (ASB #024668)
SNELL & WILMER L.L.P.
One East Washington St., Suite 2700
PHOENIX, ARIZONA  85004
Telephone:  602.382.6000
Email:  jwillis@swlaw.com
          cbraddock@swlaw.com

William Savitt (admitted *pro hac vice*)
Graham W. Meli (admitted *pro hac vice*)
Adam L. Goodman (admitted *pro hac vice*)
WACHTELL, LIPTON, ROSEN & KATZ
51 W. 52nd St.
New York, New York  10019
Telephone:  212.403.1000
Email:  WDSavitt@wlrk.com
          GWMeli@wlrk.com
          ALGoodman@wlrk.com

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Pranay K. Bajjuri, et al., | No. 4:20-cv-00468-TUC-JCH |
| Plaintiffs, | **DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS THE SECOND CONSOLIDATED CLASS ACTION COMPLAINT** |
| v. | |
| Raytheon Technologies Corporation, et al., | |
| Defendants. | **(Oral Argument Requested)** |

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004
602.382.6000

**Table of Contents**

|  |  | **Page** |
|---|---|---|
| PRELIMINARY STATEMENT | | 1 |
| ARGUMENT | | 2 |
| I. | Plaintiff fails to adequately plead falsity under § 10(b). | 2 |
| | A. Plaintiff's confidential witness allegations lack the requisite particularity. | 2 |
| | B. Plaintiff fails to sufficiently plead materiality. | 5 |
| | C. Plaintiff's new falsity theory also fails. | 9 |
| II. | Plaintiff fails to adequately plead scienter under § 10(b). | 11 |
| | A. Plaintiff concedes that it has made no specific allegations about the Officers' knowledge or state of mind. | 11 |
| | B. Plaintiff's recycled theories of scienter also fail. | 12 |
| III. | Plaintiff fails to adequately plead loss causation under § 10(b). | 14 |
| | A. Plaintiff cannot plead loss causation under *Wochos*. | 14 |
| | B. Plaintiff cannot plead loss causation because it does not adequately trace the stock drop to the alleged misstatements. | 16 |
| CONCLUSION | | 17 |

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004
602.382.6000

**Table of Authorities**

**Page(s)**

**Cases**

*City of Roseville Emps.' Ret. Sys.* v. *Sterling Fin. Corp.*,
963 F. Supp. 2d 1092 (E.D. Wash. 2013) ........................................................................ 7

*Dura Pharms., Inc.* v. *Broudo*,
544 U.S. 336 (2005) ...................................................................................................... 16

*Ikeda* v. *Baidu, Inc.*,
2021 WL 1299046 (N.D. Cal. Apr. 7, 2021) ................................................................. 11

*Immanuel Lake* v. *Zogenix, Inc.*,
2020 WL 3820424 (N.D. Cal. Jan. 27, 2020) ............................................................... 15

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ........................................................................................... 10

*In re Hansen Nat. Sec. Litig.*,
527 F. Supp. 2d 1142 (C.D. Cal. Oct. 16, 2007) ........................................................... 13

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) ......................................................................................... 7

*In re UTStarcom, Inc. Sec. Litig.*,
617 F. Supp. 2d 964 (N.D. Cal. 2009) ........................................................................... 12

*Jedrzejczyk* v. *Skillz Inc.*,
2023 WL 2333891 (N.D. Cal. Mar. 1, 2023) ................................................................. 14

*Kauffman* v. *Nat. Health Trends Corp.*,
2019 WL 7165921 (C.D. Cal. Dec. 20, 2019) .................................................................. 9

*Khoja* v. *Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ........................................................................................... 8

*Kim* v. *Allakos Inc.*,
2022 WL 17477094 (N.D. Cal. Dec. 6, 2022) ............................................................... 12

*Knox* v. *Yingli Green Energy Holdings Co. Ltd.*,
242 F. Supp. 3d 950 (C.D. Cal. 2017) ............................................................................. 8

*Lloyd* v. *CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) ....................................................................................... 17

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004
602.382.6000

*Metzler Inv. GMBH* v. *Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ................................................................................ 16

*Mineworkers' Pension Scheme* v. *First Solar, Inc.*,
    881 F.3d 750 (9th Cir. 2018) (per curiam).......................................................... 16

*Nguyen* v. *Endologix, Inc.*,
    962 F.3d 405 (9th Cir. 2020) .................................................................................. 1

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund* v. *Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) .................................................................................. 8

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund* v. *Hewlett-Packard Co.*,
    845 F.3d 1268 (9th Cir. 2017) ................................................................................ 8

*Ronconi* v. *Larkin*,
    253 F.3d 423 (9th Cir. 2001) ................................................................................ 10

*S. Ferry LP, No. 2* v. *Killinger*,
    542 F.3d 776 (9th Cir. 2008) ................................................................................ 14

*ScripsAmerica, Inc.* v. *Ironridge Global LLC*,
    119 F. Supp. 3d 1213 (C.D. Cal. 2015) ............................................................... 15

*S.E.C.* v. *Leslie*,
    2012 WL 116562 (N.D. Cal. Jan. 13, 2012) ......................................................... 8

*Thomas* v. *Magnachip Semiconductor Corp.*,
    167 F. Supp. 3d 1029 (N.D. Cal. 2016) ............................................................... 13

*Wochos* v. *Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) ......................................................................*passim*

*Zack* v. *Allied Waste Indus., Inc.*,
    2005 WL 3501414 (D. Ariz. Dec. 15, 2005) .................................................... 3, 12

*Zucco Partners, LLC* v. *Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) .................................................................................. 3

**Statutes, Rules, and Regulations**

17 C.F.R. § 229.105........................................................................................................ 11

**Other Authorities**

Rajesh K. Aggarwal & Guojon Wu, *Stock Market Manipulations*,
    79 J. of Bus. 1915 (2006)...................................................................................... 15

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004
602.382.6000

**PRELIMINARY STATEMENT**

This Court found "ample reason" to dismiss plaintiff's previous complaint, concluding that it failed to meet the PSLRA's stringent requirements for pleading falsity, scienter, or loss causation. Op. 44–45. Plaintiff's opposition offers the Court no reason to reach a different conclusion about the Second Amended Complaint (the "SAC").

On the "critical element of scienter," *Nguyen* v. *Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020), plaintiff offers even less than it did before. The one scienter allegation about the Officers that plaintiff ever made—that they sold stock—is not mentioned anymore. Instead, in a scant three pages of briefing on scienter, plaintiff falls back on the baldest of assertions: "it cannot be said that the [Officers] did not know about the misconduct." Pl. Br. 24. Plaintiff's pleading remains devoid of any factual allegation supporting this claim. There is nothing about what any individual defendant knew, much less any particularized allegation giving rise to a strong inference of scienter. As the Court correctly held in dismissing the last iteration of the complaint, this defect is fatal. But it is far from the only fatal defect in the SAC.

On falsity, plaintiff's brief is proof that its confidential witness allegations fall woefully short. Lengthy footnotes reciting what those witnesses said do nothing to explain why the Court should accept unparticularized conflicting accounts, often based on vague hearsay, from individuals many levels down the corporate chain. Nor does plaintiff plead materiality—an independent ground for dismissal. As the Court held, Ninth Circuit precedent requires a plaintiff to quantify any alleged financial misstatement. Plaintiff still does not do so and instead again asks the Court to accept a qualitative theory: this time, that Raytheon each year was awarded only a "handful" of so-called "prime contracts" with the U.S. government. But that claim—which is contradicted by Raytheon's SEC filings—rests on a vague statement from just one confidential witness, who does not allege any misconduct at all, much less misconduct implicating a material portion of these "prime contracts." Nor does plaintiff do anything to tie this allegation about "prime contracts" to any misconduct it does (vaguely) allege.

Plaintiff also all but concedes that it cannot resuscitate the theories that the Court dismissed. Though the previous allegations of misstated financials and false disclosures about internal controls still litter the complaint, plaintiff's brief largely relegates them to a footnote claiming they are "also actionable." Pl. Br. 19 n.18. Plaintiff scrapes for other disclosures to attack, but finds none that are misleading, materially or otherwise.

On loss causation, plaintiff still cannot escape the Ninth Circuit's controlling decision in *Wochos*. The quick and sustained recovery in RTX's stock price requires dismissal. Plaintiff's responses—that RTX's Chairman and CEO personally propped up the stock price and that the recovery lagged an index—are legally irrelevant, factually nonsensical, or both. Plaintiff also remains unable to plead under Ninth Circuit precedent that the transient stock drop was caused by disclosure of the "very facts" about which defendants allegedly lied.

At bottom, this remains an improper, hindsight-based action that was brought hours after the disclosure of a DOJ subpoena in the hopes that a viable theory of fraud would emerge. None has, and the complaint should now be dismissed with prejudice.

**ARGUMENT**

**I.    Plaintiff fails to adequately plead falsity under § 10(b).**

Plaintiff has pleaded no statement that is false or misleading under the exacting requirements of the PSLRA and Rule 9(b). Its scattershot challenges to defendants' disclosures remain unparticularized and fail to plead materiality under Ninth Circuit law. And its new, last-ditch falsity theory likewise founders on multiple independent grounds.

**A.    Plaintiff's confidential witness allegations lack the requisite particularity.**

Plaintiff makes almost no attempt to defend the reliability of the seven original CWs—CWs 1, 2, 3, 4, 5, 11, and 12. Plaintiff offers only that the SAC provides "missing details for *some* of the witnesses"—that is, CWs 3, 4, and 5. Pl's Br. in Opp'n ("Pl. Br.") 9 (emphasis added). The rest of the original CW allegations, which the Court already found insufficient, were left untouched. And the "detail" added for CWs 3, 4, and 5 comes nowhere near curing the deficiencies identified by the Court. *See* Op. 24–25.

-2-

CW4 and CW5 both base their allegations on hearsay. SAC ¶¶ 60, 61–64. This is not "automatically disqualifying," but it *does* diminish reliability, as the Court held. Op. 14–15, 21–22. The two CWs report hearsay about different topics and do not corroborate each other: CW4 heard about a DOJ investigation involving "issues with EACs" sometime "after" joining Raytheon in "mid-2019." SAC ¶ 60. CW5 heard about an "internal audit" involving "$250 million of false labor charges" sometime in "mid-2018," after CW5 had left the company. *Id.* ¶ 61. While the SAC now names the source of each piece of hearsay (David Zincke and Paul Hanson), it omits sufficiently particularized facts from which the Court could determine that either was "positioned to know the information alleged." *Zucco Partners, LLC* v. *Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009). Plaintiff does not even attempt to explain why Zincke—for whom the SAC provides a cryptic title but no other identifying details—would know about a supposed secret DOJ investigation into EACs. SAC ¶ 60. *See Zack* v. *Allied Waste Indus.*, 2005 WL 3501414, at *12 (D. Ariz. Dec. 15, 2005) (citing "title and responsibilities without sufficiently pleading the basis of the witness' knowledge is insufficient").

As to Hanson, plaintiff says he saw a few individuals get "marched out by security" and—stretching the game of telephone even further—one of them was the husband of a colleague, who told Hanson that her husband and the others were fired "for the misconduct." Pl. Br. 25 (citing SAC ¶ 62). What was "the misconduct"? *Cf.* Op. 35 n.6 (finding reference to "the misconduct" unacceptably ambiguous). Where did Hanson hear about an audit, false labor charges, or $250 million? The SAC never says. So much of plaintiff's case now hinges on this alleged audit, and all plaintiff has to support it is the say-so of CW5, who was not at Raytheon anymore but heard something from someone named Paul Hanson, who heard something from a colleague, who heard something from her husband. This is not what Congress had in mind when it enacted the PSLRA.

Plaintiff's attempt to rehabilitate the conflicting allegations of CW3 and CW5 likewise fails. Plaintiff argues that the conflict is explicable because the allegations relate to different projects. *See* Pl. Br. 10 n.6. But that is contradicted by the SAC, which

-3-

pleads that CW3 worked on all programs within Raytheon's "Missile and Defense System" and that, on "almost every project," work was *intentionally slowed down* to increase costs, "because the government would reimburse Raytheon for the slowdown." SAC ¶¶ 56, 58.  By contrast, the SAC pleads that CW5 heard about widespread fraud in Missile Systems to the opposite effect—faced with *unintentional* overruns, employees shifted costs between projects to "keep the contracts *on schedule*" and protect their bonuses, which were tied to contracts being "finished timely and with the right amount of labor hours." *Id.* ¶ 63 (emphasis added).  Plaintiff's assertion that CW5 was referring to "'*some*' contracts," not "all contracts," only further undermines any inference that CW3 or CW5 had a basis to know about widespread misconduct.  Pl. Br. 10 n.6 (emphasis added).

Plaintiff's explanation for the internal inconsistencies in CW5's allegations similarly does not hold up.  CW5 alleges both that an internal audit "showed at least $250 million of false labor charges made on several *contracts*," and that "the $250 million of false labor charges related to a large and important *contract* for Raytheon's Naval Systems."  SAC ¶¶ 61, 64 (emphases added).  In its brief, plaintiff now adopts only the "several contracts" variation, claiming that's all it ever meant.  *See* Pl. Br. 10 n.6.  But plaintiff's brief cannot change what was pleaded in the SAC; the inconsistent allegations are again emblematic of a complaint that falls far short of the PSLRA's exacting requirements.

The new CWs suffer from the same infirmities as the old.  For CWs 8, 9, and 10, the SAC "provides no information" about their reporting lines, contrary to the Court's guidance.  Op. 25; *see* Mot. 14–15.  For CWs 6, 7, 13, and 14, the SAC sketches out extended reporting lines to individuals with vague titles, coupled with similarly vague and inconsistent allegations of wrongdoing.  *See* Mot. 15–16.  Plaintiff does not contest either point.  Instead, plaintiff responds to two arguments defendants have not made:  that confidential witnesses can be deemed credible only if they have "direct contact with defendants" or "hold[] a 'high-level' position."  Pl. Br. 12 n.13, 13 n.14.  Both points are lifted verbatim from plaintiff's previous brief.  *See* Dkt. 43 at 8–9 & n.5.  And both points are irrelevant for the same reasons set forth in defendants' previous reply.  Dkt. 44 at 6–7.

-4-

**B.    Plaintiff fails to sufficiently plead materiality.**

The Court held that plaintiff did not meet its burden to plead materiality because it failed to "quantify the extent to which Raytheon's misconduct resulted in financial misstatements," as required by Ninth Circuit precedent.  Op. 19.  As demonstrated in defendants' opening brief, the SAC does nothing to cure this defect.  *See* Mot. 16–17.

Plaintiff tries instead to convince the Court that it can plead materiality based on "other factors."  Pl. Br. 16–17.  Plaintiff's new theory appears to be that some Raytheon contracts are particularly important, and misconduct affecting these contracts is material even if not quantified.  Plaintiff argues, for the first time in its opposition, that "while Raytheon may have thousands of contracts, . . . Raytheon is awarded yearly only a *handful of contracts* by the U.S. government, and these contracts, which are over $70 million each, are repeatedly boasted by the Company to investors."  *Id.* at 14.  Plaintiff calls these "prime contracts" in its briefing.  *Id.* at 4–5.  Though the SAC and briefing are opaque, what plaintiff appears to be doing is conflating the "IDS Bookings" it recites at ¶¶ 77, 79, 81, 83, 85, 87, 253, and 296 of the SAC (collectively, the "IDS Bookings Disclosures"), with the concept of "prime contracts" mentioned by one witness (CW10).

Plaintiff's presentation is plagued with problems.  To start, plaintiff misreads the disclosures it cites.  Raytheon's 10-Ks do not "corroborate[]" that Raytheon has "few prime contracts" with the U.S. government and that they are its most important.  Pl. Br. 4; SAC ¶ 73.  To the contrary, the disclosure in question states that Raytheon serves "both domestic and international customers, primarily as a prime contractor or subcontractor on a broad portfolio of . . . programs for government customers."  Pl. Br. 4 (quoting 2016 Form 10-K).  If anything, then, Raytheon's disclosures undermine plaintiff's claim.  *See also* Ex. 18 (Raytheon 2017 Form 10-K) at 13 (disclosing that Raytheon is a "subcontractor and not the prime contractor on *some* contracts" (emphasis added)).[1]

---

[1] Exhibit 18, the 2017 Form 10-K, is submitted with the Supplemental Declaration of Cory L. Braddock.  Exhibits to defendants' opening brief are cited by docket number.

Snell & Wilmer

L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004
602.382.6000

Plaintiff's portrayal of the IDS Bookings Disclosures is similarly misleading. Plaintiff asserts that these bookings were "single[d] out . . . because they involved contracts of over $70 million awarded by the Company's most important customer"—"the U.S. government." Pl. Br. 7. Not so. For *each* of Raytheon's five business segments (not just IDS), Raytheon was disclosing "bookings increase[s]" or "decrease[s]" as against the prior year. *See, e.g.*, Ex. 18 at 53–54, 55–56, 58, 60, and 62. The lead-in sentence that plaintiff omits from its excerpt of the 2017 IDS disclosure (at SAC ¶ 83) makes this clear: "The bookings decrease of $443 million in 2017 compared to 2016 was driven primarily by the $319 million decrease in the specifically disclosed bookings below." Ex. 18 at 53.[2]

Moreover, plaintiff is wrong that Raytheon disclosed only bookings over $70 million—a number found nowhere in the SAC. *See, e.g.*, Ex. 18 at 62 (disclosing $12- and $17-million bookings for Forcepoint segment). The disclosed bookings are also not limited to U.S.-based contracts. *See, e.g.*, SAC ¶ 85 (disclosing $4.89 billion in contracts with "international customers," including Poland, Sweden, and Australia). Indeed, the U.S. bookings reflected in the IDS Bookings Disclosures do not even represent a significant slice of Raytheon's total bookings: in 2018, they represented less than 5% of Raytheon's total bookings that year across its segments. *See id.*; Dkt. 59-2 at 35. Plaintiff's conclusory assertion that Raytheon disclosed just particularly important "prime" contracts with the U.S. government is thus unsupported by well-pleaded facts.

But even if the Court could overlook that fundamental flaw, plaintiff fails to plead that the misconduct it alleges touched anything plaintiff labels as a "prime contract" or any contract mentioned in the IDS Bookings Disclosures—let alone that the alleged

---

[2] Raytheon's disclosure that "bookings are an important measure of future performance" (cited at page 7 of plaintiff's brief, but nowhere in the SAC) appears in an introduction to results for each of Raytheon's segments—not just IDS's. And Raytheon's explanation for what it means by this, which plaintiff omits, is unremarkable and technical: "We believe bookings are an important measure of future performance and are an indicator of potential future changes in total net sales, because we cannot record revenues under a new contract without first having a booking in the current or a preceding period." Ex. 18 at 49.

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004
602.382.6000

misconduct was concentrated around such contracts.  The closest plaintiff comes is CW14's claim that the DOJ investigation "involves the Patriot Guided Enhanced Missile Program."  SAC ¶ 95; Pl. Br. 15.  But CW14 does not say in what capacity that program is "involve[d]," nor does he allege wrongdoing; and no other CW mentions that program.  Even CW10—the only witness who says anything about "prime contracts"—makes no allegation of misconduct.  In the end, the entire discussion about prime contracts and IDS bookings appears once again designed to achieve through "ambiguity and implication . . . what [the SAC's] specific allegations cannot."  Op. 35 n.6.

Plaintiff's other efforts to skirt its pleading burden on materiality likewise fail:

*First*, plaintiff again invokes the alleged internal audit relating to $250 million of false labor charges.  Pl. Br. 14.  As shown, this allegation is based on uncorroborated hearsay by a lone CW; but even if credited, the Court already held that "the posited $250 million figure[] does not plausibly allege a substantial likelihood of material misconduct given Raytheon's more than 60,000 employees, tens of thousands of annual contracts, and almost $30 billion in annual sales."  Op. 21.  Plaintiff observes that the naval system business supposedly implicated by this audit "did about one billion a year in business."  Pl. Br. 14.  But Raytheon had well over $100 billion in sales between 2016 and 2019, Dkt. 59-2 at 35, and RTX had another $56.6 billion in sales in 2020, Dkt. 59-4 at 32.  The Court's rejection of the alleged audit as a basis for materiality was and remains sound.

*Second*, plaintiff tries to disclaim the statements by RTX's CEO, Gregory Hayes, that the DOJ investigation will not be material and to contest the Court's conclusion that these disclosures "directly undermine" materiality.  Op. 20; *see* Dkt. 59-10 at 7.  But the SAC does not allege the falsity of these disclosures; it *relies* on much of what Hayes said.  And "[o]nce a document is deemed incorporated by reference, the entire document is assumed to be true for purposes of a motion to dismiss."  *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1058 n.10 (9th Cir. 2014) (quoting *City of Roseville Emps.' Ret. Sys*. v. *Sterling Fin. Corp*., 963 F. Supp. 2d 1092, 1107 (E.D. Wash. 2013)).  This principle exists to preclude plaintiffs, as here, from "selecting only portions of documents that support

-7-

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004
602.382.6000

their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Khoja* v. *Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018).[3]

*Third*, plaintiff asserts, as it did before, that the October 28, 2020 dip in RTX's stock price itself shows materiality. Pl. Br. 18. The Court did not entertain this argument before and should not now. "Contention[s] that a slump in [defendant's] stock price indicates materiality [are] not well-taken" and would read the materiality element out of the PSLRA. *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund* v. *Hewlett-Packard Co.*, 845 F.3d 1268, 1277 (9th Cir. 2017). The older in-circuit case plaintiff cites found only that a *31%* stock price drop "further support[ed] a finding of materiality" that was based on numerous other factors. *No. 84 Employer-Teamster Joint Council Pension Tr. Fund* v. *Am. W. Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003).

*Fourth*, plaintiff points to CW3's allegations of misconduct in connection with the Javelin and Tomahawk programs. But these unparticularized allegations are not new, and the Court already found them insufficient, including because "CW3's discussion of Tomahawk and Javelin overstatements is corroborated by no other witness." Op. 22.

Finally, plaintiff tries to revive its argument that "even quantitatively small amounts" can be material. Pl. Br.16. The Court did not accept this argument for good reason. While there might be rare cases in which a quantitatively small manipulation "present[s] a materially misleading picture of a company's health," *S.E.C.* v. *Leslie*, 2012 WL 116562, at *6 (N.D. Cal. Jan. 13, 2012)—*e.g.*, by "masking a change in earnings or other trends," *Knox* v. *Yingli Green Energy Holdings Co.*, 242 F. Supp. 3d 950, 971 (C.D. Cal. 2017)—nothing similar is pleaded here. Moreover, plaintiff does not plead that even a "quantitatively small amount" of Raytheon's financials were misstated—the fundamental problem is that it does not try to quantify the extent of *any* misstatement. And in all events, the independent auditor certifications of Raytheon's financial reporting, along with the absence of any restatement, further undercut plaintiff's materiality theory. Op. 44.

---

[3] The cases plaintiff invokes to shield the incorporated documents from the Court are inapposite. *See* Pl. Br. 17. Not one concerned documents incorporated by reference.

-8-

## C.    Plaintiff's new falsity theory also fails.

The SAC added a section claiming that Raytheon failed to disclose that an audit "triggered an internal investigation as well as a DoJ investigation around mid-2018." SAC ¶¶ 120–22.  Defendants showed that this alleged chain of events was based on no well-pleaded facts and could not support a falsity claim as a matter of law.  Mot. 19–20. So in its opposition, plaintiff all but abandons its claim of an undisclosed government investigation.  Pl. Br. 21 n.20.  Instead, plaintiff tries to reframe its theory around Raytheon's IDS Bookings Disclosures and certain "risk" disclosures.  But these theories are still based on the same unsupported assertions and are legally infirm.

**IDS Bookings.**  Plaintiff argues that, because Raytheon "touted . . . good news" in its IDS Bookings Disclosures, it was required to disclose the alleged mid-2018 internal audit and investigation.  Pl. Br. 20.  Raytheon was, of course, not required to disclose an alleged audit or investigation whose existence is not well-pleaded.  Mot. 19–21; p. 3, *supra*.  Moreover, as explained above, plaintiff misreads the IDS Booking Disclosures, which undermine its "good news" theory.  Indeed, one of the cited disclosures reports that IDS bookings *decreased* by over $440 million—hardly "good news."  Ex. 18 at 53 (cited, incompletely, at SAC ¶ 83). Nor does the SAC allege that the purported $250 million audit or supposed 2018 government investigation was even linked to a contract disclosed in the IDS Bookings Disclosures.  To the contrary, the SAC alleges that the audit concerned "part of the *Missile Systems*" segment at Raytheon, SAC ¶ 61 (emphasis added), which was a *separate* business segment from IDS until the April 2020 merger with UTC, *id.* ¶ 76 n.21.  In fact, no CW even mentions IDS.  In reality, then, plaintiff is arguing that whenever a company says *anything* about its financials, it must disclose *any* misconduct it addresses internally.  That is not the law.  *See Kauffman* v. *Nat. Health Trends Corp.*, 2019 WL 7165921, at *5–6 (C.D. Cal. Dec. 20, 2019).[4]

---

[4] Plaintiff casually asserts one other purported basis for falsity:  that some of the IDS Bookings Disclosures "were tainted by wrongdoing—a wrongdoing perpetrated by the top echelon at Raytheon."  Pl. Br. 19.  Plaintiff does not cite the SAC for this proposition because the SAC contains no such allegation.  This is just another example of the cavalier and inconsistent manner in which plaintiff levels accusations of fraud against Raytheon.

-9-

***Risk Disclosures.*** Plaintiff's risk-disclosure theory is just as defective.

As an initial matter, plaintiff's factual premise (an internal audit that triggered a DOJ investigation in mid-2018) is, again, not well-pleaded and, with respect to the DOJ investigation, based on no factual allegation at all. Mot. 19–20; p. 3, *supra*. And even if the existence of the internal audit were credited, the Court has already held that the alleged amount at issue is immaterial in the context of Raytheon's size and scope. Op. 21–22.

If that were not enough, plaintiff is wrong that Raytheon concealed that disclosed risks had already "come to fruition." Pl. Br. 22. The disclosure at issue identifies the following risks of noncompliance: "reductions to the value of contracts, contract modifications or termination, cash withholds on contract payments, forfeiture of profits, [] the assessments of penalties and fines, and . . . suspension or debarment, for cause, from U.S. government contracting or subcontracting." SAC ¶ 255. Plaintiff does not plead that any of the listed adverse consequences has been realized as of today—and certainly not that any had been realized as of when Raytheon made the disclosures at issue (February 2019 and February 2020), which was well before the DOJ subpoenaed Raytheon in October 2020. *See Ronconi* v. *Larkin*, 253 F.3d 423, 434 (9th Cir. 2001) (misstatements must have been "false or misleading *when made*" to be actionable (emphasis added)). That takes this case squarely out of the line of authority on which plaintiff relies, wherein defendants "knew that [the] risks had materialized." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 704, 707 (9th Cir. 2021) (individual defendants were adequately alleged to have engaged in a "cover-up" of massive and multiyear cybersecurity vulnerability).

Finally, plaintiff ignores Raytheon's robust risk-factor disclosures in the filings at issue. While plaintiff draws its alleged misstatement from an introductory section of Raytheon's 10-K, the actual risk-factor disclosures in that document are explicit that government audits and investigations are not just some hypothetical possibility, but an ongoing reality: "We are subject to audits and investigations by U.S. government agencies, including the [DoD, GAO, and DOJ] . . . . From time to time, these and other agencies conduct investigations or audits to determine whether our operations are in

-10-

compliance with applicable requirements.  The [government] also review[s] the adequacy of and our compliance with our internal control systems and policies, including our accounting, . . . earned value management and material management accounting systems." *E.g.*, Ex. 18 at 18.  Plaintiff's theory of falsity collapses under these circumstances.  *See, e.g.*, *Ikeda* v. *Baidu, Inc.*, 2021 WL 1299046, at \*10–11 (N.D. Cal. Apr. 7, 2021) (holding that statements "about [the company's] ability to comply with Chinese regulations" were "not misleading" where the risk of noncompliance was disclosed in company's "risk factors" discussion).

Companies routinely make risk disclosures like those at issue here, as required by the securities laws.  17 C.F.R. § 229.105.  Such disclosures are not rendered misleading merely because a company's internal controls work as intended to identify misconduct.[5]

**II.    Plaintiff fails to adequately plead scienter under § 10(b).**

The SAC fails to remedy the scienter-based deficiencies identified by the Court.  The absence of any well-pleaded facts giving rise to a "strong inference" of scienter again requires dismissal.

**A.    Plaintiff concedes that it has made no specific allegations about the Officers' knowledge or state of mind.**

As the Court recognized, and as remains unchanged, not a single CW alleges "that any of the Officers knew about any misconduct," were involved in the alleged misconduct or "any specific contract where misconduct was alleged," or received information from which they should have known about the alleged misconduct.  *See* Op. 27–28, 38.  Not a single CW is even alleged to have ever communicated with any of the Officers in any way.  For these reasons, the CWs' unparticularized allegations cannot support an inference of scienter.  Mot. 23–24; Op. 26–28.  Plaintiff does not dispute any of this and can point to no new allegation remedying this fatal deficiency in its pleading.

---

[5] If plaintiff still maintains that the internal-control disclosures were rendered misleading by virtue of the internal audit and supposed government investigation (Pl. Br. 23), that argument fails for the reasons set forth in defendants' opening brief.  *See* Mot. 19–21.

Snell & Wilmer<br>L.L.P.<br>LAW OFFICES<br>One East Washington Street, Suite 2700<br>Phoenix, Arizona 85004<br>602.382.6000

To the extent that anything in the SAC appeared to be aimed at the Court's concerns about scienter, it was some additional allegations about the Officers' stock sales. SAC ¶¶ 323–31. But as defendants showed in their opening brief, these allegations only further *undermined* an inference of scienter: the Officers sold stock at consistent and regular intervals, and two of them *increased* their holdings during the class period, "giv[ing] rise to an inference of good faith conduct." *See Zack*, 2005 WL 3501414, at *14; *see Kim* v. *Allakos Inc.*, 2022 WL 17477094, at *5 (N.D. Cal. Dec. 6, 2022) (same); Mot. 25–27.

Plaintiff's response: silence. After having premised allegations of securities fraud on the Officers' stock sales, plaintiff's brief fails to mention them even once. That should tell the Court all it needs to know about the adequacy of plaintiff's scienter pleading.

**B.      Plaintiff's recycled theories of scienter also fail.**

Having discarded the primary theory of scienter pleaded in both of its complaints, plaintiff falls back on other theories rejected by the Court. Each fails, again.

*First*, plaintiff repeats its theory that alleged terminations of various individuals contribute to an inference of scienter. Pl. Br. 23–26. But the Court has already held that, even if it were to credit the termination allegations, they would "directly undermine[] Plaintiff's [scienter] theory" because "[t]erminating wrongdoers" for misconduct "is the *opposite* of recklessly disregarding fraud" and is consistent with "internal controls . . . working as intended to root out bad behavior." Op. 33–34 (emphasis added). Rather than grapple with the Court's reasoning in this regard, plaintiff just copies the allegations of terminations into its brief. Pl. Br. 23–26. And while the SAC adds a few more names of allegedly terminated employees, plaintiff cites no case where a termination or resignation of a non-defendant supported a strong inference of scienter. Instead, plaintiff's authorities involved the termination of the named defendants *themselves*. *See, e.g.*, *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 967 n.1, 975 (N.D. Cal. 2009) (defendants "resigned or were terminated contemporaneously" with "financial restatements").

Plaintiff observes that "[a]n internal investigation does not negate a scienter inference" where it is an attempt to "whitewash" fraud or an "exercise in damage control."

-12-

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004
602.382.6000

Pl. Br. 24 n.21.  But plaintiff pleads neither—if anything, it trumpets the alleged 2018 internal audit as genuine and impactful, resulting in several terminations in middle-management ranks.  As for plaintiff's conclusory contention that "it cannot be said that the [Officers] did not know about the misconduct at least as of mid-2018" and "had a duty to make complete and accurate representations," *id.* at 24 & n.21, plaintiff ignores that it has pleaded nothing to link any Officer to the alleged audit in mid-2018; that it has pleaded nothing about the preparation of the disclosures it challenges or the Officers' mental states when certifying them; that an internal audit uncovering misconduct "supports the benign inference that internal controls were working as intended" in any event (Op. 34); and that the disclosures at issue are not false or misleading to begin with, as discussed above.

*Second*, plaintiff suggests that scienter can be inferred from "the fact that the DOJ is investigating" Raytheon.  Pl. Br. 25–26.  Again, plaintiff ignores that the Court rejected this argument.  Op. 30, 37–39.  And plaintiff gives the Court no reason to reverse course:  the law remains that the "mere existence of [an] investigation cannot support any inferences of wrongdoing or fraudulent scienter on the part of [a] company or its senior management." *In re Hansen Nat. Sec. Litig.*, 527 F. Supp. 2d 1142, 1162 (C.D. Cal. Oct. 16, 2007) (alterations original; citation omitted).  Plaintiff's sole in-Circuit authority recognizes the same, but found—in the context of an external auditor's statements "pointing to management" and restatements showing income "inflated" by "almost 500%"—that an SEC investigation was "one more piece of the scienter puzzle." *Thomas* v. *Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1042–43 (N.D. Cal. 2016).  No like facts are pleaded here—to say nothing of the fact that the SAC still fails to link its allegations of misconduct to the October 2020 and April 2021 disclosures.  Op. 37–38 (identifying this deficiency in prior complaint).

*Third*, in passing, plaintiff references its (still-unpleaded) "core-operations" theory, which the Court held did "not add anything" to the scienter calculus.  Op. 39.  It still doesn't.  Plaintiff gestures at its "prime contracts" theory, but defendants have already shown the many ways in which that theory is unsound.  *See* § I.B, *supra*.  Moreover, the SAC lacks "specific allegations about management's exposure to factual information within

-13-

[Raytheon]" and any allegation linking the Officers to any particular contract or set of contracts. *S. Ferry LP, No. 2* v. *Killinger*, 542 F.3d 776, 785 (9th Cir. 2008); Op. 40.  Nor does plaintiff grapple with the fact that Raytheon's independent auditor annually certified Raytheon's financial statements, undermining any inference of scienter, Op. 29–30, and that the Court already held the "U.S. government's importance to Raytheon's business" insufficient to plead scienter, *id.* at 35.  This is far from the "exceedingly rare" case in which a "core operations" theory gives rise to a strong inference of scienter.  Op. 34–36.[6]

**III.    Plaintiff fails to adequately plead loss causation under § 10(b).**

Plaintiff's claims fail for the third independent reason that it cannot plead loss causation, with the particularity required by Rule 9(b) or otherwise.

**A.    Plaintiff cannot plead loss causation under *Wochos*.**

Plaintiff does not refute that RTX's stock price recovered from its October 28, 2020 dip in just four trading days and has sustained that recovery ever since.  *See* Dkt. 59-8.  As the Court held, any inference of loss causation is thus foreclosed because, "as in *Wochos*, Raytheon's stock made a quick and *sustained* recovery[,] . . . never traded below its October 27, 2020 level again, and was substantially higher two years later." Op. 43 (citing *Wochos* v. *Tesla, Inc.*, 985 F.3d 1180 (9th Cir. 2021)); *see also Jedrzejczyk* v. *Skillz Inc.*, 2023 WL 2333891, at *4 (N.D. Cal. Mar. 1, 2023) (loss causation inadequately pleaded under *Wochos* where stock price quickly recovered).

The soundness of that holding is further underscored by the fact that RTX's stock had been tumbling for days as news of COVID-19's resurgence wreaked havoc on both the broader market and the aerospace industry.  *See* Mot. 29–30.  Thus, while not required under *Wochos*, the alleged corrective disclosure was also "accompanied by a far more plausible reason for the stock's decline—significant issues stemming from the COVID-19 pandemic."  Op. 43.  Plaintiff spends pages fighting the Court's conclusion on that point,

---

[6] Plaintiff states, without explanation, that the Officers' Sarbanes-Oxley certifications "also support scienter."  Pl. Br. 26.  As the Court held, they do not.  Op. 31, 39.  And the SAC alleges nothing new about the certifications.

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004
602.382.6000

but ignores that RTX's quarterly report issued the evening before the drop was focused on the adverse effects of and uncertainty caused by COVID-19 (Op. 20; Mot. 7–8), along with the obvious point that continued bad news related to COVID-19 was still bad news.

Plaintiff makes two other arguments, neither of which is relevant under *Wochos*:

*First*, plaintiff doubles down on its assertion that Kennedy and Hayes somehow "manipulate[d] the market through their own trading." Pl. Br. 29. But defendants demonstrated the implausibility of that claim, which is premised on a tiny sliver of RTX's trading volume on the day of the drop and the day after.[7] *See* Mot. 30. Plaintiff's answer is to cite irrelevant academic articles about illegal insider trading that undermine its own position. Pl. Br. 29–30. As one of these articles confirms, "[i]t is hard to imagine that any manipulator would be able to move a large-capitalization and highly liquid stock such as [RTX] through trade-based manipulation." Rajesh K. Aggarwal & Guojon Wu, *Stock Market Manipulations*, 79 J. of Bus. 1915, 1940 (2006). And how Kennedy's and Hayes's purchases sustained that recovery for months and years, plaintiff never even suggests.[8]

Lacking an on-point response, plaintiff asserts that trading volume is not subject to judicial notice. Pl. Br. 29. But courts routinely take notice of this indisputable public fact. *See, e.g.*, *Immanuel Lake* v. *Zogenix, Inc.*, 2020 WL 3820424, at *5 (N.D. Cal. Jan. 27, 2020); *ScripsAmerica, Inc.* v. *Ironridge Global LLC*, 119 F. Supp. 3d 1213, 1253–54 (C.D. Cal. 2015). And plaintiff pleads that on October 28 (i) trading volume was "unusually heavy" and (ii) RTX temporarily lost billions in value. SAC ¶¶ 10, 309. Such allegations also necessarily incorporate trading volume by reference.

*Second*, plaintiff argues that RTX's recovery lagged an industry index and that "measuring losses without reference to the relevant industry is not scientific," noting that

---

[7] As defendants explained, $3 million of the $4 million in purchases by Kennedy and Hayes occurred on October 28, *the day of the drop*. Mot. 30 & n.14. Plaintiff offers no explanation for how such trades could be relevant to the recovery analysis under *Wochos*.

[8] Plaintiff claims that "analysts" endorsed its "propping up" theory. This appears to be a reference to a *Bloomberg* article—not an analyst report—that simply reported on the fact of the stock trades and RTX's performance on October 30, 2020. *See* SAC ¶ 314.

-15-

damages experts rely on such indices. Pl. Br. 31. But scientific or not, evaluating loss causation based on absolute declines and recoveries in stock price is the law in the Ninth Circuit. *See Wochos*, 985 F.3d at 1198; *Metzler Inv. GMBH* v. *Corinthian Colls., Inc.*, 540 F.3d 1049, 1059 (9th Cir. 2008).

Contrary to plaintiff's briefing, *Dura* does not suggest otherwise merely because the words "industry-specific" appear in the opinion. Pl. Br. 31. The Supreme Court was only making the common-sense observation that "industry-specific" factors (among many other things) can affect a stock price, such that a lower price is not necessarily attributable to a misrepresentation. *Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336, 343 (2005). And as the Ninth Circuit has stated, *Dura* stands for the proposition that, to plead loss causation, "the complaint must allege that the defendant's 'share price fell significantly after the truth became known'"—a standard based on absolute price movements. *Metzler*, 540 F.3d at 1062 (quoting *Dura*, 544 U.S. at 347).[9]

### B. Plaintiff cannot plead loss causation because it does not adequately trace the stock drop to the alleged misstatements.

The SAC also fails to plead loss causation because plaintiff cannot attribute its alleged loss to "the very facts about which the defendant [allegedly] lied." *Mineworkers' Pension Scheme* v. *First Solar, Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (per curiam) (citation omitted). In rejecting plaintiff's loss causation theory before, the Court reasoned that "[w]ithout specific, particularized allegations connecting Plaintiff's theory of pervasive fraud and the stock drop after the DOJ investigation disclosure," plaintiff "fail[ed] to plead loss causation even under the broadest proximate cause test." Op. 44.

Plaintiff did nothing in the SAC to address this deficiency. Rather than pleading the required connection between Raytheon's alleged misconduct and the October 28, 2020 stock drop, plaintiff quibbles with the Court's words. Plaintiff asserts—citing nothing and

---

[9] Moreover, even if *Wochos* were to countenance comparison to an industry index, defendants have already shown that RTX outperformed plaintiff's index across various time horizons. Mot. 30–31.

-16-

undermining its own pleading—that "the SAC does not stand or fall on a theory of widespread fraud." Pl. Br. 32 (emphasis omitted). The SAC's allegations belie that assertion. *See, e.g.*, SAC ¶¶ 4 ("Raytheon repeatedly engaged in egregious misconduct"), 56 ("gimmicks happened on 'almost every project'"), 91 ("Everything about Raytheon is shady"); *see also* Dkt. 54 (Transcript) at 20:4–5 (contending at argument that plaintiff alleges "a companywide practice"), 25:8–10 (stating that complaint discusses "a practice of fraud . . . not isolated instances"); Op. 2 ("The Complaint alleges th[e] misconduct was so pervasive it affected almost all contracts and divisions at Raytheon[.]").

Regardless, what matters for purposes of loss causation is that the SAC fails to trace the transient stock drop to plaintiff's underlying allegations of misconduct. Plaintiff nowhere alleges that any of the CWs touched any of the contracts that are being investigated by the DOJ, nor that the instances of misconduct they allege were ever disclosed in any way. Instead, the SAC alleges that the stock price fell because RTX disclosed a *subpoena*, citing news clippings that vaguely suggested a linkage between the stock drop and the *subpoena*—not any underlying facts. SAC ¶¶ 9–10. And plaintiff's opposition repeatedly argues the same. *See, e.g.*, Pl. Br. 30 ("Raytheon's share price significantly underperformed its peers, as a result of the disclosure relating to the criminal subpoena."). As the Court correctly held, Op. 43, this is insufficient as a matter of law under Ninth Circuit precedent, including *Lloyd* v. *CVB Financial Corp.*, which reaffirmed that without more "the announcement of an investigation . . . does not reveal to the market the pertinent truth of anything, and therefore does not qualify as a corrective disclosure," 811 F.3d 1200, 1209–10 (9th Cir. 2016). *See also* Mot. 31–33. Plaintiff cites *Lloyd* in passing (Pl. Br. 33), but ignores that the Court already determined that *Lloyd* "if anything cuts *against* Plaintiff's position," for reasons that still apply with equal force. Op. 44.

## CONCLUSION

Plaintiff has had over two years, and two amended complaints, to plead a violation of federal securities law. Even with guidance from the Court, it has failed to do so. The Court should grant defendants' motion and dismiss the SAC with prejudice.

-17-

Dated this 14th day of March, 2023.

SNELL & WILMER L.L.P.

   */s/  Cory L. Braddock*

Jeffrey Willis
Cory L. Braddock
One East Washington St., Suite 2700
Phoenix, Arizona  85004

William Savitt (admitted *pro hac vice*)
Graham W. Meli (admitted *pro hac vice*)
Adam L. Goodman (admitted *pro hac vice*)
WACHTELL, LIPTON, ROSEN & KATZ
51 W. 52nd St.
New York, New York  10019

*Attorneys for Defendants*

-18-

**CERTIFICATE OF SERVICE**

I hereby certify that, on March 14, 2023, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system and served electronically through the CM/ECF system to all counsel of record.

SNELL & WILMER L.L.P.

*/s/  Cory L. Braddock*

Cory L. Braddock
One East Washington St., Suite 2700
Phoenix, Arizona  85004

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004
602.382.6000