IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Pranay K. Bajjuri, et al.,

   Plaintiffs,        4:20-CV-00468-JCH

  vs.

Raytheon Technologies Corporation, et al.,  May 8, 2023
                1:36 p.m.
   Defendants.       Tucson, Arizona
_____


REPORTER'S OFFICIAL TRANSCRIPT OF PROCEEDINGS

HEARING ON MOTION TO DISMISS

(PROCEEDINGS HELD VIA ZOOM)

BEFORE THE HONORABLE JOHN C. HINDERAKER
UNITED STATES DISTRICT JUDGE


Court Reporter:   Erica R. McQuillen, RDR, CRR
        Official Court Reporter
        405 W. Congress Street
        Tucson, Arizona 85701
        (520)205-4267

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

A P P E A R A N C E S

Present via Zoom for Plaintiffs:

> Jeremy A. Lieberman
> Emma Gilmore
> Villi A. Shteyn
> Pomerantz LLP
> 600 Third Avenue
> 20th Floor
> New York, New York 10016
>
> Gary A. Gotto
> Keller Rohrback, LLP
> National Bank Plaza
> 3101 North Central Avenue
> Suite 1400
> Phoenix, Arizona 85012

Present via Zoom for Defendants:

> Graham William Meli
> Adam Liron Goodman
> David Webb
> Wachtell Lipton Rosen & Katz
> 51 West 52nd Street
> New York, New York 10019
>
> Cory L. Braddock
> Snell & Wilmer, LLP
> One Arizona Center
> 400 East Van Buren
> Suite 1900
> Phoenix, Arizona 85004

Also present via Zoom:

> Seth Huttner

UNITED STATES DISTRICT COURT

P R O C E E D I N G

THE CLERK:  In Civil Matter 20-468, Bajjuri vs. Raytheon Technologies Corporation, on for a motion hearing.

Counsel, please state your appearances.

MR. LIEBERMAN:  Good afternoon, Your Honor.  Jeremy Lieberman, Pomerantz LLP, on behalf of the plaintiffs.

THE COURT:  Good afternoon.

MR. MELI:  Your Honor, Graham Meli from Wachtell, Lipton, Rosen & Katz for the defendants.

THE COURT:  All right.  And Ms. Gammon, do you know who the other lawyers who are pictured on the screen?  Have you got a full roster of who they are?

(A discussion was had off the record between the Clerk and the Court.)

THE COURT:  All right.  So I understand we also have Emma Gilmore.

MS. GILMORE:  Good afternoon Your Honor.

THE COURT:  Good afternoon.

Villi Shteyn.  Shteyn?

MR. SHTEYN:  Yes, good afternoon, Your Honor.

THE COURT:  Is it Shteyn?

MR. SHTEYN:  Shteyn.

THE COURT:  Shteyn.  Thank you.

Gary Gotto.  And that's who I have with the plaintiff.

And then I have met Mr. Meli. Seth Huttner, Adam Goodman, David Webb, and Cory Braddock from the defense.

Have I got everybody from the defense, Mr. Meli?

MR. MELI: Yes, you do. Thank you, Your Honor.

THE COURT: All right. Then this is the time set for the defendants' motion to dismiss the second amended complaint, and it's the defendants' motion, so why don't we go ahead and start with you, Mr. Meli.

MR. MELI: Thank you, Your Honor.

The question for the Court today is whether plaintiffs' second amended complaint has overcome each and every one of the independent grounds for dismissal in Your Honor's prior opinion. We submit that the answer is a clear no.

It's important to note here that the Court did not just hold that plaintiff failed to plead three required elements of securities fraud: falsity, scienter, and loss causation. The Court also held that there were multiple reasons for each of those conclusions, and each of those reasons was sufficient to dismiss the complaint in full.

For falsity, plaintiffs' confidential witness allegations failed to satisfy the particularity requirement under the PSLRA, and plaintiff also failed to plead materiality.

For scienter, plaintiff again failed to satisfy the

particularity requirement, failed to plead anything about the officer defendants' knowledge of or involvement in any of the alleged misconduct, and failed on each of its assorted legal theories, from stock sales to GAAP violations.

For loss causation, the complaint failed under the Ninth Circuit's Wochos v. Tesla precedent because of a swift and sustained rebound at RTX's stock price, and it failed under other Ninth Circuit precedent because the disclosures of a subpoena is not a legally sufficient corrective disclosure. A subpoena does not disclose the very facts about which the defendants allegedly lied.

THE COURT:  Mr. Meli, let me --

MR. MELI:  Yes, Your Honor.

THE COURT:  So I've got a couple questions about the last point.  So the Wochos case, is that a bright -- are you contending that's a bright-line case?  Because it still says that I have to look at things in context.  It does, I agree, have this drop and then the stock price comes back up.  Now we have arguments from the plaintiffs about the reasons for those drops.

I think they've also provided some information that would suggest the other reason that I found was more plausible, that this had to do with the COVID disclosures and the numbers of employees that were being laid off, that that had been shared with the market at an earlier point in time,

and so maybe that isn't quite as compelling an argument.

Can you talk to me a little bit more about Wochos and those issues that the plaintiffs are raising in response to my last order.

MR. MELI: Yes, Your Honor.

So Wochos, it is a rule that I believe is -- it does use the word "context." It talks about needing to talk about the context of the disclosure that's alleged to be a corrective disclosure. But as to situations in which there is a modest drop in the stock price followed by a swift and sustained recovery, we think that is a clear rule from the Ninth Circuit that such cases do not merit a finding that loss causation has been adequately pled. And as to the arguments that the plaintiffs make in response to that, we think that they fail for a number of reasons.

Wochos does not say that the Court has to look at the reason that the stock price increased in value after the modest drop, and so the various points that the plaintiffs make about, well, did it come back because of something the defendants did, that they -- that they bought stock and that somehow prompted the market to recover in value, we think that that is not something that the Ninth Circuit indicated the Court has to look at.

It did not in Wochos itself look at the reason for the recovery. All it looked at is, was there a modest drop

followed by a sustained recovery swiftly after the -- after the drop and found that, when that was the case, loss causation was not adequately pled and actually that there was not even an opportunity in that case to attempt to replead because there was nothing that the Ninth Circuit saw that the plaintiff could do to fix that issue.

THE COURT:  So -- but in Wochos, those allegations weren't made, from what I could see, so -- and it didn't look like the plaintiffs had asked to make additional allegations, but here I do have those allegations, so does that distinguish this case from Wochos?

MR. MELI:  We think it does not.  As I said, we don't think that Wochos suggested that there could be a situation in which pleading more could solve the issue.  As to what the plaintiffs have pled here, we don't think it does it either.  The allegations that they've made that the stock price recovered because the defendants, two of the individual defendants, bought some stock, we don't think that that's plausible as a factual matter given the quantity of stock that trades on a daily basis for RTX.  The fact that two of their officers bought a few million dollars of stock on a couple days, that does not plausibly explain the fact that the stock has increased in value within days of the drop and has sustained that value for months and years, frankly, never dropping where it went again.

As to the COVID issues, again, Your Honor obviously looked at that in your initial opinion in this case, and we think that was an important thing to look at, but in Wochos, the Ninth Circuit does not say that the Court has to find an alternative ground for the stock drop.  So the allegations as to the impact of COVID we think certainly help in this case, but it does not -- it's not necessary for the Court to have found an alternative reason for the stock drop to find that loss causation was not adequately pled under Wochos.

Again, loss causation is plaintiffs' burden to plead, and they have to plead the type of corrective disclosure with the type of reaction by the stock that is recognizable as a sufficient -- legally sufficient corrective disclosure in the Ninth Circuit, and we don't think they've done that here.

But even digging into the COVID issues, they have -- they did point out that, okay, some of the things that were disclosed on October 27th in the 10-Q in 2020 had previously been disclosed, and that is true.  Certain of the problems that the company was facing as a result of COVID had previously been disclosed, but that doesn't change the fact that, as Your Honor found, there were many, many references to COVID throughout the 10-Q disclosure.  It was identified as a significant headwind that the company was facing, and the stock drop happened on a day when, as we noted, there was

significant negative news in the market about COVID.  So the fact that the company had previously disclosed and then continued to disclose negative news about COVID, even if there were some need to find an alternative reason for the drop, we believe that's pled.

And the one other point I'd make on loss causation, Your Honor, is that clearly was not the only reason Your Honor found an absence of loss causation.  You also need a -- Wochos, I mean, is not the only reason that the Court found an absence of loss causation.  There also needs to be a stock price reaction to a disclosure of the specific facts about which the defendants were alleged to have lied.  That's the -- that is the First Solar case that Your Honor cited.  And there is significant case law in the Ninth Circuit that the disclosure of a Government investigation or subpoena is not sufficient without more to constitute such a corrective disclosure.

THE COURT:  Well, isn't that more an admission of wrongdoing or something like that; right?  So if you have an investigation with an admission of wrongdoing, that's a corrective disclosure; is that correct?

MR. MELI:  Right.  The point that the Lloyd case stands for, which is the sort of second pronouncement from the Ninth Circuit that we've talked about in this, is that, when you have a situation where the stock price goes down in

response to the announcement of a Government investigation, and the -- and the market has an understanding that the -- that that subpoena is revealing something about -- about some facts, and then there's subsequently a disclosure that what the market believed was in fact true, that under those specific facts, that can be sufficient to allege loss causation.

Your Honor looked at that issue in your opinion and found that that situation was not -- was not adequately pled here, that the Lloyd case, Your Honor said, if anything is a precedent that helps the defendants here because there was not a fact pattern similar to that in Lloyd in which there was some understanding by the market of the reason for the subpoena that was then confirmed --

THE COURT: Well, let me drill down on -- let me drill down on that a little bit more in this case.

MR. MELI: Yes, please do.

THE COURT: And putting aside what the first order said, don't we have here the disclosure of the investigation, the subpoena, and then in subsequent, I think it was in April, it came out, it was sort of narrowed down as to what the nature of it was, and there were admissions that there was wrongdoing, that there was liability, and then eventually there was a reserve set up, a $290 million reserve, and that came later, and that's something I hadn't -- I don't know if I

had that, but I didn't have that in my head the last time around.  It's something I picked up when I read the briefing this time around.

Don't those subsequent facts distinguish this case from Lloyd?

MR. MELI:  So I think it actually -- Lloyd is the case that found that loss causation was adequately pled in a situation where the market understood at the time of the subpoena what the reason for the subpoena was.  This case is distinct from Lloyd, as Your Honor previously held, because at the time of the subpoena, there's no pleading as to what the market understood any facts being revealed by the subpoena was.

So in Lloyd, what happened was there had been market speculation that the defendant's most significant borrower was in significant financial distress and might not be able to continue paying its -- paying -- making its payments to the defendant.  The defendant denied that, said no, that's not the case, the borrower was doing just fine.

The subpoena comes out from the Government, and the market, the analysts all say at that time, this must be showing that there actually is a problem with the -- with this largest borrower.  The stock price falls 20 percent, and a few weeks later, what happens is the company says, yes, the subpoenas about the -- about the borrower, the borrower is

having significant problems, and the stock price doesn't do anything in response. So basically there was this bombshell disclosure, the words the Ninth Circuit used, just a few weeks after the subpoena, and it has no impact on the stock price.

That is not at all the situation we have here. What we have here is a situation in which there is a subpoena, the market at the time doesn't have any specific speculation about the subpoena revealing any prior false statements, and then months later, the company says, yes, we think there is some wrongdoing, but it's small and it's immaterial, and that is nothing like the fact pattern in Lloyd, which the Court found was sufficient to plead loss causation.

So we think that, Your Honor, your prior ruling on this, that this situation does not mirror Lloyd and that Lloyd, actually, when you look at it, the distinctions between this case and Lloyd actually help our case in finding no loss causation, we think that that continues to stand, and there's been nothing added to the amended complaint, the second amended complaint, to fix this problem for the plaintiffs.

THE COURT: All right. Question about the 2018 investigation, and this is prior -- the pre2018 wrongdoing that's alleged by CW Number 1, there is a discussion about an $11.5 billion contract, but it's -- the second amended complaint, at least as I read it, was unclear as to which segment of the company that contract was in. Are the

plaintiffs entitled to an inference that the CW1 contract, the $11.5 billion contract, was a Missile Systems or an Integrated Defense Systems contract?  Is that an inference that I can draw?

MR. MELI:  I don't think so, Your Honor.  A couple things on that.  First of all, Missile Systems and Integrated Defense Systems are not the same business unit.  The complaint makes this clear.  It pleads in one paragraph that Missile Systems is the unit where a number of these issues that it's talking about took place but then separately pleads that the line of business at Raytheon where the contracts at issue in the DOJ investigation took place is actually the Integrated Defense Systems business or IDS.

So we think, even as to the complaint, the contracts where they have tried to situate them within specific lines of business, they haven't even shown that these contracts relate to the same line of business that the DOJ investigation is in.

As to this $11.5 billion contract that CW5 -- CW1 alleges, no.  The PSLRA requires pleading with particularity. There is no reason that I'm aware of that the Court can infer that a contract like that has -- relates to something when the complaint does not -- does not do so.  And even -- even if it were that that contract was related to anything else that is being talked about, as Your Honor previously found, all they -- all they do in their complaint, all CW1 says is that there

is some misconduct with respect to this $11.5 billion contract.  They don't indicate how large that misconduct is, what it relates to, or anything like that.

So simply saying there is a big contract and something bad happened on it, we don't know, was it a million dollar problem, was it a five million dollar problem, so we just think that that contract really, for many reasons, including that they don't say what line of business it's in, they don't say what the amount of any misstatement was, that they still have not overcome what Your Honor previously found, is that there's not sufficient pleading with respect to that contract for the Court to draw any inferences of material misstatements with respect to it.

THE COURT:  All right.  Mr. Meli, I'm going to suggest that you reserve a little bit of time in case there's some issues that come up with Mr. Lieberman that you want to take up before we close.  We've been talking for a little over 20 minutes, so at this time I'd like to go to Mr. Lieberman.

MR. MELI:  Thank you, Your Honor.

THE COURT:  All right.

MR. LIEBERMAN:  Thank you, Your Honor.

THE COURT:  Mr. Lieberman, what about that last question I had about the $11.5 billion contract that CW1 alleges there was misconduct related to it?  It doesn't tell me -- the second amended complaint doesn't tell me which

segment of the business that related to.  Should I draw an inference?  Is that information that you could provide in an amended complaint, a third amended complaint, for example?  Tell me more about that contract.

MR. LIEBERMAN:  Your Honor, at this stage the current pleading doesn't indicate which division that misconduct occurred in.  Potentially that could be remedied by amendments.  You know, we would have to dig further, Your Honor.

But the -- but what we would say is that the $11.5 billion contract does, though, give further color to an overall issue with EAC completion, with manipulation of contracts, with miscoding of labor costs.

Just taking the miscoding of labor costs, what CW1 alleges, that's exactly the issue that CW5, CW6, and CW7 allege with respect to the $250 million contract in the Missile Defense System.  So there is an overall issue we believe with respect to, at Raytheon, with respect to EACs and with respect to internal controls generally.  So it does help with that inference.

But specifically to Your Honor's question, we can't -- I don't think you could draw an inference at this stage that it's applying to Missiles and Defense Systems.  We do think it's certainly relevant to internal controls broadly.  Specifically, Your Honor, we have CW1, CW2, CW12, and CW --

and CW12 all discussing issues with respect to costs and overages of costs, CW10 as well, that don't necessarily relate to Missile Defense Systems.

And so when you have what we think a very well-detailed misconduct with respect to Missiles and Defense Systems, which clearly we think caught notice of higher executives at Raytheon, and when you combine that with the additional CWs that discuss misconduct in other divisions, potentially, we think that all does raise an inference of potential -- of issues with respect to internal controls and EACs.

I do want to point to something that my adversary referenced with respect to Missiles and Defense Systems versus IDS.  It's very clear in October -- in October of 2020, when defendants discuss the -- when defendants discuss the announcement of the investigation, they discuss an issue with respect to Missile Defense.  That's what they -- that's what they referred to when they referred to the investigation. Later on, in April, in April of 2021, then they say it's IDS, which was merged with Missile and Defense Systems.

So that's conflated by Raytheon itself, and so any issue with respect to any inference as far as whether a contract was Missile and Defense or whether it was IDS has to, at this stage of the pleadings, given defendants' own conflation on the two dates where they discuss these

UNITED STATES DISTRICT COURT

subpoenas, that has to go to the inference in plaintiffs' favor.

THE COURT:  So am I correct, though, that the 2018 investigation and the three employees that are discussed by I think it's CW5 having been fired, those were Missile Systems employees; right?

MR. LIEBERMAN:  That's correct.  That's correct, Your Honor.

THE COURT:  And then, when the 2020 subpoena comes out and what we learn through subsequent disclosures is that, ultimately, that relates to contracts in Integrated Defense Systems; is that correct?

MR. LIEBERMAN:  Well, Your Honor, they first say -- they say that -- in October they say that it relates to the company's legacy Integrated Defense Systems business, which is now part of the Missiles and Defense unit, but very importantly, on October 27th, 2020, October 28th, 2020, when disclosing the subpoena, they state that there are subpoenas related to the Missile and Defense business since 2009.  And so clearly there is a conflation between these two businesses. And so -- one was merged into the next.

And so, as far as the pleading goes, to say -- to draw any distinctions and to say that the contracts discussed by our CWs don't relate in any way to the actual -- to the actual subpoenas announced at the end of the class period we

think is not plausible, Your Honor.  There is a conflation by defendants themselves on this very point.

And clearly all -- the CWs discuss overcharging, overbilling on a contract, which leads to termination of not just the three employees, several employees, dozens, according to CW7, and which also lead to a DOJ investigation.

There is one of two inferences, Your Honor.  Either it's the same precise DOJ investigation or there is a whole new DOJ investigation that's going on at Raytheon that hasn't been disclosed yet, which raises a whole -- a slew of other problems with respect to defendants' disclosures and their disclosure control.

THE COURT:  All right.  So let's talk about -- let's talk about what you're terming sort of the two investigations.  And I've been through all of this.  You're much closer to this.  You spent a lot more time on it.  I've spent a lot of time on it but not as much as you.

The 2018 -- with respect to, like, DOJ investigations, the 2018 misconduct, internal audits, where is -- that's in the confidential witness statements; right?  And as I understand it, I'm looking at CW5, I think, and I may be wrong about this, that CW5 references an internal audit.  There is the reference to 250 thousand -- $250 million in false labor charges and so forth.

When I read the allegations about CW5, I understand

some of that information came from Paul Hanson, at least about the termination of the three employees.  Some of it may have come from one of the employees' wife, Darcy McDonnell, who worked with Paul Hanson.

But I'm not clear when I read the rest of it where the allegations about the 250 million in false labor charges, the internal audit and so forth, what is the source, ultimately, of that information?  I understand it's CW5, but there's no reason CW5 would have personal knowledge of that. It doesn't sound to me like Paul Hanson would have a reason to have personal knowledge about that information.  So where is it coming from and why should the Court credit those allegations as reliable?

MR. LIEBERMAN:  Your Honor, well, it just doesn't -- it doesn't only come from CW5.  It also comes from CW6, and CW6, you know, confirms the allegations with respect to Tina Fay, Callahan and McDonnell, and CW7 as well confirms these allegations and says that, around 2018, dozens of employees were fired for manipulating EAC.  And so you have at least -- and there's even CW11 as well says that several Raytheon employees were fudging the numbers and the DOJ was investigating.

And so there's a plethora of confirming, and then CW13 as well says that Callahan, McDonnell, and Fay were fired for manipulating EACs.  I count five CWs, at least five CWs,

that are all saying the same -- almost precisely the same story, Your Honor.

THE COURT:  Does CW5 -- does CW5 talk about a DOJ investigation?

MR. LIEBERMAN:  CW5 does not mention a DOJ investigation.  CW13 says that the -- no, CW11 mentions the DOJ investigation with respect to the 2018 contracts, Your Honor.

THE COURT:  Can you identify any risks that actually materialize as a result of the 2018 misconduct that's been alleged?  Were there lost contracts?  Were there financial responsibilities that -- financial liabilities that Raytheon had as a result of that?  Is there anything alleged in the second amended complaint that shows that something actually adverse happened to Raytheon as a result of the alleged 2018 misconduct?

MR. LIEBERMAN:  Oh, Your Honor, the announcement of the investigation itself was adverse to Raytheon.  The charge of $290 million, which they took as a result of -- which they anticipate penalties to pay for them, those on their own are materializations of risk that occurred.

When the market learns that Raytheon's being investigated -- a criminal subpoena, that's very uncommon, Your Honor, to get a criminal subpoena, and when the market learns that there is a criminal subpoena, and Bloomberg says

that was the reason for the stock price to climb that day, that's something that clearly caught analysts' attention, and Citigroup itself discussed it, as well as market commentary.

And then the fact that Raytheon in 2020 admits that there was some events that occurred that shouldn't have occurred, i.e. confirming many of the CW allegations, they ultimately take a $290 million charge in anticipation of penalties.  That's -- that is materialization of risk, Your Honor.

THE COURT:  So connect these for me because I'm struggling, I gotta tell you, when I read.  There is a lot here, and I've read through it.  I'm really struggling to make the connection, a firm, like, cogent connection between the 2018 misconduct and the 2020 subpoena, so walk me through that again.

MR. LIEBERMAN:  Your Honor, there is -- I'll just take you through the CWs, starting from CW, well, really CW4, who discusses that he learns from David Zincke that the DOJ was investigating EAC issues; CW5 discussing in very much detail what those manipulations were, the $250 million of manipulation of a naval contract, which results in the firing of several executives, including the CFO of Raytheon; CW6, who confirms all this misconduct; CW7, again, who confirms that dozens were fired, including -- including Taylor Lawrence; and then you have CW11 that says that he learned in 2018 or 2019

that several Raytheon employees were fudging the numbers and the Pentagon was looking into it.

You have already just on that, with respect to that particular investigation, you have five or six CWs all talking about fired employees, internal audit, EAC manipulations, and a DOJ investigation.  It is implausible that somehow the DOJ investigation that's announced in 2020 is not related to those investigations.  We think that's simply implausible.

If it is true, Your Honor, we think that does, then, raise a whole bunch of different issues because then you have just simply allegations of multiple DOJ investigations that are occurring in the Missile Defense area which are clearly not being disclosed, and that just adds more to the internal control problems.

You then, therefore, have -- you ultimately have CW8 and CW -- you have CW8 and CW10 talking about a later contract, a 2017 contract, which the DOJ has now -- which Raytheon has admitted there is an investigation into, and they discuss a whole slew of other firings, of Asbell, of Sabin, of Murphy.  And Asbell, again, very notably, Your Honor, Asbell is a CFO of the Missile and Defense.  That's -- two years prior, Greg White was the CFO of Missile and Defense.

And so you have, in the same department, you have the CFO of, in Missiles and Defense, being fired, allegations of them being terminated, once again, a glaring failure in

internal controls.  And so there is another mass layoffs on another contract, and that's pointed to by CW8 as a 2017 contract.

So the connections we think, Your Honor, are very strong.  There are certain I would say inferences you'd have to make that the discussions of terminations, internal audit, and DOJ investigations are related.  I mean, with respect to CW8, he makes that very clear.  CW11 does as well.  But the timing is so -- it lines up so almost perfectly that it would be implausible to say these are other contracts that are being investigated by that same DOJ.  And if they are, Your Honor, I think that just adds even more to the inference of poor internal controls and internal -- and scienter.  Then you'd have four DOJ investigations going, if you'd read this according to how defendants want to read it.

THE COURT:  So then -- and I've started to look. I've read through the statements, the allegations related to the confidential witnesses.  There is a lot there.  There is a lot to parse.  But at the end of the day, that's what I really have to fall back on, is the confidential witness allegations, and that's where I'll find the connection between the 2018 alleged misconduct and the 2020 subpoena.

Is that correct?  That's where it all --

MR. LIEBERMAN:  Your Honor, that's where the meat is, in addition to we would say also looking at the $290

million impairment or reserve.  That $290 million sounds a lot like $250 million.  That's basically 250 million plus legal costs.  And so you're looking at an allegation of a $250 million manipulation, and then there is a discussion of a $290 million reserve in anticipated penalties.  Those align really, Your Honor, quite perfectly, we would say.

THE COURT:  So the $250 million false labor charges that CW5 refers to, what is the source of that, ultimately?  I mean, where does CW5 get it?  Because as I understand it, CW5, a former employee, hasn't been at Raytheon for a year, and then he hears this information from Paul Hanson, but I'm not clear how Paul Hanson would know it because he worked as the director of Capture Management Excellence and reported to someone who is a VP of business development, so they're more on the business development side.

And it's never clear to me, reading the allegations -- it's clear to me where he gets the information about the firings, but then the three paragraphs that follow, it doesn't attribute it, and it almost seems like that was done artfully because, you know, I just can't get it out of that.  I know the brief says it's Paul Hanson, but can you tell me where this information ultimately comes from?

MR. LIEBERMAN:  Your Honor, that's right, that Paul Hanson told him, and he relates an internal audit.  And if we're only -- if we were only relying on CW5 as corroboration,

Your Honor's question might be more defeating, but we have then CW6 just confirming CW5's allegation. CW6 says exactly the same story, that they got fired with respect to EACs, and he was -- he was an employee in the -- supply and control program manager for Missiles and Defense until October 2021. So clearly he'd be in a position to know.

And then I'd referred Your Honor to CW7, who worked for Raytheon from September 2014 to November 2018 as a principle integrated program management analyst in Missile and Defense, and he says the same thing. He says almost the same thing. And then we have --

THE COURT: Do they -- and I may be wrong about this because again -- but do they talk about that $250 million in false labor charges, or is -- because my recollection is that figure, that number, comes from CW5.

MR. LIEBERMAN: CW13. CW13, as well, Your Honor.

THE COURT: Okay.

MR. LIEBERMAN: He talks about $200 million in -- let's get the exact --

THE COURT: Isn't that misconduct related to a $200 million contract?

MR. LIEBERMAN: Yeah, a contract, right, a contract worth over $200 million, that's correct, right.

THE COURT: So then back me up and tell me, what are false labor charges, and what does that really mean in terms

of Raytheon's bottom line?  Because the way I read that narrative, it sounded like charges may have been moved around between contracts, but maybe they were legitimate charges.  I wasn't clear that that was actually a $250 million hit that was being alleged to Raytheon's bottom line or what that really means exactly.

MR. LIEBERMAN:  Your Honor, what we -- as pled and as discussed even more by CW6 as well is that there was -- this was all an effort to -- the $250 million in false labor charges is done to mask overspending.  And this really even goes back in a way to CW1, who discusses the culture of -- what we think a culture of overspending.

So you overspend in labor charges, you spend too much, and CW3 says, who worked in Missile Defense, you slow down projects, and you cause them to incur too much money, and then at some point it looks pretty bad on certain contracts.  If you're way over budget, it looks pretty glaring.  And so what you do is you take those overcharges and you move them around to contracts that are less, that are less in the red.  And that's what CW5 and CW6 describe.

THE COURT:  All right.

MR. LIEBERMAN:  It was done in order to hide cost overruns, in CW6's language.  And it all goes to, we have numerous allegations, I would say the overwhelming majority of CW allegations, whether it be Missile Defense or not, discuss

a whole -- a scenario where EACs, projects are being overbilled, overrun, and then CW5 and CW6 clarify that, once that's done, you need then to put that money around, hide it around in a way that's going to still allow them to maintain their bonuses and continue to bill the Government without detection.

THE COURT:  All right.  So let's go back to CW5, and I understand you're contending there is some corroboration from other confidential witnesses, and I'm going to look more closely at that, but for CW5 and the reference to the $250 million in false labor charges, you're telling me that comes from Paul Hanson, and so my follow-up question is, how would Paul Hanson know about 250 million in false labor charges?  I mean, what about his position?  Because again, I get back to my point that he seemed to be more on the business development side and not in the contract performance side.

So why -- why should I credit that statement from Paul Hanson through CW5?

MR. LIEBERMAN:  Your Honor, we do -- you are correct that Paul Hanson, he was still employed at Raytheon at the time of the investigation.  That's a critical allegation, as stated paragraph 61.  As far as business development side versus project development side, I would say -- I would turn Your Honor again to, then, if somehow that's -- that somehow sheds a poor light on his testimony, we would then, you know,

just turn to the other multiple witnesses that confirm those very facts.

THE COURT:  Okay.

MR. LIEBERMAN:  And so -- and it's also the detailed -- the amount of detail alleged, Your Honor, and it's the same three employees that are referenced by CW7, CW13, and CW6.  I mean, the story is very coherent and corroborated by multiple sources.

And I'd again turn Your Honor to the $290 million charge that the company takes which we think aligns very squarely with the $250 million fraud alleged.

THE COURT:  Talk to me about your prime government contracts theory.  I have some questions about this.  Let me see.  So as I understand it, the complaint singles out sort of Integrated Defense Systems bookings in Raytheon's 2019 10-K, but wasn't Integrated Defense Systems just one of five Raytheon segments?  There were other ones.

And then, when I went and looked at the 2019 10-K and I read it, the first sentence, which wasn't included in the brief, was explaining that there was an increase in bookings, a large number, and then it went on to explain what that increase was from, and that's how it referred to -- that's why it referred to what you're calling these prime contracts, but it seemed more informational to me.

So how does that paragraph, when taken as a whole,

really support this touting theory that you have?

MR. LIEBERMAN:  Your Honor, Your Honor reads it correctly.  These are the company's discussing its large bookings in IDS or Missile Defense, and what it shows you, though, is that it's not just -- you're not dealing with thousands or tens of thousands of contracts.  You're dealing with each year a handful of new contracts.

And so in that context, the 204 contracts and one of them alleged to have been bilking by $250 million is a big deal.  You see many of these contracts are less -- are less than $250 million that are referenced in the 10-K.

So all it goes to -- it goes to confirm what CW10 said, that there are only a handful of contracts or relevant contracts in a given -- in a given unit.  It also confirms -- conforms with what CW3 says.  CW3 says there are only about 10 programs in the Missile and Defense program.

So I think a big -- Your Honor, a big if we can call it criticism of the prior complaint was that we were alleging a relatively small fraud in a vast corporation which couldn't lead to materiality, and what we're trying to direct the Court to and what we've hoped we've done in the second amended complaint is say, well, we're speaking about a much smaller universe, actually.  We're speaking about only X amount of prime contracts in one of four key divisions of Raytheon, and that becomes, when the statement's viewed in that context, and

whether or not they're material in that context, when you're discussing Missile and Defense, then a $250 million overcharge becomes a pretty big deal.

And that's where -- and not just the $250 million overcharge.  Then you have the 2017 contract which led to the firings of three more employees, including the CFO and the general counsel.  And so that's what we would -- that's how we -- we think it narrows the scope of the materiality inquiry, Your Honor.

THE COURT:  All right.  I'm going to ask you one more question.  Then I'll give you an opportunity to close with whatever you want to close with.

Is the second amended complaint where you want it to be at this point?

MR. LIEBERMAN:  Your Honor, we will always take another opportunity at amendment.  Clearly we did a lot better.  We did a lot better in our first -- between the first and second.  We're getting there, Your Honor, we think.  Can we come up with another -- another several or another ten CWs, as we almost did, in our next effort?  It's quite possible.  So we always want to make it better, Your Honor.

THE COURT:  So are there other CWs out there that you haven't included?

MR. LIEBERMAN:  Your Honor, we haven't -- there actually -- there was one, but we have to vet more of the

relevance, but we don't really -- we didn't go out and, you know, you know, do that investigation and do that effort, given that the motion to dismiss was pending, Your Honor.

THE COURT:  Have any additional relevant facts arisen since you filed the second amended complaint?

MR. LIEBERMAN:  That are on the record, Your Honor, on the public record, other than the, you know, admission of the $290 million reserve, I don't think so, Your Honor.

THE COURT:  All right.  Thank you.  And if you want to go ahead and close, then we'll give Mr. Meli a final crack at this for five, six, seven minutes, and we'll finish up.  So go ahead, Mr. Lieberman.

MR. LIEBERMAN:  Sure.  Thank you, Your Honor.

I would want to turn Your Honor to the Wochos issue with respect to loss causation.  We do think, you know, is Wochos a bright-line rule?  I mean, Your Honor, we think it can't be read as a bright-line rule.  It's one paragraph literally, Your Honor.  Very little briefing and analysis done on that issue.

We think that, Your Honor pointed to the issues regarding whether COVID was previously disclosed, the impacts of COVID, and the CEO stock purchases, all those are important, but a very key issue that hasn't been raised in discussion today, Your Honor, is just the comparison to the index.

We compared the performance of Raytheon to the Bloomberg aircraft manufacturers index, and it's clear that Raytheon underperforms the index in both time periods noted by defendants as a recovery period, be it four days or be it the 90-day PSLRA period.

And that's important, Your Honor, because every -- and defendants' do know this -- every loss causation expert, every class certification expert on market efficiency, looks at one thing.  They do not look at raw prices.  They look at -- they look at actual -- they look at net returns.

You can only look at the stock market reaction in the context of this industry and in context of the broader market.  According to defendants' argument, Your Honor, if one day there would be an oil company would announce a restatement which would hurt its stock by 10 percent, but the next day the war on Ukraine would come out, which would spike the price of oil and make the stock go up 25 percent, according to defendants, you would have zero ability to allege loss causation.

That simply isn't the law.  That is simply not the way that any financial expert or damages expert would analyze the stock price.  You always have to look at net returns compared to the industry and broader market, Your Honor.

THE COURT:  All right.  Thank you, Mr. Lieberman.

All right.  We have about seven more minutes, so go

ahead, counsel.

MR. MELI: Yes, thank you, Your Honor. I'll be brief.

On the question of whether they should be given another chance to amend here, I think the answer to that is pretty clearly no. Your Honor has laid out for them in a 45-page opinion the issues that you found in the prior complaint. They had an opportunity to amend. They've had two-and-a-half years.

And while I know Your Honor said that maybe they've improved some things, I think in certain areas they've actually gone in the wrong direction, and there really has been no indication of what they can do to fix those things if they were given yet another opportunity to amend two-and-a-half years after the events that they are talking about.

One thing that really hasn't been talked about at all today, Your Honor, which is probably the most glaring omission in this whole complaint, is scienter. They have -- still have nothing talking about what the individual defendants knew, what information was available to them, or anything else that one would need to find that there had been a strong inference of scienter pled here.

Both of their complaints seemed to be focusing on stock sales as the basis for scienter. They seem to have

completely given up on that, and now they're all focused on this 2018 conduct which there is no allegation involved any of the individual defendants. Allegations of scienter have to be about what the individual defendants knew and their state of mind, and that's just completely absent, and we want to make sure that doesn't get lost in all of this, is that that is still a major hole in the complaint, even if you overlook all of the other things we've been talking about today.

Just a few other points just to clear up a couple things we've talked about. Mr. Lieberman talked about whether certain of these confidential witnesses corroborated one another. The only thing that we really see that's consistent across some of the witnesses is this idea that a few people were fired back in 2018. Yes, a few witnesses talk about that. It appears that perhaps that happened, that at least some people saw at least three people, Tina Fay and others, get marched out by security. But even assuming that's true, where does that get them?

Your Honor already held that allegations of terminations of lower-level employees are, if anything, cut against a finding of scienter because it shows that individual defendants, who are the ones who need to be pled to have had scienter, were not complicit in wrongdoing but took steps to remedy it.

So as to other things, there is no consistency. We

went all around about what are the -- who else said anything about a DOJ investigation in 2018.  The answer is no one else said anything about a DOJ investigation in 2018.  Not even no one else, no one at all.  CW5 talked about an internal audit in 2018 that he heard about from Paul Hanson.  No other witness, even the ones who mentioned people being fired, said anything about an internal audit in 2018, and certainly no one, not even CW5, said anything about a DOJ investigation in 2018.

On this question of Missile Systems versus IDS, I just ask, Your Honor, if you look at paragraph 76 of their complaint, they explain exactly this distinction.  The conflation is simply that, when the company merged with United Technologies, they combined those segments, but at the time Missile Systems and IDS were separate segments.  They plead that in paragraph 76.  The fact that there may have been some wrongdoing, which was promptly dealt with by firing the three or so wrongdoers, in a different line of business does not mean that there was some pervasive fraud, certainly not that there was scienter of the individual defendants.

And I guess I'll just end, Your Honor, with the $290 million point.  That is not, as Mr. Lieberman suggested, something that's come up since the amended complaint.  It's in the amended complaint, so it's not -- it's not some new development, nor is it -- nor is it material.  Your Honor

found the $250 million would not be material in a company with hundreds -- over a hundred billion dollars in sales over the class period.  If 250 million was not material, 290 is not either.

These points about whether it's coincidental that they're similar amounts, that's not the type of particularized pleading that's required here.  There's no allegation of material misstatement, no allegation of scienter, no allegation of loss causation, and for all of those reasons, as Your Honor previously held, we believe the complaint should be dismissed, and this time with prejudice.

Thank you, Your Honor.

THE COURT:  All right.  Thank you, Mr. Meli.

Mr. Lieberman, Mr. Meli got into scienter.  I'm going to give you, if you wanted, a couple minutes to talk about scienter because he raised it, he went over it a little bit, he pointed that out, and I didn't ask you any questions about it, so if you want a moment with that, please go ahead.

MR. LIEBERMAN:  Sure, Your Honor.

Two points on scienter.  One is, beginning from the time of the internal investigation and the firings alleged in the complaints, there can be little doubt at that stage, when you conduct an internal investigation, when there are firings of senior personnel within a key division of the company, at that stage, clearly, the senior executives at a company are

aware of the misconduct, particularly when there is a DOJ investigation alleged.

And we allege that CW4 learns of an investigation in 2000 -- early 2019, and the same thing with CW11. And so when you're aware of a DOJ investigation into significant misconduct which leads to firings of several high-level employees, including the CFO of the Missiles and Defense division, you know about these internal controls issues, you know about these EAC issues, and yet you're not disclosing to the public, and so from that point on, scienter's clearly, we would say, Your Honor, a slam dunk.

The question then becomes with respect to scienter for earlier periods, first of all, the scienter of those individuals that were fired we would say are alleged. According to Omnicom and also according to the Loreley case, you don't need scienter of a speaker or a maker of a statement. You need scienter of anyone in high-level management whose actions could be attributed to the company.

And so that you clearly have. You have the scienter of Greg White, of Taylor Lawrence, and of Tina Fay, as well as Callahan and McDonnell, all of whom who knew and participated, participated and/or knew of the fraud alleged. And so we think that's a very important point, Your Honor, as far as scienter goes. We have to look at the scienter of those individuals who were fired and alleged to have participated in

misconduct.

In addition, Your Honor, with respect to scienter, we would say, looking beyond the allegations of Missiles and Defense, you do have what approaches allegations of a culture of issues with respect to miscoding, with respect to EAC cost overruns, between CW1's testimony that he actually brought up his EAC overspending issues to top management, to the head of ethics, to also the head of internal audit, CW2 alleging issues with respect to competitive bidding, and then you have CW10 and CW11 also discussing hundreds of millions of dollars in overspending, not necessarily related to Missiles and Defense.

And so we think, then, you start to get to an issue regarding a culture of overspending, which we think then does lead to the scienter of the individual defendants, at the very least top management, Your Honor.

THE COURT:  All right.  With that, Mr. Lieberman, thank you very much.  Mr. Meli, thank you.  Thank you to everyone else for attending, and I'm going to take the motion under advisement, and we'll work up an order as quickly as we can.

And with that, we are adjourned.  Have a good day.

MR. LIEBERMAN:  Thank you, Your Honor.

MR. MELI:  Thank you, Your Honor.

(Proceedings conclude at 2:28 p.m.)

C E R T I F I C A T E


I, Erica R. McQuillen, Federal Official Realtime Reporter, in and for the United States District Court for the District of Arizona, do hereby certify that, pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 10th day of May, 2023.


s/Erica R. McQuillen
Erica R. McQuillen, RDR, CRR
Federal Official Court Reporter