**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Pranay K Bajjuri, et al., | No. CV-20-00468-TUC-JCH |
| Plaintiffs, | **ORDER** |
| v. | |
| Raytheon Technologies Corporation, et al., | |
| Defendants. | |

In this case, Plaintiff Bajjuri (representing a class of Raytheon shareholders, together "Plaintiffs") alleges Defendants ("Raytheon" and certain of its individual "Officers") violated federal securities laws by making misleading statements in Raytheon's public filings. According to Plaintiffs, the truth was revealed in October 2020 when Raytheon disclosed a DOJ subpoena and its stock fell, injuring Raytheon's shareholders.

Plaintiffs' amendments have brought this case's theories into sharper focus. One, previously rejected, is that Raytheon's filings were misleading due to widespread fraud. This theory still has no basis in well-plead facts. Another theory, newly reinforced, is that Raytheon's filings were misleading due to a failure to disclose misconduct discovered in 2018. This theory fails for lack of connection to the 2020 DOJ subpoena or to any well-plead impact on Raytheon's finances or internal controls. In fact, Plaintiffs' theory tends to suggest Raytheon's controls worked effectively and as intended. Plaintiffs' case also suffers because Raytheon's stock did not fall far and recovered quickly. For those reasons, discussed more fully below, the Court will dismiss this case with prejudice.

## I.     Background

On October 30, 2020, Bajjuri brought a federal securities class action suit against Defendants. Doc. 1. In July 2021, the Court consolidated Bajjuri's case with a related case, retained Bajjuri as the lead case, Doc. 30, and the newly consolidated Plaintiffs filed their first amended complaint. Doc. 34 ("FAC"). In March 2022, Raytheon moved to dismiss. Doc. 41. The Court granted Raytheon's motion with leave to amend. Doc. 55. In December 2022, Plaintiffs filed their second amended complaint. Doc. 56 ("SAC").

Before the Court are Defendants' two motions for judicial notice, Docs. 60, 64, and Motion to Dismiss the SAC. Doc. 59 ("MTD"). The motions are fully briefed. Doc. 61 ("Response"); Doc. 63 ("Reply"). On May 8, 2023, the Court heard oral argument. Doc. 73 ("Hr'g Tr.").

## II.     Legal Standards

Several legal standards apply to Plaintiffs' claims. The claims arise under the Securities Exchange Act ("SEA") Section 10(b) (Count 1, against Raytheon) and Section 20(a) (Count 2, against the Officers). To state a claim under §§ 10(b) and 20(a), a plaintiff must allege (as relevant to Defendants' challenges): "(1) a material misrepresentation or omission by the defendant [("falsity")]; (2) scienter; … [and (3)] loss causation." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014) (citation omitted).

**Federal Rules of Civil Procedure 12(b)(6) and 9(b).** When deciding any motion to dismiss for failure to state a claim, the Court must "consider the complaint in its entirety" and, in doing so, "accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); Fed. R. Civ. P. 12(b)(6). When a claim alleges fraud, "a party must state with particularity the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b). Rule 9(b)'s particularity requirement "applies to all elements of a securities fraud action[.]" *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014).

**SEA §§ 10(b) and 20(a), and SEC Rule 10b-5.** SEA § 10(b) makes it unlawful to employ any "manipulative or deceptive device" in connection with the purchase or sale of

a security, or to contravene "such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b-5 prohibits "any act, practice, or course of business" that operates as a "fraud or deceit" in connection with the purchase or sale of a security. 17 C.F.R. § 240.10b-5(c). SEA § 20(a) extends § 10(b) liability to "controlling" individuals. 15 U.S.C. § 78t(a).

**Private Securities Litigation Reform Act ("PSLRA").** The PSLRA imposes additional "exacting" pleading obligations for § 10(b) claims. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). These obligations differ between the falsity and scienter elements. Falsity requires particularity together with a *reasonable* inference of plausibility, and scienter requires particularity together with a *strong* inference of plausibility. *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023).

## III. Judicial Notice

Defendants present two unopposed motions to take judicial notice. Docs. 60, 64. The Court may judicially notice facts "not subject to reasonable dispute," Fed. R. Evid. 201, and documents incorporated by reference in the complaint. *Tellabs*, 551 U.S. at 322. Facts are "not subject to reasonable dispute" if they are "generally known," Fed. R. Evid. 201(b)(1)–(2), such as "matters of public record." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (citation omitted). Documents are incorporated by reference if the complaint refers to them "extensively." *Id.* at 1002. The Court will grant in part consistent with this Order's reasoning and citations.

## IV. Falsity

Defendants first challenge the falsity element of Plaintiffs' § 10(b) claim. To plead falsity, the complaint must allege a "material" misrepresentation with "particularity." *In re NVIDIA*, 768 F.3d at 1052; Fed. R. Civ. P. 9(b). Specifically, the complaint must (A) state with particularity all facts on which a pleading is based, (B) specify which statements were materially misleading, and why. 15 U.S.C. § 78u-4(b)(1).

Plaintiffs fail to state the falsity element sufficiently for two independent reasons. First, the SAC does not allege falsity with particularity. Plaintiffs allege that all Raytheon's key financial metrics were misleading, as well as specifically the Tomahawk program financials and the Integrated Defense Systems segment bookings, and that Raytheon failed to disclose a 2018 DOJ investigation. But Plaintiffs rely primarily on confidential witness accounts that do not reliably allege widespread fraud, issues with the Tomahawk program, a 2018 investigation, or any risk the alleged misconduct brought to fruition. Second, the SAC does not allege "material" falsity. Plaintiffs fail even to estimate the extent to which Raytheon's various statements were misleading, or to contend with the fact that Raytheon never restated earnings and an independent auditor continued to certify Raytheon's internal controls as effective.

### A.  Facts on Which the SAC is Based

Plaintiffs base their allegations primarily on 14 confidential witness accounts, SAC ¶¶ 41–96, as well as Raytheon's disclosure of the DOJ investigation, SAC ¶¶ 123–125, and certain earnings-call statements by Raytheon's CEO. SAC ¶¶ 319–322; *see also* SAC at 1 (pleading almost entirely on information and belief).

### i.  Confidential Witnesses

Plaintiffs' obligation to state their basis in fact includes an obligation to "reveal with particularity the sources of [Plaintiffs'] information," such as confidential witnesses. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005). Confidential witnesses must be described "with sufficient particularity to establish their reliability and personal knowledge." *Zucco Partners*, 552 F.3d at 995 (internal quotation and citation omitted).

As discussed in the Appendix below (p. 38–63), only some of the individual and corroborated confidential witness allegations are sufficiently reliable. Focusing only on those allegations, the following picture emerges:

- At some point before 2018, a relatively low-level Raytheon employee witnessed many instances of wrong-doing on a large support-services contract in an unknown Raytheon segment. App'x § II.A.

- In 2018, a "Deputy Vice President" Callahan, "Program Manager" McDonnell, and

"Contract Director" Fay were fired for hiding cost overruns on a contract or contracts in the Naval Systems subsection of Raytheon's Missile Systems segment. App'x § II.O.i.

- At some point after April 2020, a relatively low-level Raytheon employee determined that a Raytheon EAC in an unknown segment had accumulated "hundreds of millions" in cost overruns not related to misconduct. App'x § II.J.

- At some point after October 2020, high-level Missiles & Defense division employees Murphy, Asbell, and Sabin were fired in connection with the DOJ investigation into three Integrated Defense System segment contracts from 2011–2013 and one from 2017. App'x § II.O.ii.

- The DOJ investigation "involves" the Patriot Guided Enhanced Missile Program, which was part of the Integrated Defense System segment. App'x § II.N.

### ii.   DOJ Investigation Disclosures and CEO Statements

According to Plaintiffs, "the truth [of the foregoing misconduct] emerg[ed]" when Raytheon disclosed the DOJ investigation, and Raytheon's CEO "acknowledge[d] wrongdoing." *See* SAC at i. On October 27, 2020, Raytheon disclosed it had received a DOJ subpoena earlier that month. SAC ¶ 9. The subpoena sought "information and documents in connection with an investigation relating to financial accounting, internal controls over financing, and cost reporting regarding [Raytheon's] Missiles & Defense business since 2009." *Id.*[1] On April 27, 2021, Raytheon disclosed it had received another DOJ subpoena in connection with the same investigation. *See* SAC ¶ 11.[2] That same day,

---

[1] Plaintiffs omit part of Raytheon's October 2020 disclosure, which states, "Based on the information available to date ... we do not believe the results of this inquiry will have a material adverse effect on our financial condition, results of operations or liquidity." Doc 59-3 at 50.

[2] Plaintiffs omit the text of Raytheon's April 2021 disclosure, which states:

> The [DOJ] investigation includes potential civil defective pricing claims for three [Missiles & Defense] contracts entered into between 2011 and 2013. As part of the same investigation, ... [Raytheon] received a second criminal subpoena from the DOJ seeking documents relating to a different [Missiles & Defense] contract entered into in 2017.

Doc. 59-9 at 31. The disclosure also states "there is a meaningful risk of civil liability for damages, interest and potential penalties," and concludes "[b]ased on the information to date, however, we do not believe the results of the investigation ... will have a material adverse effect on our financial condition, results or liquidity." *Id.*

Raytheon's CFO and CEO provided more information to analysts on an earnings call. *See* SAC ¶¶ 11, 76. Raytheon's CFO explained that the subpoena related to Raytheon's former Integrated Defense System segment, which became part of Raytheon's "Missiles & Defense" division in April 2020. SAC ¶ 76. Raytheon's CEO "affirmed that 'It was alleged that we defectively priced some contracts. We've looked into it[. W]e think there is potential liability for defective pricing clearly.'" SAC ¶ 11.[3]

**B.  Statements the SAC Alleges Were Misleading, and Why**

Plaintiffs allege Raytheon's misconduct rendered many statements in its public filings misleading. Two of these statements described Raytheon's financial controls as "effective." Others reported Raytheon's financial performance. Several more singled out specific bookings and government risks in 2018 and 2019. Plaintiffs allege these statements were misleading because Raytheon's financial controls were ineffective, its financial performance was based on fraudulent behavior, and Raytheon had discovered significant misconduct related to government contracts in 2018 that it failed to disclose.

**i.   Regarding Financial Controls and Statements**

Plaintiffs allege Raytheon misled investors with two statements that describe

---

[3] Plaintiffs omit the context and some substance from the CEO's remarks, and liberally reformat them. During the earnings call, a member of Citigroup's research division asked the CEO to clarify Raytheon's quarterly report statement that the "DOJ items" were immaterial. Doc. 59-10 at 12. The Citigroup representative also asked the CEO to say whether any "connective tissue" or "narrative" existed between the DOJ items. *Id.* The CEO replied:

> I would tell you, again, the dollar amounts are not going to be material in our view today. These -- again, these are older contracts, where it was alleged that we defectively priced some contracts. Again, I can't get into much more detail than that. But again, we've looked into it. We think there is potential liability for defective pricing. Clearly, we've provided for that this quarter. And we're going to continue to work with DOJ to bring these things to a resolution.

> I would tell you, these investigations take time. We're still going through doing some work. But we don't believe there's going to be any ongoing impact to any of the businesses as a result of these investigations. We think these were one-off events that occurred -- should not have occurred, but they did. And we're going to clean it up and move on. *Id.*

Raytheon's internal financial controls as "effective." *See, e.g.*, SAC ¶¶ 126, 127; *see also* ¶ 301 (reporting Raytheon's controls largely unchanged post-merger). These statements appear in each of Raytheon's annual and quarterly reports. *Id.* Plaintiffs allege these statements were misleading because Raytheon's internal controls were not effective. *See, e.g.*, SAC ¶ 128. Plaintiffs further allege these statements were particularly misleading in 2018 and 2019 because Raytheon failed to disclose it had identified "significant misconduct" involving the "top echelon" of its Missiles and Defense segment, and the DOJ was investigating several important government contracts. *See, e.g.*, SAC ¶ 234.

Plaintiffs also allege Raytheon misled investors with virtually all Raytheon's financial statements for the Class Period.[4] Specifically, the SAC refers to all "net sales (revenues)[,] operating expenses[,] and operating income" metrics. *See, e.g.*, SAC ¶ 130. Plaintiffs allege these statements were misleading because Raytheon misused, misappropriated, and violated its contracts with the government. *See, e.g.*, *id.* Plaintiffs also specifically refer to all financial "statements regarding the Tomahawk [and Javelin missile] projects." *See, e.g.*, SAC ¶ 135. Plaintiffs allege these statements were misleading because Raytheon significantly overstated them by intentionally slowing down projects. *See, e.g.*, SAC ¶¶ 130, 135.

### ii.    Regarding 2018 and 2019 Bookings and Risks

Plaintiffs also allege that 2018 and 2019 10-K statements singling out Raytheon's Integrated Defense Systems segment bookings were misleading. *See, e.g.*, SAC ¶ 253. Plaintiffs allege these statements failed to disclose that at least one of Raytheon's major contracts with the U.S. government was the subject of a DOJ investigation beginning no later than mid-2018. *See, e.g.*, SAC ¶ 254.

Plaintiffs also allege that 2018 and 2019 10-K statements about risks related to U.S. government contracts were misleading. *See, e.g.*, SAC ¶ 255. Plaintiffs allege these statements failed to disclose that Raytheon had identified significant misconduct at that time, and the DOJ was investigating several important government contracts involving the

---

[4] The Class Period is February 10, 2016, through October 27, 2020. SAC ¶ 1 n. 1.

1    "top echelon" of Raytheon's Missiles & Defense division. SAC ¶ 256.

2        **C. The SAC fails to allege the § 10(b) falsity element with particularity.**

3        Plaintiffs provide insufficiently particular reasons for alleging Raytheon's

4    statements were misleading. Particularity is not established by contending that "virtually

5    every statement made … during the Class Period related to the company's financial …

6    performance was, by definition, false." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540

7    F.3d 1049, 1070 (9th Cir. 2008). Particularity also requires more than general allegations

8    that certain practices resulted in a false or misleading report. *Daou*, 411 F.3d at 1007

9    (citation omitted). Instead, particularity is established where plaintiffs identify 'the who,

10   what, when, where, and how of the misconduct charged,' as well as 'what is false or

11   misleading about [the purportedly fraudulent] statement, and why it is false.'" *Cafasso,*

12   *United States ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011)

13   (alteration in original) (quotation omitted) (explaining the Rule 9(b) standard in a False

14   Claims Act context).

15           **i.    Regarding Financial Controls and Statements**

16       Plaintiffs fail to support their allegations that Raytheon's financial controls and

17   statements were misleading. The SAC implicitly refers to the DOJ investigation and

18   Raytheon's key financial measures, but these attempts fail. Plaintiffs' Response identifies

19   no other support. The few sufficiently reliable confidential witness allegations fail to

20   support, or directly undermine, Plaintiffs' claim.

21       **DOJ Investigation.** In the same paragraphs alleging Raytheon's controls were not

22   effective, the SAC states without explanation that Raytheon's controls are the subject of

23   the DOJ investigation. *See, e.g.*, SAC ¶ 234. Plaintiffs' Response clarifies that the

24   investigation is a reason why Raytheon's controls were ineffective. Response at 27 n. 18.

25   But the fact of an investigation into financial controls is not a particular basis for

26   concluding controls were ineffective. *See In re Hansen Nat. Sec. Litig.*, 527 F. Supp. 2d

27   1142, 1162 (C.D. Cal. Oct. 16, 2007). The Court cannot infer an investigation's result from

28   its subject. And the SAC alleges no additional facts about the DOJ investigation or its

findings that could establish with particularity that Raytheon's controls were not effective.

**Key Financial Measures.** In the same paragraphs alleging Raytheon's controls were ineffective, the SAC also states that Raytheon's key financial measures were all inaccurate. *See, e.g.*, SAC ¶ 234. Plaintiffs' Response identifies this as a second reason why Raytheon's controls were ineffective. *See* Response at 27 n. 18 (citing ¶ 234). That allegation rests heavily on Plaintiffs' theory of widespread or generalized fraud, which is not supported by the confidential witness accounts. App'x § II.O.iii. As the Court previously identified, "[w]hat is lacking in both the [SAC] and the Response is the connection between the specific allegation and the extent to which it impacted a specific line item or financial statement." Doc. 55 at 24. Plaintiffs have not addressed that feedback through amendment. *See, e.g.*, SAC ¶¶ 57, 59 (unchanged, uncorroborated, and unreliable confidential witness allegation inexplicably paired with Tomahawk and Javelin project revenues). Plaintiffs still fail to plead *how* Raytheon's controls were ineffective, insisting instead that they just must have been. That inference is unwarranted given the limited misconduct the SAC sufficiently alleges.

Finally, Raytheon's disclosure of the DOJ investigation and its CEO's remarks did not reveal that all key financial measures were inaccurate, only that the DOJ was investigating at least four contracts. *See, e.g.*, SAC ¶ 320; *supra* n. 3. The SAC implies Raytheon's key financial measures were inaccurate because Raytheon failed to properly measure and manipulated "the EAC" on its long-term production contracts. *See, e.g.*, SAC ¶ 234. This allegation also has no basis in the confidential witness accounts, which refer to EACs but fail to reliably allege issues with more than a few contracts. *See* App'x § II.O.

**Sufficient Confidential Witness Allegations.** The only sufficient confidential witness allegations either do not support Plaintiffs' claim or undermine it. The confidential witnesses sufficiently allege several issues with a support-services contract, and the termination of several employees for hiding cost overruns on several other contracts. But failing to detect all misconduct does not mean that financial controls are ineffective. The SAC's quotation from Raytheon's disclosures makes that clear. *See* SAC ¶¶ 102–103

(Raytheon's internal controls are "designed to provide *reasonable assurance* regarding the achievement of objectives" and "*reduce*, to an acceptable level, the risk of not achieving an objective [in operations, reporting, or compliance]") (emphasis added). The relatively limited allegations that boil out of the confidential witness accounts do not plausibly suggest that Raytheon's controls did not provide a "reasonable assurance" or "reduce the risk" of misconduct. The most robust allegations—that several employees were fired for misconduct—supports the opposite conclusion that Raytheon's controls worked effectively and as intended. The Court declines to draw that inference here, though, because competing inferences are considered only under the scienter element.

For these reasons, Plaintiffs fail to allege with particularity why Raytheon's statements regarding its controls and financial statements were misleading.

### ii.     Regarding 2018 and 2019 Bookings and Risks

Plaintiffs also fail to explain with particularity why Raytheon's statements regarding its 2018 and 2019 bookings and risks were misleading. Part of Plaintiffs' theory rests on the allegation that Raytheon failed to disclose a DOJ investigation in 2018. *See* SAC ¶¶ 6, 120, 254. But this allegation is based on an uncorroborated and unreliable confidential witness statement. *See* SAC ¶ 60 (hearsay from low-level employee); App'x § II.O.i. Plaintiffs alternately contend that an internal investigation in 2018 showed at least $250 million in false labor charges on several government contracts in Raytheon's Naval Weapons System. *See* SAC ¶ 6, 120, 330. But large portions of this allegation come from an uncorroborated and unreliable source. SAC ¶ 61 (reporting hearsay allegations from a "Director of Capture Management Excellence"); App'x § II.O.i (identifying CW5's account as the only one alleging an internal investigation or $250 million in false labor charges). Taken together, the confidential witness statements reliably allege only that in 2018, Callahan, McDonnell, and Fay were fired for hiding cost overruns on a contract or contracts in the Naval Systems subsection of Raytheon's Missile Systems segment. App'x § II.O.i. Without an investigation adequately plead, the Court cannot conclude, as Plaintiffs insist, that Raytheon had a duty to disclose it.

Even if Plaintiffs had adequately plead an internal investigation, the SAC fails to explain how it rendered Raytheon's statements misleading. Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose" even "material information," but instead require disclosure "only when necessary to make ... statements made, in light of the circumstances under which they were made, not misleading." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 699 (9th Cir. 2021) (citation omitted). For example, a statement or omission could be misleading if it "suggested [a company] was *not* under any regulatory scrutiny." *Metzler*, 540 F.3d at 1071 (emphasis in original). A statement or omission could also be misleading if it acknowledged a hypothetical risk but neglected to state that the risk had already come to fruition. *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985–87 (9th Cir. 2008); *see also Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009), *aff'd*, 563 U.S. 27. In *Berson*, for example, a statement of anticipated revenues was misleading because it failed to disclose that a significant portion of the backlogged work was "substantially delayed and at serious risk of being cancelled altogether." 527 F.3d at 986. Plaintiffs fail to allege anything like that in this case.

Plaintiffs focus on two statement categories without identifying what in them is misleading. The first category is statements related to Raytheon's Integrated Defense Systems segment bookings. *See, e.g.*, SAC ¶ 253. Plaintiffs allege these statements were misleading because "they failed to disclose that one of Raytheon's major contracts was the subject of a DOJ investigation that began no later than 2018." SAC ¶ 254. Setting aside the deficiently-alleged-investigation issue, Plaintiffs' place the 2018 misconduct in Raytheon's Missile Systems segment, not the Integrated Defense Systems segment. Plaintiffs do not explain why an investigation in one segment should have been disclosed alongside bookings for another segment. Instead, Plaintiffs allege Raytheon should have disclosed "the whole truth." But the whole truth of the IDS segment notable bookings apparently was

disclosed, and Plaintiffs identify no aspect of it that was misleading.[5]

Plaintiffs next focus on a category of statements about Raytheon's government contract risks. Raytheon's 2019 risk warning stated:

> U.S. government contracts generally are subject to the Federal Acquisition Regulation (FAR), which sets forth policies, procedures and requirements for the acquisition of goods and services by the U.S. government; department-specific regulations that implement or supplement the FAR, such as the DoD's Defense Federal Acquisition Regulation Supplement (DFARS); and other applicable laws and regulations. These regulations impose a broad range of requirements, many of which are unique to government contracting, including various procurement, import and export, security, contract pricing and cost, contract termination and adjustment, audit and product integrity requirements. A contractor's failure to comply with these regulations and requirements could result in reductions to the value of contracts, contract modifications or termination, cash withholds on contract payments, forfeiture of profits, and the assessment of penalties and fines, and could lead to suspension or debarment, for cause, from U.S. government contracting or subcontracting for a period of time.

SAC ¶ 255. Plaintiffs imply this warning was misleading because "Raytheon [had] already identified significant misconduct by that time[.]" SAC ¶ 256. Aside from that general allegation, Plaintiffs do not contend with the language they quote. Plaintiffs do not allege, for example, that a Raytheon "contractor failed to comply" with FAR and DFAR guidelines in 2018. Instead, they allege that employees Callahan, McDonnell, and Fay were fired for hiding cost overruns. Plaintiffs also do not allege that a Raytheon contractor's failure to comply with FAR or DFAR guidelines "resulted in reductions to the value of contracts, their modification or termination," or any other such outcome. Finally, Plaintiffs neglect to discuss the full extent of Raytheon's risk disclosures. Plaintiffs draw from Raytheon's summary of government risks, *see, e.g.*, Doc. 59-2 at 10–11, while omitting the detailed

---

[5] Elsewhere Plaintiffs imply that statements about IDS bookings were misleading because four contracts from that section are the focus of the DOJ investigation announced in 2020. *See, e.g.*, SAC ¶ 76. But to be actionable, statements must have been misleading *at the time they were made*. *See Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001). Plaintiffs do not specifically allege that Raytheon was aware of the 2020 DOJ investigation before receiving a subpoena in October 2020. And Plaintiffs do not connect the allegations related to Callahan, McDonnell, and Fay to the 2020 investigation. *See* App'x § II.O.iv.

- 12 -

discussion frequently referred to by the summary. Doc. 59-2 at 12–29 ("Item 1A: Risk Factors"). These "Risk Factors" explain, for example, that Raytheon is routinely subject to investigations and audits, the results of which could have "a negative impact on our reputation, lead to contract terminations and reduce our ability to procure other U.S. government contracts in the future." Doc. 59-2 at 19. Critically, the risks identified are *not* investigations and audits. Those are given. The identified risks are the *result* of investigations and audits. *See, e.g.*, Doc. 59-2 at 23. Plaintiffs fail to show with particularity how the 2018 discovery of misconduct on one or more Missile Systems contracts brought any hypothetical risk like contract termination to fruition.

**D. The SAC fails to allege materiality under the § 10(b) falsity element.**

The SAC also fails to allege "material" misstatements. Although "[d]etermining materiality in securities fraud cases 'should ordinarily be left to the trier of fact[,]'" *SEC v. Phan*, 500 F.3d 895, 908 (9th Cir. 2007) (quotation omitted), the Court is not instructed to end all § 78u-4(b)(1) investigation where a plaintiff pleads any level of misconduct, no matter how vague or apparently minor. That would set the bar for pleading a materially misleading statement far too low—Plaintiffs could then plead a single instance of misconduct to defeat a motion to dismiss on that basis. Rather, Plaintiffs "must show with particularity how the [misconduct] affected the company's financial statements and whether they were material in light of the company's overall financial position." *Or. Pub. Emps. Ret. Fund*, 774 F.3d at 609 (citation omitted). Mere "conclusory statements ... and unwarranted inferences are insufficient [to state a claim]." *In re Cutera Secs. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010). The relevant inquiry is whether Plaintiffs plausibly allege a "*substantial* likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having *significantly* altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (emphasis added) (giving the summary judgment standard); *Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988) (adopting the *TSC Industries* standard in a § 10(b) and Rule 10b-5 context). Plaintiffs cannot simply allege that an omission was material—they must show the omission renders

1  other statements misleading. *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 880 n.8.

2  ### i.  Regarding Financial Controls and Statements

3  The SAC does not sufficiently allege that Raytheon's statements about its financial

4  performance and controls were misleading at all, much less materially so. As discussed

5  above, the confidential witnesses sufficiently allege far less than widespread fraud. CW1,

6  for example, alleged many instances of wrongdoing on a large contract, but never

7  quantified the effect or alleged facts suggesting the wrongdoing was material to that

8  contract or Raytheon's overall business. As above, the fact of a DOJ investigation does not

9  imply its result. And as above, Plaintiffs' reference to all key financial measures fails to

10  indicate any in particular that were misstated, or even to estimate by how much. Plaintiffs'

11  Response focuses on CW3's uncorroborated and unreliable allegations about the

12  Tomahawk program and Raytheon's disclosure that Tomahawk booked $424 million in

13  2017, concluding that the "fact that such important contracts were tainted with wrongdoing

14  further contributes to a finding of materiality at the pleading stage." Response at 23–24.

15  But Plaintiffs have not sufficiently alleged any wrongdoing in the Tomahawk program, or

16  even attempted to articulate how that wrongdoing impacted, for example, the $424 million

17  booked in 2017. Plaintiffs alternately try focusing on the contracts associated with

18  Callahan, McDonnell, and Fay. Response at 23. But Plaintiffs were unable to sufficiently

19  allege the size of the misconduct there. CW5 heard from an unreliably situated colleague

20  that the misconduct involved $250 million in false labor charges, inconsistently alleged as

21  both on one contract and between several. CW13 alleged misconduct on a contract worth

22  more than $200 million, but CW13's account was also not based in personal knowledge

23  and marred by indicia of unreliability. *See* App'x § II.M. Together, the SAC only alleged

24  that Callahan, McDonnell, and Fay were terminated for misconduct, not the value of their

25  misconduct. The Court cannot infer materiality without substantially more.

26  Plaintiffs also fail to defuse the fact that Raytheon did not restate earnings, and an

27  independent auditor continued to certify Raytheon's controls as effective. *See, e.g.*, Doc.

28  59-2 at 87–89. In 2019, for example, Raytheon's 10-K independent-auditor report

highlighted revenue recognition as a "Critical Audit Matter" and stated that:

> Due to the nature of the work required to be performed on many of the Company's performance obligations, the estimation of total revenue and cost at completion is complex, subject to many variables and requires significant judgment by management on a contract by contract basis. ….
>
> [Continuing to detail these procedures and ultimately concluding:] In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2019 and 2018, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2019 in conformity with accounting principles generally accepted in the United States of America.

Doc. 59-2 at 88. The Court previously identified this as undermining a theory of widespread fraud. *See* Doc. 55 at 21, 44. Plaintiffs cite several cases for the proposition that earnings restatements and independent auditor assessments do not decide the issue. Response at 24 n. 17 (citing among others *Feiner v. SS&C Techs., Inc.*, 11 F. Supp. 2d 204, 209 (D. Conn. 1998); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 84 (1st Cir. 2002)). Plaintiffs are correct in general, but the facts of this case are distinguishable. *See, e.g.*, *In re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965, 985–86 (N.D. Cal. 2007) (distinguishing *Feiner* and *Aldridge* with similar facts to this case). A lack of earnings restatement or changed auditor assessments would not be dispositive given substantially stronger facts. But here it directly undermines Plaintiffs' vague claims of materiality.

### ii.      Regarding 2018 and 2019 Bookings and Risk

As partly discussed above already, the SAC also fails to allege a material misrepresentation in Raytheon's 2018 and 2019 bookings and risk statements. Plaintiffs' theory is that Raytheon's 2018 and 2019 bookings singled out Raytheon's "largest and most important contracts" with the U.S. government, its "most important customer." Response at 15. Having disclosed these contracts, Plaintiffs argue, it was materially misleading not to disclose that "some of Raytheon's [other] major contracts with the U.S. government were tainted with wrongdoing." *Id.* That could be true if Plaintiffs' theory were supported by sufficiently particular allegations of specifically material misconduct. The bar is high for securities fraud, but not impossibly so. And resolving materiality as a matter of law is

- 15 -

inappropriate unless "the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ." *In re Alphabet*, 1 F.4th at 700 (citations omitted). Resolving materiality would be inappropriate given, for example, widespread misconduct at Raytheon. But that is not sufficiently alleged here.

A closer question is whether $250 million in false labor charges is "obviously" "substantially likely" to "significantly alter the total mix of information available to a reasonable investor." Again, the details are not sufficiently alleged. Plaintiffs manage to allege only that Callahan et al. were fired for hiding cost overruns of some amount. But accepting the alleged value for the sake of argument, is the significance obvious? The answer would be no if the question were simpler. If the question were, for example, whether $250 million is significant to Raytheon's overall business, reasonable minds likely could differ. That is sort of like asking if $250 million is a lot of money. Reckon it is. But the question is more complicated. First, the allegation is that Callahan et al. hid cost overruns by swapping $250 million between contracts. That implies the underlying charges were legitimate—the misconduct was the swapping, not the charges. The contracts were also all for the same client, the Navy. A reasonable investor could conclude that Raytheon's bottom line was never impacted. Shifting charges between contracts is improper, but it may not have meant the Navy was overcharged in aggregate. Second, Raytheon never restated its earnings, never reported any financial consequences from the alleged misconduct, and Raytheon's independent auditor did not change its assessment. A reasonable investor could conclude that material misconduct would result in at least some specific financial consequence. Third, Raytheon appears to have fired the people responsible. An investor could reasonably view that as evidence Raytheon's controls were working as intended rather than as evidence of a larger conspiracy. Fourth, Raytheon's disclosures and CEO remarks consistently asserted the DOJ investigation matter was not material to Raytheon's finances. A reasonable investor could believe that Raytheon's disclosures and its CEO are generally truthful. Finally, Raytheon's sales for the Class Period exceeded $150,000 million. *See* Doc. 59-2 at 38. A reasonable investor could also think $250 million is

overshadowed by that figure. All those various aspects individually do not remove the 2018 misconduct beyond what reasonable minds could debate, but together they do a decent job.

In any event, Plaintiffs have not sufficiently alleged any amount associated with Callahan et al.'s misconduct. The SAC thus fails to state a claim of a "material" misrepresentation in Raytheon's 2018 and 2019 filings, as it did with respect to Raytheon's other statements.

**V.    Scienter**

Defendants also challenge the scienter element of Plaintiffs' § 10(b) claim. To plead scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). A "strong" inference is more plausible than any benign opposing inference one could draw from the same facts. *Tellabs*, 551 U.S. at 324. To reach the required state of mind, the strong inference must be of the Officers' "highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Zucco Partners*, 552 F.3d at 991 (citing *Daou*, 411 F.3d at 1014–15). Courts in this circuit first determine whether the complaint's bases individually create a strong inference of scienter, and, if not, then conduct a "holistic" review of all together. *Id.* at 992.

Plaintiffs assert seven bases for alleging the Officers either knew or must have known Raytheon's public filings presented a danger of misleading investors.  Only three are substantially changed from the previous complaint: (1) the confidential witness statements, (2) the Officers' personal stock sales during the Class Period, and (3) the alleged fact that certain "prime" U.S. government contracts form the core of Raytheon's operation. The remaining four bases are virtually unchanged: (4) alleged violations of Generally Accepted Accounting Practices ("GAAP"); (5) the DOJ investigation; (6) Raytheon's Sarbanes-Oxley certifications; and (7) the alleged termination of Raytheon's Missile Systems CFO in 2018 and VP 2019.

- 17 -

Plaintiffs fail to state the scienter element because (1) the confidential witnesses do not say anything about the Officers and were poorly positioned to know anything about them; (2) the Officers' stock sales were ordinary; (3) the "prime" contracts theory is not well plead; (4) the other bases continue to add nothing; and (5) viewed as a whole, the SAC both pleads implausibly widespread fraud and inconsequentially narrow fraud. As a result, the benign inference is far stronger: Raytheon's internal controls worked as intended to discover misconduct on a few contracts, which was swiftly and firmly handled.

### i.    Confidential Witness Statements

The 14 confidential witness statements fail to create a strong inference of scienter. To create an inference of scienter, confidential witnesses must both indicate scienter and be described with sufficient particularity to establish their reliability and personal knowledge. *Zucco Partners*, 552 F.3d at 995 (citing *Daou*). In *Zucco Partners*, for example, the witnesses were insufficiently described even though they worked directly on the accounting software system alleged to have been manipulated, one reported to the president of the company's biggest divisions, another was the vice president of that section, and another reported directly to the CEO. *Id.* Despite "a large degree of specificity" about the witnesses' titles and responsibilities, the court concluded the witnesses were "not positioned to know the information alleged, many report[ed] only unreliable hearsay, and others allege[d] conclusory assertions of scienter." *Id.* (noting also that two were not employed at the company during the period in question and had only secondhand information, and other allegations were vague).

As discussed in the Appendix, the 14 confidential witness statements are individually weak. To an even greater extent than in *Zucco Partners*, they mostly are not positioned to know what they allege. One sufficiently alleges misconduct on a single contract (CW1). CW1, a relatively low-level employee, identified many instances of wrongdoing on a large support-services contract. The contract is not alleged to have been in the Missile Systems or Integrated Defense Systems segments. CW1 also does not allege that the Officers knew of the misconduct on the support-services contract, or even that the

misconduct involved employees higher than CW1's supervisors. CW1 alleges reporting misconduct to a "Senior Director of Internal Audit" and a "Director of Ethics and Business Conduct," SAC ¶ 49, both apparently removed from the Officers. *See* App'x § II. Nothing else in CW1's account suggests otherwise. The benign inference that the Officers were unaware of any issues on CW1's contract is therefore much stronger than the inference that the Officers knew about the issues and recklessly disregarded them. The rest of the confidential witnesses add no substance. Two allege no misconduct at all (CW13 (cost overrun), CW14 (focus of DOJ investigation)). Many report unreliable hearsay or make vague and suspiciously rote allegations. And none allege any interaction with the Officers or that any of the Officers knew about any misconduct. Their individual accounts thus do not indicate scienter.

Taken together, the confidential witness accounts create only one other relevant and sufficiently corroborated allegation, which also does not indicate scienter. Several witnesses corroborate that a "Deputy Vice President" Callahan, "Program Manager" McDonnell, and "Contract Director" Fay were fired for hiding cost overruns on a contract or contracts in the Naval Systems subsection of Raytheon's Missile Systems segment. App'x § II.O. Only CW5 heard from an unreliably situated Director-level colleague that Callahan reported to the Vice President of Missile Systems, who reported to Defendant Kennedy. SAC ¶ 62. Even setting aside the limitations of CW5's account and granting that Defendant Kennedy was aware of the terminations in 2018, the SAC does not explain how that supports a strong inference of reckless indifference. The strong inference here cuts the other way—firing Callahan et al. marks conformity with a standard of care, not an extreme departure from it. The SAC also does not show how failing to disclose the alleged misconduct was a departure from the standard of care. As discussed above, Raytheon's disclosures were not rendered false by the misconduct, and no material value is ever placed on it. The Officers could not have been recklessly indifferent to Raytheon's statements under those circumstances. But that is all hypothetical anyway. The Court has no basis to set aside CW5's limitations or grant that Kennedy was aware of the terminations in any

detail. Unreliable hearsay from a director that a deputy vice president and two of his reports were fired for misconduct does not allege something that would obviously warrant the Officers' direct involvement or implicate them in a scheme to cover up fraud.

Plaintiffs' argument to the contrary is not persuasive. Plaintiffs argue that scienter may be plausibly alleged from the accounts of low-level employees. Response at 20 n. 13 (citing *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1139, 1145 (9th Cir. 2017)). But *In re Quality Systems* is distinguishable. There, five lower-level employee accounts weighed in favor of scienter when combined with three members of the board of directors. *In re Quality Sys.*, 865 F.3d at 1138–39. Plaintiffs here do not have anyone close to a board director among their confidential witnesses. Plaintiffs' highest ranked witness is a former Vice President of Business Development for Air Warfare Systems who heard something from a Director of Capture Management Excellence. Plaintiffs' witnesses also allege far more than they would be expected to know. In *Quality Systems*, the five lower-level employees were sales representatives reporting a general downturn in sales. *See id.* at 1139. That is different from this case, where the confidential witnesses report misconduct of widely varying scope and character, far beyond what their titles and job descriptions suggest they would know. Plaintiffs' other cases are also distinguishable. *See* Response at 21 n. 14 (citing *Karinski v. Stamps.com, Inc.*, 2020 WL 281716, at *16 (C.D. Cal. Jan. 17, 2020); *Emps' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015)). Both involved more reliable low-level employee accounts that were more focused on information they would be expected to know. *See, e.g.*, *Karinski*, 2020 WL 281716 at *16 (employer discount policies); *Emps' Ret. Sys.*, 794 F.3d at 307 (employer inventory practices).

The only other sufficiently alleged accounts are not relevant to scienter. Several witnesses report that three employees were fired in connection with the DOJ investigation announced in October 2020. One alleges discovering cost overruns on a contract, but no misconduct. And another reports that the DOJ investigation involves the Patriot Missile program. None of these accounts could imply that the Officers recklessly disregarded the

truth of Raytheon's statements during the Class Period. The SAC does not allege that Raytheon knew about the DOJ investigation before receiving a subpoena in October 2020 or connect it to any other sufficiently alleged misconduct. And cost overruns without misconduct do not render Raytheon's various statements misleading.

For those reasons, the 14 confidential witness accounts do not create a strong inference of scienter on their own.

### ii.     Officers' personal stock sales

The Officers' personal stock sales also do not create a strong inference of scienter on their own. Stock sales may suggest scienter when "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Ronconi v. Larkin*, 253 F.3d 423, 437 (9th Cir. 2001). To determine whether sales were "dramatically out of line," courts assess three factors: "(1) the amount and percentage of the shares sold; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's trading history." *Metzler*, 540 F.3d at 1067. To help this analysis, plaintiffs must "provide a meaningful trading history for purposes of comparison to the stock sales within the class period." *Zucco Partners*, 552 F.3d at 1005 (internal quotation marks and citation omitted).

What trading history Plaintiffs now provide undermines an inference of scienter. Plaintiffs argue the Officers' stock sales were "suspiciously timed" because they sold stock in March 2019, the same month Raytheon's Vice President of Missile Systems was terminated. *See, e.g.*, SAC ¶¶ 325, 328. But the provided trading history shows that the Officers consistently sold stock in March every year. *See, e.g.*, SAC ¶¶ 325, 327. The SAC also does not reliably allege the date, circumstances, or even the fact of the Vice President's termination. *See* App'x § II.O.i. Only one unreliably situated witness heard from an unknown colleague that the VP was "eventually" terminated in March 2019. SAC ¶ 90. Even if that allegation were credited, it would not create a strong inference of suspicious timing with the Officers' regular March stock sales.

Plaintiffs' other arguments are not supported by the facts or the law. Plaintiffs argue

the Officers' Class Period stock sales generated "net proceeds … grossly disproportionate to the net proceeds … in the equivalent time period pre-dating the Class Period. *See, e.g.*, SAC ¶ 323. As the Court previously reasoned, the Ninth Circuit factors likely do not include net proceeds because net proceeds are a function of a stock's value, which changes over time. Doc. 55 at 32. A stock sale at any time likely would yield net proceeds different from any other time. *Id.* Different net proceeds therefore cannot be evidence of an inconsistent trading history. *Id.* The SAC mostly ignores the Court's feedback. New references to the number of shares each Officer sold before and during the Class Period do not provide meaningful support. *See, e.g.*, SAC ¶ 325. For example, Defendant Kennedy sold 59,841 shares before the Class Period, and 146,346 shares during the Class Period. *Id.* Considering Kennedy became CEO in 2014, SAC ¶ 21, and his total holdings potentially increased 34% during the Class Period, MTD at 25–26, higher sales are not "dramatically out of line." Plaintiffs also allege Defendant Wood sold 621 shares on June 4, 2018, the same year of an internal audit a colleague told CW5 about. SAC ¶ 330. But Plaintiffs provide no comparison for Wood's stock sales, and CW5's allegations are insufficiently reliable hearsay that does not specify the month even if they were credited. Nothing in Wood's stock sales raises an inference of scienter.

The SAC also does not address other, previously identified deficiencies. Unless the fraud began at the start of the Class Period, sales preceding the Class Period would provide no meaningful comparison because they would also be suspect. Doc. 55 at 32 n. 5. And a one-time jump in one Officer's total compensation is not relevant or even alleged to relate to the Officer's trading history. *Id.* at 32; SAC ¶ 332. Thus, the SAC fails to create a strong inference of scienter from the Officers' stock sales.

###      iii.      Raytheon's "core operations" involving government contracts

The fact that U.S. government contracts are Raytheon's "core operation" also does not raise a strong inference of scienter.[6] Generally, "core operations" allegations create a

---

[6] Plaintiffs' Response again raises a "core operations" theory not found in the SAC but drawing on several of its allegations. Response at 34. The Court again construes Plaintiffs' argument as clarifying an aspect of "the complaint in its entirety."

strong inference of scienter only "when made in conjunction with detailed and specific allegations about management's exposure to factual information within the company." *City of Dearborn Heights Act 345 Police & Fire Retirement System v. Align Technology, Inc.*, 856 F.3d 605, 620 (9th Cir. 2014) (citation omitted). Alternately, the Court may infer scienter based solely on a core operations theory in "exceedingly rare" cases where misconduct is "patently obvious," and it would be "absurd" to suggest that management was without knowledge of it. *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 n.3, 786 (9th Cir. 2008); *see also Berson*, 527 F.3d at 987. In *Berson*, for example, it would have been absurd to suggest defendants did not know about "stop-work" orders from their largest customers that had "a devastating effect on the corporation's revenue," and which defendants admitted knowing about two weeks after making misleading statements. *Id.*

Plaintiffs argue that because Raytheon had very few large contracts with the U.S. government, and because four are the subject of the DOJ's investigation, and because the Officers knew about "the misconduct" as early as mid-2018, the Officers were "highly reckless in issuing misleading statements after mid-2018[.]" Response at 31–32 (citing the SAC's references to Raytheon's IDS contracts). None of the confidential witnesses specifically allege that the Officers were involved with any of these contracts. Plaintiffs thus implicitly assert that this is an exceedingly rare case involving patently obvious misconduct. The Court disagrees for two reasons.

First, Plaintiffs have not sufficiently plead the foundation of their argument. Plaintiffs have not plausibly alleged that the DOJ investigation and the terminations of Callahan, McDonnell, and Fay stem from the same misconduct. *See* App'x § II.O.iv. Plaintiffs have not even plausibly alleged Raytheon had very few large contracts with the U.S. government. *See* SAC ¶ 36 (showing large total sales to U.S. government, but not contracts); SAC ¶¶ 75–89 (showing that a "handful of large contracts" composed the majority of Raytheon's IDS segment, which accounted for 23% of Raytheon's total sales); App'x § II.J (only one witness unreliably alleging Raytheon had only few "prime" government contracts); *see also* Doc. 59-2 at 13 (referring to "thousands of U.S.

government contracts"), 37 ("no single contract account[s] for more than 5% of … total net sales"). Finally, Plaintiffs continue to refer vaguely to "the misconduct," as if there were a single, clearly articulated instance in the SAC's sprawling 153 pages of competing inferences and innuendo. But none of those 153 pages explicitly link the Officers to the issues surrounding Callahan, McDonnell, and Fay. The closest they get is unreliably alleging that Callahan reported to Lawrence who reported to an Officer. Even if credited, that reporting hierarchy does not reasonably or strongly imply that the Officers knew of Callahan's misconduct. If anything, the fact of the reporting structure raises the benign inference that the Officers learned about Callahan's misconduct after the terminations. But Plaintiffs do not allege any materialized risks due to Callahan et al.'s misconduct. App'x § II.O.i. Instead, the SAC unsuccessfully seeks to connect those allegations with the DOJ investigation. *Id.* Failing that, this case is unlike *Berson*, where stop-work orders had an immediate, profound impact, and defendants admitted awareness of them two weeks after claiming otherwise.

Second, even if Plaintiffs' foundation were adequately plead, "absurdity" is a very high bar not reached in cases with more extreme facts than this one. *See, e.g.*, *In re NVIDIA*, 768 F.3d at 1063–64 (affirming no scienter where allegations concerned company's "flagship product" and "two largest customers"). The fact that the U.S. government is Raytheon's biggest customer does not imply the Officers monitor every U.S. government contract. Plaintiffs' allegations also do not sufficiently plead that the Officers actually knew of the disputed information. Of course, it would be absurd to suggest the Officers did not actually know of the top-line metrics involved in their financial statements. But Plaintiffs' claim rests on actual knowledge of individual contracts that contributed to top-line reporting errors, not knowledge of top-line metrics. In that respect Plaintiffs' claim is even weaker than *Zucco Partners*, where a core operations theory was unsuccessful even though the complaint alleged that senior management "closely reviewed the accounting numbers" and discussed a related component. 552 F.3d at 1000.

///

iv.    **GAAP Violations, Sarbanes-Oxley certifications, DOJ investigation, and Missile Systems terminations in 2018 and 2019**

Plaintiffs' remaining bases for alleging scienter are unchanged, as is the Court's analysis that they add nothing individually. *See* Doc. 55 at 28–31.

**GAAP Violations.** Publishing inaccurate accounting figures or failing to follow GAAP, without more, is not sufficient to establish scienter. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1207 (9th Cir. 2016). Instead, plaintiffs must allege facts demonstrating that defendants "knowingly and recklessly engaged in an improper accounting practice"—for example, that a company's external auditors counseled against a practice or that a company's CFO was aware that the practice was improper. *Id.* (citing *Metzler*, 540 F.3d at 1068–69). As discussed in the Appendix, the confidential witnesses do not allege the Officers were aware of or directly involved in any improper accounting practices. What little the confidential witnesses reliably allege tends to show the opposite: a range of low-level bad behavior on a single non-Missiles contract, and the termination of Callahan et al. for misconduct on one or a few Navy contracts. Even crediting all the various unreliable allegations, the SAC never describes the extent to which the practices impacted Raytheon's financial statements. Alleging vaguely that revenue figures "were materially overstated" (*e.g.* SAC ¶ 131) or "inflated" (Response at 11, 17) is insufficiently particular because it does not permit evaluation of whether the alleged GAAP violations were minor or isolated, or instead widespread and significant.

**DOJ Investigation.** An investigation, standing alone, is not enough to raise any inference of scienter, much less a strong inference. *Zamir v. Bridgepoint Educ., Inc.*, 2018 WL 1258108 (S.D. Cal. Mar. 12, 2018) (citing *In re Maxim Integrated Prods., Inc. Sec Litig.*, 639 F. Supp. 2d 1038, 1047 (N.D. Cal 2009); *In re Hansen*, 527 F. Supp. 2d at 1162). Plaintiffs' citations all stand for the same principle. *Cf.* Response at 33–34.

**Sarbanes-Oxley certifications**. Plaintiffs' Response states without explanation that the Officers' "Sarbanes Oxley certifications also support scienter." Response at 34. Absent any argument or newly alleged facts, the certifications continue to add nothing individually

to an inference of scienter. *See Zucco Partners*, 552 F.3d at 1003–04 ("Sarbanes–Oxley [certifications] ... add nothing substantial to the scienter calculus ... [and] are not sufficient, without more, to raise a strong inference of scienter.").

**Missile Systems Terminations.** The SAC implies and the Response clarifies that the termination of Raytheon's Missile Systems CFO and VP support a strong inference of scienter. SAC ¶¶ 63, 90; Response at 32–33. Particularized allegations that a termination was "uncharacteristic when compared to ... typical hiring and termination patterns" or "accompanied by suspicious circumstances" may support an inference of scienter. *Zucco Partners*, 552 F.3d at 1002. In *Zucco Partners*, the complaint alleged scienter based on the CFO's retirement just before disclosure of improper accounting and lack of financial controls, and two controllers' resignations during the class period. *Id.* The *Zucco Partners* court declined to infer scienter because the complaint did not allege details about the termination, and the accounts were "based on vague hearsay allegations." *Id.*

As discussed in the Appendix, Plaintiffs have not sufficiently alleged the date, circumstances, or even the fact of the CFO's and VP's termination. *See* App'x § II.O.i. Only one witness heard from an unreliably situated colleague that the CFO was fired "around the same time" as Callahan et al. SAC ¶ 63. Another unreliably situated witness heard from an unknown colleague that the VP was "eventually" terminated in March 2019. SAC ¶ 90. That's it. The SAC therefore does not "plead[] corroborating allegations that the terminations occurred because [the CFO and VP] were engaged in wrongdoing." Response at 32. Even if the Court credited the SAC's allegations, they directly undermine Plaintiffs' theory that the Officers themselves were participating in or recklessly disregarding misconduct. Terminating wrongdoers for committing fraud is the opposite of recklessly disregarding it. Plaintiffs similarly do not explain why terminations for fraud suggest the Officers were complicit. And Plaintiffs do not allege any specific negative consequences of Callahan et al.'s misconduct, resorting instead to general allegations that the Officers must have known all Raytheon's public filings were misleading. That is less plausible than the inferences that the CFO and VP either were not terminated "around that time," were

- 26 -

1   not terminated in connection with Callahan et al., or were terminated for misconduct that

2   had no specifically alleged consequences for Raytheon's finances or contracts.

3               v.   ***Tellabs* holistic analysis**

4         The final question in the Court's scienter analysis is whether the whole of the SAC

5   is greater than the sum of its parts. The Court considers whether all Plaintiffs' allegations

6   together give rise to the inference that the Officers made false or misleading statements

7   intentionally or with deliberate recklessness. If so, the Court then compares that inference

8   to the competing benign inference that the misconduct was limited to a few employees and

9   a few contracts, and the Officers took steps to address the misconduct when it was

10  discovered. Once again, the SAC's broad and narrow theories fall short.

11        The SAC's broad theory does not sufficiently connect or support its many

12  allegations to create an inference of widespread fraud at Raytheon. The SAC retains all the

13  shortcomings of its predecessor in this respect despite substantial feedback. *See* Doc. 55 at

14  36–38. The Court reiterates its finding that Plaintiffs fail to adequately allege widespread

15  fraud. The few sufficiently reliable confidential witness allegations do not refer to

16  widespread fraud; the Officers' stock sales, the "core operations" theory, the DOJ

17  investigation, and the Missile Systems terminations are not relevant to widespread fraud;

18  and the insufficiently alleged GAAP violations and inarticulate gesture toward the

19  Sarbanes-Oxley certifications add nothing. In that light, the benign inference that the

20  Officers were unaware of widespread fraud, much less perpetrated it, is far stronger.

21  Plaintiffs appear to recognize that reality by focusing virtually all amendments on

22  bolstering a far narrower theory: that misconduct uncovered in 2018 rendered Raytheon's

23  statements misleading.

24        The SAC's narrow theory does not state a cause of action. The confidential witnesses

25  sufficiently allege a variety of misconduct on a support-services contract neither in the

26  Missile Systems nor IDS segments. They also sufficiently allege Callahan et al. were

27  terminated for misconduct in the Missile Systems segment. Finally, they sufficiently allege

28  that the DOJ investigation is focused on the Integrated Defense System segment and

resulted in several other terminations. These limited allegations undermine an inference the Officers were complicit in or tolerated fraud. They also fail to allege any materialized risks that might render Raytheon's various disclosures misleading. The rest of the SAC's bases do not add anything.

The DOJ investigation and the Missile Systems terminations reinforce the benign inference that Raytheon did not tolerate fraud. The DOJ investigation is inconclusively focused on four contracts in Raytheon's former IDS segment.[7] The SAC does not connect these contracts to any other misconduct. None of the confidential witnesses allege the Officers knew about the contracts. The Officers would not obviously have been involved with the details of every government contract. And none of the Officers resigned or were terminated as a result. The Missile Systems VP and CFO terminations were insufficiently alleged but would tend to show Raytheon took any misconduct seriously. That impression is reinforced by the high-level terminations associated with the DOJ investigation. Plaintiffs' objection that high-level terminations support an inference of scienter is inaptly based. In one of Plaintiffs' cases, the court saw no scienter where a CFO, two controllers, and defendant's independent auditor resigned shortly before and after an earnings restatement. *See* Response at 33 (citing *Zucco Partners*, 552 F.3d at 1002). The court emphasized that plaintiffs must refute the reasonable and benign inference that the terminations were for failing to adequately supervise. *See Zucco Partners*, 552 F.3d at 1002. Plaintiffs have not done that here. In Plaintiffs' other cases, named defendants were fired. *See* Response at 33. That is different from this case, where if anything named

---

[7] Plaintiffs' investigation cases are distinguishable. Response at 33–34. In one, an SEC investigation was a "piece of the scienter puzzle" along with evidence of a 500% revenue inflation, an independent auditor conclusion that management was responsible, and much more. *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1042–1043 (N.D. Cal. 2016). Plaintiffs have nothing like that here. Plaintiffs' out-of-circuit citations are similar and support the uncontroversial principle that the Court must consider the SAC in its entirety. *Compare Tellabs*, 551 U.S. at 322, *with Frank v. Dana Corp.*, 646 F.3d 954, 960–62 (6th Cir. 2011); *Collier v. ModusLink Glob. Sols., Inc.*, 9 F. Supp. 3d 61, 76 (D. Mass. 2014).

defendants did the firing.

The Sarbanes-Oxley certifications, alleged GAAP violations, and "core operation" theory do not find new life through the *Tellabs* holistic analysis. A "core operation" theory may be successful when combined with "detailed and specific allegations about management's exposure to factual information within the company." *S. Ferry LP*, 542 F.3d at 785 (scienter established where individual defendants discussed the relevant technology and integrations in detail on several occasions); *Dearborn Heights*, 856 F.3d at 620 (no scienter where individual defendants' awareness of parent company's financial information did not establish exposure to a subsidiary acquisition's financial information). Here, Plaintiffs do not say the Officers were involved in any of the specific contracts alleged to have contributed to Raytheon's misstatements. Rather, Plaintiffs ask the Court to infer that the Officers must have been aware of these contracts in enough detail either to know of the misconduct or to have recklessly disregarded it because the lifetime value of one was $11.5 billion (*see* SAC ¶ 42), and several others involved a Missile Systems "Deputy Vice President," "Program Manager," and "Contract Director." *See, e.g.*, SAC ¶ 61. That is insufficient. Without significantly more, Plaintiffs' inference is less compelling than the benign inference that, in a company as large as Raytheon, the Officers were not familiar with the details of each contract to know of the specific fraud alleged and disregard it.

## VI.    Loss Causation

Defendants also challenge the loss-causation element of Plaintiffs' § 10(b) claim. Loss causation is "a variant of proximate cause," and turns on "whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Lloyd*, 811 F.3d at 1210. The main question is whether a plaintiff's loss was caused by "the very facts about which the defendant lied." *Mineworkers' Pension Scheme v. First Solar, Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (per curiam) (citation omitted). This inquiry is naturally "fact-specific," *id.*, but may find loss causation allegations insufficient where a "modest" drop in the stock prices coincides with the disclosure of certain news but then "recover[s] very shortly after." *Wochos v. Tesla*, 985 F.3d 1180, 1197 (9th Cir. 2021) (citing *Metzler*,

540 F.3d at 1064–65).

Plaintiffs fail to state loss causation because Raytheon's stock did not fall far, recovered quickly, and the DOJ subpoena did not reveal any misstatement by Raytheon.

**A. Plaintiffs' amendments do not overcome *Metzler* and *Wochos*.**

*Metzler* and *Wochos* support the proposition that a quick, sustained recovery can refute an inference of loss causation, and the SAC tries to distinguish them with limited success. Previously, the Court found *Metzler* and *Wochos* instructive. Doc. 55 at 41–42. In *Metzler*, the plaintiff alleged that Defendant Corinthian's colleges were pervaded by fraudulent practices designed to maximize their federal funding. 540 F.3d at 1055. The plaintiff further alleged that because Corinthian's fraud was pervasive, virtually every class-period financial statement was false. *Id.* Finally, the plaintiff alleged its losses were caused by two disclosures that purportedly revealed Corinthian's fraudulent practices. *Id.* at 1059. The first was a newspaper article reporting a Department of Education investigation into one of Corinthian's campuses. *Id.* The second was a press release about a month later disclosing Corinthian had failed to hit prior earnings estimates and containing a passing reference to one of Metzler's alleged fraudulent practices. *Id.* After the first disclosure, Corinthian's stock fell 10 percent but rebounded within three trading days. *Id.* After the second disclosure, Corinthian's stock fell 45 percent. *Id.* Affirming under the more permissive Rule 8(a) pleading requirement, the court held that Metzler failed to plead loss causation. *Id.* at 1065. The court reasoned it was unwarranted to infer that Corinthian's disclosures revealed systematic fraud because Corinthian's stock recovered quickly after the first disclosure, and the second disclosure "contained a far more plausible reason" for the accompanying drop—missed earnings. *Id.*

*Wochos* followed *Metzler* in a similar context. In *Wochos*, Defendant Tesla's stock fell 3.9% from $356.88 after a newspaper article revealed that Tesla was making its new Model 3 cars by hand and not on an automated assembly line. 985 F.3d at 1198. But the stock recovered immediately, rising the next day to $355.59 and trading over the next week between $350 and $360. *Id.* Citing *Metzler*, the *Wochos* court held that plaintiffs could not

plead loss causation because "[t]he quick and sustained price recovery after the modest …

drop refutes the inference that the alleged concealment … caused any material drop in the

stock price." *Id.* (also citing *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir.

2010) ("To adequately plead loss causation … a plaintiff must allege that the 'share price

*fell significantly* after the truth became known.'") (emphasis in original)).

Seeking to distinguish *Metzler* and *Wochos*, the SAC attacks alternative

explanations for Raytheon's stock price drop, adds a theory that Raytheon's stock recovered

due to stock purchases by two Officers, and adds allegations that Raytheon's stock price

lagged an industry index. These efforts are unavailing.

### i.    Stock Price Drop Alternative Explanations

The SAC first seeks to distinguish *Metzler* and *Wochos* by weakening alternative

explanations for Raytheon's stock-price drop. The Court previously found an alternative

explanation highly relevant. Doc. 55 at 42–42. In the same report Raytheon disclosed the

DOJ subpoena, it also stated it would fire 15,000 employees due to the COVID-19

pandemic and mentioned the pandemic more than 70 times. *See* Doc. 55 at 42. Plaintiffs

now allege Raytheon disclosed its pandemic layoffs a month before disclosing the DOJ

subpoena. SAC ¶¶ 315–16. Although Defendants fairly reply the layoffs were 30% larger

than previously anticipated, MTD at 7, Plaintiffs' new allegation is still sufficient to take

this case off all fours with *Metzler*. But three "fours" remain because *Metzler* also involved

a theory of pervasive fraud, allegedly revealed by the disclosure of a government

investigation, and followed by a modest stock price drop that recovered in three trading

days. 540 F.3d at 1055–65.

Plaintiffs' new alternative-explanation attack also seeks to reinforce an analogy to

*Lloyd*. The Court previously distinguished *Lloyd*, where analysts explicitly linked a price

drop to disclosure of an investigation. Doc. 55 at 44. The Court reasoned the "two …

newspaper articles Plaintiffs cite … merely paraphrase Raytheon's disclosure without

analyzing it, implying a connection but never articulating it." *Id.* The SAC adds two more

newspaper articles to support the claim that "[o]ther analysts also specifically attributed the

- 31 -

fall in Raytheon's stock price … to the disclosure of the DOJ subpoena, as opposed to other factors." SAC ¶¶ 312–313. The first article is titled "Raytheon Falls After Disclosure of Criminal Subpoena From DOJ" and states that "Raytheon … fell as much as 4.5% after [it] disclosed … that it received a criminal subpoena from the DOJ." SAC ¶ 312. The second article is titled "Raytheon Discloses Defense-Unit Criminal Subpoena; Shares Fall" and states that "Raytheon … shares fell after the company disclosed a criminal subpoena from the [DOJ.]" SAC ¶ 313. These new articles do not support Plaintiffs' claim. First, news articles are typically written by journalists, not analysts. *See also* Response at 41 (referring to the authors as "news commentators"). Second, if two articles implying a connection without articulating it will not do, four articles should not either. In both new articles, the word "after" and the semicolon in the headlines imply a connection between the drop and the disclosure. In both, the quoted body repeats the headline without analyzing it. That is like the other articles previously found lacking.

Even setting aside the issues above, Plaintiffs' circumstances are still much less clear than in *Lloyd*. Here, Plaintiffs allege a 7% drop that recovered in four trading days, whereas *Lloyd* involved a 22% drop that never recovered. 811 F.3d at 1204. Here, Raytheon's stock price drop is at least muddied by the circumstances, such as the fact that the stock price had already been falling for two days. *See* MTD at 40; Doc. 59-8 at 3–4. In *Lloyd*, the drop was easily traced to the defendant's disclosure of a subpoena. *Id.* at 1204–05. Here, Plaintiffs have at best four "analysts" observing that Raytheon's stock price fell "after" disclosing the DOJ subpoena. In *Lloyd*, analysts immediately connected the drop to concerns circulating about the defendant's biggest borrower. *Id.* at 1205. Here, Raytheon acknowledged defective pricing in four contracts but did not change its financial statements or projections. Raytheon's independent auditor did not change its assessment of Raytheon's internal controls. And Raytheon continued to emphasize that the amounts at issue were not material. In *Lloyd*, the defendant later disclosed it was writing off tens of millions in loans from its biggest borrower, and the stock price did not react. Given those differences from *Lloyd*, Plaintiffs continue to make too much of Raytheon's stock price reacting "hardly at

all" to Raytheon's April 2021 disclosure.

Plaintiff's arguments respond to the previous Order but do not change the outcome. *Metzler* and *Lloyd* remain unhelpful to Plaintiffs, and the quick and sustained recovery here continues to negate an inference of loss causation under *Wochos*. 985 F.3d at 1197.

### ii.   Stock Price Recovery Theory

In what may be an effort to confront *Wochos* indirectly, the SAC adds a theory that the Raytheon's stock price recovered due to stock purchases by two Officers. The SAC alleges that Defendants Kennedy and Hayes propped up the stock price and helped it recover by purchasing approximately $3 million in shares the day Raytheon disclosed the DOJ subpoena, and another $1 million the next day. SAC ¶ 314. While not "bizarre," MTD at 30, Plaintiffs' theory does ask the Court to "check [its] disbelief at the door." *Nguyen*, 962 F.3d at 415. Of course, it is at least possible that $4 million in stock purchases could lead a sustained recovery for years in a company worth billions—possible, but not plausible. Plaintiffs find in academic studies the "unremarkable point that when insiders purchase stock in their own company in large amounts, investors tend to follow course." Response at 37. Defendants are quick to point out another unremarkable point from the same studies: "It is hard to imagine that any manipulator would be able to move a large-capitalization and highly liquid stock … through trade-based manipulation." Reply at 15. This is not an insider-trading case, and the Court would need substantially more than insider-trading studies to conclude that two Officers' stock purchases are relevant to Raytheon's quick and sustained recovery.

Far from distinguishing *Wochos*, Plaintiffs' new theory tacitly acknowledges that, left unchallenged, Raytheon's quick and sustained recovery is problematic. Plaintiffs assert that *Wochos* "did not address the scenario presented here" because the SAC's new allegations weaken alternative explanations for the drop. Response at 38. But the fact that *Wochos* did not discuss alternative explanations strengthens rather than weakens its relevance. *See* 985 F.3d at 1197. *Wochos* held that a quick and sustained recovery refutes the inference that a particular disclosure "caused any material drop in the stock price." *Id.*

at 1198 (citing *Metzler*, 540 F.3d at 1064–65; *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010) ("To adequately plead loss causation ... a plaintiff must allege that the 'share price *fell significantly* after the truth became known.'" (emphasis added in *Wochos*) (citation omitted)). At oral argument, Plaintiffs illustrated their position by way of an example; if an oil company's stock fell 10% on some disclosure, then leapt up 25% the next day because Russia invaded Ukraine, loss causation should not be defeated as a matter of law. Hr'g Tr. 29:6–16. Plaintiffs' reasoning seems sound, but the facts here are quite different. Nothing like a war coincided with Raytheon's stock rebound. Loss-causation analysis is contextual, so the magnitude of a drop and the stock's behavior after the drop are highly relevant. In this case, as in *Wochos* and with *Metzler*'s first disclosure, the drop was modest, and the stock price recovered quickly.

### iii.    Stock Performance Indicator

The SAC also adds allegations that Raytheon's stock price lagged the "applicable industry index." SAC ¶ 317. The SAC alleges that Raytheon's stock price "significantly underperformed its peers" for five days after disclosure of the DOJ subpoena and cumulatively over the following "90-day lookback period described by the PSLRA[.]" *Id.* Plaintiffs conclude that "measuring losses without reference to the relevant industry is not scientific." Response at 39.

However reasonable, Plaintiffs' arguments are not based in law. The law creates a cause of action given an absolute decline in a stock's price, not a relative decline. *See, e.g.*, *Wochos*, 985 F.3d at 1198 (discussing absolute decline); *Lloyd*, 811 F.3d at 890 (same); *Metzler*, 540 F.3d at 1059 (same). Plaintiffs' two cases do not stand for the proposition that relative decline is actionable. One is an unpublished district court order discussing Rule 23 class certification. *See* Response at 39 (citing *Nursing Home Pension Fund v. Oracle Corp.*, 2006 WL 8071391, at *11 n. 4 (N.D. Cal. Dec. 20, 2006) (distinguishing *Dura,* 544 U.S. at 342–43)). The other is *Dura*, 544 U.S. at 342–43, where the Court discussed factors that may contribute to a stock price's *absolute* decline. *See id.*; *see also Dura*, 544 U.S. at 347 ("the complaint must allege that the defendant's share price *fell* significantly after the truth

- 34 -

became known") (emphasis added).

The law's focus on absolute performance is sensible, though inconvenient to Plaintiffs. The law promotes investment by protecting against *material* losses and misrepresentations, not by insuring investors against all loss. *See, e.g.*, *Dura*, 544 U.S. at 345. Focusing on absolute performance thus appropriately reserves legal action for exceptional circumstances.[8] As Defendants point out, if relative performance were actionable, a plaintiff could adequately allege loss causation where the stock price rose but not as much as an industry index. MTD at 31. Though hypothetically scientific, that scenario is practically out of line with the law's policy. The law's focus on absolute performance also promotes judicial economy by avoiding issues with determining the relevant timeframe. *Compare* SAC ¶ 317 (5-day and 90-day relative returns negative), *with* MTD at 30–31 (10-day and 30-day relative returns positive). For these reasons, Plaintiffs new allegations regarding Raytheon's relative performance do not change the Court's loss-causation analysis. Raytheon's quick and sustained recovery continues to negate the inference that the DOJ subpoena disclosure caused Plaintiffs' losses.

**B.  Plaintiffs still do not show loss causation under *First Solar*.**

Setting aside *Metzler* and *Wochos*, the SAC fails to connect Plaintiffs' loss to specific misstatements by Raytheon. Pleading loss causation "is not meant to impose a great burden upon a plaintiff," Response at 34 (citing *Dura*, 544 U.S. at 347), but it does require connecting loss from "the very facts about which the defendant lied." *First Solar, Inc.*, 881 F.3d at 753 (citation omitted).

The SAC, like its predecessor, mumbles the specifics. It ambiguously alleges two

---

[8] This is also why Plaintiffs' argument about lost market capitalization is unpersuasive. *See* Response at 40–41. Plaintiffs urge the Court to ignore the percent drop and focus on the corresponding $6 billion loss in market capitalization. *See id.* (citing two unpublished district court orders that took this approach and found percentage drops ranging from 2.8% to 5.1% significant, and one published district court order that did *not* take this approach and found three drops totaling ~14% significant). With all respect to the other district courts, focusing on percent decline in absolute terms seems best. A 0.1% decline in a company's stock could correspond to a market cap loss that sounds big. But that is not the kind of loss our securities laws are meant to treat.

theories: (1) pervasive fraud affecting virtually every financial statement, and (2) non-pervasive fraud affecting unknown "prime" contracts. When one theory fails to deliver, Plaintiffs switch to the other. *Compare, e.g.*, Response at 40 ("[T]he SAC does not stand or fall on a theory of widespread fraud."), *with, e.g.*, SAC ¶¶ 7, 52–58 (CW2 & CW3), 91 (CW12), 108, 114–116 (substantially unchanged paragraphs the Court previously identified as alleging implausibly widespread fraud). Plaintiffs fail to connect their widespread fraud theory to the DOJ subpoena disclosure because the DOJ investigation concerns only four contracts. Plaintiffs also fail to connect their narrow fraud theory of 2018 misconduct to the DOJ subpoena disclosure because the DOJ investigation concerns a different Raytheon segment.[9] And Plaintiffs fail to connect the contracts associated with the DOJ investigation to any material Class Period statements or omissions. Instead, Plaintiffs repeatedly assert their loss was caused by the subpoena itself. But "[t]he announcement of an investigation reveals just that—an investigation—and nothing more." *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014) (citation omitted). Without a "subsequent revelation of the inaccuracy of [Raytheon's public filings]," the DOJ subpoena could not be a corrective disclosure. *See Lloyd*, 811 F.3d at 1203. The DOJ subpoena also does not combine with Raytheon's CEO's remarks in April to create a revelation of inaccuracy—only wrongdoing on a few contracts.[10]

///

---

[9] Plaintiffs maintain a connection is plausible because both "involv[e] what is now the Missiles and Defense division." Response at 20 (citing SAC ¶¶ 94, 308). But the "Missiles and Defense division" did not exist before April 2020. SAC ¶ 76 n. 21. The DOJ subpoena could therefore reveal at best a possible connection, not a plausible one. *See also infra* App'x § II.O.iv.

[10] Plaintiffs cite several cases for the proposition that a corrective disclosure need not be a mirror image of the misconduct. Response at 20–21 (citing, e.g., *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020)). Plaintiffs' cases are not on point because they involved adequately alleged falsity, reliable confidential witness allegations, and 21–63% stock drops. *See, e.g.*, *In re BofI Holding*, 977 F.3d at 790. This case is closer to those *In re BofI Holding* distinguished. *See id.* at 792–93 (citing *Loos*, 762 F.3d at 890 (investigation revealed no facts); *Curry v. Yelp Inc.*, 875 F.3d 1219, 1223 (9th Cir. 2017) (customer allegations lacked firsthand knowledge)).

1    **VII.    Section 20(a)**

2          SEA § 20(a) makes "controlling" individuals liable for § 10(b) violations. 15 U.S.C.

3    § 78t(a). Plaintiffs fail to state a § 10(b) claim, so they also fail to state a § 20(a) claim.

4    **VIII.   Dismissal With Prejudice**

5          Plaintiffs request leave to amend under Fed. Civ. P. Rule 15. *See* Response at 41.

6    Defendants oppose this request. *See* Reply at 21.

7          The Court has already granted Plaintiffs leave to amend. Doc 55 at 45. The same

8    Order provided substantial feedback on Plaintiffs' claims, some of which was not

9    addressed. *See, e.g.*, App'x § II. Most of Plaintiffs' amendments brought further into focus

10   a narrow theory that does not state a cause of action. *See, e.g.*, *supra* § IV.v. And

11   amendment cannot avoid certain fatal issues. *See, e.g.*, *supra* § VI. Plaintiffs point to no

12   additional facts they might allege to cure the addressed deficiencies, which persisted in a

13   similar light between the FAC and SAC. Hr'g Tr. 27:12–28:5. Thus, the Court exercises its

14   discretion and denies Plaintiffs' request to amend the SAC. *See In re Read-Rite Corp.*, 335

15   F.3d 843, 845 (9th Cir. 2003) (discretion to deny leave to amend is particularly broad given

16   prior amendment); *Zucco Partners*, 552 F.3d at 1007 (no error to dismiss second amended

17   complaint where plaintiffs clearly "made their best case and [were] found wanting").

18   **IX.    Order**

19          For these reasons,

20          **IT IS ORDERED GRANTING IN PART** Defendants' motions for judicial notice

21   (Docs. 60, 64), consistent with this Order's reasoning and citations.

22          **IT IS FURTHER ORDERED GRANTING WITH PREJUDICE** Defendants'

23   Motion to Dismiss (Doc. 59). The Clerk of the Court shall enter judgment accordingly.

24          Dated this 25th day of May, 2023.

25

26

27          _____
              Honorable John C. Hinderaker

28            United States District Judge

# Appendix

## *Confidential Witness Analysis*

The SAC relies primarily on 14 confidential witness ("CW") accounts. These form much of the basis of the SAC's allegations that Raytheon's public filings were misleading. These accounts also form the basis of the SAC's allegations that the Officers knew or recklessly disregarded that Raytheon's public filings were misleading. For clarity's sake, the Court discusses the confidential witness accounts together in this Appendix rather than above. This Appendix nonetheless forms an integral part of the Order.

## I.    Legal Standard

Confidential witnesses may be credited if described "with sufficient particularity to establish their reliability and personal knowledge." *Zucco Partners*, 552 F.3d at 995 (internal quotations marks and citation omitted). Personal knowledge does not require first-hand observation, but the facts attributed to the witness must reasonably imply personal knowledge. *Berson*, 527 F.3d at 985. The Court's analysis may consider the number of sources, the level of detail provided, corroborating facts, the coherence and plausibility of the allegations, and "similar indicia of reliability." *Zucco Partners*, 552 F.3d at 995 (internal quotations marks and citation omitted).

The Court considers each confidential witness account separately, then together. *See Tellabs*, 551 U.S. at 322. With a few exceptions, the accounts are individually unreliable. Taken together, they sufficiently corroborate a few more allegations.

## II.    Analysis

To begin, the Court infers a few helpful orienting details for future reference. As noted below, many of the confidential witness accounts fail to explicitly provide this information. Drawing on the totality of the SAC, though, some patterns emerge.

First, Raytheon's structure and segment names changed during the Class Period. Raytheon merged with United Technologies in April 2020. SAC ¶ 1. Before the merger, Raytheon consisted of five "segments": (1) "Missile Systems," (2) "Integrated Defense Systems," (3) "Intelligence, Information, and Services," (4) "Space & Airborne Systems,"

and (5) "Forcepoint." Doc. 63-2 at 1. Of these, the pre-merger "Missile Systems" segment was based in Tucson and had five sub-sections: (1) "Air Warfare Systems," (2) "Air & Missile Defense Systems," (3) "Naval & Area Mission Defense," (4) "Land Warfare Systems," and (5) "Advanced Missile Systems." *Id.* By contrast, after the April 2020 merger, the emergent "Raytheon Technologies" consisted of four segments: (1) "Raytheon Missiles & Defense," (2) "Raytheon Intelligence & Space," (3) "Collins Aerospace," and (4) "Pratt & Whitney." Doc. 59-4 at 4–6. Plaintiffs explain that Raytheon's "Integrated Defense System" segment merged with its "Missiles System" segment to become the "Missiles and Defense System" in April 2020. SAC ¶ 74 n. 21.

Second, Raytheon's corporate reporting hierarchy appears implicitly, if incompletely, through the collection of confidential witness accounts. It loosely corresponds to: analysts, then managers, then senior managers, then directors, then senior directors, then deputy vice presidents, then vice presidents, then presidents (for each of an unspecified number of "programs," "sections," or "divisions"), then an unknown number of Raytheon vice presidents, then the Raytheon CEO.[11]

With that orientation in mind, the Court turns to the accounts and their allegations.

---

[11] *See* SAC ¶¶ 51 (senior analyst reporting to "Senior Finance Manager"), 56 (senior analyst reporting to "Finance Manager"), 67 (analyst reporting to "Section Manager" who reported to "Department Manager"), 60 (senior analyst reporting to "Finance Manager of Hypersonic Weapons & Strategy"), 95 (contract manager reporting to a "Senior Manager," who reported to a Director, who reported to a "Senior Director"), 92 (program manager reporting to a Director, who reported to an Executive Director, who reported to a Vice President, who reported to the Missiles & Defense President), 65 (manager reporting to a "Program Director," who reported to a "Senior Director," who reported to a "Vice President Global Supply System Management"), 62 (contract director and program manager reporting to a "Deputy Vice President of Naval Weapons Systems," who reported to the "Vice President overseeing Raytheon's Missile Systems"), 61 (vice president of business development in air warfare systems reporting to a vice president of business development for Missile Systems, who reported to the vice president "overseeing Missile Systems," who reported to the CEO), 63 (CFO "overseeing Raytheon's Missile Systems," who reported to a vice president "overseeing Raytheon's Missile Systems," who reported to the CEO), 71 (Intelligence & Space President reporting to CEO). *But see infra*, n. 15 (aspects of CW5 account departing from the general pattern).

1

### A. CW1

2       CW1 worked as a "Purchasing Agent and Subcontracts Manager" from July 2009

3   until August 2018, when CW1 was terminated for reporting misconduct. SAC ¶¶ 41, 48.

4   After termination, CW1 filed several whistleblower complaints with the DOD. SAC ¶ 49.

5   CW1's duties included "auditing procurement group pre-award and post-award purchase

6   order files[.]" SAC ¶ 41. Because the SAC provides CW1's title and job description, CW1

7   is described with sufficient particularity. *See, e.g.*, *Daou*, 411 F.3d at 1015. But a

8   fundamental weakness the Court previously identified remains for CW1 and other

9   confidential witnesses. *See* Doc. 55 at 10. Throughout the Class Period, Raytheon

10  employed 60,000–70,000 people. Doc. 59-2 at 38. In that context, titles and job

11  descriptions do not orient the Court as well as they might with a smaller company or with

12  executive officer titles like "CFO" or "COO." The SAC does not incorporate this feedback

13  into CW1's account.

14      CW1 alleges "many instances of wrongdoing ... related to a government contract

15  worth approximately $11.5 billion" and other misconduct throughout the Class Period.

16  SAC ¶¶ 42–45, 46–50. The $11.5-billion contract "continued into close to mid-2018" and

17  "provided for training, engineering, and logistics support … and mission-focused, global

18  training support."[12] SAC ¶ 42. CW1 alleges misconduct under this contract including (1)

19  failure to submit 155 sub-contracts to a competitive bidding process, (2) miscoding labor

20  as a direct charge, (3) failure to provide Individual Work Authorizations to a procurement

21  group, (4) failure to receive long-lead material purchase authority for materials delivered

22

---

23  [12] This description is similar to the Warfighter FOCUS contract described in a product line
    within Raytheon's Virginia-based pre-merger "Intelligence, Information, and Services"

24  ("IIS") segment. Doc. 63-2 at 2. Like CW1's contract, the IIS "Global Training Solutions"
    product line "provide[d] training solutions, logistics and engineering support worldwide,

25  principally under the Warfighter FOCUS contract with the U.S. Army, which [continued]
    through October 2018[.]" *Id.*; *see also id.* at 56 (describing annual bookings under this

26  contract ranging from $963 million to $1.1 billion). At this stage, the Court declines to
    draw the inference that CW1's allegations relate to the Warfighter contract. But without

27  particularized allegations one way or another, the Court also cannot infer that CW1's
    allegations relate to the Missile Systems or Integrated Defense System segments.

28

after certain task orders' performance end date, (5) improper procurement from Chinese companies doing business with North Korea, in violation of presidential executive orders, and (6) doctoring dates and information on "certain contracts in advance of government reviews and audits," in conspiracy with the sub-contractors. SAC ¶¶ 42–47. CW1 specifically notes government audits occurred in 2010, 2015, and 2018. SAC ¶ 47 n. 14.

Beyond the support-services contract, CW1 alleges (1) "Operations & Maintenance Funding" was misappropriated toward "Military Construction" in order to avoid requisite approvals and oversight, (2) suppliers were improperly advanced payments, allowing Raytheon to bill the government and book revenues earlier than permitted, (3) Raytheon violated the Truth In Negotiations Act ("TINA") by obtaining competitor cost data "under the table" and using it to secure awards, and (4) CW1 was fired for reporting this misconduct to Raytheon's "Senior Director of Internal Audit" and its "Director of Ethics and Business Conduct." SAC ¶ 49.

Some of CW1's allegations about the support-services contract have sufficient indicia of reliability to credit them, such as the level of detail alleged and the relationship between the allegations and CW1's job title and responsibilities. For example, CW1's alleges a lack of competitive bidding or miscoded labor on subcontracts, which is something a "Subcontracts Manager" and auditor could be expected to know. Similarly, CW1 alleges that CW1 was personally ordered to falsify dates to pass government review. Other aspects of CW1's support-services contract allegations are not clearly related to CW1's title and job description. For example, CW1 alleges violation of presidential orders without providing any indication of legal training or any other relevant perspective. That shortcoming also makes CW1's allegations beyond the support-services contract unreliable. TINA violations, improperly advanced payments, and misappropriation of "Operations and Maintenance Funding" do not clearly relate to CW1's responsibilities.

## B. CW2

CW2 was a "Senior Princip[al] Financial Analyst" from October 2016 to December 2018. SAC ¶ 51. CW2 reported to "the" Senior Finance Manager, and the SAC details the

names of both persons in the role of Senior Finance Manager during CW2's tenure. *Id.* Finally, CW2's employment scope is described as within "Global Business Services, working across all of Raytheon's divisions," and CW2's job responsibilities include "Internal Auditor who 'vetted [Raytheon's] proposals from vendors and contractors and other companies.'" *Id.* The SAC states that CW2's job responsibilities also included "review[ing] proposals to ensure that they were financially sound [and] compliant with FAR and DFAR, and [reviewing] audit proposals that met and/or exceeded the [TINA] threshold of $750,000 submitted through supply chain management. [CW2] also audited proposals and other cost-saving initiatives." SAC ¶ 52. Because the SAC provides CW2's title, reporting lines, and job description, CW2 is described with sufficient particularity. The Court previously identified questions about whether "the" Senior Finance Manager is a single position, the function of Raytheon's Global Business Services unit, and the meaning of "all Raytheon's divisions." Doc. 55 at 12. The SAC does not incorporate this feedback into CW2's account (although CW4 suggests that a "Senior Manager" is "one level below" a "Director"). *See* SAC ¶ 60.

CW2 principally alleges that Raytheon failed to use a competitive bidding process in awarding certain "aerospace and defense and missile" supplier contracts but nevertheless maintained the appearance of doing so. SAC ¶ 54. CW2 alleges that competitive bidding for subcontracts has the "benefit" of showing the government that a company is "using due diligence to follow the regulations, the guidelines they set in place." SAC ¶ 52. CW2 implies—but never states explicitly—that competitive bidding for subcontracts is required under FAR or DFAR guidelines to minimize government costs. SAC ¶¶ 51, 54. CW2 further alleges Raytheon uses a color-coding system for its suppliers; those marked green "are good, yellow means 'Go,' and Red means 'No.'" SAC ¶ 54. CW2 alleges "[m]ost of the suppliers Raytheon used were either green or red, and only a handful were yellow," but could not explain "how a supplier could get out of the red category and go to the green one, or why Raytheon didn't just cut off the suppliers in the red category." SAC ¶ 55. CW2 alleges that rather than solicit competitive bids from different suppliers, Raytheon instead

"favored" certain aerospace, defense, and missile suppliers they used repeatedly and placed them "in the green category, irrespective of whether they qualified for the green rating." SAC ¶ 54.) CW2 estimated that "maybe about 30 percent" of the green suppliers shouldn't have been green. SAC ¶ 55. Finally, CW2 also alleges unspecified "obstacles" when working, being told "to keep my mouth shut," and that CW2's superior said, "Just do your job. Don't ask questions." SAC ¶ 55.

Although CW2's allegations are sufficiently detailed, CW2's confusion about the color-coding system renders CW2's allegations insufficiently reliable to credit on their own. CW2 provided no basis for stating that certain suppliers should not have been green. CW2 also did not explain the tension between that statement and CW2's inability to explain Raytheon's continued use of red suppliers or the criteria for a red supplier to become green. CW2's allegations are also not clearly related to CW2's title and responsibilities. Reviewing or "vetting" proposals for financial soundness would not appear to include reviewing details of a competitive bidding process. The SAC provides no information about TINA compliance nor suggests that CW2's observations about the competitive bidding process related to CW2's TINA, FAR, or DFAR responsibilities. Finally, even if CW2's allegations were reliable enough to credit, they are insufficiently particular. CW2 identifies no specific contracts or consequences of failing to avoid competitive bidding. Instead CW2 implies that a lack of competitive bidding results in higher costs and other vaguely alluded risks. Securities fraud claims require more particularity than that.

### C. CW3

CW3 worked as a "Senior Financial Analyst" in Raytheon's "Missiles and Defense System" from July 2012 to October 2015, before the beginning of the Class Period.[13] SAC ¶ 56. CW3 reported to "the" Finance Manager, Clayton Lesher. *Id.* CW3 "work[ed] with project managers on budgets and forecasts and calculating Estimates at Completion [EACs]" on all ten programs in Raytheon's Missiles and Defense System, including "the

---

[13] The Missiles & Defense segment was created in April 2020, SAC ¶ 74 n. 21, so the Court infers that CW3 was in either the Missile Systems segment or the Integrated Defense System segment before April 2020.

Javelin and Tomahawk programs." *Id.* Because the SAC provides CW3's title and job description, CW3 is described with sufficient particularity. The SAC does not clarify the relative rank of a "Senior Financial Analyst," although CW4's account suggests that a Senior Financial Analyst's "Manager" supervisor is below a "Director." *See* SAC ¶ 60.

CW3 alleges Raytheon "flowed down" its EACs, which means Raytheon slowed down the project "to get more money" when the government "reimburse[d] Raytheon" for the slowdown. SAC ¶¶ 56, 58. CW3 alleges that Raytheon "had all of the essential tools and funding" to complete a project but nonetheless "would say, 'It's going to take longer. We need additional funds.'" SAC ¶ 56. Specifically, CW3 alleges that Raytheon's Tomahawk and Javelin missile projects "could have been done sooner." SAC ¶ 57. CW3 alleges "the misconduct was significant because it would cause Raytheon to lose contracts because of the wrongdoing." SAC ¶ 58. Finally, CW3 alleges that it was "common practice for Raytheon to get extensions for its projects and miss its Estimates at Completion," and that "almost every" project was slowed down as it "was kind of becoming the norm around the place." SAC ¶ 56.

Although CW3's allegations are sufficiently detailed, they are insufficiently reliable to credit on their own and allege issues before the beginning of the Class Period. CW3's title and responsibilities do not clearly relate to CW3's assessment that various projects could have been done sooner, that project slowdowns were intentional, or that Raytheon lost contracts because of "the wrongdoing." CW3 does not allege, for example, that the program managers CW3 "worked with" said they were slowing down projects intentionally, or allege any specific lost contracts. CW3 also does not specifically allege that getting project extensions or missing EACs was improper. Critically, CW3 does not quantify or even estimate the issues except in the most general and vague terms.

**D. CW4**

CW4 was a "Principal Finance Analyst" from mid-2019 to fall 2020 in Raytheon's "Financial Controls Department" of the Hypersonic Weapons and Strategy program, which was in the "Missile Systems division." SAC ¶ 60. CW4 reported to the Hypersonic

Weapons program Finance Manager, who was "a level below a Director." *See id.* The SAC alleges CW4 would send the EACS to "the program managers, the finance managers, and the directors, who in turn provided the EACs to the executives within that business area, *i.e.*, the hypersonic missiles division." *Id.* Because the SAC provides CW4's title and job description, CW4 is described with sufficient particularity.

CW4 alleges that shortly after joining Raytheon in mid-2019, CW4 heard from a "Senior Manager in Material Program Management" that Raytheon was being investigated by the DOJ and "there were issues with EACs." SAC ¶ 60.

CW4's allegations are based in unreliable hearsay. Hearsay is not "automatically disqualify[ing]," but it may be credited only where "sufficiently reliable, plausible, or coherent." *Lloyd*, 811 F.3d at 1208 (crediting COO statements that were specific in time, context, and details, and involved a meeting between a CEO and the Board). CW4's colleague is not clearly situated to know anything about EACs or a DOJ investigation. The SAC is also unclear how "Material Program Management" relates to the Missile Systems division or "Hypersonic Weapons and Strategy."

**E.  CW5**

CW5 worked as a "Vice President of Business Development, Air Warfare Systems" from December 2015 to mid-2017. SAC ¶ 61. CW5 reported to "Vice President of Business Development for all of Raytheon's Missile Systems" Fitzpatrick.[14] *Id.* Because the SAC provides CW5's title, and because that title involves an executive position, CW5 is described with sufficient particularity.

---

[14] CW5's descriptions of various positions can be bewildering. CW5 first says Fitzpatrick was "Vice President of Business Development of all of Raytheon's Missile Systems." SAC ¶ 61. CW5's colleague later says that Fitzpatrick reports to Taylor Lawrence, who was "the Vice President overseeing Raytheon's Missile Systems." *Id.* CW5's colleague also says that "the CFO overseeing Raytheon's Missile Systems … reported to Taylor Lawrence." SAC ¶ 63. And CW7 refers to Lawrence as "Vice President of Missile Systems." SAC ¶ 67. The Court infers that a *Business Development* Vice President of Missile Systems is different from "the" Vice President "overseeing" Missile Systems, that a CFO "overseeing" Missile Systems is the same as a CFO "of" Missile Systems, and that that position is subordinate to "the" Vice President of Missile Systems.

CW5 alleges that, after leaving Raytheon in mid-2017, "a former colleague and friend still employed at Raytheon at that time" told CW5 about misconduct within Raytheon's Naval Weapons System section of its Missile Systems division. SAC ¶ 61. CW5's former colleague was Paul Hanson, a "Director of Capture Management Excellence" who reported to the same Vice President of Business Development that CW5 had previously. *Id.* Hanson alleges that the Vice President of Business Development reported to the Vice President of Raytheon's Missile Systems division, Fitzpatrick, who in turn reported to Raytheon's CEO, Defendant Kennedy.[15] *Id.*

CW5's former colleague Hanson allegedly told CW5 that an internal audit showed $250 million in "false labor charges made on several contracts" in the Navy Weapons System section of the Missile Systems division. SAC ¶¶ 62–64. Hanson attributed the labor charges to employees including Todd Callahan, the "Deputy Vice President of Naval Weapon Systems," Richard McDonnell, the "Program Manager for Close-in Weapon Systems," and Tina Fay, the "Contract Director" for "the entire product line." SAC ¶ 62. CW5 alleges that McDonnell and Fay reported to Callahan, who reported to the Vice President of Raytheon's Missile Systems, who in turn reported to Raytheon's CEO, Defendant Kennedy. *Id.* Hanson told CW5 he personally saw Callahan, McDonnell, and Fay "get marched out by security." *Id.* Hanson also told CW5 that one of Hanson's

---

[15] CW5's account of the corporate hierarchy is different from other accounts and, to some extent, defies common sense. CW5 alleges that an Air Warfare Vice President of Business Development and a Director of Capture Management Excellence reported to the same person, the Missile Systems Vice President of Business Development. That is unusual because directors are typically one level below vice presidents and would not be expected to report to the same person as someone one level above them. CW5 also alleges a deputy vice president, vice president, and CFO all reported to another vice president. Specifically, CW5 alleges the Missile Systems Vice President of Business Development, SAC ¶ 61, a Naval Systems Deputy Vice President, SAC ¶ 62, and a CFO "overseeing" Missile Systems all reported to "the Vice President overseeing Raytheon's Missile Systems," who reported to the CEO. SAC ¶ 63. By contrast, CW10 and CW13 both allege that vice presidents reported to presidents. CW10 alleges the Intelligence & Space President reported directly to the CEO, SAC ¶ 71, and CW13 alleges a Missiles & Defense Vice President reported to the Missiles & Defense President. SAC ¶ 92. CW5's account is less typical than CW10's and CW13's because Vice Presidents and Presidents form an intuitive reporting hierarchy.

employees, McDonnell's wife, told him that Callahan, McDonnell, and Fay were fired for "the misconduct." Hanson also told CW5 that the Missile Systems CFO "was terminated around that time[,]" and that the CFO reported to the Missile Systems Vice President. *Id.*

Hanson told CW5 that Callahan, McDonnell, and Fay "were swapping labor charges amongst contracts." SAC ¶ 63. Specifically, they shifted labor charges from one contract to another to preserve their performance bonuses. *Id.* CW5 explained that Raytheon paid employees a bonus for contracts that finished with the right number of labor hours, so charging excess labor hours for one contract to another fraudulently secured that bonus. *See id.* CW5 also alleged that "if Callahan, McDonnell and Fay were over-budget and behind schedule, then Raytheon would take financial hits for that and the government would not pay [Raytheon], so the manipulations described above were also designed to avoid that result." *Id.* CW5 further "explained that the $250 million of false labor charges related to a large and important contract for Raytheon's Naval Systems[,]" and that "Naval Systems did about one billion a year of business[.]" SAC ¶ 64.

CW5's allegations are based on hearsay and double hearsay. Aspects of the hearsay are internally inconsistent. For example, CW5 alleges that "$250 million in false labor charges" were both "made on several contracts" and "related to a large and important contract." At this stage, the Court must accept every allegation as true, but not as plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (distinguishing truth and plausibility). Thus, plausibility yields given true-yet-inconsistent allegations. Here, the plausibility of CW5's allegations are reduced by the facial inconsistency of $250 million both "made on several contracts" and "related to a large and important contract." That deficiency is particularly damaging because the allegation is already based on hearsay. *See Zucco Partners*, 552 F.3d at 995 n. 4 (hearsay inconsistency diminishes reliability). The Court reaches the same result even by drawing an unwarranted inference in Plaintiffs' favor. The Court could infer that the $250 million was "swapped between" several contracts, one of which was "a large and important" contract. That inference is unwarranted because "$250 million … made on several" and "$250 million … related to a" are mutually exclusive.

Plaintiffs indirectly acknowledge the conflict by rephrasing to avoid the issue. *See* Response at 18 n. 6 ("CW5 described false labor charges *impacting* several contracts … *including* one large and important naval contract.") (emphasis added). But even if Plaintiffs' pleading deficiency were a matter of drawing an inference in Plaintiffs' favor, the SAC does not explain how Hanson would be familiar with the contract or contracts at issue. The SAC does not connect the role of a "Director of Capture Management Excellence" within Raytheon's "Business Development" segment to Raytheon's Naval Weapons Systems section except that both are within the Missile Systems division. Without information about the size of that division, and given Raytheon's 60,000–70,000 employees, the Court cannot infer that Missile Systems was so small that directors in business development were privy to internal audits in naval weapons systems. CW5's reliance on Hanson's reliance on McDonnell's wife does not bridge that gap. In the end, the only factor weighing in favor of CW5's reliability is the level of detail alleged. But that factor is outweighed by the others.

**F. CW6**

CW6 worked as "the Supplier and Control Program Manager" for Raytheon's "Missiles and Defense division" from August 2006 to October 2021.[16] SAC ¶ 65. CW6 "put[] together EACs for the various projects he worked on, including managing twelve program hardware portfolios worth $160 million." *Id.* CW6 reported to "Program Director Shoup," who reported to "Senior Director Davis," who reported to "Global Supply System Management Vice President Jaramillo." *Id.* Because the SAC provides CW6's job title, description, and reporting line, CW6 is described with sufficient particularity.

CW6 alleges that Callahan, McDonnell, and Fay were fired in October 2018 for "trying to hide their cost overruns on their EACs." SAC ¶ 66. CW6 alleges that Callahan, McDonnell, and Fay were "fudging the EACs" to hide "how bad their numbers were." *Id.* CW6 alleges that Callahan, McDonnell, and Fay were "improperly moving money around … to hide cost overruns." *Id.* CW6 alleges they were "taking money from different projects

---

[16] The Missiles & Defense segment was created in April 2020, SAC ¶ 74 n. 21, so the Court infers that CW6 was in either the Missile Systems segment or the Integrated Defense System segment before April 2020.

to beef up their management reserves because they were overspending." *Id.*

CW6's allegations are not sufficiently based in personal knowledge. CW6 does not explain and it is not clear how CW6's role or responsibilities provide insight into details of a termination of a Deputy Vice President of Naval Weapon Systems, Senior Director of Close-In Weapon Systems, and Contract Director "of the entire line." For example, CW6 does not allege that any of CW6's projects were the projects Callahan, McDonnell, and Fay allegedly manipulated.

### G. CW7

CW7 worked as a "Principal Integrated Program Management Analyst" in Raytheon's Missiles and Defense division from late 2014 to late 2018.[17] SAC ¶ 67. CW7 "supported Finance, Engineering, and other types of employees through research and analysis related to predicted costs and project schedules," and "worked on EACs." *Id.* CW7 reported to "Program Management Excellence Senior Section Manager Bowles," who reported to "Department Manager Bailes." *Id.* Because the SAC provides at least a vague description of responsibilities and reporting line, CW7 is described with sufficient particularity.

CW7 alleges that "Raytheon fired a 'couple-dozen' Tucson-based employees, including senior leaders, when [CW7] was still at the company in 2018 for issues related to EACs, like 'playing with the numbers' and 'cooking the books.'" SAC ¶ 67. CW7 alleges "it was a huge deal," and "a lot of high-level people were fired because of it." *Id.* CW7 alleges that the "Vice President of Missile Systems" Lawrence "was implicated in the EAC issue," and "Tina Fay appeared to be implicated." *Id.* CW7 also alleges the "Naval Air Division (which fell under Missiles and Defense) was linked to the EAC issues." *Id.*

CW7's vague allegations are not sufficiently based in personal knowledge. CW7 does not explain how CW7's role or responsibilities provide insight into details of a termination of a Vice President of Missile Systems. For example, CW7 does not allege that

---

[17] The Missiles & Defense segment was created in April 2020, SAC ¶ 74 n. 21, so the Court infers that CW7 was in either the Missile Systems segment or the Integrated Defense System segment before April 2020.

1   any of CW7's projects were "linked to EAC issues."   CW7's allegations also sound

2   strangely canned, referring to "issues … *like* 'playing with the numbers' and 'cooking the

3   books'" as if those were distinct issues and not colloquial expressions that mean the same

4   thing. Overall, CW7's allegations come across as regurgitated gossip and innuendo.

5     **H. CW8**

6       CW8 worked as "the Subcontracts Manager" and "the Contracts Manager" of

7   "Missiles and Defense" from mid-2015 to mid-2022.[18] SAC ¶ 68. Aside from asserting

8   CW8's role as "the" Manager, CW8's responsibilities and place in the corporate hierarchy

9   are not provided. Given Raytheon's size, the Court cannot draw the unwarranted inference

10  that Raytheon's Missiles and Defense division had one ("the") Subcontracts and Contracts

11  Manager. Without even basic reporting information or responsibilities, CW8 is not

12  described with sufficient particularity. *See Zucco Partners*, 552 F.3d at 995.

13      Even if CW8 were described with more particularity, CW8's allegations are not

14  clearly based in personal knowledge. CW8 alleges that "the DOJ investigation"[19] of "the

15  2017 Raytheon contract"[20] led to the "ouster" of the "CFO for the Missiles & Defense

16  division" Asbell,[21] "Raytheon's Vice President and the Missiles and Defense division

17

18

19

---

20  [18] The Missiles & Defense segment was created in April 2020, SAC ¶ 74 n. 21, so the Court

21  infers that CW8 was in either the Missile Systems segment or the Integrated Defense
    System segment before April 2020.

22  [19] CW8 does not define "the DOJ investigation," but the SAC refers elsewhere both to "the
    DOJ investigation," SAC ¶¶ 72, 76, 320, and "a DOJ investigation." SAC ¶¶ 6, 120, 254,

23  297. "The" DOJ investigation consistently refers to the 2020 investigation, and "a" DOJ
    investigation consistently refers to an alleged 2018 investigation. Given the consistent

24  distinction, the Court infers that CW8 allegations relate to the 2020 investigation.

25  [20] CW8 does not define "the 2017 Raytheon contract," but the SAC alleges elsewhere that
    the DOJ subpoenaed Raytheon in March 2021 as part of its 2020 investigation, seeking

26  information about "a contract awarded to Missiles & Defense in 2017." SAC ¶ 124; *see
    also* SAC ¶¶ 76, 125, 320. At this stage, Plaintiffs are entitled to the inference that these

27  statements refer to the same contract.

28  [21] CW9 refers to Asbell as the "CFO of Contracts," not the Missiles and Defense CFO.

- 50 -

General Counsel" Sabin,[22] and "Vice President of Contracts, Offset & Localization" Murphy. SAC ¶ 68. CW8 provides no basis for concluding that a "Contracts Manager" would have insight into the termination of a division CFO, General Counsel, and Vice President. CW8's allegations are also vague and inconsistent with other confidential witness accounts.

### I. CW9

CW9 worked as a "Manager, Contracts" and "Senior Contracts Negotiator" in the "Missiles & Defense division" from late 2001 to late 2021.[23] SAC ¶ 69; Response at 19 n. 9 (repeating the odd "Manager, Contracts" phrasing). CW9 was responsible for "the contracts Raytheon was working on." *Id.* As with CW8, CW9's description is insufficiently particular. It does not orient the Court to CW9's place in the corporate hierarchy or illuminate the basis for CW9's allegations. The Court also notes the facially implausible implication that a single position within the Missiles & Defense division was responsible for all of Raytheon's contracts.

Even if CW9 were described with more particularity, CW9's allegations are not clearly based in personal knowledge. CW9 alleges "VP and General Counsel" Sabin,[24]

---

[22] This phrasing could mean Sabin was "Raytheon's Vice President," but the Court infers Sabin was a Missiles & Defense Vice President primarily because CW9 refers to Sabin as "VP and General Counsel … who[] worked in Missiles & Defense." SAC ¶ 69. The SAC elsewhere refers to "Presidents" and "Vice Presidents" of segments, divisions, and of Raytheon itself. *See* SAC ¶¶ 23 (defining Defendants O'Brien and Wood as former Vice Presidents of "Raytheon Technologies'" and "Raytheon Company"), 61 (distinguishing the "Vice President of Business Development, Air Warfare Systems," from the "Vice President of Business Development for all of Raytheon's Missile Systems," from the "Vice President overseeing Missile Systems"), 70 (referring to "Raytheon's Missiles and Defense President"), 71 (referring to "Raytheon's Intelligence & Space President"), 90 (referring to the "president of the Company"). From these distinctions, the Court understands Raytheon has many vice presidents, and most are within subdivisions.

[23] The Missiles & Defense segment was created in April 2020, SAC ¶ 74 n. 21, so the Court infers that CW9 was in either the Missile Systems segment or the Integrated Defense System segment before April 2020.

[24] *See supra*, n. 22 (discussing confusing and conflicting accounts of Sabin's title).

"CFO of Contracts Asbell,"[25] and "VP of Contracts Murphy" all "left Raytheon due to 'EAC-type accounting issues.'" CW9 does not explain whether a "CFO of Contracts" is different from a "CFO of the Missiles and Defense division" (per CW8's account), whether "left Raytheon" means they were fired or quit, or what "EAC-type accounting issues" are. The SAC does not make clear whether SAC ¶ 70 is also part of CW9's account. Paragraph 70 follows CW9's account, and is followed by CW10's account, but does not refer to CW9. It simply states that "Raytheon failed to disclose to the investing public what led to the departure of the three senior executives." SAC ¶ 70. It further alleges that the Missiles and Defense President announced the departures without explanation in an internal email dated January 2022. *Id.* Without any articulated connection to CW9, and given the fact that CW9 allegedly left Raytheon before January 2022, the Court cannot infer that, for example, CW9 received this email or was otherwise situated to discuss its contents.

**J.  CW10**

CW10 worked as "the Senior Manager, Contracts/Hypersonics Portfolio Lead" in Missiles & Defense, and "Senior Manager, Program Contracts for Intelligence & Space" from "2020"[26] to "December 2022." SAC ¶ 71. CW10's responsibilities included "leading the contracts team and all contract management activities for multiple Hypersonic programs/contracts portfolio, which included reviewing and analyzing EACs." *Id.* CW10 describes CW10's position as "the contract police," which meant that CW10 "did the forensics on the EACs." *Id.* CW10 alleges a "high security clearance level" and attendance of "monthly EAC meetings" led by "Raytheon Intelligence & Space President Azevedo," and also attended by "Vice President & Chief Operating Systems for Intelligence & Space,

---

[25] CW8 refers to Asbell as "CFO for the Missiles & Defense division," not CFO of Contracts.

[26] By omitting the month, the SAC obscures whether CW10 started after October 27, 2020, the end of the Class Period. Plaintiffs' Response conspicuously repeats the omission, Response at 19 n. 10, after Defendants point it out. MTD at 18 n. 6. At this stage, the Court must infer that CW10 started before the end of the Class Period. Because both the Missiles & Defense and Intelligence & Space segments were created in April 2020, *see* SAC ¶ 74 n. 21, Doc. 59-4 at 5–7, the Court also infers that CW8 started after April 2020.

Dave Broadbent." *Id.* CW10 alleged that "President Azevedo" reported directly to Raytheon's CEO. *Id.* Because the SAC provides CW10's job description and reporting line, CW10 is described with sufficient particularity.

CW10 alleges that one of the EACs CW10 "did the forensics on" "involved a technology that didn't yet exist but had 'hundreds of millions of overruns.'" SAC ¶ 71. CW10 also alleges that "the ouster of Raytheon's executives Murphy, Asbell and Sabin were linked to the DOJ investigation."[27] SAC ¶ 72. CW10 also alleges that Raytheon has "very few … prime contracts," which are "contracts that Raytheon obtains directly from the government." SAC ¶ 73. CW10 also alleges that these "prime contracts" "always make more money for Raytheon." *Id.* CW10 contrasts these "prime contracts" with the "many 'subcontracts' [Raytheon receives] from other companies that have main contracts with the government." *Id.*

Only one of CW10's allegations is sufficiently reliable to credit on its own. That is the allegation that an EAC CW10 personally worked on had "hundreds of millions of overruns." As a member of the "contract police" "doing forensics on EACs," CW10's job title and description adequately alleges that CW10 would know if an EAC CW10 was working on had cost overruns. But CW10 does not allege that these overruns were improper or were the result of misconduct or allege misconduct in any other respect. And CW10's other allegations are insufficiently based in CW10's personal knowledge. CW10's vague title and the fact that CW10 attended Intelligence & Space meetings do not suggest that CW10 had insight into the "ouster" of Raytheon executives in another segment. CW10's role also does not suggest insight into the importance and value of "prime contracts" as opposed to "subcontracts issued from other companies that have main contracts."

**K. CW11**

CW11 worked in Raytheon's "Executive Communications and Employee Engagement division" from December 2016 to April 2020. SAC ¶ 90. CW11's

---

[27] As with CW8, the Court infers CW10 means "the [2020] DOJ investigation." *See supra*, n. 19.

responsibilities included "among other things" writing speeches for the "president of [Raytheon]" and editing Raytheon's newsletter. *Id.* Because the SAC provides CW11's job description and reporting line, CW11 is described with sufficient particularity. The Court previously noted a lack of clarity regarding CW11's job title and the relative rank or role of "the president of Raytheon," but the SAC does not incorporate this feedback into CW11's account.

CW11 alleges that in late 2018 or early 2019, a colleague told CW11 that "several Raytheon employees" were "fudging numbers" on the contracts, and that "the Pentagon was also looking into it, and they wanted answers." SAC ¶ 90. CW11 also alleges that "Lawrence was eventually terminated in March 2019." *Id.*

CW11's allegations are based on vague hearsay. CW11 does not say which colleague made the declaration, how that person was positioned to know the information, where the person got the information, or what relationship the employees who "fudged numbers" had to the Officers. CW11's colleague's account also lacks critical details; for example, "eventually terminated" implies a connection without actually alleging it.

**L. CW12**

CW12 worked as a "Director of Digital Transformation" from October 2019 to October 2020. SAC ¶ 91. CW12's responsibilities included "reengineering" Raytheon's servers and "separating UTC from its parent company" after UTC merged with Raytheon. *Id.* Because the SAC provides CW12's job title and description, CW12 is described with sufficient particularity. The Court previously noted a lack of clarity regarding CW12's place in Raytheon's organization, but the SAC does not incorporate this feedback into CW12's account.

CW12 alleges that (1) "everything about Raytheon is shady," (2) "it's a** covering all the way around," (3) Raytheon keeps no records of what "hundreds of millions dollars" spent on outside contractors is for, (4) Raytheon paid "hundreds of millions of dollars" in "funny money" to outside vendors, (5) Raytheon has no control over its contractors and no accountability, and (6) "months and months" passed without contractors doing their work.

SAC ¶ 91.

CW12's allegations are somewhat detailed but largely uninformed impressions. *See Police Ret. Sys.*, 759 F.3d at 1063 (sales representative allegation based on three months' experience was the "impression of a low-level employee[,] unsubstantiated [and] without substance or context."). The SAC does not establish how CW12's role upgrading servers provided a basis for sweeping pronouncements on Raytheon's management of contractors or financial practices. This is significant because CW12's assertion that Raytheon had "no" system of contractor accountability and control is facially implausible given Raytheon's compliance obligations to the government and the apparently large number of employees dedicated to ensuring government compliance.

**M. CW13**

CW13 worked as a "Program Manager" and "Lead Material Program Manager" for the "Stormbreaker Program" in the "Missiles and Defense division" from mid-2014 to mid-2020.[28] SAC ¶ 92. CW13's responsibilities included ensuring program performance requirements and audit compliance. *Id.* CW13 reported to "Director Howlett," who reported to "Executive Director Dunlap," who reported to "Vice President Ferraro," who reported both to "President of Missiles & Defense Kramer" and to "CEO [Defendant] Kennedy." *See id.* ("Ferraro reported to … Kramer …. Ferraro reported to … Kennedy[.]") Because the SAC provides CW13's job title, description, and reporting lines, CW13 is described with sufficient particularity. The Court notes the implausibility of a Vice President reporting both to a division President and directly to the CEO.

CW13 alleges Callahan, McDonnell, and Fay, the "Contract Director for the entire line," were fired in October 2018 for manipulating EACs for a U.S. Navy contract worth over $200 million. SAC ¶ 94.

---

[28] The Missiles & Defense segment was created in April 2020, SAC ¶ 74 n. 21, so the Court infers that CW13 was in either the Missile Systems segment or the Integrated Defense System segment before April 2020. *Compare also, e.g.*, Doc. 59-2 at 4 (2019 10-K locating the "StormBreaker program" within the "Air Warfare Systems" subsection of the "Missile Systems" segment), *with* Doc. 59-4 at 6 (2020 10-K locating the "StormBreaker smart weapon" within the "Raytheon Missiles & Defense" segment).

CW13's allegations are not clearly based in personal knowledge. The SAC does not explain how a relatively low-level manager in the Stormbreaker Program would be familiar with the details of a termination of a Deputy Vice President of Naval Weapon Systems, Senior Director of Close-In Weapon Systems, and Contract Director "for the entire line." *See* SAC ¶ 94. The phrase "for the entire line" also appears in CW5's account, SAC ¶ 62, and the Court previously identified it as vague. Doc. 55 at 15. The phrase remains vague in CW13's account.

**N. CW14**

CW14 worked as a "Contracts Manager" and a "Senior Contracts Manager" in Raytheon's Missiles and Defense division from early 2007 to late 2022.[29] SAC ¶ 95. As a contracts manager, CW14 negotiated contracts with the U.S. Government for the Missiles and Defense division. *Id.* CW14 reported to "Senior Manager of Contracts" Hill, who reported to "Director of Contracts" Natali, who reported to "Senior Director of Contracts" Taves. *Id.* Because the SAC provides CW14's job title, description, and reporting lines, CW14 is described with sufficient particularity.

CW14 alleges that "the DOJ investigation involves the Patriot Guided Enhanced Missile Program."[30] SAC ¶ 95.

CW14's allegation is somewhat vague but sufficiently detailed and based in personal knowledge to credit on its own. A senior contracts manager who negotiates government contracts for the Missiles and Defense division could plausibly know that a government missile contract is under government investigation. The SAC also elsewhere identifies the "Patriot Air and Missile Defense System" as within Raytheon's former Integrated Defense System segment. *See, e.g.*, SAC ¶ 77. That consistency increases the reliability of CW14's

---

[29] The Missiles & Defense segment was created in April 2020, SAC ¶ 74 n. 21, so the Court infers that CW14 was in either the Missile Systems segment or the Integrated Defense System segment before April 2020.

[30] As with CW8 and CW10, the Court infers CW14 means "the [2020] DOJ investigation." *See supra*, n. 19. Additionally, CW14's allegation is in present tense, which implies that CW14 is referring to an ongoing DOJ investigation, not a concluded one.

1 allegation.

2 **O. Corroborated Allegations**

3 Although the confidential witness statements are individually unreliable with a few

4 exceptions, the Court also considers them as a whole. *See Tellabs*, 551 U.S. at 322.

5 Corroborated allegations may bolster reliability. *See Zucco Partners*, 552 F.3d at 995. At

6 various points, the SAC describes the confidential witnesses as "corroborating" each other

7 and Plaintiffs' theory of fraud. *See, e.g.*, SAC at 2, ¶ 60. The SAC also implies that the

8 witness statements are connected. *See, e.g.*, SAC ¶¶ 51 ("CW2 witnessed similar

9 misconduct"), 56 ("CW3 also witnessed misconduct"), 61 ("CW5 also recounted

10 wrongdoing"). The Court disagrees. Only certain aspects of the confidential witness

11 statements corroborate each other.

12 **i.     Callahan et al. Misconduct**

13 Three confidential witnesses explicitly refer to misconduct linked to Callahan,

14 McDonnell, and Fay, and three confidential witness implicitly refer to the same:

15 • CW4 heard from a colleague in "mid-2019" about a DOJ investigation related to
16   "issues with EACs." SAC ¶ 60.

17 • CW5 heard from a colleague in "mid-2018" that an internal audit resulted in
   Callahan, McDonnell, and Fay being terminated for "swapping labor charges
18   amongst contracts" and/or "$250 million of false labor charges related to a large and
   important contract for Raytheon's Naval Systems." SAC ¶¶ 63, 64. CW5's colleague
19   told CW5 that Callahan, McDonnell, and Fay were swapping labor charges to
   preserve their performance bonuses, and to protect Raytheon from the consequences
20   of being over budget or behind schedule. SAC ¶ 63. CW5's colleague also told CW5
   that Callahan reported to Lawrence, the "Vice President overseeing Raytheon's
21   Missile Systems," and that the Missile Systems CFO "was terminated around that
22   time." SAC ¶ 61, 63.

23 • CW6 alleged that Callahan, McDonnell, and Fay were fired "in October 2018" for
24   "hid[ing] their cost overruns on their EACs." SAC ¶ 66.

25 • CW7 alleged "a couple-dozen Tucson-based employees" were fired before CW7
   left in November 2018 for "Naval Air Division … EAC issues" "implicating"
26   Missile Systems VP Lawrence and "potentially" Tina Fay. SAC ¶ 67.

27 • CW11 heard "in 2018 or 2019" that "the Pentagon was looking into [several
   Raytheon employees "fudging numbers" on contracts]," and that Missile Systems
28   VP Lawrence "eventually" was terminated in early 2019. SAC ¶ 90.

- CW13 alleges Callahan, McDonnell, and Fay were fired "in October 2018" for "manipulating EACs" on "a Navy contract worth over $200 million." SAC ¶ 94.

Similarities notwithstanding, these six accounts do not "corroborate" each other in a strong sense of the word. The accounts are individually quite unreliable. CW4's account is hearsay from a "Senior Manager in Material Program Management," CW5's account is internally inconsistent hearsay and double hearsay from a "Director of Capture Management Excellence," CW11's account is also hearsay, CW6 is three levels below a "Global Supply System Management Vice President," CW7 is three levels below a "Department Manager," and CW13 is three levels below one of an unknown number of Missiles & Defense Vice Presidents. The accounts are also in some tension with each other. CW7 alleges Lawrence was "implicated" before CW7 left Raytheon in November 2018, but CW11 heard "in 2018 or 2019" that Lawrence was "eventually" terminated in March 2019. CW5 refers to "$250 million in false labor *charges* [related both to one contract and "amongst" contracts]," but CW13 refers to misconduct in a "*contract* worth over $200 million." Finally, the accounts do not corroborate each other in all respects. For example, only CW11 specifically heard that Lawrence was terminated "eventually"; CW5 only heard that Callahan reported to Lawrence, and CW7 alleged Lawrence was "implicated." Similarly, only CW4 heard about a DOJ investigation; CW5 heard about an internal audit, and CW11 heard about a Pentagon investigation.

Despite the relatively weak corroboration of these accounts, they do combine to form a recognizable whole. Considering the various issues identified above, the six accounts do not exactly provide a clear "indicia of reliability." *Zucco Partners*, 552 F.3d at 995. In *Zucco Partners*, for example, corroboration indicated reliability where an "ID Systems Vice President" added compatible and illuminating details to the account of an "ID Systems Controller" who reported directly to the ID Systems CFO defendant. *Id.* at 993. Similarly, in *Glazer*, four confidential witnesses described in different ways how they and other sales representatives were pressured by senior executives including the

company's Chief Revenue Officer.[31] 63 F.4th at 772–73. By contrast, here all six accounts appear be based on rumors. That is not the kind of corroboration that substantially increases reliability. But at least some indicia of reliability are present. All refer to something that happened around 2018. Several refer to a Navy contract, contracts, or section (CW5, CW7, CW13). Several refer to Callahan, McDonnell, or Fay (CW5, CW6, CW7, CW13). And two provide a high level of nearly compatible detail: the misconduct involved hiding cost overruns, either by shifting labor charges from one contract to another to avoid overages (CW5), or "moving money around at the end of a project" (CW6).

These family resemblances are sufficiently reliable to support the following, somewhat vague allegation: Callahan, McDonnell, and Fay were fired around 2018 for hiding cost overruns on a contract or contracts in the Naval Systems subsection of Raytheon's Missile Systems segment.

Notably, the witness accounts do not corroborate each other in several key respects. First, they do not corroborate how the misconduct was uncovered. Only three accounts allege an investigation or audit, and each alleges something different. Of course, Raytheon presumably uncovered misconduct somehow because Callahan, McDonnell, and Fay were fired. But *how* the misconduct was uncovered is relevant to Plaintiffs' argument that Raytheon had a duty to disclose the issue. That critical detail is not alleged with sufficient reliability. Second, the confidential witness accounts do not corroborate each other with respect to Callahan's, McDonnell's, and Fay's motivation. Only CW5 heard anything about their motivation, and said it was primarily for private benefit—securing performance

---

[31] Plaintiffs' counsel also represented the *Glazer* plaintiffs. The contrast between this case and that one is therefore particularly illuminating. *See, e.g.*, Second Consolidated Amended Complaint ¶¶ 52(F), 99(E), *Sayce v. Forescout Techs., Inc.*, No. 20-cv-00076-Sl., 2021 WL 9121232 (N.D. Cal. May 10, 2021) (much stronger confidential witness accounts).

bonuses.[32] Third, the confidential witness accounts above do not corroborate each other with respect to Missile Systems VP Lawrence or the Missile Systems CFO. Only one witness vaguely alleges Lawrence was "implicated" and another heard he was terminated "eventually." And only one account heard that the CFO was terminated "around that time." That is not enough to reliably allege that either was fired in connection with Callahan, McDonnell, and Fay. Fourth, and finally, the confidential witness accounts do not corroborate the value or size of the misconduct. CW5 heard that the amount was $250 million in false labor charges on one and several contracts, while CW13 alleges misconduct on a contract worth over $200 million.[33] The other accounts do not quantify the issue at all. None report consequences beyond the terminations. Without any corroborating information, the Court cannot infer the scale of the misconduct.

### ii.   Murphy et al. Misconduct

Three confidential witnesses explicitly refer to misconduct linked to Murphy, Asbell, and Sabin:

- CW8 alleges "the DOJ investigation of the 2017 Raytheon contract led to the eventual ouster" of Murphy ("Vice President of Contracts, Offset & Localization for the Missiles & Defense division"), Asbell ("CFO for the Missiles & Defense division"), and Sabin ("Raytheon's Vice President and General Counsel for the Missiles & Defense division"). SAC ¶ 68.

- CW9 alleges Murphy ("VP of Contracts"), Asbell ("CFO of Contracts"), and Sabin ("VP and General Counsel"), "all of whom worked in Missiles & Defense, left Raytheon due to 'EAC-type accounting issues.'" SAC ¶ 69.

- CW10 alleges "the ouster of Murphy, Asbell, and Sabin [was] linked to the DOJ investigation." SAC ¶ 72.

---

[32] CW5 also heard that the motivation was to benefit Raytheon, but that seems ancillary or tacked on. CW5 provides much more detail about the incentive bonus structure and discusses the private benefit before mentioning a benefit to Raytheon. The private benefit is specific and cogent. The benefit to Raytheon is generic. And CW5 heard that Callahan et al. were *fired* for hiding cost overruns, not that they were *directed* to do so for Raytheon's benefit.

[33] At oral argument, Plaintiffs acknowledged that "only relying on CW5 … might be … defeating." Hr'g Trns. 22:3–4. Plaintiff was talking about CW5's internal-audit allegation, but the reasoning applies with equal force to the monetary value allegation.

As discussed above, the Court infers "the" DOJ investigation refers to the investigation disclosed after Raytheon was subpoenaed in October 2020. *See supra* n. 19; SAC ¶ 70 (departures announced in January 2022). Despite some issues, these accounts loosely corroborate each other. CW8 and CW9 were not described with sufficient particularity from which the Court could infer their personal knowledge, and they inconsistently allege Asbell's and Sabin's position within Raytheon. CW10 was described with sufficient particularity, but not with respect to allegations about "the DOJ investigation." As with the allegations about Callahan et al., the "corroboration" of allegations about Murphy et al. only slightly increases their reliability. None of these allegations specifically allege misconduct, only that the DOJ investigation "led" or "was linked" to the departures. Even so, and if only to ensure every inference is drawn in Plaintiffs' favor, the three accounts are consistent enough to reliably allege that the DOJ investigation resulted in Murphy, Asbell, and Sabin's termination.

### iii.   General or Widespread Misconduct

Twelve confidential witnesses allege misconduct of some kind or another, to some degree or another, in some segment or another, but the allegations are not coherent enough to corroborate each other meaningfully. Several accounts refer to misconduct linked with Callahan, McDonnell, and Fay (CW4–CW7, CW11, CW13). Two refer to misconduct linked with the DOJ investigation and, by extension Murphy, Asbell, and Sabin (CW8, CW9). One confirms Murphy, Asbell, and Sabin were fired, but does not allege misconduct (CW10). One refers to misconduct—including a failure to solicit competitive bidding— within a large support-services contract in an unspecified part of Raytheon's business (CW1). One refers to misconduct—limited to failure to solicit competitive bidding— involving "maybe about 30%" of Raytheon's "aerospace and missile and defense" suppliers (CW2). One refers to misconduct involving slowing down "almost every project" and on contracts "valued in the high millions" within the Missiles and Defense segment, particularly the Javelin and Tomahawk programs (CW3). And one refers to a total lack of accountability and "a** covering all around" (CW12). At oral argument, Plaintiffs

characterized their broadest theory of misconduct as relating to a "culture of overspending." Hr'g Tr. 26:12, 38:13–14. Plaintiffs urged the Court to connect the alleged "issues with … miscoding, with respect to EAC cost overruns, … with … competitive bidding, and … hundreds of millions of dollars in overspending, not necessarily related to Missiles and Defense." Hr'g Tr. 38:4–12. Plaintiffs' point is that with all this wrongdoing affecting every corner of Raytheon, the Officers simply must have known about it.

These accounts fail to form a reliable allegation of widespread fraud because they do not all allege or plausibly suggest widespread fraud. First, a "culture of overspending" is so broad it ceases to describe misconduct and more accurately alleges mismanagement. Second, only CW12 alleges fraud extending to all of Raytheon. The limitations of that account are discussed above and are relatively obvious. CW3's allegation of misconduct on "almost every project" is similarly uncorroborated, unreliable, and implausible given Raytheon's compliance workforce. The same is true for CW2's allegation of misconduct involving "maybe about 30%" of Raytheon's aerospace and missiles and defense suppliers. The other accounts allege a much narrower issue. CW1 only reliably alleges misconduct on one contract. Callahan et al. were allegedly terminated for misconduct on one or a few contracts, and Murphy et al. were allegedly terminated for misconduct on four contracts in a different segment. Misconduct involving fewer than ten contracts and resulting in at least six terminations hardly warrants the inference that misconduct was rampant at Raytheon.

### iv.   Conclusion and Summary

Putting together the sufficiently reliable individual and corroborated confidential witness accounts, the following allegations emerge. At some point before 2018, a relatively low-level employee identified many instances of wrong-doing on a large support-services contract (CW1). In 2018, Callahan, McDonnell, and Fay were fired for hiding cost overruns on a contract or contracts in the Naval Systems subsection of Raytheon's Missile Systems segment (CW4, CW5, CW6, CW7, CW11, CW13). At some point after April 2020, one of Raytheon's Intelligence & Space segment employees determined that one of Raytheon's EACs had accumulated "hundreds of millions" in cost overruns but did not allege the

overruns were the result of misconduct (CW10). At some point after Raytheon disclosed the 2020 DOJ investigation, Murphy, Asbell, and Sabin were fired in connection with its focus on three Integrated Defense System contracts from 2011–2013 and one from 2017 (CW8, CW9, CW10). Finally, the 2020 DOJ investigation involves the Patriot Guided Enhanced Missile Program, which was part of the Integrated Defense System segment (CW14).

These allegations do not connect usefully for Plaintiff. Callahan et al. were fired for misconduct in Raytheon's Missile Systems segment, while Murphy et al. were fired for misconduct in Raytheon's Integrated Defense Systems segment. Plaintiffs emphasize that both were within what became "Missiles & Defense." *See, e.g.*, Response at 28–29. That connection is weak because "Missiles & Defense" was created in April 2020. SAC ¶ 74 n. 21. At oral argument, Plaintiffs claimed entitlement to the inference that the DOJ investigation related to Missile Systems because Raytheon's October disclosure did not specify Integrated Defense Systems. Hr'g Tr. at 14:9–15. Following Plaintiffs' logic, the 2018 and 2020 misconduct were connected as a matter of legal inference for a brief window. The window opened when Raytheon disclosed an investigation into "Missiles & Defense" and closed when Raytheon clarified that the investigation had to do with "Integrated Defense Systems." So much should not depend upon an inferential flicker. Besides, the inference is both unwarranted and a dead end. Drawing inferences in the non-movant's favor is meant to allow discovery on potentially meritorious claims. And an investigation, without more, indicates nothing. *Loos*, 762 F.3d at 890. In October 2020, that's all there was. Moving on, the SAC does not allege which segment held CW1's support-services contract, and no inference to connect it to any other named segments is warranted. Even if it were, Plaintiffs cannot thus elude their obligation to state the basis of the SAC's allegations with particularity. Similarly, CW10's allegation of cost overruns on an unspecified EAC provides no particular basis for inferring misconduct or that it was not part of a contract in the Intelligence & Space segment where CW10 worked. These shortcomings are fatal to Plaintiffs' case in many ways, as discussed throughout this Order.